# No. 23-384

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

AVRAHAM GOLDSTEIN; MICHAEL GOLDSTEIN; FRIMETTE KASS-SHRAIBMAN;
MITCHELL LANGBERT; JEFFREY LAX; MARIA PAGANO,

*Plaintiffs-Appellants,*

v.

PROFESSIONAL STAFF CONGRESS/CUNY; CITY UNIVERSITY OF NEW YORK; JOHN
WIRENIUS, in his official capacity as Chairperson of the New York Public Employee
Relations Board; ROSEMARY A. TOWNLEY, in her official capacity as Member of the
New York Public Employee Relations Board; ANTHONY ZUMBOLO, in his official
capacity as Member of the New York Public Employee Relations Board; CITY OF
NEW YORK; THOMAS P. DINAPOLI, in his official capacity as New York State
Comptroller,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

**JOINT APPENDIX
VOLUME I OF II (Pages A.1–A.275)**

| | |
|---|---|
| Nathan J. McGrath | Milton L. Chappell |
| Danielle R. Acker Susanj | William L. Messenger |
| THE FAIRNESS CENTER | Glenn M. Taubman |
| 500 North Third Street, Suite 600B | c/o National Right to Work Legal |
| Harrisburg, Pennsylvania 17101 | Defense Foundation, Inc. |
| Telephone: 844.293.1001 | 8001 Braddock Road, Suite 600 |
| | Springfield, Virginia 22160 |
| | Telephone: 703.321.8510 |

*Attorneys for Plaintiffs-Appellants*

*(cover continued on next page)*

Scott A. Kronland
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone: 415.421.7151

Hanan B. Kolko
COHEN, WEISS AND SIMON LLP
900 Third Avenue, Suite 2100
New York, New York 10022
Telephone: 212.563.4100

Peter Zwiebach
Professional Staff Congress
61 Broadway, Suite 1500
New York, New York 11105
Telephone: 212.354.1252

*Attorneys for Defendant-Appellee PSC-CUNY*

David Lawrence III
Office of the New York State
Attorney General
28 Liberty Street
New York, New York 10005
Telephone: 212.416.8023

*Attorneys for Defendants-Appellees City
University of New York,
Thomas DiNapoli, Rosemary Townley, John
Wirenius, and Anthony Zumbolo*

## JOINT APPENDIX TABLE OF CONTENTS

### VOLUME I OF II

**Page**

1. S.D.N.Y. Docket Report, Case No. 1:22-cv-00321-PAE ........................................A.1

2. Complaint (ECF No. 1)...............................................................................A.19

3. Exhibit A to Complaint—Collective Bargaining Agreement (ECF No. 1-1)......A.45

4. Exhibit B to Complaint—Memorandum of Agreement (ECF No. 1-2) ......... A.243

5. Exhibit C to Complaint—Resolution (ECF No. 1-3) ........................................ A.262

6. State Defs.' Motion to Dismiss (ECF No. 53)................................................ A.265

7. Affidavit in Support of State Defs.' Motion to Dismiss (ECF No. 54)............. A.267

8. Exhibit 1 to Affidavit in Support of State Defs.' Motion to Dismiss (ECF No. 54-1) ..................................................................................... A.270

9. Exhibit 2 to Affidavit in Support of State Defs.' Motion to Dismiss (ECF No. 54-2) ..................................................................................... A.271

10. Exhibit 3 to Affidavit in Support of State Defs.' Motion to Dismiss (ECF No. 54-3) ..................................................................................... A.272

11. Exhibit 4 to Affidavit in Support of State Defs.' Motion to Dismiss (ECF No. 54-4) ..................................................................................... A.273

12. PSC's Motion to Dismiss (ECF No. 56)................................................ A.274

# VOLUME II OF II

13. Order Requesting Joint Letter on Count Three Claims (ECF No. 79) ............. A.276

14. Joint Letter Re. Count Three Claims (ECF No. 80) .............................................. A.277

15. Memo Endorsement from Judge Re. Joint Letter (ECF No. 81) ....................... A.279

16. Transcript Re. Oct. 26, 2022, Oral Argument on Motions to Dismiss (ECF No. 82) ............................................................................................................ A.281

17. Opinion and Order Granting Motions to Dismiss (ECF No. 95) ..................... A.353

18. Pls.' Motion for Entry of Final Judgment (ECF No. 111) ................................. A.383

19. Proposed Order Re. Pls.' Entry of Final Judgment (ECF No. 111-1) .............. A.387

20. Order—Final Judgment (ECF No. 112) ................................................................ A.389

21. Pls.' Notice of Appeal (ECF No. 113) ................................................................... A.391

CLOSED,APPEAL,CASREF,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:22−cv−00321−PAE

| | |
|---|---|
| Goldstein et al v. Professional Staff Congress/CUNY et al | Date Filed: 01/12/2022 |
| Assigned to: Judge Paul A. Engelmayer | Date Terminated: 02/14/2023 |
| Referred to: Magistrate Judge Jennifer E Willis (Settlement) | Jury Demand: Both |
| Cause: 42:1983 Civil Rights Act | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Avraham Goldstein**                    represented by    **Danielle Susanj**
The Fairness Center
500 North Third Street
Suite 600b
Harrisburg, PA 17101
844−293−1001
Email: drasusanj@fairnesscenter.org
*ATTORNEY TO BE NOTICED*

**Milton L Chappell**
National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Rd.
Ste 600
Springfield, VA 22151
703−770−3329
Fax: 703−321−9319
Email: mlc@nrtw.org
*ATTORNEY TO BE NOTICED*

**William Messenger**
National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Rd.
Ste 600
Springfield, VA 22151
703−321−8510
Email: wlm@nrtw.org
*ATTORNEY TO BE NOTICED*

**Nathan J. McGrath**
The Fairness Center
500 North Third Street
Suite 600b
Harrisburg, PA 17101
844−293−1001
Email: njmcgrath@fairnesscenter.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Goldstein**                    represented by    **Danielle Susanj**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Milton L Chappell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Messenger**
(See above for address)
*ATTORNEY TO BE NOTICED*

A.1

**Nathan J. McGrath**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Frimette Kass−Shraibman**                 represented by **Danielle Susanj**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Milton L Chappell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Messenger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nathan J. McGrath**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Mitchell Langbert**                 represented by **Danielle Susanj**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Milton L Chappell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Messenger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nathan J. McGrath**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Jeffrey Lax**                 represented by **Danielle Susanj**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Milton L Chappell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Messenger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nathan J. McGrath**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Maria Pagano**                 represented by **Danielle Susanj**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Milton L Chappell**

A.2

(See above for address)
*ATTORNEY TO BE NOTICED*

**William Messenger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nathan J. McGrath**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Professional Staff Congress/CUNY**          represented by          **Hanan B. Kolko**
Cohen Weiss and Simon LLP
900 Third Avenue
Ste 2100
New York, NY 10022
212−563−4100
Fax: 212−563−6527
Email: HKolko@cwsny.com
*ATTORNEY TO BE NOTICED*

**Kate Montgomery Swearengen**
Cohen, Weiss and Simon LLP
900 Third Avenue
Suite 2100
New York, NY 10022−4869
212−356−0272
Fax: 646−473−8272
Email: kswearengen@cwsny.com
*ATTORNEY TO BE NOTICED*

**Peter Zwiebach**
Professional Staff Congress
61 Broadway
Suite 1500
New York, NY 11105
212−354−1252
Email: pzwiebach@pscmail.org
*ATTORNEY TO BE NOTICED*

**Scott A. Kronland**
Altshuler Berzon LLP
177 Post Street
Suite 300
San Francisco, CA 94108
415−421−7151
Fax: 415−362−8064
Email: skronland@altshulerberzon.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**City University of New York**          represented by          **Jonathan Adam Siegel**
*TERMINATED: 11/30/2022*                                         Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
212−416−8888
Email: Jonathan.Siegel@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

A.3

**Defendant**

**John Wirenius**
*in his official capacity as Chairperson of*
*the New York Public Employee Relations*
*Board*
*TERMINATED: 11/30/2022*

represented by **Jonathan Adam Siegel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rosemary A. Townley**
*in her official capacity as Member of the*
*New York Public Employee Relations*
*Board*
*TERMINATED: 11/30/2022*

represented by **Jonathan Adam Siegel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Anthony Zumbolo**
*in his official capacity as Member of the*
*New York Public Employee Relations*
*Board*
*TERMINATED: 11/30/2022*

represented by **Jonathan Adam Siegel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**City of New York**
*TERMINATED: 11/30/2022*

represented by **John Francis Walpole**
New York City Law Department
100 Church Street
Ste 2−187
New York, NY 10007
212−356−2470
Email: Walpole@thsh.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachel Michelle DiBenedetto**
New York City Law Department
Labor & Employment
100 Church Street
New York, NY 10007
212−356−5031
Email: rdibened@law.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Thomas P. DiNapoli**
*in his official capacity as New York State*
*Comptroller*
*TERMINATED: 11/30/2022*

represented by **Jonathan Adam Siegel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2022 | 1 | COMPLAINT against City University of New York, City of New York, Thomas P. DiNapoli, Professional Staff Congress/CUNY, Rosemary A. Townley, John Wirenius, Anthony Zumbolo. (Filing Fee $ 402.00, Receipt Number ANYSDC−25579727)Document filed by Maria Pagano, Frimette Kass−Shraibman, Michael Goldstein, Avraham Goldstein, Mitchell Langbert, Jeffrey Lax. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C).(McGrath, Nathan) (Entered: 01/12/2022) |
| 01/12/2022 | 2 | CIVIL COVER SHEET filed..(McGrath, Nathan) (Entered: 01/12/2022) |
| 01/12/2022 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to Professional Staff Congress/CUNY, re: 1 Complaint,. Document filed by Avraham Goldstein, Michael |

| | | |
|---|---|---|
| | | Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano..(McGrath, Nathan) (Entered: 01/12/2022) |
| 01/12/2022 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to City University of New York, re: 1 Complaint,. Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano..(McGrath, Nathan) (Entered: 01/12/2022) |
| 01/12/2022 | 5 | REQUEST FOR ISSUANCE OF SUMMONS as to John Wirenius, re: 1 Complaint,. Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano..(McGrath, Nathan) (Entered: 01/12/2022) |
| 01/12/2022 | 6 | REQUEST FOR ISSUANCE OF SUMMONS as to Rosemary A. Townley, re: 1 Complaint,. Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano..(McGrath, Nathan) (Entered: 01/12/2022) |
| 01/12/2022 | 7 | REQUEST FOR ISSUANCE OF SUMMONS as to Anthony Zumbolo, re: 1 Complaint,. Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano..(McGrath, Nathan) (Entered: 01/12/2022) |
| 01/12/2022 | 8 | REQUEST FOR ISSUANCE OF SUMMONS as to City of New York, re: 1 Complaint,. Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano..(McGrath, Nathan) (Entered: 01/12/2022) |
| 01/12/2022 | 9 | REQUEST FOR ISSUANCE OF SUMMONS as to Thomas P. DiNapoli, re: 1 Complaint,. Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano..(McGrath, Nathan) (Entered: 01/12/2022) |
| 01/12/2022 | 10 | MOTION for Nathan J. McGrath to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25579965. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano. (Attachments: # 1 Affidavit in Support of Motion, # 2 Certificate of Good Standing Pennsylvania, # 3 Proposed Order).(McGrath, Nathan) (Entered: 01/12/2022) |
| 01/13/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 10 MOTION for Nathan J. McGrath to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25579965. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (aea)** (Entered: 01/13/2022) |
| 01/13/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above−entitled action is assigned to Judge Paul A. Engelmayer. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district−judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf−related−instructions..(vf) (Entered: 01/13/2022) |
| 01/13/2022 | | Magistrate Judge Kevin Nathaniel Fox is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018−06/AO−3.pdf. (vf) (Entered: 01/13/2022) |
| 01/13/2022 | | Case Designated ECF. (vf) (Entered: 01/13/2022) |
| 01/13/2022 | 11 | ELECTRONIC SUMMONS ISSUED as to Professional Staff Congress/CUNY. (vf) (Entered: 01/13/2022) |
| 01/13/2022 | 12 | ELECTRONIC SUMMONS ISSUED as to City University of New York. (vf) (Entered: 01/13/2022) |

A.5

| 01/13/2022 | 13 | ELECTRONIC SUMMONS ISSUED as to John Wirenius. (vf) (Entered: 01/13/2022) |
|---|---|---|
| 01/13/2022 | 14 | ELECTRONIC SUMMONS ISSUED as to Rosemary A. Townley. (vf) (Entered: 01/13/2022) |
| 01/13/2022 | 15 | ELECTRONIC SUMMONS ISSUED as to Anthony Zumbolo. (vf) (Entered: 01/13/2022) |
| 01/13/2022 | 16 | ELECTRONIC SUMMONS ISSUED as to City of New York. (vf) (Entered: 01/13/2022) |
| 01/13/2022 | 17 | ELECTRONIC SUMMONS ISSUED as to Thomas P. DiNapoli. (vf) (Entered: 01/13/2022) |
| 01/13/2022 | 18 | ORDER FOR ADMISSION PRO HAC VICE granting 10 Motion for Nathan J. McGrath to Appear Pro Hac Vice. (Signed by Judge Paul A. Engelmayer on 1/13/2022) (va) (Entered: 01/13/2022) |
| 01/14/2022 | 19 | MOTION for Danielle R. Acker Susanj to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25587509. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano. (Attachments: # 1 Affidavit in Support of Motion, # 2 Certificate of Good Standing Pennsylvania, # 3 Certificate of Good Standing DC, # 4 Proposed Order).(Susanj, Danielle) (Entered: 01/14/2022) |
| 01/14/2022 | 20 | MOTION for Milton L Chappell to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25588795. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano. (Attachments: # 1 Affidavit in Support of Motion, # 2 Exhibit Certificate of Good Standing − DC, # 3 Exhibit Certificate of Good Standing − MD, # 4 Text of Proposed Order).(Chappell, Milton) (Entered: 01/14/2022) |
| 01/18/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 19 MOTION for Danielle R. Acker Susanj to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25587509. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 01/18/2022) |
| 01/18/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 20 MOTION for Milton L Chappell to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25588795. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 01/18/2022) |
| 01/18/2022 | 21 | ORDER FOR ADMISSION PRO HAC VICE granting 19 Motion for Danielle R. Acker Susanj to Appear Pro Hac Vice. (Signed by Judge Paul A. Engelmayer on 1/18/2022) (tg) (Entered: 01/18/2022) |
| 01/18/2022 | 22 | ORDER FOR ADMISSION PRO HAC VICE granting 20 Motion for Milton L. Chappell to Appear Pro Hac Vice. (Signed by Judge Paul A. Engelmayer on 1/18/2022) (tg) (Entered: 01/18/2022) |
| 01/24/2022 | 23 | MOTION for William L. Messenger to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25625248. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano. (Attachments: # 1 Affidavit WLM Affidavit, # 2 Exhibit WLM Cert of Good Standing, # 3 Text of Proposed Order Proposed Order).(Messenger, William) (Entered: 01/24/2022) |
| 01/25/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 23 MOTION for William L. Messenger to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25625248. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (aea)** (Entered: 01/25/2022) |

A.6

| | | |
|---|---|---|
| 01/25/2022 | 24 | ORDER FOR ADMISSION PRO HAC VICE granting 23 Motion for William L. Messenger to Appear Pro Hac Vice.. (Signed by Judge Paul A. Engelmayer on 1/25/2022) (tg) (Entered: 01/25/2022) |
| 02/08/2022 | | Magistrate Judge Jennifer Willis is so redesignated. (sjo) (Entered: 02/08/2022) |
| 02/11/2022 | 25 | NOTICE OF APPEARANCE by Jonathan Adam Siegel on behalf of City University of New York, Thomas P. DiNapoli, Rosemary A. Townley, John Wirenius, Anthony Zumbolo..(Siegel, Jonathan) (Entered: 02/11/2022) |
| 02/11/2022 | 26 | CONSENT LETTER MOTION for Extension of Time to File Answer re: 1 Complaint, addressed to Judge Paul A. Engelmayer from Jonathan A. Siegel dated February 11, 2022. Document filed by City University of New York, Thomas P. DiNapoli, Rosemary A. Townley, John Wirenius, Anthony Zumbolo..(Siegel, Jonathan) (Entered: 02/11/2022) |
| 02/11/2022 | 27 | NOTICE OF APPEARANCE by John Francis Walpole on behalf of City of New York..(Walpole, John) (Entered: 02/11/2022) |
| 02/11/2022 | 28 | LETTER MOTION for Extension of Time addressed to Judge Paul A. Engelmayer from John F. Walpole dated February 11, 2022. Document filed by City of New York..(Walpole, John) (Entered: 02/11/2022) |
| 02/11/2022 | 29 | ORDER granting 26 Letter Motion for Extension of Time to Answer re 26 CONSENT LETTER MOTION for Extension of Time to File Answer re: 1 Complaint, addressed to Judge Paul A. Engelmayer from Jonathan A. Siegel dated February 11, 2022., 1 Complaint,. Granted. All defendants' time to answer or otherwise respond to the complaint is extended until April 20, 2022. SO ORDERED. City University of New York answer due 4/20/2022; City of New York answer due 4/20/2022; Thomas P. DiNapoli answer due 4/20/2022; Professional Staff Congress/CUNY answer due 4/20/2022; Rosemary A. Townley answer due 4/20/2022; John Wirenius answer due 4/20/2022; Anthony Zumbolo answer due 4/20/2022. (Signed by Judge Paul A. Engelmayer on 2/11/2022) (tg) (Entered: 02/11/2022) |
| 02/23/2022 | 30 | NOTICE OF APPEARANCE by Hanan B. Kolko on behalf of Professional Staff Congress/CUNY..(Kolko, Hanan) (Entered: 02/23/2022) |
| 02/23/2022 | 31 | NOTICE OF APPEARANCE by Kate Montgomery Swearengen on behalf of Professional Staff Congress/CUNY..(Swearengen, Kate) (Entered: 02/23/2022) |
| 02/23/2022 | 32 | NOTICE OF INITIAL PRETRIAL CONFERENCE: An initial pretrial conference is hereby scheduled for March 9, 2022 at 9 a.m. This conference will be held telephonically. The parties should call into the Court's dedicated conference line at (888) 363−4749, and enter Access Code 468−4906, followed by the pound(#) key. Counsel are directed to review the Court's Emergency Individual Rules and Practices in Light of COVID−19, found at https://nysd.uscourts.gov/hon−paul− engelmayer, for the Court's procedures for telephonic conferences and for instructions for communicating with chambers. (Initial Conference set for 3/9/2022 at 09:00 AM before Judge Paul A. Engelmayer.) (Signed by Judge Paul A. Engelmayer on 2/23/2022) (rro) (Entered: 02/23/2022) |
| 02/25/2022 | 33 | SUMMONS RETURNED EXECUTED. City University of New York served on 1/26/2022, answer due 4/20/2022. Service was accepted by Tatiana Dunlap, Authorized Agent. Document filed by Maria Pagano; Frimette Kass−Shraibman; Michael Goldstein; Avraham Goldstein; Mitchell Langbert; Jeffrey Lax..(Susanj, Danielle) (Entered: 02/25/2022) |
| 02/25/2022 | 34 | SUMMONS RETURNED EXECUTED. Thomas P. DiNapoli served on 1/26/2022, answer due 4/20/2022. Service was accepted by Victoria Jones, Administrative Assistant. Document filed by Maria Pagano; Frimette Kass−Shraibman; Michael Goldstein; Avraham Goldstein; Mitchell Langbert; Jeffrey Lax..(Susanj, Danielle) (Entered: 02/25/2022) |
| 02/25/2022 | 35 | SUMMONS RETURNED EXECUTED. City of New York served on 1/27/2022, answer due 4/20/2022. Service was accepted by Ariton Marke, Authorized Agent. Document filed by Maria Pagano; Frimette Kass−Shraibman; Michael Goldstein; Avraham Goldstein; Mitchell Langbert; Jeffrey Lax..(Susanj, Danielle) (Entered: 02/25/2022) |

| 02/25/2022 | 36 | SUMMONS RETURNED EXECUTED. Rosemary A. Townley served on 1/26/2022, answer due 4/20/2022. Service was accepted by Sheila Kennedy, Secretary to the Board. Document filed by Maria Pagano; Frimette Kass−Shraibman; Michael Goldstein; Avraham Goldstein; Mitchell Langbert; Jeffrey Lax..(Susanj, Danielle) (Entered: 02/25/2022) |
|---|---|---|
| 02/25/2022 | 37 | SUMMONS RETURNED EXECUTED. John Wirenius served on 1/26/2022, answer due 4/20/2022. Service was accepted by Sheila Kennedy, Secretary to the Board. Document filed by Maria Pagano; Frimette Kass−Shraibman; Michael Goldstein; Avraham Goldstein; Mitchell Langbert; Jeffrey Lax..(Susanj, Danielle) (Entered: 02/25/2022) |
| 02/25/2022 | 38 | SUMMONS RETURNED EXECUTED. Anthony Zumbolo served on 1/26/2022, answer due 4/20/2022. Service was accepted by Sheila Kennedy, Secretary to the Board. Document filed by Maria Pagano; Frimette Kass−Shraibman; Michael Goldstein; Avraham Goldstein; Mitchell Langbert; Jeffrey Lax..(Susanj, Danielle) (Entered: 02/25/2022) |
| 02/25/2022 | 39 | CERTIFICATE OF SERVICE of Notice of Initial Pretrial Conference served on all parties on 2/25/2022. Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano..(McGrath, Nathan) (Entered: 02/25/2022) |
| 02/28/2022 | 40 | NOTICE OF APPEARANCE by Peter Zwiebach on behalf of Professional Staff Congress/CUNY..(Zwiebach, Peter) (Entered: 02/28/2022) |
| 03/01/2022 | 41 | MOTION for Scott A Kronland to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25798412. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Professional Staff Congress/CUNY. (Attachments: # 1 Affidavit of Scott A Kronland in support of motion for admission pro hac vice, # 2 Supplement Certificate of Good Standing for Scott A Kronland, # 3 Text of Proposed Order Proposed Order granting admission pro hac vice).(Kronland, Scott) (Entered: 03/01/2022) |
| 03/02/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 41 MOTION for Scott A Kronland to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25798412. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 03/02/2022) |
| 03/02/2022 | 42 | ORDER FOR ADMISSION PRO HAC VICE granting 41 Motion for Scott A. Kronland to Appear Pro Hac Vice. (Signed by Judge Paul A. Engelmayer on 3/2/2022) (va) (Entered: 03/02/2022) |
| 03/02/2022 | 43 | CONSENT LETTER MOTION to Stay re: 32 Order for Initial Pretrial Conference,, *seeking a stay of discovery and an adjournment of the deadline to submit a case management plan pending resolution of defendants' motions to dismiss* addressed to Judge Paul A. Engelmayer from Jonathan A. Siegel dated March 2, 2022. Document filed by City University of New York, Thomas P. DiNapoli, Rosemary A. Townley, John Wirenius, Anthony Zumbolo..(Siegel, Jonathan) (Entered: 03/02/2022) |
| 03/02/2022 | 44 | LETTER addressed to Judge Paul A. Engelmayer from Jonathan A. Siegel dated March 2, 2022 re: ECF 43. Document filed by City University of New York, Thomas P. DiNapoli, Rosemary A. Townley, John Wirenius, Anthony Zumbolo..(Siegel, Jonathan) (Entered: 03/02/2022) |
| 03/02/2022 | 45 | ORDER with respect to 43 Letter Motion to Stay re: 43 CONSENT LETTER MOTION to Stay re: 32 Order for Initial Pretrial Conference,, *seeking a stay of discovery and an adjournment of the deadline to submit a case management plan pending resolution of defendants' motions to dismiss* The Court has received a request from defendants, to which plaintiffs do not object, to stay discovery pending the resolution of defendants' forthcoming motions to dismiss, to adjourn submission of a case management plan, and to use the initial pretrial conference scheduled for March 9, 2022 to take up the issue of whether discovery should be stayed pending resolution of a motion to dismiss. The Court will take up this issue at the March 9 conference. Counsel need not submit a proposed case management plan in advance of that conference. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 3/2/2022) (jca) (Entered: 03/02/2022) |

| 03/04/2022 | 46 | JOINT LETTER addressed to Judge Paul A. Engelmayer from Nathan J. McGrath, Jonathan Siegel, John F. Walpole, and Scott Kronland dated March 4, 2022 re: Initial Pretrial Conference requirement. Document filed by Professional Staff Congress/CUNY..(Kolko, Hanan) (Entered: 03/04/2022) |
|---|---|---|
| 03/09/2022 | 47 | ORDER granting 28 Letter Motion for Extension of Time; granting 43 Letter Motion to Stay re: 28 LETTER MOTION for Extension of Time addressed to Judge Paul A. Engelmayer from John F. Walpole dated February 11, 2022., 43 CONSENT LETTER MOTION to Stay re: 32 Order for Initial Pretrial Conference,, *seeking a stay of discovery and an adjournment of the deadline to submit a case management plan pending resolution of defendants' motions to dismiss* addr. At today's initial pretrial conference, the Court set the following schedule for the pending motions to dismiss: April 20, 2022: Defendants' motions; May 24, 2022: Plaintiffs' opposition; June 14, 2022: Defendants' replies Should plaintiffs amend their complaint in response to defendants' motion to dismiss, the parties will jointly propose a briefing schedule at that time. The Court also granted the parties' joint request to stay discovery pending the resolution of the motions to dismiss. The Clerk of the Court is respectfully directed to close the motions pending at dockets 28 and 43. SO ORDERED.. (Signed by Judge Paul A. Engelmayer on 3/9/2022) (kv) (Entered: 03/09/2022) |
| 03/09/2022 | | Set/Reset Deadlines: Motions due by 4/20/2022. Responses due by 5/24/2022 Replies due by 6/14/2022. (kv) (Entered: 03/09/2022) |
| 03/09/2022 | | Minute Entry for proceedings held before Judge Paul A. Engelmayer: Telephonic Initial Pretrial Conference held on 3/9/2022. Court reporter present. (ajs) (Entered: 03/09/2022) |
| 03/09/2022 | 48 | CERTIFICATE OF SERVICE. Professional Staff Congress/CUNY served on 3/9/2022, answer due 4/20/2022. Service was accepted by Hanan B. Kolko, Attorney. Document filed by Maria Pagano; Frimette Kass−Shraibman; Michael Goldstein; Avraham Goldstein; Mitchell Langbert; Jeffrey Lax..(McGrath, Nathan) (Entered: 03/09/2022) |
| 04/01/2022 | 49 | TRANSCRIPT of Proceedings re: CONFERENCE held on 3/9/2022 before Judge Paul A. Engelmayer. Court Reporter/Transcriber: Khristine Sellin, (212) 805−0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/22/2022. Redacted Transcript Deadline set for 5/2/2022. Release of Transcript Restriction set for 6/30/2022..(Moya, Goretti) (Entered: 04/01/2022) |
| 04/01/2022 | 50 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 3/9/22 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 04/01/2022) |
| 04/18/2022 | 51 | SECOND LETTER MOTION for Extension of Time addressed to Judge Paul A. Engelmayer from John F. Walpole dated April 18, 2022. Document filed by City of New York..(Walpole, John) (Entered: 04/18/2022) |
| 04/19/2022 | 52 | ORDER denying 51 Letter Motion for Extension of Time. Given the elongated nature of the original briefing schedule, the Court denies the motion for an extension. The parties may resubmit a proposed schedule to which all parties consent that alters their intermediate deadlines but still provides for all briefing on defendants' motion to dismiss to be complete by June 14, 2022, assuming plaintiffs do not amend their complaint. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 4/19/2022) (va) (Entered: 04/19/2022) |
| 04/20/2022 | 53 | MOTION to Dismiss *Complaint by State Defendants*. Document filed by City University of New York, Thomas P. DiNapoli, Rosemary A. Townley, John Wirenius, Anthony Zumbolo. Responses due by 5/24/2022.(Siegel, Jonathan) (Entered: 04/20/2022) |

| 04/20/2022 | 54 | DECLARATION of Amanda Ciano in Support re: 53 MOTION to Dismiss *Complaint by State Defendants*.. Document filed by City University of New York, Thomas P. DiNapoli, Rosemary A. Townley, John Wirenius, Anthony Zumbolo. (Attachments: # 1 Exhibit 1 − Prof. Kass−Shraibman Payroll Record 1, # 2 Exhibit 2 − Prof. Kass−Shraibman Payroll Record 3, # 3 Exhibit 3 − Prof. Kass−Shraibman Payroll Record 2, # 4 Exhibit 4 − Prof. Langbert Payroll Record).(Siegel, Jonathan) (Entered: 04/20/2022) |
|---|---|---|
| 04/20/2022 | 55 | MEMORANDUM OF LAW in Support re: 53 MOTION to Dismiss *Complaint by State Defendants*. . Document filed by City University of New York, Thomas P. DiNapoli, Rosemary A. Townley, John Wirenius, Anthony Zumbolo..(Siegel, Jonathan) (Entered: 04/20/2022) |
| 04/20/2022 | 56 | MOTION to Dismiss *the Complaint*. Document filed by Professional Staff Congress/CUNY..(Kolko, Hanan) (Entered: 04/20/2022) |
| 04/20/2022 | 57 | AFFIDAVIT of Denyse Procope−Gregoire in Support re: 56 MOTION to Dismiss *the Complaint*.. Document filed by Professional Staff Congress/CUNY. (Attachments: # 1 Exhibit Exhibits A thru I to Affidavit of Denyse Procope−Gregoire).(Kolko, Hanan) (Entered: 04/20/2022) |
| 04/20/2022 | 58 | MEMORANDUM OF LAW in Support re: 56 MOTION to Dismiss *the Complaint*. . Document filed by Professional Staff Congress/CUNY..(Kolko, Hanan) (Entered: 04/20/2022) |
| 04/20/2022 | 59 | MOTION to Dismiss *the Complaint by Defendant City of New York*. Document filed by City of New York..(Walpole, John) (Entered: 04/20/2022) |
| 04/20/2022 | 60 | MEMORANDUM OF LAW in Support re: 59 MOTION to Dismiss *the Complaint by Defendant City of New York*. . Document filed by City of New York..(Walpole, John) (Entered: 04/20/2022) |
| 04/21/2022 | 61 | ORDER: Accordingly, it is hereby ORDERED that plaintiffs shall file any amended complaint by May 11, 2022. As directed in the Court's order of March 9, 2022, should plaintiffs amend their complaint, the parties will jointly propose a briefing schedule for defendants' motions to dismiss at that time. Dkt. 47. No further opportunities to amend will ordinarily be granted. If plaintiffs do amend, by June 1, 2022−−−or at another date jointly proposed and approved by the Court−defendants shall each: (1) file an answer; (2) file a new motion to dismiss; or (3) submit a letter to the Court, copying plaintiffs, stating that they rely on their previously filed motions to dismiss. It is further ORDERED that, per the briefing schedule, Dkt. 47, if no amended complaint is filed, plaintiffs shall serve any opposition to the motion to dismiss by May 24, 2022. Defendants' replies, if any, shall be served by June 14, 2022. At the time any reply is served, the moving party shall supply the Court with a courtesy copy of all motion papers by attaching them as PDF files to a single email addressed to EngelmayerNYSDChambers@nysd.uscourts. gov. The Court will determine later, after receipt of plaintiffs' anticipated brief opposing a motion to dismiss the current or amended complaint, whether to schedule oral argument. SO ORDERED. ( Amended Pleadings due by 5/11/2022.) (Signed by Judge Paul A. Engelmayer on 4/21/2022) (va) (Entered: 04/21/2022) |
| 05/11/2022 | 62 | LETTER MOTION for Leave to File Excess Pages *and Consolidated Briefing* addressed to Judge Paul A. Engelmayer from Counsel for Plaintiffs dated May 11, 2022. Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano. (Attachments: # 1 Text of Proposed Order Granting Plaintiffs' Motion).(McGrath, Nathan) (Entered: 05/11/2022) |
| 05/11/2022 | 63 | ORDER GRANTING PLAINTIFFS' MOTION FOR CONSOLIDATED BRIEFING AND INCREASED PAGE LIMITATION PLAINTIFF's granting 62 Letter Motion for Leave to File Excess Pages. AND NOW, this 11th day of May, 2022, upon consideration of Plaintiffs' Motion for Consolidated Briefing and Increased Page Limitation, and for good cause shown, the motion is GRANTED, and it is hereby ORDERED that Plaintiffs shall file one Memorandum of Law in opposition to each Defendant's Motion to Dismiss, not to exceed thirty−five (35) pages in length, on or before May 24, 2022. (Signed by Judge Paul A. Engelmayer on 5/11/2022) (vfr) (Entered: 05/11/2022) |

A.10

| | | |
|---|---|---|
| 05/11/2022 | | Set/Reset Deadlines: Responses due by 5/24/2022 (vfr) (Entered: 05/11/2022) |
| 05/24/2022 | 64 | MEMORANDUM OF LAW in Opposition re: 56 MOTION to Dismiss *the Complaint*., 53 MOTION to Dismiss *Complaint by State Defendants*., 59 MOTION to Dismiss *the Complaint by Defendant City of New York.*. Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano..(McGrath, Nathan) (Entered: 05/24/2022) |
| 05/24/2022 | 65 | LETTER addressed to Judge Paul A. Engelmayer from Counsel for Plaintiffs dated 5/24/2022 re: Request for Oral Argument. Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano..(McGrath, Nathan) (Entered: 05/24/2022) |
| 06/14/2022 | 66 | REPLY MEMORANDUM OF LAW in Support re: 53 MOTION to Dismiss *Complaint by State Defendants*. . Document filed by City University of New York, Thomas P. DiNapoli, Rosemary A. Townley, John Wirenius, Anthony Zumbolo..(Siegel, Jonathan) (Entered: 06/14/2022) |
| 06/14/2022 | 67 | NOTICE of ACCEPTANCE OF RULE 68 OFFER OF JUDGMENT. Document filed by City of New York. (Attachments: # 1 Exhibit Affirmation of Service, # 2 Exhibit Acceptance of Rule 68 Offer of Judgment).(Walpole, John) (Entered: 06/14/2022) |
| 06/14/2022 | 68 | REPLY MEMORANDUM OF LAW in Support re: 56 MOTION to Dismiss *the Complaint*. . Document filed by Professional Staff Congress/CUNY..(Kolko, Hanan) (Entered: 06/14/2022) |
| 08/29/2022 | 69 | LETTER addressed to Judge Paul A. Engelmayer from Hanan B. Kolko dated 08/29/2022 re: Transmission of Recent Decision. Document filed by Professional Staff Congress/CUNY..(Kolko, Hanan) (Entered: 08/29/2022) |
| 09/28/2022 | 70 | ORDER: The Court hereby schedules oral argument on the pending motions to dismiss Counts One and Two of the Complaint, for Wednesday, October 26, 2022 at 2 p.m. in Courtroom 1305 at the Thurgood Marshall U.S. Courthouse, 40 Centre Street, New York, New York 10007. As to Count Three, its scope appears significantly narrowed by concessions in briefing, see, e.g., Dkt. 64, and an accepted Rule 68 offer of judgment, see Dkt. 67. To assist the Court todetermine the surviving scope, if any, of this Count, the parties are ordered to jointly file, by October 7, 2022, a letter stating which, if any, plaintiff(s) continue to pursue Count Three claims and, for each, against which defendant(s) and for which specific monetary relief. For avoidance of doubt, the Court does not authorize further advocacy on this point. The Court merely seeks adelineation of the surviving claims. SO ORDERED., ( Oral Argument set for 10/26/2022 at 02:00 PM in Courtroom 1305, 40 Centre Street, New York, NY 10007 before Judge Paul A. Engelmayer.) (Signed by Judge Paul A. Engelmayer on 9/28/2022) (ama) (Entered: 09/28/2022) |
| 10/07/2022 | 71 | **FILING ERROR − WRONG EVENT TYPE SELECTED FROM MENU −** NOTICE of ACCEPTANCE OF RULE 68 OFFER OF JUDGMENT. Document filed by City of New York. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C).(Walpole, John) Modified on 10/11/2022 (km). (Entered: 10/07/2022) |
| 10/07/2022 | 72 | JOINT LETTER addressed to Judge Paul A. Engelmayer from Nathan J. McGrath dated 10/7/2022 re: Count Three Claims. Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano..(McGrath, Nathan) (Entered: 10/07/2022) |
| 10/11/2022 | | **\*\*\*NOTICE TO ATTORNEY TO RE−FILE DOCUMENT − EVENT TYPE ERROR. Notice to Attorney John Walpole to RE−FILE Document 71 Notice (Other). Use the event type Other Filings, Notices, Notice of Acceptance with Offer of Judgment. The notice of acceptance needs to have a handwritten signature. A proposed judgment needs to be filed separately under proposed orders, proposed judgment. (km)** (Entered: 10/11/2022) |
| 10/12/2022 | 73 | MEMO ENDORSEMENT on re: 72 Letter, filed by Avraham Goldstein, Mitchell Langbert, Frimette Kass−Shraibman, Maria Pagano, Michael Goldstein, Jeffrey Lax ENDORSEMENT: The Court appreciates this update from the parties. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 10/11/2022) (ks) (Entered: 10/12/2022) |

A.11

| 10/26/2022 | | Minute Entry for proceedings held before Judge Paul A. Engelmayer: Oral Argument held on 10/26/2022. Plaintiffs' counsel present. Defendants' counsel present. Court reporter present. (ajs) (Entered: 10/27/2022) |
|---|---|---|
| 11/01/2022 | 74 | **FILING ERROR − WRONG EVENT TYPE SELECTED FROM MENU −** NOTICE of Acceptance of Rule 68 Offer of Judgment. Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano. (Attachments: # 1 Exhibit Rule 68 Offer of Judgment).(McGrath, Nathan) Modified on 11/1/2022 (km). (Entered: 11/01/2022) |
| 11/01/2022 | 75 | **FILING ERROR − DUPLICATE DOCKET ENTRY −** NOTICE of Acceptance of Defendant City of New York's Rule 68 Offer of Judgment. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit Rule 68 Offer of Judgment).(McGrath, Nathan) Modified on 11/1/2022 (km). (Entered: 11/01/2022) |
| 11/01/2022 | | **\*\*\*NOTE TO ATTORNEY THAT THE ATTEMPTED FILING OF Document No. 75 HAS BEEN REJECTED. THIS IS A DUPLICATED DOCUMENT. Note to Attorney Nathan McGrath : This is a Duplicate Document. Do Not Re−File. (km)** (Entered: 11/01/2022) |
| 11/01/2022 | | **\*\*\*NOTICE TO ATTORNEY TO RE−FILE DOCUMENT − EVENT TYPE ERROR. Notice to Attorney Nathan McGrath to RE−FILE Document 74 Notice (Other). Use the event type Other Filings, Notices, Notice of Acceptance with Offer of Judgment. The acceptance needs to have a handwritten signature (not s/). The proposed judgment needs to be filed separately under Proposed Orders, Proposed Judgment. (km)** (Entered: 11/01/2022) |
| 11/02/2022 | 76 | NOTICE OF ACCEPTANCE WITH OFFER OF JUDGMENT . Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit Rule 68 Offer of Judgment).(McGrath, Nathan) (Entered: 11/02/2022) |
| 11/02/2022 | 77 | PROPOSED JUDGMENT. Re: Document No. 76 Notice of Acceptance with Offer of Judgment. Document filed by City of New York..(Walpole, John) **Proposed Judgment to be reviewed by Clerk's Office staff.** (Entered: 11/02/2022) |
| 11/02/2022 | | **\*\*\*NOTICE TO COURT REGARDING NOTICE OF ACCEPTANCE WITH OFFER OF JUDGMENT. Document No. 76 Notice of Acceptance with Offer of Judgment was reviewed and approved as to form. (km)** (Entered: 11/02/2022) |
| 11/02/2022 | | **\*\*\*NOTICE TO COURT REGARDING PROPOSED JUDGMENT. Document No. 77 Proposed Judgment was reviewed and approved as to form. (km)** (Entered: 11/02/2022) |
| 11/02/2022 | 78 | RULE 68 JUDGMENT: IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, that pursuant to Rule 68 of the Federal Rules of Civil Procedure, Plaintiff Goldstein takes judgment against Defendant City of New York in this action in the amount of two hundred and twenty−three dollars and thirty−five cents ($223.35), plus reasonable attorneys' fees, expenses, and costs in an amount to be determined by the Court. (Signed by Judge Paul A. Engelmayer on 11/2/2022) (va) (Entered: 11/03/2022) |
| 11/04/2022 | 79 | ORDER: On November 3, 2022, the Court approved an offer of judgment as between defendant City of New York and plaintiff Avraharn Goldstein, pursuant to Federal Rule of Civil Procedure 68, in the amount of $233.35. See Dkt. 78. To assist the Court in determining which aspects of Count Three remain live between the parties at this juncture, the Court orders the parties to file a joint letter by November 11, 2022, informing the Court of the current scope of Count Three. (Signed by Judge Paul A. Engelmayer on 11/4/2022) (ate) (Entered: 11/04/2022) |
| 11/11/2022 | 80 | JOINT LETTER addressed to Judge Paul A. Engelmayer from Nathan J. McGrath dated 11/11/2022 re: Count Three Claims. Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano..(McGrath, Nathan) (Entered: 11/11/2022) |
| 11/14/2022 | 81 | MEMO ENDORSEMENT on re: 80 Letter, filed by Avraham Goldstein, Mitchell Langbert, Frimette Kass−Shraibman, Maria Pagano, Michael Goldstein, Jeffrey Lax. ENDORSEMENT: The Court appreciates this update from the parties. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 11/14/2022) (vfr) (Entered: 11/14/2022) |

| 11/15/2022 | 82 | TRANSCRIPT of Proceedings re: CONFERENCE held on 10/26/2022 before Judge Paul A. Engelmayer. Court Reporter/Transcriber: Paula Horovitz, (212) 805−0348. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/6/2022. Redacted Transcript Deadline set for 12/16/2022. Release of Transcript Restriction set for 2/13/2023..(McGuirk, Kelly) (Entered: 11/15/2022) |
|---|---|---|
| 11/15/2022 | 83 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 10/26/2022 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 11/15/2022) |
| 11/17/2022 | 84 | MOTION for Attorney Fees *and Costs*. Document filed by Avraham Goldstein. (Attachments: # 1 Text of Proposed Order Proposed Order).(McGrath, Nathan) (Entered: 11/17/2022) |
| 11/17/2022 | 85 | MEMORANDUM OF LAW in Support re: 84 MOTION for Attorney Fees *and Costs*. . Document filed by Avraham Goldstein..(McGrath, Nathan) (Entered: 11/17/2022) |
| 11/17/2022 | 86 | DECLARATION of Nathan J. McGrath in Support re: 84 MOTION for Attorney Fees *and Costs*.. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit 1 − McGrath Time Entries, # 2 Exhibit 2 − Costs, # 3 Exhibit 3 − Wanner Time Entries).(McGrath, Nathan) (Entered: 11/17/2022) |
| 11/17/2022 | 87 | DECLARATION of Danielle R. Acker Susanj in Support re: 84 MOTION for Attorney Fees *and Costs*.. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit 1 − Time Entries [Redacted]).(McGrath, Nathan) (Entered: 11/17/2022) |
| 11/17/2022 | 88 | DECLARATION of Milton L. Chappell in Support re: 84 MOTION for Attorney Fees *and Costs*.. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit 1 − Time Entries [Redacted]).(McGrath, Nathan) (Entered: 11/17/2022) |
| 11/17/2022 | 89 | DECLARATION of William L. Messenger in Support re: 84 MOTION for Attorney Fees *and Costs*.. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit 1 − Time Entries [Redacted]).(McGrath, Nathan) (Entered: 11/17/2022) |
| 11/17/2022 | 90 | LETTER MOTION to Seal *Exhibit 1 to Acker Susanj Declaration, Exhibit 1 to Chappell Declaration, Exhibit 1 to Messenger Declaration* addressed to Judge Paul A. Engelmayer from Nathan J. McGrath dated 11/17/2022. Document filed by Avraham Goldstein..(McGrath, Nathan) (Entered: 11/17/2022) |
| 11/17/2022 | 91 | ***EX−PARTE***DECLARATION of Danielle R. Acker Susanj in Support re: 84 MOTION for Attorney Fees *and Costs*.. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit 1 − Time Entries)Motion or Order to File Under Seal: 90 .(McGrath, Nathan) (Entered: 11/17/2022) |
| 11/17/2022 | 92 | ***EX−PARTE***DECLARATION of Milton L. Chappell in Support re: 84 MOTION for Attorney Fees *and Costs*.. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit 1 − Time Entries)Motion or Order to File Under Seal: 90 .(McGrath, Nathan) (Entered: 11/17/2022) |
| 11/17/2022 | 93 | ***EX−PARTE***DECLARATION of William L. Messenger in Support re: 84 MOTION for Attorney Fees *and Costs*.. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit 1 − Time Entries)Motion or Order to File Under Seal: 90 .(McGrath, Nathan) (Entered: 11/17/2022) |
| 11/29/2022 | 94 | LETTER MOTION for Extension of Time addressed to Judge Paul A. Engelmayer from John F. Walpole dated November 29, 2022. Document filed by City of New York..(Walpole, John) (Entered: 11/29/2022) |
| 11/30/2022 | 95 | OPINION & ORDER re: 56 MOTION to Dismiss *the Complaint* filed by Professional Staff Congress/CUNY, 53 MOTION to Dismiss *Complaint by State Defendants* filed by Rosemary A. Townley, Anthony Zumbolo, John Wirenius, Thomas P. DiNapoli, City University of New York, 59 MOTION to Dismiss *the Complaint by Defendant* |

| | | |
|---|---|---|
| | | *City of New York* filed by City of New York. For the reasons above, the Court grants defendants' motions to dismiss in full. The Court therefore dismisses Counts One and Two, and the portions of Count Three on which defendants have moved. The case will now proceed to discovery on the surviving portion of Count Three, which is limited to the claims against the PSC by Goldstein, Kass−Shraibman, and Langbert, with respect to dues and interest allegedly deducted from their wages after their resignations from the union. Because no live claims remain against any defendants other than the PSC, the Court accordingly dismisses all other defendants from this case. The court directs counsel for the remaining parties (Goldstein, Kass−Shraibman, Langbert, and the PSC) to jointly submit, by December 9, 2022, a proposed case management plan contemplating, inter alia, the completion of discovery on the remaining claim by February 9, 2023. The Court respectfully directs the Clerk of the Court to close the motions pending at docket numbers 53, 56, and 59, and to terminate the City of New York, CUNY, DiNapoli, Wirenius, Townley, and Zumbolo as defendants in this matter. SO ORDERED. Thomas P. DiNapoli (in his official capacity as New York State Comptroller), Rosemary A. Townley (in her official capacity as Member of the New York Public Employee Relations Board), John Wirenius (in his official capacity as Chairperson of the New York Public Employee Relations Board), Anthony Zumbolo (in his official capacity as Member of the New York Public Employee Relations Board), City University of New York and City of New York terminated. (Signed by Judge Paul A. Engelmayer on 11/30/2022) (vfr) (Entered: 11/30/2022) |
| 11/30/2022 | 96 | ORDER denying without prejudice 84 Motion for Attorney Fees; denying 94 Letter Motion for Extension of Time. On November 30, 2022, the Court issued an Opinion and Order, Dkt. 95 (the "Opinion"), granting defendants' motions to dismiss Counts One and Two, and denying as moot the motions to dismiss portions of Count Three, that no longer present live claims. The balance of Count Three, which consists of claims of improper dues taken from three plaintiffs by the Professional Staff Congress/CUNY, will now proceed to discovery. On November 17, 2022, Avraham Goldstein moved for attorneys' fees and costs pursuant to his Count Three judgment against defendant the City of New York (the "City"). Dkt. 84. On November 29, 2022, the City filed an extension request to respond to this motion, with the consent of plaintiffs. Dkt. 94. As the Court noted in the opinion, however, it will not entertain fees motions piecemeal, but will do so only after all claims have been resolved. Opinion at 29 n.17. Accordingly, the Court denies without prejudice the pending motion for attorneys' fees and costs at Docket 84. Goldstein is free to renew such a motion at the conclusion of the litigation. The Court also denies as moot the pending extension request at Docket 94. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 11/30/2022) (va) (Entered: 12/01/2022) |
| 12/05/2022 | 97 | TRANSCRIPT of Proceedings re: CONFERENCE held on 10/26/2022 before Judge Paul A. Engelmayer. Court Reporter/Transcriber: Paula Horovitz, (212) 805−0348. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/27/2022. Redacted Transcript Deadline set for 1/5/2023. Release of Transcript Restriction set for 3/6/2023..(McGuirk, Kelly) (Entered: 12/05/2022) |
| 12/05/2022 | 98 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 10/26/2022 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 12/05/2022) |
| 12/09/2022 | 99 | LETTER addressed to Judge Paul A. Engelmayer from Hanan B. Kolko dated 12/09/2022 re: Requesting Permission to file Motion for Summary Judgment. Document filed by Professional Staff Congress/CUNY..(Kolko, Hanan) (Entered: 12/09/2022) |
| 12/09/2022 | 100 | PROPOSED CASE MANAGEMENT PLAN. Document filed by Avraham Goldstein, Frimette Kass−Shraibman, Mitchell Langbert..(McGrath, Nathan) (Entered: 12/09/2022) |

| 12/13/2022 | 101 | LETTER addressed to Judge Paul A. Engelmayer from Nathan J. McGrath dated 12/13/2022 re: Response to PSC's Letter of December 9, 2022. Document filed by Frimette Kass−Shraibman, Mitchell Langbert..(McGrath, Nathan) (Entered: 12/13/2022) |
|---|---|---|
| 12/15/2022 | 102 | MEMO ENDORSEMENT on re: 101 Letter filed by Mitchell Langbert, Frimette Kass−Shraibman. ENDORSEMENT: The Court has received defendant PSC's letter proposing to make a pre−discovery motion for summary judgment on the issue of whether PSC is a state actor, Dkt. 99, and plaintiffs' opposition, Dkt. 101. The Court denies the motion, because PSC's motion, if denied, would potentially result in successive summary judgment motions on the same point. However, for avoidance of doubt, the Court's view is that the proper scope of discovery on the portions of Count Three that survive is very limited. Such discovery is to be completed by January 31, 2022, and, as to deposition testimony from the defense, should not entail testimony from any more than a single (presumably Rule 30(B)(6)) witness. The Court directs the parties to submit a proposed case management plan by December 21, 2022, consistent with these parameters. SO ORDERED. ( Discovery due by 1/31/2023.) (Signed by Judge Paul A. Engelmayer on 12/15/2022) (va) Modified on 1/10/2023 (va). (Entered: 12/16/2022) |
| 12/15/2022 | | Set/Reset Deadlines: Discovery due by 1/31/2023. (va) (Entered: 01/10/2023) |
| 12/20/2022 | 103 | PROPOSED CASE MANAGEMENT PLAN. Document filed by Frimette Kass−Shraibman, Mitchell Langbert..(Susanj, Danielle) (Entered: 12/20/2022) |
| 12/20/2022 | 104 | ORDER OF REFERENCE TO A MAGISTRATE JUDGE: Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Settlement. Referred to Magistrate Judge Jennifer E Willis. Counsel for plaintiff is directed to contact the Magistrate Judge's chambers to schedule a settlement conference on a mutually agreeable date at such time that the parties agree a conference would be useful. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 12/20/2022) (ama) (Entered: 12/20/2022) |
| 12/20/2022 | 105 | CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER: This Civil Case Management Plan (the "Plan") is submitted by the parties in accordance with Fed. R. Civ. P. 26(f)(3). All parties do not consent to conducting all further proceedings before a Magistrate Judge, including motions and trial. 28 U.S.C. § 636(c). This case is not to be tried to a jury. Deposition due by 1/31/2023. All Fact Discovery due by 1/31/2023. Counsel for the parties have conferred and their present best estimate of the length of trial is 2 days. The next Case Management Conference set for 2/28/2023 at 02:00 PM before Judge Paul A. Engelmayer. Unless otherwise indicated, the Case Management Conference will be held telephonically. The parties should call into the Court's dedicated conference line at (888) 363−4749, and enter Access Code 468−4906, followed by the pound (#) key. And as set forth herein. (Signed by Judge Paul A. Engelmayer on 12/20/2022) (ama) (Entered: 12/20/2022) |
| 12/22/2022 | 106 | ORDER: This matter has been referred for settlement. Dkt. No. 104. Should the parties wish to schedule a settlement conference, the Parties are directed to contact Courtroom Deputy Christopher Davis via email by January 6, 2023 at WillisNYSDChambers@nysd.uscourts.gov to provide three mutually agreeable dates in February. Any conference will be held in−person at Courtroom 228, 40 Foley Square, New York, New York. Parties must attend in−person with their counsel. Corporate parties must send the person with decision making authority to settle the matter to the conference. The parties are instructed to prepare pre−conference submissions in accordance with Judge Willis's Standing Order for all Cases Referred for Settlement. SO ORDERED. (Signed by Magistrate Judge Jennifer E Willis on 12/22/2022) (tg) (Entered: 12/22/2022) |
| 12/27/2022 | 107 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Professional Staff Congress/CUNY..(Kolko, Hanan) (Entered: 12/27/2022) |
| 12/27/2022 | 108 | ANSWER to 1 Complaint,. Document filed by Professional Staff Congress/CUNY..(Kolko, Hanan) (Entered: 12/27/2022) |
| 02/14/2023 | 109 | JOINT MOTION for Voluntary Dismissal with Prejudice of Count Three Under Fed. R. Civ. P. 41(a)(2) as to Professional Staff Congress/CUNY . Document filed by |

A.15

| | | |
|---|---|---|
| | | Frimette Kass−Shraibman, Mitchell Langbert. (Attachments: # 1 Text of Proposed Order Proposed Order).(Susanj, Danielle) (Entered: 02/14/2023) |
| 02/14/2023 | 110 | ORDER OF DISMISSAL WITH PREJUDICE OF COUNT THREE: Having considered the recently filed Joint Motion for Voluntary Dismissal With Prejudice Of Count Three Under Fed. R. Civ. P. 41(a)(2) as to defendant Professional Staff Congress/CUNY ("PSC"), it is hereby: ORDERED that Count III is dismissed with prejudice as to Defendant PSC pursuant to Federal Rule of Civil Procedure 41(a)(2). As to Count III, the PSC and plaintiffs bear their own costs and attorneys' fees. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 2/14/2023) (tg) (Entered: 02/14/2023) |
| 02/14/2023 | | Terminate Transcript Deadlines (tg) (Entered: 02/14/2023) |
| 03/14/2023 | 111 | MOTION for Judgment . Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano. (Attachments: # 1 Text of Proposed Order Proposed Order).(Messenger, William) (Entered: 03/14/2023) |
| 03/14/2023 | 112 | FINAL JUDGMENT IN A CIVIL CASE: IT IS ORDERED AND ADJUDGED THAT FINAL JUDGMENT IS HEREBY ENTERED in accordance with the November 30, 2022 Opinion and Order granting in full the Motions to Dismiss filed by Defendants Professional Staff Congress/CUNY ("PSC"), City University of New York ("CUNY"), DiNapoli, Wirenius, Townley and Zumbolo and dismissing counts one and two of the complaint and all Defendants other than Defendant PSC (Doc. No. 95) and the February 14, 2023 Order of Dismissal with Prejudice of Count Three as to Defendant PSC (Doc. No. 110). IT IS FURTHER ORDERED that the Unopposed Motion for Entry of Final Judgment, Doc. No. 111, be, and the same hereby is, GRANTED. FINAL JUDGMENT is therefore entered in favor of Defendants CUNY, DiNapoli, Wirenius, Townley and Zumbolo against all Plaintiffs on all three counts of the complaint; in favor of Defendant PSC against all Plaintiffs on counts one and two of the complaint; AND with the voluntary dismissal of count three by the remaining Plaintiffs against Defendant PSC, the complaint is HEREBY DISMISSED IN ITS ENTIRETY. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 3/14/2023) (tg) (Entered: 03/14/2023) |
| 03/16/2023 | 113 | NOTICE OF APPEAL from 95 Memorandum & Opinion, Add and Terminate Parties,,,,,,,,,,,,,,,. 112 Judgment,,,,. Document filed by Avraham Goldstein, Michael Goldstein, Frimette Kass−Shraibman, Mitchell Langbert, Jeffrey Lax, Maria Pagano. Filing fee $ 505.00, receipt number ANYSDC−27478914. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(McGrath, Nathan) (Entered: 03/16/2023) |
| 03/16/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 113 Notice of Appeal,..(nd) (Entered: 03/16/2023) |
| 03/16/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 113 Notice of Appeal, filed by Avraham Goldstein, Mitchell Langbert, Frimette Kass−Shraibman, Maria Pagano, Michael Goldstein, Jeffrey Lax were transmitted to the U.S. Court of Appeals..(nd) (Entered: 03/16/2023) |
| 03/28/2023 | 114 | SECOND MOTION for Attorney Fees *and Costs*. Document filed by Avraham Goldstein. (Attachments: # 1 Text of Proposed Order Proposed Order).(McGrath, Nathan) (Entered: 03/28/2023) |
| 03/28/2023 | 115 | MEMORANDUM OF LAW in Support re: 114 SECOND MOTION for Attorney Fees *and Costs*. . Document filed by Avraham Goldstein..(McGrath, Nathan) (Entered: 03/28/2023) |
| 03/28/2023 | 116 | DECLARATION of Nathan J. McGrath in Support re: 114 SECOND MOTION for Attorney Fees *and Costs*.. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit 1 − McGrath Time Entries, # 2 Exhibit 2 − Costs, # 3 Exhibit 3 − Wanner Time Entries).(McGrath, Nathan) (Entered: 03/28/2023) |
| 03/28/2023 | 117 | DECLARATION of Danielle R. Acker Susanj in Support re: 114 SECOND MOTION for Attorney Fees *and Costs*.. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit 1 − Time Entries [Redacted]).(McGrath, Nathan) (Entered: 03/28/2023) |

A.16

| | | |
|---|---|---|
| 03/28/2023 | 118 | DECLARATION of Milton L. Chappell in Support re: 114 SECOND MOTION for Attorney Fees *and Costs*.. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit 1 − Time Entries [Redacted]).(McGrath, Nathan) (Entered: 03/28/2023) |
| 03/28/2023 | 119 | DECLARATION of William L. Messenger in Support re: 114 SECOND MOTION for Attorney Fees *and Costs*.. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit 1 − Time Entries [Redacted]).(McGrath, Nathan) (Entered: 03/28/2023) |
| 03/28/2023 | 120 | LETTER MOTION to Seal *Exhibit 1 to Acker Susanj Declaration, Exhibit 1 to Chappell Declaration, Exhibit 1 to Messenger Declaration* addressed to Judge Paul A. Engelmayer from Nathan J. McGrath dated 03/28/2023. Document filed by Avraham Goldstein..(McGrath, Nathan) (Entered: 03/28/2023) |
| 03/28/2023 | 121 | ***EX−PARTE***DECLARATION of Danielle R. Acker Susanj in Support re: 114 SECOND MOTION for Attorney Fees *and Costs*.. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit 1 − Time Entries)Motion or Order to File Under Seal: 120 .(McGrath, Nathan) (Entered: 03/28/2023) |
| 03/28/2023 | 122 | ***EX−PARTE***DECLARATION of Milton L. Chappell in Support re: 114 SECOND MOTION for Attorney Fees *and Costs*.. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit 1 − Time Entries)Motion or Order to File Under Seal: 120 .(McGrath, Nathan) (Entered: 03/28/2023) |
| 03/28/2023 | 123 | ***EX−PARTE***DECLARATION of William L. Messenger in Support re: 114 SECOND MOTION for Attorney Fees *and Costs*.. Document filed by Avraham Goldstein. (Attachments: # 1 Exhibit 1 − Time Entries)Motion or Order to File Under Seal: 120 .(McGrath, Nathan) (Entered: 03/28/2023) |
| 03/29/2023 | 124 | ORDER: Accordingly, the Court directs defendants to respond by April 12, 2023. Any reply from plaintiff is due April 19, 2023. Separately, the Court grants Goldstein's motion to file under seal billing records with proposed redactions, which the Court has reviewed and approved. The Court expects that Goldstein will expediently file the redacted versions of these documents on the public docket. And as set forth herein. SO ORDERED., ( Responses due by 4/12/2023, Replies due by 4/19/2023.) (Signed by Judge Paul A. Engelmayer on 3/29/2023) (ama) (Entered: 03/29/2023) |
| 03/29/2023 | 125 | REDACTION to 121 Declaration in Support of Motion, *Danielle R. Acker Susanj* by Avraham Goldstein (Attachments: # 1 Exhibit 1 − Time Entries [Redacted]).(McGrath, Nathan) (Entered: 03/29/2023) |
| 03/29/2023 | 126 | REDACTION to 122 Declaration in Support of Motion, *Milton L. Chappell* by Avraham Goldstein (Attachments: # 1 Exhibit 1 − Time Entries [Redacted]).(McGrath, Nathan) (Entered: 03/29/2023) |
| 03/29/2023 | 127 | REDACTION to 123 Declaration in Support of Motion, *William L. Messenger* by Avraham Goldstein (Attachments: # 1 Exhibit 1 − Time Entries [Redacted]).(McGrath, Nathan) (Entered: 03/29/2023) |
| 04/04/2023 | 128 | LETTER MOTION for Extension of Time addressed to Judge Paul A. Engelmayer from John F. Walpole dated April 4, 2023. Document filed by City of New York..(Walpole, John) (Entered: 04/04/2023) |
| 04/05/2023 | 129 | ORDER granting 128 Letter Motion for Extension of Time. Granted. SO ORDERED. Motions due by 4/25/2023.. (Signed by Judge Paul A. Engelmayer on 4/5/2023) (rro) (Entered: 04/05/2023) |
| 04/11/2023 | 130 | RESPONSE in Opposition to Motion re: 114 SECOND MOTION for Attorney Fees *and Costs*. . Document filed by Professional Staff Congress/CUNY..(Kolko, Hanan) (Entered: 04/11/2023) |
| 04/24/2023 | 131 | NOTICE OF APPEARANCE by Rachel Michelle DiBenedetto on behalf of City of New York..(DiBenedetto, Rachel) (Entered: 04/24/2023) |
| 04/25/2023 | 132 | MEMORANDUM OF LAW in Opposition re: 114 SECOND MOTION for Attorney Fees *and Costs*. . Document filed by City of New York..(DiBenedetto, Rachel) (Entered: 04/25/2023) |
| 05/09/2023 | 133 | REPLY MEMORANDUM OF LAW in Support re: 114 SECOND MOTION for Attorney Fees *and Costs*. . Document filed by Avraham Goldstein. (Attachments: # 1 |

A.17

| | | Exhibit A − Lum v. SEIU, Local 521, # 2 Text of Proposed Order (Amended)).(McGrath, Nathan) (Entered: 05/09/2023) |

A.18

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVRAHAM GOLDSTEIN; MICHAEL GOLDSTEIN; FRIMETTE KASS-SHRAIBMAN; MITCHELL LANGBERT; JEFFREY LAX; MARIA PAGANO, | **Case No. 1:22-cv-321** |
| Plaintiffs, | (Hon. _____) |
| v. | |
| PROFESSIONAL STAFF CONGRESS/CUNY; CITY UNIVERSITY OF NEW YORK; JOHN WIRENIUS, in his official capacity as Chairperson of the New York Public Employee Relations Board; ROSEMARY A. TOWNLEY, in her official capacity as Member of the New York Public Employee Relations Board; ANTHONY ZUMBOLO, in his official capacity as Member of the New York Public Employee Relations Board; CITY OF NEW YORK; THOMAS P. DINAPOLI, in his official capacity as New York State Comptroller, | **COMPLAINT** |
| Defendants. | |

AND NOW come Plaintiffs Avraham Goldstein, Michael Goldstein, Frimette Kass-Shraibman, Mitchell Langbert, Jeffrey Lax, and Maria Pagano, by and through their undersigned attorneys, and state the following claims for relief against Defendants Professional Staff Congress/CUNY ("PSC"); the City University of New York ("CUNY"); John Wirenius, in his official capacity as Chairperson of the New York Public Employee Relations Board; Rosemary A. Townley, in her official capacity as Member of the New York Public Employee Relations Board; Anthony Zumbolo, in his official capacity as Member of the New York Public Employee Relations Board; the City of New York ("City"); and Thomas P. DiNapoli, in his official capacity as New York State Comptroller:

A.19

## SUMMARY OF THE CASE

1.      Plaintiffs are faculty of CUNY who strongly object to being exclusively represented by PSC and forced to associate with other employees within their assigned bargaining unit. They object to being forced to associate with PSC in any manner, to having PSC speak for them in any manner, and to providing support to PSC in any form.

2.      Plaintiffs have all chosen to resign their memberships in PSC due to their opposition to its representation of them, based largely on its ideological and political advocacy, which they abhor, as well as its representation of them in their employment.

3.      All but one of the plaintiffs are Jewish, and several of them resigned from PSC following its adoption in June 2021 of a "Resolution in Support of the Palestinian People" ("Resolution") that Plaintiffs view as anti-Semitic, anti-Jewish, and anti-Israel. Since the Resolution, PSC has continued to advocate positions and take actions that Plaintiffs believe to be anti-Semitic, anti-Jewish, and anti-Israel, in a manner that harms the Jewish plaintiffs and singles them out for opprobrium, hatred, and harassment based on their religious, ethnic, and/or moral beliefs and identity. Because of this, they have no faith and confidence in PSC's ability to represent them as their exclusive, fiduciary representative, and they desire to end such forced representation.

4.      Despite Plaintiffs' resignations from membership in PSC, Defendants PSC, CUNY, Wirenius, Townley, and Zumbolo, acting in concert and under color of state law, force all Plaintiffs to continue to utilize PSC as their exclusive bargaining representative. Thus, under color of state law, Plaintiffs are forced to remain part of a bargaining unit that is represented exclusively by PSC and are forced to associate with PSC and other employees within the bargaining unit.

5.      Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983 for declaratory, injunctive, and monetary relief to redress and to prevent the ongoing deprivation of rights, privileges, and/or immunities under the First and Fourteenth Amendments to the United States

2

A.20

Constitution caused by state statutes and Defendants' contracts, policies, and practices that designate PSC as Plaintiffs' exclusive bargaining representative with their Employer, force Plaintiffs into a defined bargaining unit with others who do not share the same interests, and require some Plaintiffs to continue to financially subsidize PSC's speech even though they have resigned their membership in the union. PSC's designation as exclusive bargaining representative and Plaintiffs' mandatory inclusion in a bargaining unit violate Plaintiffs' speech, petitioning, and associational rights under the First Amendment.

## JURISDICTION AND VENUE

6.      This action arises under the Constitution of the United States of America and the Federal Civil Rights Act of 1871, 42 U.S.C. § 1983, to redress the deprivation, under color of state law, of Plaintiffs' rights, privileges, and immunities under the Constitution of the United States, particularly the First and Fourteenth Amendments thereto.

7.      The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331, because their claims arise under the Constitution of the United States, and 28 U.S.C. § 1343, because Plaintiffs seek relief under 42 U.S.C. § 1983.

8.      This action is an actual controversy in which Plaintiffs seek declarations of their rights under the United States Constitution. Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court may declare plaintiffs' rights and grant further necessary and proper relief, including injunctive relief, pursuant to Federal Rule of Civil Procedure 65.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because one or more defendants are domiciled in and operate or do significant business in this judicial district. Additionally, many of Plaintiffs' injuries and a substantial part of the events giving rise to this action occurred in this judicial district.

A.21

## PARTIES

10.     Plaintiff Avraham Goldstein is a "public employee" within the meaning of the Public Employees' Fair Employment Act, N.Y. Civ. Serv. Law, Article 14 (the "Taylor Law"), *see* N.Y. Civ. Serv. Law § 201.7 (McKinney 2020). He is employed full-time by CUNY as an assistant professor of math at Borough of Manhattan Community College. Professor Goldstein is represented by PSC exclusively for purposes of collective bargaining with CUNY. He was a member of PSC but has not been a member since the date of his resignation letter on August 2, 2021.

11.     Plaintiff Michael Goldstein is a "public employee" within the meaning of the Taylor Law, *see* N.Y. Civ. Serv. Law § 201.7. He is employed full-time by CUNY as a Higher Education Officer and Adjunct Professor. Professor Goldstein is represented by PSC exclusively for purposes of collective bargaining with CUNY. He was a member of PSC but has not been a member since the date of his resignation letter on June 22, 2021.

12.     Plaintiff Frimette Kass-Shraibman is a "public employee" within the meaning of the Taylor Law, *see* N.Y. Civ. Serv. Law § 201.7. She is employed full-time by CUNY as a professor of accounting at Brooklyn College. Professor Kass-Shraibman is represented by PSC exclusively for purposes of collective bargaining with CUNY. She was a member of PSC but has not been a member since the date of her resignation letter on September 17, 2021.

13.     Plaintiff Mitchell Langbert is a "public employee" within the meaning of the Taylor Law, *see* N.Y. Civ. Serv. Law § 201.7. He is employed full-time by CUNY as an associate professor of business at Brooklyn College. Professor Langbert is represented by PSC exclusively for purposes of collective bargaining with CUNY. He was a member of PSC but has not been a member since the date of his resignation letter on June 22, 2021.

14.     Plaintiff Jeffrey Lax is a "public employee" within the meaning of the Taylor Law, *see* N.Y. Civ. Serv. Law § 201.7. He is employed full-time by CUNY as a professor of business at

Kingsborough College. Professor Lax is represented by PSC exclusively for purposes of collective bargaining with CUNY. He was a member of PSC but has not been a member since the date of his resignation letter on June 17, 2021.

15.     Plaintiff Maria Pagano is a "public employee" within the meaning of the Taylor Law, *see* N.Y. Civ. Serv. Law § 201.7. She is employed full-time by CUNY as an associate professor at the New York City College of Technology. Professor Pagano is represented by PSC exclusively for purposes of collective bargaining with CUNY but was not a member of PSC at any time relevant to this Complaint.

16.     Defendant PSC is an "employee organization" within the meaning of the Taylor Law, *see* N.Y. Civ. Serv. Law § 201.5. PSC and its affiliates represent over 30,000 faculty and staff at CUNY and the CUNY Research Foundation, including both full-time and part-time employees. PSC represents Plaintiffs, and all those in their bargaining unit, exclusively for purposes of collective bargaining with CUNY. PSC maintains a place of business at 61 Broadway, 15th Floor New York, New York and conducts its business and operations in the Southern District of New York.

17.     Defendant CUNY is a "government" or "public employer" within the meaning of the Taylor Law, *see* N.Y. Civ. Serv. Law § 201.6. CUNY recognizes PSC as Plaintiffs' exclusive representative pursuant to the Taylor Law and pursuant to both its memorandum of understanding ("MOA") and collective bargaining agreement ("CBA") with PSC.

18.     Defendant John Wirenius is Chairperson of the New York Public Employee Relations Board ("PERB"). In a certification order issued in 1972, PERB defined the "instructional staff" bargaining unit that includes Plaintiffs and certified PSC as the exclusive representative for that unit of more than 30,000 CUNY instructional staff. Defendant Wirenius is sued in his official capacity.

5

A.23

19.     Defendant Rosemary A. Townley is a Member of PERB, which defined Plaintiffs' bargaining unit and certified PSC as the exclusive representative for Plaintiffs' bargaining unit. She is sued in her official capacity.

20.     Defendant Anthony Zumbolo is a Member of PERB, which defined Plaintiffs' bargaining unit and certified PSC as the exclusive representative for Plaintiffs' bargaining unit. He is sued in his official capacity.

21.     Defendant City of New York is a "government" or "public employer" within the meaning of the Taylor Law, *see* N.Y. Civ. Serv. Law § 201.6. The City issues wages to certain CUNY employees, including Plaintiffs A. Goldstein, M. Goldstein, and Lax, and processes payroll deductions of union dues and/or fees pursuant to the requirements of the CBA and the Taylor Law.

22.     Defendant Thomas P. DiNapoli, in his official capacity as the New York State Comptroller, is responsible for, among other things, issuing wages to certain CUNY employees, including to Plaintiffs Kass-Shraibman, Langbert, and Pagano. He oversees the payroll system for the state, which includes processing payroll deductions, including union dues and/or fees deductions pursuant to the requirements of the CBA and the Taylor Law. Mr. DiNapoli is sued in his official capacity.

## FACTUAL ALLEGATIONS

**Plaintiffs Desire to End Association with PSC**

23.     Plaintiffs are all employed by CUNY within the instructional staff bargaining unit that is exclusively represented by PSC and are all former members of PSC.

24.     Acting in concert under color of state law, CUNY and PSC have entered into the MOA, CBA, and other agreements that control the terms and conditions of Plaintiffs' employment. The CBA is attached hereto as "Exhibit A," and incorporated by reference herein. The MOA is attached hereto as "Exhibit B," and incorporated by reference herein.

A.24

25.     PSC is Plaintiffs' exclusive representative under state law—PERB certified PSC as the exclusive representative for Plaintiffs' bargaining unit in 1972—and pursuant to Article 1 of the CBA between CUNY and PSC.

26.     PSC purports to represent over 30,000 employees, the majority of which, on information and belief, are included in Plaintiffs' bargaining unit.

27.     Plaintiffs have lost confidence in and become alienated from PSC due to its political advocacy and stated positions on Israel and involvement in international affairs, as well as the quality of PSC's representation, especially as to Plaintiffs, in the terms and conditions of their employment.

28.     Professor Avraham Goldstein is an observant Orthodox Jew. He was born in the former Soviet Union, where he and his family suffered from extreme anti-Semitic and anti-Jewish abuse at the hands of the Soviet authorities. Their request to leave the Soviet Union was denied for 15 years, until in 1986 the Soviet authorities permitted them to relocate to Israel. Professor Goldstein is a citizen of the State of Israel, he has friends and family residing there, and he is a supporter of that country based on his religious and moral beliefs. Professor Goldstein has felt marginalized and ostracized by PSC because the union has made it clear that Jews who support the Jewish homeland, the State of Israel, are not welcome. Since Zionism is an integral component of Professor Goldstein's Jewish identity, the impact of PSC's conduct has been to marginalize and ostracize him on the basis of his identity as a Jew. Professor Avraham Goldstein also believes that his employment, economic, and career interests as a full-time tenured faculty member often conflict with the interest of others in the bargaining unit, such as part-time adjunct faculty. He believes that his inclusion in a bargaining unit with these other groups, which greatly outnumber the full-time tenure-track faculty, infringes on his employment interests and that PSC's rules give some of these other groups more power to advance their interests, because of their size, at the expense of the interests of the full-time faculty.

7

A.25

29.     Professor Michael Goldstein is a Jew and an ardent Zionist. He bases his love of the State of Israel and his Zionism on his belief in God and the Jewish people. He has worked for CUNY for over 32 years, and, combined with his parents, has over 100 years of service to CUNY, including his father's service as Acting Chancellor of CUNY. Professor Goldstein has experienced anti-Semitic and anti-Zionist attacks from members of PSC, including what he sees as bullying, harassment, destruction of property, calls for him to be fired, organization of student attacks against him, and threats against him and his family. He now has a guard follow him everywhere he goes on campus. Professor Goldstein has felt marginalized and ostracized by PSC because the union has made it clear that Jews who support the Jewish homeland, the State of Israel, are not welcome. Since Zionism is an integral component of Professor Goldstein's Jewish identity, the impact of PSC's conduct has been to marginalize and ostracize him on the basis of his identity as a Jew. Professor Goldstein resigned from PSC because he believes PSC was behind the anti-Semitic and anti-Zionist attacks against him on campus. He believes that PSC does not represent Jewish and pro-Israel members of the bargaining unit and instead works to eliminate them from CUNY. He also believes PSC hurts some members of the bargaining unit economically, does not offer the same level of representation to Higher Education Officers ("HEOs"), and prioritizes the pay of part-time adjuncts and others over HEOs.

30.     Professor Kass-Shraibman is an Orthodox Jew and lifelong Zionist. She was born and still resides in Brooklyn, New York.  She and her family helped raise funds for Israel before and during its War of Independence in 1948 and during the Six-Day War in 1967. She hopes to emigrate to Israel after retiring from CUNY. She believes that the PSC's Resolution and other positions and activities support those who would destroy Israel and are antithetical to all she believes in. Furthermore, she believes that the PSC's positions considering support of the "Boycott, Divestment, and Sanctions" ("BDS") movement and the current Palestinian regime in the

A.26

achievement of its stated goals would bring death and destruction to her immediate and extended family living in Israel. Professor Kass-Shraibman has felt marginalized and ostracized by PSC because the union has made it clear that Jews who support the Jewish homeland, the State of Israel, are not welcome. Since Zionism is an integral component of Professor Kass-Shraibman's Jewish identity, the impact of PSC's conduct has been to marginalize and ostracize her on the basis of her identity as a Jew. Professor Kass-Shraibman also believes that she and her colleagues have been harmed economically by PSC's actions and inaction over the years. She believes that instead of negotiating contracts on behalf of the CUNY faculty as it should have, PSC frequently acted as a "social justice" agency instead of a labor union. For example she believes that, instead of prioritizing the pay of full-time faculty, PSC expended resources advocating on behalf of teachers in Peru, graduate students at various other universities and the so-called "Occupy Wall Street" movement.

31.     Professor Langbert is a business professor, a political libertarian, a Jew, and a Zionist. He has long been opposed to PSC's political and ideological activities and causes. He has published op-eds and other writings that questioned the political activities of PSC and its leadership. Professor Langbert has also filed complaints concerning the failure of PSC to adequately represent business faculty, failure to represent the views of dues payers who do not agree with the leadership's political speech and activities, and failure to represent Jews like him who support Zionism and the State of Israel. Professor Langbert has felt marginalized and ostracized by PSC because he believes that the union has made it clear that Jews who support the Jewish homeland, the State of Israel, are not welcome. Since Zionism is an integral component of Professor Langbert's Jewish identity, the impact of PSC's conduct has been to marginalize and ostracize him on the basis of his identity as a Jew.

32.     Professor Lax is an observant Orthodox Jew who supports the State of Israel and believes in biblically-based Zionism, as described in the book of Genesis. Professor Lax resigned

A.27

from PSC after 17 years of membership on June 17, 2021, due to EEOC-substantiated claims that PSC discriminated against him on his campus because he was a Zionist and observant Jew, and because of PSC's failure to represent its Zionist members, as shown by the Resolution and similar actions. In a separate case brought by Professor Lax, the EEOC issued a letter of determination that CUNY and PSC leaders discriminated against him, retaliated against him, and subjected him to a hostile work environment on the basis of religion. PSC members failed to accommodate Professor Lax by holding at least one event on a Friday night, the Jewish Sabbath, so he could not attend. The EEOC also substantiated that PSC leaders excluded Professor Lax and other observant or Zionist Jews from a powerful faculty group called the Progressive Faculty Caucus. Professor Lax has felt marginalized and ostracized by PSC because the union has made it clear that Jews who support the Jewish homeland, the State of Israel, are not welcome. Since Zionism is an integral component of Professor Lax's Jewish identity, the impact of PSC's conduct has been to marginalize and ostracize him on the basis of his identity as a Jew.

33.    Professor Pagano resigned from PSC in approximately 2010, after PSC attempted to interfere with the settlement of a grievance her retained attorney had negotiated with CUNY, after PSC had refused to handle that grievance. She has often disagreed with positions PSC has taken in contract negotiations, where it acts as her mandatory exclusive representative. She opposes PSC's failure to negotiate adequate raises for the faculty, and its adoption of compulsory contributions for paid family leave insurance that she does not desire and would not purchase on her own. In recent years, Professor Pagano has become increasingly concerned over PSC's political radicalization, culminating in the adoption of the Resolution and PSC's continued defense of its involvement in

political activities following the Resolution. She would consider choosing another union if she was not forced to associate with PSC.

34.     Plaintiffs' opposition to PSC's political and ideological positions crystalized in June 2021, when PSC adopted the Resolution regarding what it termed "the continued subjection of Palestinians to the state-supported displacement, occupation, and use of lethal force by Israel," and requiring chapter-level discussion of possible support by PSC for the BDS movement. The Resolution is attached hereto as "Exhibit C" and is incorporated by reference herein.

35.     Plaintiffs believe that this Resolution is openly anti-Semitic and anti-Israel, as it attacks and applies a double standard to the one Jewish nation in the world, Israel, while ignoring every other nation.

36.     In protest of PSC's anti-Semitic and anti-Israel statements, actions, and positions, particularly the Resolution, Plaintiffs A. Goldstein, M. Goldstein, Kass-Shraibman, Langbert, and Lax resigned their memberships in PSC after the adoption of the Resolution.

37.     Plaintiffs' resignations, through correspondence sent to Defendants PSC, CUNY, the City, and/or DiNapoli, ended their memberships in PSC and revoked the authorization for the continued deduction of union dues from their wages.

38.     Despite their resignations and revocations of authorization, dues deductions continued from the wages of Plaintiffs A. Goldstein, Kass-Shraibman, and Langbert.

39.     Plaintiff Pagano had already ended her membership in PSC years before PSC adopted the Resolution, and she signed a resolution opposing PSC's Resolution.

40.     On information and belief, over 260 members of PSC have resigned and revoked their authorizations for dues deductions since PSC adopted the Resolution.

41.     In the months since the Resolution, PSC members have held chapter-level discussions, as required by the Resolution. These discussions encourage support for the anti-Semitic

and anti-Israel BDS movement among rank-and-file members of PSC, who are Plaintiffs' colleagues, as well as PSC officials. By ensuring that the Resolution and the BDS movement's goals would be discussed over and over again at chapter meetings across the CUNY campuses, PSC ensured that the isolation, marginalization, harassment, and ridicule experienced by the pro-Israel Zionist faculty would continue throughout the academic year.

42.     Plaintiffs strongly oppose the political positions and speech of PSC, including the positions espoused in the Resolution, and do not want to be associated with, represented by, or linked to PSC in any way.

43.     The Jewish Plaintiffs believe the Resolution, and related conduct by PSC, sets them and their co-religionists apart and singles them out for disparate treatment, opprobrium, and hostility, based solely upon their religious, ethnic, and moral beliefs and identity, including their support for Israel, the nation-state of the Jewish people. Due to PSC's expressed anti-Semitism and anti-Zionism, none of the Plaintiffs believe PSC can serve as a fiduciary to represent them fairly in negotiating their terms and conditions of employment, or in any interactions with their Employer.

44.     All Plaintiffs believe, based on past experiences they have had with PSC's poor representation of them or refusal to represent them, along with their opposition to PSC's positions and speech, that PSC could not and would not fairly represent them in grievances, disciplinary matters, or other interactions with their Employer.

45.     Plaintiffs oppose the ways in which PSC spends members' dues money, including, among other things, its support for a political party known as the Working Families Party.

46.     Plaintiffs also oppose the ways in which PSC represents them in the negotiation of their terms and conditions of employment. Among other things, Plaintiffs believe that PSC prioritizes the economic and employment interests of part-time adjunct professors and other groups in the bargaining unit over their interests as full-time faculty and/or staff of CUNY. For example,

PSC has prioritized securing health insurance for part-time adjuncts over higher raises for full-time faculty. Plaintiffs believe that PSC cannot and does not fairly represent the wide variety of positions and large numbers of employees who are forced to associate within their bargaining unit. In fact, PSC's representation policies and practices are performed to the detriment of Plaintiffs.

**Plaintiffs Cannot End Association with PSC or the Bargaining Unit**

47.    Although Plaintiffs have resigned from PSC and want to have no connection with it, they are forced by the Taylor Law, CBA, and MOA to accept and associate with PSC as their exclusive representative with CUNY.

48.    Although Plaintiffs' interests in the terms and conditions of their employment diverge from the interests of others in their bargaining unit, they are still forced to be in the bargaining unit and to associate with PSC and tens of thousands of other instructional staff of CUNY in the unit who do not share their same economic interests, and who also do not share their beliefs or are overtly hostile to them.

49.    Under New York law, a union may become public employees' exclusive representative for collective bargaining purposes by recognition or certification. A union so designated has exclusive legal authority to speak for all employees in the bargaining unit, irrespective of whether each individual employee agrees to or desires such exclusive representation. N.Y. Civ. Serv. Law § 204.

50.    When a union has been certified or recognized as the exclusive representative, the public employer is required by law to negotiate only with that union regarding the terms and conditions of employment for the public employees the union exclusively represents. N.Y. Civ. Serv. Law § 204.2. This requirement on the public employer includes a "mutual obligation" to meet at reasonable times and confer in good faith. N.Y. Civ. Serv. Law § 204.3.

51.     The Taylor Law requires that "[a] public employer shall extend to an employee organization certified or recognized pursuant to this article the following rights: . . . (b) to membership dues deduction, upon presentation of dues deduction authorization cards signed by individual employees. . . ." N.Y. Civ. Serv. Law § 208.1.

52.     The Taylor Law also provides that "[t]he right to such membership dues deduction shall remain in full force and effect until: (i) an individual employee revokes membership in the employee organization in writing in accordance with the terms of the signed authorization." N.Y. Civ. Serv. Law § 208.1.

53.     The Taylor Law also limits the duties an exclusive representative owes to any employees in its bargaining unit who choose not to be union members. The Taylor Law authorizes PSC, Plaintiffs' exclusive representative, to treat Plaintiffs less favorably than PSC members, solely because they have exercised their constitutional rights to become or remain nonmembers.

54.     Specifically, the Taylor Law provides that "[n]otwithstanding any law, rule or regulation to the contrary, an employee organization's duty of fair representation to a public employee it represents but who is not a member of the employee organization shall be limited to the negotiation or enforcement of the terms of an agreement with the public employer." N.Y. Civ. Serv. Law § 209-a(2).

55.     In addition, the Taylor Law specifically provides,

No provision of this article shall be construed to require an employee organization to provide representation to a non-member:

> (i) during questioning by the employer,
> (ii) in statutory or administrative proceedings or to enforce statutory or regulatory rights, or
> (iii) in any stage of a grievance, arbitration or other contractual process concerning the evaluation or discipline of a public employee where the non-member is permitted to proceed without the employee organization and be represented by his or her own advocate.

A.32

N.Y. Civ. Serv. Law § 209-a(2).

56.     Finally, the Taylor Law also provides: "Nor shall any provision of this article prohibit an employee organization from providing legal, economic or job-related services or benefits beyond those provided in the agreement with a public employer only to its members." N.Y. Civ. Serv. Law § 209-a(2).

57.     PSC was certified by the New York State Public Employment Relations Board on June 16, 1972, to represent the "instructional staff" of CUNY.

58.     Pursuant to state law, the certification order, the CBA, and the MOA, the CUNY instructional staff, including Plaintiffs, are forced to be included in the instructional staff bargaining unit and be exclusively represented by PSC.

59.     Article 4 of the CBA grants certain rights to PSC, including "exclusive check-off of annual PSC dues." Ex. A, art. 4.1.

60.     Due to its status as exclusive representative for the instructional staff bargaining unit, PSC represents 30,000 CUNY employees, which it touts on its website. PSC represents these employees regardless of whether the employees are union members and regardless of whether these employees agree with PSC's speech and its positions.

61.     No Plaintiff has ever participated in a vote to certify or recognize PSC as his or her exclusive representative.

62.     Pursuant to state law, the duty of fair representation that PSC owes to Plaintiffs and other nonmembers is limited to "the negotiation or enforcement of the terms of an agreement with the public employer," and PSC has no duty to represent Plaintiffs in any of the situations designated in Section 209-a of the Taylor Law. *See also* paragraphs 53–56.

63.     Plaintiffs believe that PSC does not and cannot represent their interests, beliefs, or needs related to the terms and conditions of their employment or in interactions with their Employer.

64.     Plaintiffs' forced inclusion in their bargaining unit does a disservice to them and causes them to be disadvantaged in their terms and conditions of employment and in their relations with their fellow employees and the general public.

65.     Plaintiffs object to being forced into a bargaining unit with other CUNY employees whose interests in terms and conditions of employment differ from their own.

66.     Plaintiffs strongly disagree with PSC on many issues, including those related to the terms and conditions of employment and to PSC's political positions, advocacy, and public speech.

67.     Plaintiffs believe that PSC's actions, including the Resolution, subject the Jewish Plaintiffs to hostility in the workplace and in the general public, and single them out for opprobrium, discrimination, and hatred based upon their religious, ethnic, and/or moral beliefs and identity.

68.     Due to PSC's status as Plaintiffs' exclusive representative, Plaintiffs have no ability to represent themselves in connection with their terms and conditions of employment with their Employer or to associate with a different collective bargaining representative of their choosing. Under New York law, Plaintiffs are forced to accept PSC's representation even though they vehemently disagree with its speech, actions, and positions in negotiations and elsewhere.

69.     PSC's statutory entitlement to speak and bargain exclusively with CUNY as Plaintiffs' sole and mandatory representative deprives Plaintiffs of their ability to speak and bargain with CUNY regarding their terms and conditions of employment, both individually and through other associations they might choose.

70.     Plaintiffs do not want to be associated with PSC in any way, including having PSC as their exclusive representative or through forced financial support of PSC or its affiliates.

A.34

71.     Plaintiffs do not want to be associated with all members of their bargaining unit.

**Certain Plaintiffs Cannot End Financial Support of PSC**

72.     Pursuant to the CBA, the MOA, state law, and/or other agreements between Defendants, the City of New York, through its Office of Payroll Administration ("OPA"), oversees or oversaw the deduction of union dues and/or fees from Plaintiff A. Goldstein for PSC, and transmits or transmitted them to PSC.

73.     Pursuant to the CBA, the MOA, state law, and/or other agreements between Defendants, Defendant DiNapoli oversees or oversaw the deduction of union dues and/or fees from Plaintiffs Kass-Shraibman and Langbert for PSC and transmits or transmitted them to PSC.

74.     The City of New York and Defendant DiNapoli have denied requests of Plaintiffs and other CUNY employees to end union dues deductions from their wages unless authorized by PSC.

75.     After Plaintiff A. Goldstein resigned his union membership, the City continued to deduct union dues from his wages.

76.     After Plaintiffs Kass-Shraibman and Langbert resigned their union memberships, Defendant DiNapoli continued to deduct union dues from their wages.

77.     Since the resignations of Plaintiffs A. Goldstein, Kass-Shraibman, and Langbert, the City and Defendant DiNapoli transmitted and/or continues to transmit union dues deducted from their wages to PSC.

78.     Since the resignations of Plaintiffs A. Goldstein, Kass-Shraibman, and Langbert, PSC has continued to accept union dues deducted from their wages.

79.     Acting in concert under color of state law, Defendants PSC and the City or DiNapoli have taken and continue to take and/or have accepted and continue to accept union dues from

A.35

certain Plaintiffs' wages as a condition of employment pursuant to state law, the CBA, the MOA, and other agreements between them, and/or their joint policies and practices.

80. Defendants PSC and the City or DiNapoli have taken and continue to take and have accepted and continue to accept union dues from Plaintiffs' wages even though the seizure of union dues from their wages was and is against Plaintiffs' wills and without their consent.

81. Plaintiffs object to being forced to fund PSC, including any of its speech and activities, for any purpose.

## CLAIMS FOR RELIEF

### COUNT ONE
**Compelled Association with Exclusive Representative**
(Violation of 42 U.S.C. § 1983 and the First and Fourteenth Amendments
to the United States Constitution)

82. Plaintiffs re-allege and incorporate by reference all allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

83. The First Amendment protects "[t]he right to eschew association for expressive purposes," *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463 (2018), because the "[f]reedom of association . . . plainly presupposes a freedom not to associate." *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984).

84. "[M]andatory associations are permissible only when they serve a 'compelling state interes[t] . . . that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Knox v. SEIU, Loc. 1000*, 567 U.S. 298, 310 (2012) (alterations in original) (quoting *Roberts*, 468 U.S. at 623).

85. In the context of public-sector unions, the Supreme Court has recognized that "[d]esignating a union as the employees' exclusive representative substantially restricts the rights of individual employees. Among other things, this designation means that individual employees may not be represented by any agent other than the designated union; nor may individual employees

A.36

negotiate directly with their employer." *Janus*, 138 S. Ct. at 2460. Indeed, such compelled union representation "extinguishes the individual employee's power to order his own relations with his employer." *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967).

86. The duty of fair representation "is a necessary concomitant of the authority that a union seeks when it chooses to serve as the exclusive representative of all the employees in a unit." *Janus*, 138 S. Ct. at 2469.

87. PSC's status as exclusive representative compels Plaintiffs to associate with PSC, and to therefore be associated with PSC's speech and PSC positions with which Plaintiffs vehemently disagree and that they believe to be anti-Semitic and anti-Israel.

88. PSC's status as exclusive representative compels Plaintiffs to speak and to petition the government because it authorizes PSC to speak for Plaintiffs and to petition the government for Plaintiffs.

89. PSC's status as exclusive representative attributes PSC's speech and petitioning to Plaintiffs.

90. PSC's status as exclusive representative diminishes Plaintiffs' own speech and petitioning.

91. PSC's status as exclusive representative restricts Plaintiffs' ability to associate, or not to associate, with a labor organization and with other members of the bargaining unit.

92. PSC's status as exclusive representative carries with it only a limited duty to fairly represent Plaintiffs and other nonmembers under the Taylor Law, which exacerbates the associational and other harms Plaintiffs suffer as a result of being compelled to accept PSC as their exclusive representative.

93. Defendants PSC, CUNY, Wirenius, Townley, and Zumbolo, by compelling Plaintiffs to accept PSC as their exclusive representative, have deprived and are depriving Plaintiffs of their

A.37

First Amendment rights to free speech and association, as secured against state infringement by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

94. Section 204 of the Taylor Law and the CBA are unconstitutional under the First and Fourteenth Amendments to the Constitution of the United States to the extent they authorize and empower PSC to act as Plaintiffs' exclusive representative.

95. Section 204 of the Taylor Law's provision of exclusive representation is unconstitutional under the First and Fourteenth Amendments to the Constitution of the United States because Section 209-a of the Taylor Law limits the duty of fair representation that PSC owes to Plaintiffs.

96. As a direct result of the concerted actions of Defendants PSC, CUNY, Wirenius, Townley, and Zumbolo, taken pursuant to state law, the certification order, CBA, MOA, and/or other agreements between Defendants, and their joint policies and practices, Plaintiffs are suffering irreparable harm, damage, and injury inherent in the violation of First and Fourteenth Amendment rights, for which there is no adequate remedy at law.

97. If not enjoined by this Court, Defendants PSC, CUNY, Wirenius, Townley, and Zumbolo and/or their agents will continue to effect the aforementioned deprivations and abridgments of Plaintiffs' constitutional rights, thereby causing them to suffer irreparable harm for which there is no adequate remedy at law.

<div align="center">

**COUNT TWO**
**Compelled Association with Bargaining Unit**
(Violation of 42 U.S.C. § 1983 and the First and
Fourteenth Amendments to the United States Constitution)

</div>

98. Plaintiffs re-allege and incorporate by reference all allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

99. Under New York law, and specifically Section 204 of the Taylor Law, PERB, through Defendants Wirenius, Townley, and Zumbolo, and/or their predecessors, issued the

<div align="center">20</div>

<div align="center">A.38</div>

certification order that defined the "instructional staff" bargaining unit at CUNY and designated PSC as the exclusive representative for that unit.

100. Because Plaintiffs' positions are defined as "instructional staff" under the certification order and the CBA and/or MOA, it is a term and condition of employment for Plaintiffs that they must be in the bargaining unit with tens of thousands of other CUNY employees, regardless of whether they desire to be included or whether they have shared economic, political, or employment interests with other employees in the unit.

101. Because Plaintiffs' positions are defined as "instructional staff" under the certification order and the CBA and/or MOA, as required by the Taylor Law, only PSC may negotiate with CUNY regarding the terms and conditions of Plaintiffs' employment.

102. PSC's status as exclusive representative of Plaintiffs' bargaining unit compels Plaintiffs to associate with other employees within the bargaining unit and restricts their ability not to associate with other employees in the bargaining unit.

103. Plaintiffs oppose being forced to associate with other employees within the bargaining unit who do not share their political views and who espouse views Plaintiffs believe to be anti-Semitic or anti-Israel.

104. Plaintiffs also oppose being forced into the same bargaining unit with CUNY instructional staff, such as part-time adjuncts, whose employment interests diverge from their own.

105. Defendants PSC, CUNY, Wirenius, Townley, and Zumbolo, by compelling Plaintiffs to associate with employees in the bargaining unit whose views they oppose and whose interests are not aligned with Plaintiffs, have deprived and are depriving Plaintiffs of their First Amendment rights to free speech and association, as secured against state infringement by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

A.39

106.     As a direct result of the concerted actions of Defendants PSC, CUNY, Wirenius, Townley, and Zumbolo, taken pursuant to state law, the CBA, MOA, the certification order, and/or other agreements between Defendants, and their joint policies and practices, Plaintiffs are suffering irreparable harm, damage, and injury inherent in the violation of First and Fourteenth Amendment rights, for which there is no adequate remedy at law.

107.     If not enjoined by this Court, Defendants PSC, CUNY, Wirenius, Townley, and Zumbolo and/or their agents will continue to effect the aforementioned deprivations and abridgments of Plaintiffs' constitutional rights, thereby causing them to suffer irreparable harm for which there is no adequate remedy at law.

<div align="center">

**COUNT THREE**
**Compelled Financial Support of Union Speech**
by Plaintiffs A. Goldstein, Kass-Shraibman, and Langbert
(Violation of 42 U.S.C. § 1983 and the First and
Fourteenth Amendments to the United States Constitution)

</div>

108.     Plaintiffs A. Goldstein, Kass-Shraibman, and Langbert re-allege and incorporate by reference all allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

109.     The United States Supreme Court held that the First Amendment to the Constitution of the United States prohibits the government and unions from compelling public employees to pay dues or fees to a union as a condition of employment. *See Janus*, 138 S. Ct. at 2486.

110.     The First Amendment requires that "[n]either an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay." *Janus*, 138 S. Ct. at 2486.

111.     There is no state interest, compelling or otherwise, justifying the state's requirement that individuals remain members of or provide financial support to a private organization, including a labor organization, for any length of time.

<div align="center">

22

A.40

</div>

112.    Sections 201 and 208 of the Taylor Law authorize Defendants to compel employees to continue to financially support a union even after they provide notice that they resigned their union membership and want to end financial support of the union.

113.    Defendants PSC and the City or DiNapoli compelled these Plaintiffs to financially support PSC and its speech, as nonmembers and over their objections, by seizing payments for PSC from these Plaintiffs' wages after they provided notice that they resigned their membership in PSC and did not consent to union dues deductions.

114.    Defendants PSC and the City or DiNapoli, by compelling these Plaintiffs to financially support PSC and its speech as nonmembers and over their objections, deprived these Plaintiffs of their First Amendment rights to free speech and association, as secured against state infringement by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

115.    At no time did Plaintiffs A. Goldstein, Kass-Shraibman, and Langbert waive their First Amendment right to refrain from financially supporting PSC and its speech. A valid waiver of constitutional rights requires clear and compelling evidence that a putative waiver was voluntary, knowing, and intelligent and that enforcement of the waiver is not against public policy. Defendants cannot prove, by clear and compelling evidence, that these Plaintiffs voluntarily, knowingly, and intelligently waived their First Amendment right or that enforcement of any such waiver is consistent with public policy.

116.    Sections 201 and 208 of the Taylor Law are unconstitutional under the First and Fourteenth Amendments to the Constitution of the United States to the extent they authorize Defendants PSC and the City or DiNapoli to compel public employees to continue to financially support PSC and its speech over their objections and after they resigned their union membership.

117.    As a direct result of the concerted actions of Defendants PSC, the City, and/or DiNapoli, taken pursuant to state law, the CBA, MOA, and/or other agreements between

23

A.41

Defendants, and their joint policies and practices, these Plaintiffs are in imminent danger of suffering irreparable harm, damage, and injury inherent in the violation of First and Fourteenth Amendment rights, for which there is no adequate remedy at law.

118.    If not enjoined by this Court, Defendants and/or their agents and officials will continue to effect the deprivations and abridgments of these Plaintiffs' constitutional rights, thereby causing irreparable harm, damage, and injury for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court order the following relief:

A.    **Declaratory:** A judgment based upon the actual, current, and *bona fide* controversy between the parties as to the legal relations among them, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, declaring that:

i.    the certification and recognition of PSC as Plaintiffs' exclusive representative by Defendants PSC, CUNY, Wirenius, Townley, and Zumbolo, pursuant to the Taylor Law, CBA, and MOA violate Plaintiffs' First Amendment rights of free speech and free association and are unconstitutional;

ii.    Defendants PSC, CUNY, Wirenius, Townley, and Zumbolo violate Plaintiffs' First Amendment rights of free speech and free association by compelling them to associate with other employees in the bargaining unit for purposes of speech and expressive activities;

iii.    Section 204 of the Taylor Law is unconstitutional under the First Amendment to the United States Constitution to the extent that it requires or authorizes PSC to be Plaintiffs' exclusive representative and compels Plaintiffs to associate with other employees in the bargaining unit for purposes of speech and expressive activities; and

iv.    any taking of union dues from any Plaintiffs after their resignation of membership in PSC violates those Plaintiffs' rights under the First and Fourteenth

A.42

Amendments of the United States Constitution, and that any provisions of the Taylor Law, the CBA and/or MOA, other agreements between Defendants, and/or any other purported authorizations that allow or require such deductions of union dues from Plaintiffs' wages are unconstitutional.

B.      **Injunctive:** A permanent injunction enjoining Defendants, their officers, employees, agents, attorneys, and all others acting in concert with them, from:

   i. engaging in any of the activities listed in Part A above that the Court declares illegal;

   ii. certifying or recognizing PSC, or any other union, as Plaintiffs' exclusive representative without their consent; and

   iii. enforcing any provisions in the Taylor Law, the CBA or MOA, other agreements between Defendants, and/or Defendants' policies and practices that require Plaintiffs to provide financial support to PSC.

C.      **Monetary:** A judgment against Defendants PSC, CUNY, and the City, awarding Plaintiffs nominal and compensatory damages, including but not limited to the dues seized from the wages of Plaintiffs A. Goldstein, Kass-Shraibman, and Langbert after they resigned their membership in PSC and revoked their dues deduction authorizations, for the injuries sustained as a result of Defendants' unlawful interference with and deprivation of their constitutional and civil rights, plus interest thereon, and such amounts as principles of justice and compensation warrant.

D.      **Attorneys' Fees and Costs:** A judgment awarding Plaintiffs their costs and reasonable attorneys' fees under 42 U.S.C. § 1988.

E.      **Other:** Such other and further relief as the Court may deem just and proper.

A.43

Respectfully submitted,

Dated: January 12, 2022

**s/ Nathan J. McGrath**
Nathan J. McGrath*
Email: njmcgrath@fairnesscenter.org
Danielle R. Acker Susanj*
Email: drasusanj@fairnesscenter.org
THE FAIRNESS CENTER
500 North Third Street, Suite 600B
Harrisburg, Pennsylvania 17101
Telephone: 844.293.1001
Facsimile: 717.307.3424

Milton L. Chappell*
Email: mlc@nrtw.org
William L. Messenger*
Email: wlm@nrtw.org
c/o National Right to Work Legal
   Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Telephone: 703.321.8510
Facsimile: 703.321.9319

*Attorneys for Plaintiffs*

*motions for admission *pro hac vice* to be filed

A.44

# Exhibit A

Collective Bargaining Agreement Between PSC and CUNY

# THE CITY UNIVERSITY OF NEW YORK

# AGREEMENT

## between

# THE CITY UNIVERSITY

# OF NEW YORK

## and the

# PROFESSIONAL STAFF CONGRESS/CUNY

## December 1, 2017 – February 28, 2023

# TABLE OF CONTENTS

**Page**

**I.**   **2017-2023 PSC/CUNY Collective Bargaining Agreement**

| | | |
|---|---|---|
| Preamble | | 1 |
| Article  1 | Recognition | 2 |
| Article  2 | CUNY-PSC Relationships | 6 |
| Article  3 | Unit Stability | 9 |
| Article  4 | Union Dues and Membership | 9 |
| Article  5 | Information and Data | 10 |
| Article  6 | Reassigned Time | 11 |
| Article  7 | Organizational Use of Facilities | 12 |
| Article  8 | Non-Discrimination | 12 |
| Article  9 | Appointment and Reappointment | 13 |
| Article 10 | Schedule for Notification of Reappointment and Non-Reappointment | 16 |
| Article 11 | Classification of Titles | 18 |
| Article 12 | Certificate of Continuous Employment | 22 |
| Article 13 | Appointments and Reappointments in the Higher Education Officer (HEO) Series | 24 |
| Article 14 | Leaves and Holidays | 31 |
| Article 15 | Workload | 35 |
| Article 16 | Temporary Disability and Parental Leave | 41 |
| Article 17 | Jury Duty | 44 |
| Article 18 | Professional Evaluation | 44 |
| Article 19 | Personnel Files | 50 |
| Article 20 | Complaint, Grievance and Arbitration Procedure | 51 |
| Article 21 | Disciplinary Actions | 56 |
| Article 21A | Medical Separation Leave Procedure | 61 |
| Article 22 | Increased Promotional Opportunities | 64 |
| Article 23 | Distinguished Professorship | 65 |
| Article 24 | Salary Schedules | 66 |
| Article 25 | Research, Fellowship, and Scholar Incentive Awards | 93 |
| Article 26 | Welfare Benefits | 97 |
| Article 27 | Retirement | 98 |
| Article 27A | Voluntary Phased Retirement Program | 101 |
| Article 28 | Travel Allowances | 102 |
| Article 29 | Waiver of Tuition Fees | 102 |
| Article 30 | Facilities and Services | 103 |
| Article 31 | Rehiring of Persons who are Discontinued | 104 |
| Article 32 | Discontinuances | 105 |
| Article 33 | Faculty and Staff Development | 106 |
| Article 34 | Medical Series | 109 |
| Article 35 | CUNY Law School | 112 |
| Article 36 | Resident Series | 116 |
| Article 37 | Academic Calendar | 118 |
| Article 38 | Workers' Compensation | 118 |

| Article 39 | Occupational Safety and Health | 118 |
| Article 40 | No Strike Pledge | 119 |
| Article 41 | Legislative Action | 119 |
| Article 42 | 2017-2023 Financial Provisions | 119 |
| Article 43 | Duration | 120 |

**II.  Appendices**

| Appendix A | Pertinent Sections of the Workload Settlement Agreement | 121 |
| Appendix B | Guidelines for the Implementation of the Adjunct Professional Development Fund | 123 |
| Appendix C | Settlement Agreement: Salaries above Base | 125 |
| Appendix D | CUNY Start Instructor and CUNY Language Immersion Program Instructors | 128 |
| Appendix E | Multi-Year Appointments for Teaching Adjuncts | 134 |
| Appendix F | Dedicated Sick Leave Program | 138 |
| Appendix G | Catastrophic Sick Leave Bank Program | 144 |
| Appendix H | Article 21 Pilot Program | 150 |
| Appendix I | Distinguished Professor Side Letter | 155 |
| Appendix J | Adjunct Health Insurance Eligibility | 156 |
| Appendix K | Voluntary Phased Retirement Program | 158 |
| Appendix L | Labor Management Committees | 166 |
| Appendix M | Payment for Defined Projects Through Stipends | 168 |
| Appendix N | Baruch College Workload Credit in Executive Degree and International Master's Programs | 170 |
| Appendix O | HEO Discretionary Assignment Differential Pilot Program | 172 |

**III.  Supplemental Agreement on Continuing Education**  173

**IV.  Supplemental Agreement on Educational Opportunity Centers**  180

A.48

# PREAMBLE

AGREEMENT entered into this 21st day of October 2019 by and between THE CITY UNIVERSITY OF NEW YORK (hereinafter referred to as "CUNY" or the "University"), and the PROFESSIONAL STAFF CONGRESS/CUNY (hereinafter referred to as the "PSC").

WITNESSETH: WHEREAS, CUNY has had a long-standing policy that there exists an academic community of interest within The City University of New York ("CUNY") and that such community of interest includes Instructional Staff, and

WHEREAS, CUNY has been recognized as a "Public Employer" consistent with the terms and provisions of the Public Employees' Fair Employment Act of the State of New York, and

WHEREAS, CUNY elected to come under the rules of procedure and regulations of the New York State Public Employment Relations Board, and

WHEREAS, a secret ballot election was conducted by the New York State Employment Relations Board, and

WHEREAS, the members of the Instructional Staff in the unit hereinafter set forth freely selected the PSC as their representative for the purposes of collective negotiations and the settlement of grievances, and

WHEREAS, CUNY and the PSC affirm collective bargaining as a process to be used for the improvement of the University, and

WHEREAS, CUNY and the PSC seek to maintain and encourage, in accordance with law, full freedom of inquiry, teaching, research and publication of results, the parties subscribe to Academic Freedom for faculty members. The principles of Academic Freedom are recognized as applicable to other members of the Instructional Staff, to the extent that their duties include teaching, research and publication of results, the selection of library or other educational materials or the formation of academic policy.

NOW, THEREFORE, it is agreed:

1

# ARTICLE 1
## RECOGNITION

1.1     The PSC is recognized by The City University of New York for the effective period of this Agreement as the exclusive collective negotiating representative under the Public Employees' Fair Employment Act for the persons in the following titles:

| | |
|---|---|
| Professor | Associate Registrar |
| Associate Professor | Assistant Registrar |
| Assistant Professor | Chief College Laboratory Technician |
| Adjunct Professor | Senior College Laboratory Technician |
| Adjunct Associate Professor | College Laboratory Technician |
| Adjunct Assistant Professor | Adjunct College Laboratory Technician |
| Adjunct Lecturer | College Physician |
| Adjunct Lecturer (Doctoral Student) [1] | Higher Education Officer |
| Non-Teaching Adjunct (I-V) | Higher Education Associate |
| Non-Teaching Adjunct (Doctoral Student) [1] | Higher Education Assistant |
| Lecturer | Assistant to Higher Education Officer |
| Graduate Assistant ("A," "B," "C") | Chairperson of College Departments |
| Graduate Assistant "D" [1] | Distinguished Professor |
| Instructor | Substitute (full-time title) |
| Instructor (Nursing Science) | University Professor |
| Research Associate | Distinguished Lecturer |
| Research Assistant | Clinical Professor |

in the Hunter College Elementary School and Hunter College High School:

| | |
|---|---|
| Chairperson of Department | Teacher of Library |
| Teacher | Placement Director |
| Assistant Teacher | Educational and Vocational |
| Substitute Teacher |   Teacher |
| Temporary Teacher | Teacher (Hourly) |
| Guidance Counselor | |
| Campus Schools College Laboratory Technician | |
| Campus Schools Senior College Laboratory Technician | |

and in the Early Childhood Centers: Teacher, Assistant Teacher.

---

[1] Effective December 22, 2015

2

A.50

The following titles are included in the unit but excluded from the provisions of the Agreement with the exception of Articles 3, 4, 8, 20, 21, 21A, 24.3, 24.4, 25.5, 26, 27, 27A, 34, 38, 39, 40, 41, 42, and 43.

| | |
|---|---|
| Medical Professor<br>    (Basic Sciences) | Adjunct Medical Professor<br>    (Basic Sciences) |
| Associate Medical Professor<br>    (Basic Sciences) | Adjunct Associate Medical Professor<br>    (Basic Sciences) |
| Assistant Medical Professor<br>    (Basic Sciences) | Adjunct Assistant Medical Professor<br>    (Basic Sciences) |
| Medical Professor (Clinical) | Adjunct Medical Professor (Clinical) |
| Associate Medical Professor<br>    (Clinical) | Adjunct Associate Medical Professor<br>    (Clinical) |
| Assistant Medical Professor<br>    (Clinical) | Adjunct Assistant Medical Professor<br>    (Clinical) |
| Medical Lecturer | Adjunct Medical Lecturer |
| Distinguished Lecturer – Medical Series | Clinical Professor – Medical Series[2] |

The following titles are included in the unit but excluded from the provisions of the Agreement with the exception of Articles 3, 4, 8, 20, 21, 21A, 23.1, 23.4, 24.3, 26, 27, 27A, 35, 38, 39, 40, 41, 42 and 43.

| | |
|---|---|
| Law School Professor | Law School Adjunct Associate Professor |
| Law School Associate Professor | Law School Adjunct Assistant Professor |
| Law School Assistant Professor | Law School Non-Teaching Adjunct I, II, III |
| Law School Instructor | Law School Lecturer |
| Distinguished Lecturer – Law School | Law School Library Professor |
| Law School Adjunct Professor | Law School Library Associate Professor |
| | Law School Library Assistant Professor |

The following titles are included in the unit but excluded from the provisions of the Agreement with the exception of Articles 20, section 20.3, 36, 38, 39, 40 and 41.

| | |
|---|---|
| Resident Professor | Resident Instructor |
| Resident Associate Professor | Resident Lecturer |
| Resident Assistant Professor | |

The following title is included in the unit but excluded from the provisions of the Agreement with the exception of Articles 3, 4, 5, 7, 8, 17, 38, 39, 40, 41, and 43.

Continuing Education Teacher

---

[2] Effective August 25, 2016

3

A.51

The following title is included in the unit but excluded from the provisions of the Agreement with the exception of Articles 3, 4, 5, 7, 8, 17, 38, 39, 40, 41, and 43.

Postdoctoral Fellow

Employees in the following titles in the Educational Opportunity Centers are included in the unit but excluded from the provisions of the Agreement except as provided in the Supplemental Agreement attached hereto:

EOC Lecturer
EOC HEO Series
EOC College Laboratory Technician
EOC Adjunct Lecturer
EOC Adjunct College Laboratory Technician
EOC Substitute (full-time title) titles

The following title is included in the unit but excluded from the provisions of the Agreement with the exception of Articles 1, 3, 4, 8, 23, 24.3, 26, 38, 39, 40, 41, 42, and 43:

Visiting (full-time title) one-half to full-time.

Effective August 25, 2006, the following title in the Hunter College Elementary School and Hunter College High School is included in the unit but excluded from the provisions of the Agreement with the exception of Articles 1, 3, 4, 8, 24.5(a), 38, 39, 40, 41, 42, and 43:

Occasional Per Diem Substitute Teacher

Effective August 25, 2016, the following titles are included in the unit but excluded from the provisions of the Agreement with the exception of Articles 3, 4, 5, 7, 8, 17, 20, 33.5, 38, 39, 40, 41, 42 and 43.

CUNY Language Immersion Program ("CLIP") Instructor
CUNY Start Instructor

Terms and conditions for the CLIP Instructor and CUNY Start Instructor are set forth in Appendix D.

4

Employees in the following functions or titles are excluded:

| | |
|---|---|
| Chancellor | Office of the Senior Vice Chancellor for |
| Executive Vice Chancellor | Labor Relations |
| Sr. Vice Chancellor | Director (b.) |
| Vice Chancellor | Provost |
| Associate Vice Chancellor | Office of the Vice Chancellor for Human |
| President | Resources Management |
| Deputy to the President | Office of the General Counsel |
| Sr. Vice President | of the Board of Trustees |
| Vice President | Labor Designees (c.) |
| Assistant Vice President | Office of the Labor Designee (d.) |
| Dean | Chief Diversity Officer |
| Associate Dean | Personnel Directors |
| Assistant Dean | Office of the Personnel Director (e.) |
| Principal-Hunter College | Chief Librarian |
| Elementary and High Schools | Administrative Series |
| Director of Campus Schools | Dean of CUNY Law School |
| Executive Assistants to: | Law School Chief Librarian |
| The Board Chairperson, | Dean of CUNY Medical School |
| Chancellor, | Business Manager (f.) |
| Executive Vice Chancellor, | Hunter College Campus Schools |
| Sr. Vice Chancellor, | Assistant Principal |
| Vice Chancellors, | (Administration) (g.) |
| Associate Vice Chancellor (j.), | Dean of Executive Search and Evaluation |
| College Presidents, | University Office of Executive Search and |
| Sr. Vice President (a.), | Evaluation (h.) |
| Vice President (a.) | Occupational Safety and Health Officer |
| Office of the Chancellor | Visiting (full-time title) less than one-half time |
| Office of the Secretary | |
| of the Board of Trustees | |

EOC Director, Associate Director, Assistant Director, Coordinator (i.)

(a)     Not more than one excluded Executive Assistant per Vice President.

(b)     University Directors, SEEK and CD Directors, Educational Opportunity Center Directors, Student Center Directors, Public Relations Directors, Security Directors, and Directors of Continuing Education.

(c)     Not more than a number equal to two times the number of colleges, plus two (for the Central Office).

(d)     Not more than two members of the instructional staff in addition to the Labor Designee.

5

A.53

(e)      Not more than four members of the instructional staff in addition to the Personnel Director.

(f)      Not more than one per campus.

(g)      Not more than one in the Hunter College Elementary School and not more than two in the Hunter College High School.

(h)      Not more than two members of the instructional staff in addition to the Dean of Executive Search and Evaluation. Effective January 1, 2020, not more than three members of the instructional staff in addition to the Dean of Executive Search and Evaluation, provided that no incumbent employee's representation status shall be changed while he/she remains in his/her current position.

(i)      Number of Coordinators not to exceed those specified in contract between SUNY and the individual college.

(j)      Not more than one excluded Executive Assistant per Associate Vice Chancellor and not more than four in total, provided that no incumbent Executive Assistant's representation status shall be changed.

In addition to the excluded functions or titles already identified in Article 1, effective August 25, 2016, each college and the Central Office may exclude up to three additional positions for employees newly appointed to those positions; no employee's representation status shall be changed while he/she remains in his/her current position.

1.2      It is understood that nothing contained in this Article shall be construed to prevent the Board of Trustees of The City University of New York, (hereinafter referred to as the "Board") or any University official from meeting with any individual or organization to hear views on any matters, except that as to matters so presented which are proper subjects of collective negotiations, and covered by a term of this Agreement, any changes or modifications shall be made only through negotiation and agreement with the PSC.

## ARTICLE 2
## CUNY-PSC RELATIONSHIPS

2.1      The parties agree to maintain the academic character of the University as an institution of higher education.

2.2      The entire Agreement between the parties consists of the terms herein stated, and this Agreement terminates all prior Agreements and understandings. All Bylaws, policies and resolutions of the Board, and all Governance plans and practices of the Colleges and of the departments, as

6

A.54

Case 1:22-cv-04032-JSR Document 51 Filed 06/22/2022 Page 59 of 279

currently in effect, or as the same may be hereafter adopted, supplemented or amended, shall be subject to the said stated terms of this Agreement.

2.3     Nothing contained in this Agreement shall be construed to diminish the rights granted under the Bylaws of the Board to the entities and bodies within the internal structure of CUNY so long as such rights are not in conflict with a stated term of this Agreement.

2.4     The rights, functions and powers of the Board and its officers and agents, and of the officers of CUNY, under the applicable law of the State and the Bylaws of the Board, including the Board's right to alter or waive existing Bylaws or policies in accordance with the procedures specified in the Bylaws shall remain vested in the Board and in said officers and agents, subject to the following:

(a)     The Board shall supply the PSC with three copies of the Board's Bylaws and written policies.  If there is an inconsistency or conflict between an existing Bylaw or policy of the Board and a stated term of this Agreement, the said term of this Agreement shall govern, and the Board shall promptly cause its Bylaws to be amended or repealed to conform therewith.

(b)     The Board shall not adopt any new or amended Bylaws, policy or resolution which conflicts with a stated term of this Agreement.  In the event any such Bylaw, policy or resolution is adopted by the Board, the said term of this Agreement shall nevertheless govern.

(c)     In the event it is proposed that a Bylaw, procedure or policy respecting a term or condition of employment of all or some of the employees covered by this Agreement be adopted, amended or rescinded by resolution of the Board, the PSC shall be given notice and an opportunity to consult in respect of said action prior to said action being taken or becoming effective, in the manner specified below:

(i)     The Board or its agent shall furnish the PSC with three copies of all proposed resolutions to adopt, amend or rescind a Bylaw at such time as a standing Committee of the Board or, in the event a committee does not consider the resolution in advance, as soon as the Board as a whole receives a copy of the text of such resolutions or as soon thereafter as practicable, but in no event later than the time the Board's Committee delivers notice of proposed Bylaw changes to the Board.

(ii)    The Board or its agent shall furnish the PSC two copies of the agenda of each regular or special meeting of the Board at the time said agendas are made available to members of the Board, and two copies of the minutes of Board meetings at the time said minutes are made available to members of the Board.

7

A.55

(iii)    If a standing Board Committee has scheduled hearings on any proposed Board action respecting a term or condition of employment of employees covered by this Agreement, the PSC shall, on request, be permitted to participate in such hearing on such terms as the appropriate Committee shall determine.

(iv)    The PSC may request to be heard by the Board at a regularly scheduled or special meeting in order to speak to any item of the Board's agenda, provided that such request is made known to the Board Chairman not less than three (3) days prior to the meeting.

(v)    Upon the delivery to a standing Committee of the Board of any proposal for a Board resolution respecting a term or condition of employment of employees covered by this Agreement, or upon the appearance on the Board's agenda of any such resolution, the PSC may request consultation with the Chancellor or the Chancellor's designee in respect of such proposed Board action, in advance of its being taken, and such opportunity for such advance consultation shall be provided unless manifestly impracticable, and the Chancellor or the Chancellor's designee, prior to the Board's action, shall report to the Board the substance of such advance consultation, it being understood that the PSC's consent to the Board's action shall not be required prior to such action being taken or becoming effective, unless the Board action shall be inconsistent with a stated term of this Agreement.

2.5    The Chancellor shall meet with the President of the PSC and a reasonable number of other officers of the PSC twice each semester for the purpose of consultation in respect of the terms and conditions of employment of employees covered by this Agreement, and of matters necessary to the implementation of this Agreement which are University-wide in nature. Other matters may be placed on the agenda by the Chancellor or the PSC by mutual agreement. In emergencies which prevent the Chancellor's attendance, the Chancellor's designee shall meet with the PSC. Each party shall submit to the other a list of particular matters to be discussed not less than five (5) days before the scheduled date of meeting.

2.6    Each College President shall meet with the PSC chapter chairperson and a reasonable number of other officers of the PSC, which may, at the discretion of the PSC, include cross campus representation, twice each semester for the purpose of consultation in respect of matters directly affecting the terms and conditions of employment of employees of said College covered by this Agreement, and matters necessary to the implementation of this Agreement which are local in nature. Other matters may be placed on the agenda by the President or the PSC by mutual agreement. In emergencies which prevent the President's attendance, the President's designee shall meet with the PSC. Each party shall submit to the other a list of particular matters to be discussed not less than five (5) days before the scheduled date of meeting.

2.7    Nothing contained herein shall prevent the PSC from consulting with the Chancellor and the College Presidents, as described above, at times other than those set forth if matters within the area of collective negotiation arise of an urgent or emergency nature.

8

A.56

# ARTICLE 3
## UNIT STABILITY

Any group of employees in the present collective negotiation unit whose group classification is changed during the life of this Agreement will remain in the unit for the duration of this Agreement.

# ARTICLE 4
## UNION DUES AND MEMBERSHIP[3]

4.1   Check-Off:

a)   The University agrees to the principle of exclusive check-off of annual PSC dues on behalf of each represented employee who elects to join the union in amounts to be determined by the PSC in accordance with the forms and procedures approved by the appropriate offices of the City of New York or State of New York.  Authorizations to withhold dues will be reported to the appropriate office of the University.  The employer (or its designee) shall commence deduction of dues as soon as practicable, but in no case more than 30 days after receiving the report from PSC of a signed dues authorization card and shall ensure the prompt remission of dues to the PSC.

b)   The right to membership dues shall remain in effect until: 1) the employee is no longer employed at CUNY in a position represented by the PSC; or 2) the PSC notifies the University that the employee has revoked his/her dues check-off authorization.

   i.   When an employee is re-employed at the same college within a period of one year in a title represented by the PSC, the employee shall continue to be covered by the same dues check-off authorization card and not be required to sign another authorization card.  The University will issue appropriate administrative instructions to all colleges to ensure compliance with this provision.

   ii.   When an employee in a PSC title is promoted or reclassified to another title represented by the PSC, the dues check-off shall continue uninterrupted.  The University will issue appropriate administrative instructions to all colleges regarding this provision.

   iii.   When an employee in a PSC title returns from an approved leave of absence, with or without pay, or from a layoff, or is reappointed or temporarily appointed in the same or another title represented by the PSC, any dues check-off authorization in effect prior to the approved leave of absence or layoff shall be reactivated.

---

[3] The provisions set forth in Article 4.1 herein concerning check-off are effective June 28, 2018.  For the period December 1, 2017 through June 27, 2018, the provisions of Article 4 of the 2010-2017 collective bargaining agreement continued in effect.

9

4.2     New Member Information and Orientations:

    a)     Within thirty (30) days of an employee's first being employed, re-employed, newly promoted or transferred to the PSC bargaining unit, the University shall notify the PSC of the employee's name, job title, employing college or unit, CUNY ID number, last four digits of the Social Security number, department, work location, work email address, home address, and work phone number, to the extent that one has been designated in CUNYfirst.

    b)     Where orientation kits are supplied to new employees, the PSC shall be permitted to have union literature included, provided that such literature is acceptable to the University Office of Human Resources Management.  Online orientation materials shall include an electronic link to the PSC website, and PSC membership cards provided to the colleges by the PSC shall be available in the college Human Resources offices.

    c)     Within sixty (60) days of an employee's first being employed, re-employed, newly promoted or transferred to the PSC bargaining unit, the University shall allow a duly appointed representative of the PSC to meet with such employee for a reasonable amount of time during his or her work time, without charge to leave credits, provided that such meeting is scheduled in consultation with a designated representative of the college or constituent unit of the University to which the employee is appointed.  This requirement may be satisfied for employees attending a formal employee orientation program by allowing PSC representative/s a reasonable amount of time during the program to provide membership information to employees.

## ARTICLE 5
## INFORMATION AND DATA

5.1     The University, through the Office of the Senior Vice Chancellor for Labor Relations, shall make available to the PSC, upon its reasonable request and within a reasonable time thereafter, such statistics and financial information related to the collective negotiation unit and in possession of the University as are necessary for the implementation of this Agreement and for negotiation of a successor agreement. It is understood that this provision shall not be construed to require the University to compile information and statistics in the form requested if not already compiled in that form, unless mutually agreeable.

5.2     The University shall make available to the PSC:

    (a)     Two copies of the proposed Annual University Budget immediately upon its receipt by the Board.

    (b)     The name, title, salary, CUNY ID number, college, department and tenure status of each member of the negotiation unit, and whether an employee is in a substitute title.  Such

10

A.58

data shall be made available in electronically sortable format once during each Fall and Spring semester, by October 15 and March 15.

## ARTICLE 6
## REASSIGNED TIME

6.1   Reassigned time for the handling of grievances and implementation of this Agreement shall be granted:

(a)      to designees of PSC to a maximum aggregate for all campuses (including the Central Office) of 123 classroom contact hours for each semester. 120 hours shall be apportioned amongst the various colleges of The City University of New York with a minimum of 3 hours to be apportioned to each college.

(b)      to an officer of the PSC, full time.

6.2   Any designee under 6.1(a), who is a non-teaching member of the Instructional Staff, may be granted a maximum of one day reassigned time each week from August 30 until the day after the Spring commencement of the academic year. The reassigned time granted to such designee(s) of the PSC during the Spring semester may be continued during the period from the day subsequent to the Spring commencement of the college through August 29 up to a maximum aggregate for all colleges (including the Central Office) of two days of reassigned time each week without further charge. Reassigned time for additional designees during the period from the day subsequent to the Spring commencement until August 29 may be purchased by the PSC in accordance with Section 6.5 below. For purposes of this article, a day of reassigned time shall be the equivalent of six classroom contact hours.

6.3   The names of such PSC designees shall be supplied in writing to the President of each college, with a copy to the Senior Vice Chancellor for Labor Relations, no later than prior to the Spring commencement preceding the beginning of the fall semester and no later than two months preceding the beginning of the spring semester for which such reassigned time is sought. No member of the Instructional Staff who is not a full-time employee in this unit may be eligible for such reassigned time.

6.4   Such reassigned time may not be used to solicit PSC membership.  Effective August 25, 2016, neither PSC grievance counselors nor PSC principal officers may serve as a Department Chairperson.

6.5   Consistent with the proper staffing of college and university programs and services, the University will permit the PSC to purchase reassigned time for additional designees. Such reassigned time shall be purchased at the adjunct rate appropriate to the designee. The amount of reassigned time under this paragraph shall be subject to agreement between the parties.

11

A.59

# ARTICLE 7
## ORGANIZATIONAL USE OF FACILITIES

7.1   Upon request to the President or his or her designee, the college chapter of the PSC shall be permitted to meet at the college if appropriate facilities are available.  All requests must be in writing at least three days prior to the requested meeting.

7.2   The PSC shall be permitted to use all college mailroom and electronic mail facilities for the distribution of PSC communications.

7.3   At each college campus, the President or his or her designee shall assign two (2) bulletin boards for the exclusive use of the PSC for the purpose of posting PSC notices.  The number of bulletin boards at each college campus shall not exceed eight (8). However, the PSC shall be entitled to post notices on existing college bulletin boards customarily used for general notices to Instructional Staff, such as in the Faculty Lounge and in the Faculty Dining Room.

# ARTICLE 8
## NON-DISCRIMINATION

8.1   Neither the University nor the Union will interfere with, restrain or coerce the employees covered by this Agreement because of membership in or non-membership in or lawful activity on behalf of the Union. Neither the University nor the Union will discriminate in respect to hire, tenure of employment or any terms or conditions of employment of any employee covered by this Agreement because of sex, race, national origin, religion, sexual orientation, political belief or membership in, or lawful activity on behalf of the Union. The University and the Union shall comply with applicable provisions of federal, state and municipal laws and ordinances regarding discrimination in employment because of age or because of disability.

The City University and the PSC recognize that sexual harassment is illegal under Federal, State, and City law.  They jointly resolve that sexual harassment will not be tolerated within the University.  The City University will make copies of its policy against sexual harassment available at each College, including the Central Office.

8.2   The Union agrees that it will admit to membership and represent equally all members in the bargaining unit.

12

A.60

# ARTICLE 9
## APPOINTMENT AND REAPPOINTMENT

9.1    When reasonably practicable, initial full-time appointment to the Instructional Staff shall be made, in writing, by the President or his or her designee and approved by the Board prior to the effective date of appointment. Where such written appointment in advance of the effective date is not practicable, appointment shall be made by the President or his or her designee, subject to final action by the Board; in such instances, the President or his or her designee shall advise the appointee, in writing, that the appointment is subject to Board approval.

When a non-tenured or non-certificated member of the instructional staff does not appear at the college to perform his/her duties and fails to receive an authorized leave of absence, the individual shall be considered to have abandoned his/her position, and the college shall have no further obligation to that individual under the following circumstances: for a full-time member of the instructional staff, such abandonment shall be deemed to have occurred after 10 consecutive days of absence, other than Saturdays, Sundays or legal holidays. For an adjunct, such abandonment shall be deemed to have occurred after unauthorized absence from the first week of scheduled classes or other assigned duties. In either case the college shall notify the staff member in writing by certified mail that abandonment of his/her position has occurred.

In any grievance filed pursuant to abandonment of a position based upon the above, the burden of proof shall be upon the grievant to show:

1.    He/She taught assigned classes or performed his/her duties on the days at issue, or

2.    He/She applied for and received a prior approved leave for the days at issue, or

3.    He/She was unable to report for work or give notice because of an emergency which made it impossible to report for work or give notice

9.2    In the event that the Board does not approve of the appointment, and the appointee has already commenced work, the appointee shall have the option of receiving compensation pro rata for time worked or accepting a college appointment for the duration of that single semester.  When, however, the Board does not approve the appointment for cause involving matters such as falsified credentials or inaccurate vita, the University shall be under no obligation other than payment for work performed to that point.

9.3    All initial full-time appointments to the Instructional Staff (except for those of substitutes and distinguished professors) shall be for one year or to the end of the academic year in which the appointment takes effect.  For appointments to the HEO series which are made on the basis of the fiscal year, the fiscal year shall obtain.

13

A.61

9.4 All full-time reappointments to the Instructional Staff shall be for no less than one year, except for substitutes and for retirement leave. Employees, other than those who announce their bona fide intent to retire and meet applicable conditions contained in section 3107 of the Education Law, shall be compensated in a lump sum for all annual leave or compensatory time owed on the final date of the appointment or in the case of resignation as of the final work day.

9.5 Part-time appointments may be for less than one year, except as provided in Article 10.1(a)3.

9.6 Appointments to the title of Graduate Assistant shall be in accordance with the provisions of 11.2 of this Agreement.

9.7 Substitutes are temporary employees appointed to fill vacancies caused by leaves and/or emergencies; such persons shall have no presumption of retention.

9.8 Instructors and non-certificated Lecturers with four or more years of continuous full-time service in those titles immediately preceding appointment to the rank of Assistant Professor shall receive two years of service credit toward the achievement of tenure in the title Assistant Professor.

By August 31, preceding the first full-year appointment to the title Assistant Professor, the employee shall state, in writing, his/her preference regarding whether or not he/she wishes to waive the service credit toward tenure provided in the previous paragraph. In the event the employee wishes the service credit waived and the President or the President's designee approves, the service credit shall be waived irrevocably. In the event that the employee wishes to have the service credit applied or does not state a preference, the service credit shall apply. Approval or denial of the request shall not be subject to the provisions of Article 20.

9.9 When a College President determines not to make a recommendation to the Board for reappointment of a full-time member of the instructional staff or promotion of a full-time member of the instructional staff recommended to him/her by a College P&B Committee or other appropriate body, the individual affected by that decision shall be notified of the Committee's favorable recommendation and of the President's decision. The notice shall not state the reasons for the President's action.

Within ten (10) calendar days, excluding Saturdays, Sundays and legal holidays, after receipt of said notice, the affected individual may submit to the President a signed request for a statement of the reasons for the President's action. Within ten (10) calendar days, excluding Saturdays, Sundays and legal holidays, after receipt of the request, the President shall furnish a written statement of his or her reasons to the affected employee.

The President shall not be required thereafter to justify his or her decision or his or her reasons. It is recognized that the President has an independent duty to recommend to the Board for appointment, reappointment, tenure or promotion only those persons he/she is reasonably certain will contribute to the improvement of academic excellence at the college and to consider institutional factors.

14

A.62

9.10    In the event that a full-time member of the instructional staff appeals through academic channels a negative decision regarding reappointment, tenure, a Certificate of Continuous Employment, or promotion, and the appeal is not successful, the individual shall be so notified by the President or his/her designee in writing.

For a pilot period beginning with the 2016-17 academic year and extending through the end of the 2023-2024 academic year, the President shall be required to respond to an appeal from a full-time faculty member regarding a negative decision on reappointment or tenure within 120 calendar days after the submission on appeal is complete, including the submission of any additional materials and the meeting with the President, if the college permits one, whichever comes later.

Within 10 calendar days, excluding Saturdays, Sundays and legal holidays, after receipt of said notice the affected individual may submit to the President a signed request for a statement of reasons for the denial of the appeal. Within ten (10) calendar days, excluding Saturdays, Sundays and legal holidays, after receipt of the request, the President shall furnish a written statement of the reason(s) for denial to the affected employee.

It is recognized that the President has an independent duty to recommend to the Board for appointment, reappointment, tenure or promotion only those persons he/she is reasonably certain will contribute to the improvement of academic excellence at the college and to consider institutional factors.

Consistent with Section 20.5 of this Agreement the President's academic judgment shall not be reviewable by an arbitrator.

9.11    An individual who has received a statement of reasons pursuant to section 9.9 may not, upon appeal to the President, receive a second statement of reasons pursuant to section 9.10.

9.12    The reasons referred to in Section 9.10 of Article 9 (Appointment and Reappointment) are understood to be the reasons of the President. Further, where no academic appeals procedure is in existence or where such currently existing procedures do not culminate in an appeal to the President there shall be a direct appeal to the President, and the academic channels in the first paragraph of Section 9.10 may be limited to a direct appeal to the President.

15

A.63

# ARTICLE 10
# SCHEDULE FOR NOTIFICATION OF
# REAPPOINTMENT AND NON-REAPPOINTMENT

10.1    Members of the Instructional Staff other than employees in the HEO Series and in the Hunter College Campus Schools shall receive written notice of reappointment or of non-reappointment on the following schedule:

(a)    Instructional Staff Members in Tenure-Bearing and Certificate-Bearing Titles, Adjunct and Instructor Titles:

1.    Persons hired on an annual basis in their first year of service shall receive such notice as follows:

Persons hired on September 1, on or before April 1;
Persons hired on February 1, on or before May 1;
Persons hired in Institutes and Centers, on or before May 1.

An individual who has had prior service in another unit of the University shall be deemed to be serving his or her initial year of appointment in the first full year of service at the new unit. This provision shall not be deemed to affect the accumulation of service credit toward tenure or toward a certificate of continuous employment.

2.    Persons hired on an annual basis in their second or later years of continuous service shall receive such notice on or before December 1, except that:

Lecturers in their second year, on or before April 1;
Persons hired in Institutes and Centers, on or before May 1;
Persons reappointed as the direct result of a proceeding resolving a grievance or complaint under Article 20 of the then current agreement between the University and the PSC (i.e., a Step I decision, a Step II decision, a settlement agreement, arbitral award, or select faculty committee recommendation), on or before May 1.

3.    Persons in adjunct titles hired on a semester basis shall receive such notice on or before December 1 in the Fall semester or May 15 in the Spring semester. Such notification of appointment shall be subject to sufficiency of registration and changes in curriculum which shall be communicated to the employee as soon as they are known to the appropriate college authorities.

An employee who has served as an adjunct in the same department of the college for not fewer than six (6) consecutive semesters (exclusive of summer sessions)

16

A.64

during the three (3) year period immediately preceding the appointment, to whom the college intends to offer another appointment, shall be notified on or about May 15 of appointment for both the following Fall and Spring semester. Such notification of appointment shall be subject to sufficiency of registration and changes in curriculum in each semester, which shall be communicated to the employee as soon as they are known to the appropriate college authorities. Such notification shall also be subject to all other conditions of employment including, but not limited to, the workload provisions of Article 15.2.

Effective the Fall 2008 semester, where an adjunct's continuous appointments are immediately followed by an appointment to a Substitute full-time position on the instructional staff with no break in service, and the period of Substitute service is immediately followed by continuous appointment to an adjunct title with no break in service, the period of adjunct service immediately preceding the Substitute appointment will be added to the continuous adjunct service immediately following the Substitute service, as though there were no break in adjunct service, for the purpose of determining eligibility for appointment for both the following Fall and Spring semester.

4. Multi-year Appointments for Teaching Adjuncts:

The parties agree to a pilot program that establishes multi-year appointments for teaching adjuncts beginning with the 2016-2017 academic year, and three-year appointments shall continue to be available starting in each Fall semester through Fall 2023. See Appendix E.

(b) All other members of the Instructional Staff not otherwise specified shall receive such written notice:

1. On or before June 1 in the first year of service. An individual who has had prior service in another unit of the University shall be deemed to be serving his or her initial year of appointment in the first year of service at the new unit. This provision shall not be deemed to affect the accumulation of service credit toward tenure or toward a certificate of continuous employment.

2. On or before May 1 in their second year or later year of service.

10.2 All notifications shall be made by the President or his or her designee subject to financial ability and subject to ratification by the Board.

10.3 When timely notice of non-reappointment has once been given, but it is later determined in the grievance procedure that there was some irregularity in the original decision not to reappoint, a subsequent notice of non-reappointment, otherwise valid, given after the irregularity has been removed or corrected, shall be deemed timely for the purposes of this Article.

17

A.65

10.4   Teachers in tenure-bearing titles in the Hunter College Campus Schools shall receive notice of reappointment or of non-reappointment on the following schedule:

   (a)   Teachers hired on an annual basis on September 1 in their first year of service shall receive such notice on or before May 1.

   (b)   Teachers hired on an annual basis in their second or later years of continuous service shall receive such notice on or before April 1.

## ARTICLE 11
## CLASSIFICATION OF TITLES

11.1   The title Lecturer shall be a tenure-bearing (certificate of continuous employment) title used for full-time members of the faculty who are hired to teach and perform related faculty functions, but do not have a research commitment.  A certificate of continuous employment shall be granted in accordance with the provisions of Article 12.  Persons appointed to this rank shall be entitled to all faculty retirement and other fringe benefits and shall be scheduled in accordance with the provisions of Article 14.  In the Schools of General Studies, Lecturers who are employed primarily to perform professional library functions shall not be required to perform guard duty or maintenance duties.

11.2   Graduate Assistant:

This category was designed to provide support for full-time CUNY students to enable them to complete their graduate degrees in a reasonable time while receiving financial support and gaining teaching experience.  This title designates a student who is the equivalent of a graduate assistant at other universities and who is receiving graduate student financial aid similar to the undergraduate work study financial aid plan.

First priority shall be given to graduate students in The City University for such graduate fellowships.

No persons shall be appointed to the title Graduate Assistant more than five years consecutively except when special permission is requested by the executive officer of the doctoral program in which the student is enrolled and the Chairperson of the department in which he or she is employed.  In no instance shall such extensions be granted for more than two additional appointments.  Appointments may be for less than one year.

   (a)   The employment, retention, evaluation or assignment of persons employed in the title Graduate Assistant, to the extent that it is based upon their status, progress and evaluation as graduate students, shall not be subject to the grievance procedure established in this contract.

18

A.66

(b)    A joint committee of the PSC and the University shall be established to develop a University-wide formula for the employment and distribution of Graduate Assistants in the University based on proposals submitted by the faculty of the Graduate Division.

(c)    Starting January 1, 2020, the University will make available up to $700,000 in incremental amounts to enable doctoral students in their first five years of enrollment in a Ph.D. program who were not previously enrolled in the New York State Health Insurance Program (NYSHIP) and who have been admitted to a Ph.D. program on a tuition-only basis to receive health insurance through the New York State Health Insurance Program to the extent that such students are appointed to titles within the PSC bargaining unit and meet the eligibility requirements for New York State Health Insurance Program coverage. A labor management committee will be established no later than December 1, 2019, to discuss implementation of expanded access to the New York State Health Insurance Program for graduate employees.[4]

11.3    The regular full-time academic title shall be used for those members of the full-time Instructional Staff of a College within the City University who assume teaching or related assignments in a University session which are in addition to normal full-time assignments. The extent of such additional assignments shall be limited by the multiple position regulations of the Board.

11.4    The titles of Adjunct College Laboratory Technician, Adjunct Lecturer, Adjunct Assistant Professor, Adjunct Associate Professor or Adjunct Professor shall be used for people who are not full-time members of The City University of New York faculty and who teach part-time or who have other part-time assignments in the University. The assignment of title shall depend on meeting the relevant qualifications as stipulated by the Bylaws of the Board.

11.5    Hunter College Campus Schools

A teacher at the Hunter College Campus Schools who has achieved a Master's degree prior to appointment or during service as a substitute at the Campus Schools will receive service credit toward tenure for service rendered subsequent to the attainment of the Master's degree as a substitute in the area in which the Master's degree is held when he or she is appointed on a permanent line, on the following basis: One year of service credit for one full year of service; two years of service credit for two full years of service; three years of service credit for three or more full years of service.

11.6    University Professor

(a)    Appointment to the title University Professor shall not confer, nor shall time served in such title be credited as service toward the achievement of tenure in such position or any other position on the instructional staff. Appointment to such position or removal

---

[4] See Appendix L.

19

therefrom shall not deprive the person so appointed or removed of tenure in the highest position held with tenure prior to his/her appointment to such position or conjointly with such office.

(b)     Notwithstanding the provisions of section 6.4.b. of the bylaws, the term of appointment shall be for a period to be determined by the Chancellor, which may not exceed five years. Upon recommendation of the Chancellor, such person shall be eligible for one reappointment.

(c)     Compensation for employees in this title shall be the same as that for Distinguished Professors.

11.7    Distinguished Lecturer and Clinical Professor

(a)     Distinguished Lecturer

Appointment to the title Distinguished Lecturer is in accordance with the following principles:

- The Distinguished Lecturer title is a full-time, non-tenure-bearing faculty title.
- An individual in the title of Distinguished Lecturer is eligible for annual reappointment, but may not serve in the title for more than a total of seven years, except that Distinguished Lecturers on payroll as of May 1, 2016, are eligible for up to fifteen (15) additional annual appointments.
- Individuals who reach the seven-year limit during the term of the 2007-2010 collective bargaining agreement, or prior to the conclusion of negotiations for a successor to the 2007-2010 agreement, may be reappointed at the discretion of the college through the end of the academic year during which a successor to the 2007-2010 agreement is concluded.
- The salary range for the title will be from the minimum of the Lecturer schedule to the seven-year step on the Professor schedule.
- The position will be primarily a teaching position, but it may include research.
- The workload for Distinguished Lecturers will be the same as that of Professors in the college to which they are appointed.

(b)     Clinical Professor

Effective with the start of the 2008-09 academic year, the University will establish a Clinical Professor title. Appointment to the title Clinical Professor is in accordance with the following principles:

- The Clinical Professor title is a full-time, non-tenure-bearing faculty title.
- An individual in the title of Clinical Professor is eligible for annual reappointment, but may not serve in the title for more than a total of seven years, except that Clinical

20

A.68

Professors on payroll as of May 1, 2016, are eligible for up to fifteen (15) additional annual appointments.

- The salary range for the title will be from the minimum of the Lecturer schedule to the seven-year step on the Professor schedule.
- The position will be a full-time faculty position, the responsibilities of which will include teaching (including, in some cases, clinical instruction) and may include research.
- The workload for Clinical Professors will be the same as that of Professors in the college to which they are appointed.
- Effective August 25, 2016, when a Clinical Professor is hired by the Medical School, the salary range shall be from the minimum of the Medical Lecturer range to the maximum of the Medical Professor (Clinical) range. With the exception of the applicable salary ranges, the other terms and conditions of employment of Clinical Professors, as provided in Article 11.7(b), shall apply to Clinical Professors in the Medical School.

(c)     Prior to the start of the Fall 2016 semester, the total number of Distinguished Lecturers and Clinical Professors combined shall not exceed 125 at any time, University-wide. Effective with the start of the Fall 2016 semester, the total number of such positions combined shall not exceed 250 at any time, University-wide.

11.8     HEOs serving as Academic Advisors

On or after September 1, 1998, the University may appoint/assign employees in Higher Education Officer Series titles to serve as Academic Advisors. Academic Advisors assist students with academic rules and regulations and degree requirements. Specific duties may include:

- Screen requests for exceptions to the college's rules and practices;
- Advise students regarding academic probation and related matters;
- Assist students in the development of academic skills such as time management, note taking, test taking, study habits, etc.;
- Provide assistance to specialized populations such as disabled students and veterans (*e.g.,* accommodations for specific disabilities, special services that are available, etc.);
- Advise students in career exploration;
- Interact with the faculty, college advisory personnel and other administrative offices and academic departments;
- Assist in college's registration;
- Monitor student's progress in various credited and non-credited programs;
- Refer students to tutorial and counseling assistance;
- Coordinate tutoring activities and monitor student participation;
- Inform students regarding procedures for course selection and declaration of majors;
- Develop tutoring schedules;

21

A.69

- Coordinate Peer sessions, with referral to counselors as necessary;
- Train peer advisors and coordinate peer advisement;
- Participate in workshops and provide technical assistance to facilitate the transition of international students into college;
- Work closely with faculty and other student services personnel to facilitate educational planning and advisement for new and continuing students;
- Assist in the planning and developing of Freshman Year Program, which includes Freshman and other orientation programs, academic advisement models, outreach and referral strategies;
- Coordinate and conduct sessions on community and career information for students;
- Assist in planning special activities/projects to meet college, program, staff and student needs;
- Provide advisement regarding academic requirements, career opportunities, and scholarship information;
- Ensure the students are assigned to career department advisors when they complete certification requirements;
- Help students with their interaction with other college offices/services;
- Maintain and update student records; and
- Keep record of the numbers of the eligible and continuing credit students.

11.9    HEO Counselors

On or after July 1, 2006, employees in Higher Education Officer Series titles may be appointed or assigned as counselors. Employees in the Higher Education Officer series appointed or assigned as counselors may perform all of the functions currently performed by faculty serving as counselors, except for teaching academic courses in other academic departments and for performing the unique roles that faculty play in the governance of the University (*e.g.*, service on departmental personnel and budget committees) unless the college Governance Plan provides for such participation. It is understood that employees in Higher Education Officer Series titles who are appointed or assigned as counselors shall not be required to have a research commitment.

Colleges may continue to appoint or assign faculty as counselors.


# ARTICLE 12
## CERTIFICATE OF CONTINUOUS EMPLOYMENT

12.1    Members of this unit in the title Lecturer shall be eligible for a certificate of continuous employment upon a sixth full-time appointment in the title of Lecturer immediately preceded by five years of continuous full-time service in the title of Lecturer. In computing eligible time in service, such time shall commence with the first September of appointment.

22

A.70

12.2 When service has been continuous and a break in full-time service has occurred by virtue of a reduced schedule, such less than full-time service shall be prorated towards its equivalency in full-time service.

12.3 The certificate of continuous employment shall be valid only in the college or in the Educational Opportunity Center which makes the certificate or sixth appointment and shall carry with it the guarantee of full-time reappointment subject to continued satisfactory performance, stability in academic program, sufficiency of registration and financial ability.

12.4 The terms of this article do not apply to service in any title other than Lecturer.

12.5 Effective one year after initial appointment, no member of this unit in the title Lecturer shall be denied reappointment on the basis of professional incompetence unless he or she has been evaluated during at least three semesters (including the first year of appointment) according to the provisions contained in this Agreement, Article 18 and unless two of the last four evaluations indicate unsatisfactory professional performance.

12.6 An Instructor may be appointed in the title Lecturer immediately preceded by five years of continuous full-time service as an Instructor in the same department, in which case he or she shall receive a Certificate of Continuous Employment as a Lecturer.

23

A.71

# ARTICLE 13
## APPOINTMENTS AND REAPPOINTMENTS IN THE
## HIGHER EDUCATION OFFICER (HEO) SERIES

13.1   The normal appointment year for employees in the HEO series shall be July 1 through June 30.

13.2   An employee serving in a multiple-year appointment as of July 1, 1988 pursuant to the provisions of Article 13, sections 13.2 and 13.3, of the 1984-87 Agreement and the 1982-84 Agreement shall continue to serve until the expiration of that appointment.   Further reappointments, if granted, shall be subject to Sections 13.7, 13.8, or 13.9 below, as appropriate.  Appointments made under Section 13.3b of the 1982-84 and 1984-87 Agreements shall continue in effect.

13.3   Employees Hired Effective September 1, 1987 or Later Who Continue to Serve in the Same HEO Series Title

Employees hired effective September 1, 1987 or later who continue to serve in the same title in the Higher Education Officer series shall be subject to the following appointment and reappointment schedule:

(a)   Terms of appointment and reappointment

| | |
|---|---|
| First Full Year Appointment | One Year |
| First Reappointment | One Year |
| Second Reappointment | One Year |
| Third Reappointment | One Year |
| Fourth Reappointment | Two Years |
| Fifth Reappointment | Two Years |

(b)   Upon recommendation of the President and approval of the Board of Trustees, an employee who is granted a subsequent reappointment shall receive a Certificate of Continual Administrative Service.   Such employee shall not be subject to annual or multiple-year reappointments.

13.4   Employees Serving in the Higher Education Aide Title

(a)   Effective January 1, 1988, no new appointments shall be made to the title Higher Education Aide (HE Aide). Effective January 1, 1993 employees in the title HE Aide

24

A.72

shall have their titles converted to Assistant to Higher Education Officer and shall be placed on the Assistant to Higher Education Officer I salary schedule on the step equal to their current salary, or, if there is no equal salary step, then on the next higher salary step of the Assistant to HEO I salary schedule, except that employees converted from the HE Aide title who possess or thereafter attain all of the qualifications set forth in the Bylaws of The City University of New York for the position of Assistant to Higher Education Officer shall be placed on the salary step equal to their current salary, or, if there is no equal salary step, then on the next higher step of the Assistant to HEO schedule.

(b)    The schedule of reappointment for all employees whose titles are converted from HE Aide to the Assistant to HEO title shall be in accordance with Section 13.7 below.

13.5    Employees Serving in a Title in the Registrar Series

(a)    Effective January 1, 1988, no new appointments will be made to titles in the Registrar series, and no promotions will be made to titles in the Registrar series after January 1, 1988.  An employee who has tenure in a Registrar series title shall maintain his or her title and status during satisfactory service while continuing to perform job duties consistent with the Registrar series title held.  An employee in the Registrar series accruing time toward tenure shall maintain his or her title and status, subject to the regular reappointment processes and satisfactory service, while continuing to perform job duties consistent with the Registrar series title held.

Appointment to a higher-level position with increased duties and greater responsibility shall be made to a Higher Education Officer series title.  In the event the employee appointed to a HEO series title has tenure in a Registrar series title, the employee shall be placed on leave of absence from the Registrar series title.  A tenured member of the Registrar series who accepts, on or after January 1, 1988, a HEO series title at a college other than the college at which he or she was awarded tenure shall retain his or her tenure in the college in which it was awarded until the effective date of the second reappointment in the HEO series title, at which time the tenure shall transfer to the new college.

(b)    The first full-year appointment of a tenured member of the Registrar series to a HEO series title shall be for a one-year period, and the first and second reappointments shall each be for a one-year period.  A subsequent reappointment, if granted, shall be in accordance with Section 13.3b above.

(c)    The schedule of appointment and reappointment for non-tenured members of the Registrar series appointed to titles in the HEO series shall be in accordance with Section 13.8 below.

13.6    Any interruption of paid service, following a determination by the college that the demands of service permit such interruption, other than a child care leave, for any employee in a Higher Education Officer series title, of more than 60 calendar days during a period when an appointment is in effect shall break service, and the appointment effective as of the next July 1, if

25

A.73

recommended, shall be deemed to be the employee's first appointment under section 13.3a, provided however, that:

(a) if the interruption of paid service occurs during the first year of a multiple year appointment, the second year of the multiple year appointment shall be deemed to be the employee's first appointment under Section 13.3a;  and

(b) if the interruption of paid service occurs during the reappointment period in which the employee would normally be considered for a 13.3b appointment, then prior service shall be bridged if the duration of the interruption of paid services does not exceed six months. A full one year appointment following the return from the interruption of paid service, if granted, shall be required for consideration for a 13.3b appointment, and a subsequent reappointment, if granted, shall be in accordance with Section 13.3b above.

26

A.74

13.7     Employees Serving Prior to June 30, 1988 in a Single Title

Effective July 1, 1988, employees with at least one full year of continuous full-time service in a single title in the HEO series shall be subject to the following reappointment schedule upon the expiration of their current appointments:

<div align="center">

Reappointment Periods Upon Expiration
of Current Appointment in Effect on
September 1, 1987
(To be Read Across)

</div>

| Total Full Years of Service at Expiration of Appointment in Effect on September 1, 1987 | First Reappt | Second Reappt | Third Reappt | Fourth Reappt | Fifth Reappt | Sixth Reappt |
| --- | --- | --- | --- | --- | --- | --- |
| One Year | 1 | 1 | 1 | 2 | 2 | 13.3b |
| Two Years | 1 | 1 | 2 | 2 | 13.3b | |
| Three Years | 1 | 2 | 2 | 13.3b | | |
| Four Years | 2 | 2 | 13.3b | | | |
| Five Years | 1 | 2 | 13.3b | | | |
| Six Years | 1 | 1 | 13.3b | | | |
| Seven Years | 1 | 13.3b | | | | |
| Eight or more Years | 13.3b | | | | | |

27

A.75

13.8    Employees Appointed to a Higher Title in the HEO Series on or after September 1, 1987

When an employee with at least one full year of continuous full-time service in a HEO, Business Manager, or Registrar series title is appointed to a higher HEO series title on or after September 1, 1987, the appointment and reappointment schedules, effective with the first full year appointment, shall be as follows:

| Total Full Years of Service in HEO, Bus. Mgr., or Registrar Series Titles | First Full Yr Appt | First Reappt | Second Reappt | Third Reappt | Fourth Reappt | Fifth Reappt |
|---|---|---|---|---|---|---|
| One Year | 1 | 1 | 1 | 2 | 2 | 13.3b |
| Two Years | 1 | 1 | 2 | 2 | 13.3b | |
| Three Years | 1 | 2 | 2 | 13.3b | | |
| Four Years | 1 | 1 | 2 | 13.3b | | |
| Five Years | 1 | 2 | 13.3b | | | |
| Six Years | 1 | 1 | 13.3b | | | |
| Seven Years | 1 | 13.3b | | | | |
| Eight or more Years | 1 | 13.3b | | | | |

Reappointment Periods in New Titles (To be Read Across)

28

A.76

13.9    Employees Appointed to a Higher Title prior to September 1, 1987

Effective with the appointment or reappointment beginning July 1, 1988, employees with continuous full-time service in the HEO or Business Manager series who were appointed to a higher title prior to September 1, 1987 and have served for at least one full year in the higher title shall have the following reappointment schedule applied upon the expiration of their current appointments:

<div align="center">

Reappointment Periods Upon Expiration
of Current Appointment
(To be Read Across)

</div>

| Total Full Years of Service Upon Expiration of Current Appt. | First Reappt | Second Reappt | Third Reappt | Fourth Reappt | Fifth Reappt | Sixth Reappt |
|---|---|---|---|---|---|---|
| One Year | 1 | 1 | 1 | 2 | 2 | 13.3b |
| Two Years | 1 | 1 | 2 | 2 | 13.3b | |
| Three Years | 1 | 2 | 2 | 13.3b | | |
| Four Years | 2 | 2 | 13.3b | | | |
| Five Years | 1 | 2 | 13.3b | | | |
| Six Years | 1 | 1 | 13.3b | | | |
| Seven Years | 1 | 13.3b | | | | |
| Eight or more Years | 13.3b | | | | | |

29

A.77

Other Provisions

13.10  When an employee in a HEO series title serving in a multiple-year appointment or in an appointment with a Certificate of Continual Administrative Service is appointed to a higher title, only a substitute may be employed in the lower title and function during the full-year appointment and one full-year reappointment, if any, in the higher title. In the event the employee appointed to the higher title does not receive a reappointment in the higher title he/she shall be permitted to return to the lower title with either Certificate of Continual Administrative Service status, if applicable, or for the remaining period, if any, of the multiple-year appointment in the lower title. An employee with a Certificate of Continual Administrative Service, who after serving one full year in the higher title is reappointed in that title shall have a Certificate of Continual Administrative Service in the higher title.

13.11  During the period of service in the first appointment, first reappointment, second reappointment, and third reappointment in each title in the HEO series, the provisions of Sections 9.9, 9.10, and 9.11 of the Agreement shall not apply to employees covered by this Article. If, however, an employee has been appointed to a higher title in the HEO series (or in the Business Manager series prior to January 1, 1988), and has served continuously for a total of four or more full years in these titles, the provisions of Articles 9.9, 9.10, and 9.11 shall be applicable to the employee.

For purposes of Section 13.11, continuous service in the Registrar title series, immediately preceding appointment to a HEO series title, shall be treated as if it were service in a HEO series title, except as follows:

1.  If the person has achieved tenure, the provisions of Sections 9.9, 9.10, and 9.11 shall not apply during the first appointment and first reappointment in the HEO series title; or

2.  If the person is untenured and has served continuously for a total of four or more full years, the provisions of Sections 9.9, 9.10, and 9.11 shall not apply during the first appointment in the HEO series title.

13.12  (a)  An employee with a Certificate of Continual Administrative Service may be terminated after three consecutive unsatisfactory annual evaluations in three successive fiscal years (July 1-June 30) or after three consecutive annual evaluations in three successive years in which institutional factors specified in such evaluations indicate abolition of the function performed by the individual should occur.

Annual evaluations for HEO series personnel shall state whether the evaluation is satisfactory or unsatisfactory.

(b)  When a decision to terminate an employee is made under Section 13.12.a., the President or his/her designee shall advise the candidate in writing that his/her employment shall be terminated 120 calendar days from the date of such communication.

13.13    Notice of non-reappointment shall be given on or before April 1 in respect of the first and second reappointments, except in the case of persons who assume the duties of the position on October 1 or later in which case the notice of non-reappointment date shall be May 1. For all subsequent reappointments, employees shall be given notice of non-reappointment on or before March 1.

Effective with the start of the 2016-2017 academic year, the notice of non-reappointment shall be given to employees on or before April 1, except that employees who first assumed their position at a given college on or after October 1 of the preceding year shall be given notice on or before May 1 (for the first reappointment only).

13.14    Partial year appointments may be made in the following circumstances:

   (a)    when an initial appointment is made after July 1 for a year ending June 30; or

   (b)    when an employee announces a bona fide intention to retire and meets applicable conditions contained in section 3107 of the Education Law.

Appointments effective on or after July 1 but on or before September 1 shall be considered as if they were full-year appointments for purposes of applying this article.

13.15    Except as provided in 13.5, nothing contained in this article shall abrogate or diminish the University's right and authority to assign and/or reassign individuals in the HEO series or to discontinue employees consistent with Article 32.


## ARTICLE 14
## LEAVES AND HOLIDAYS

14.1    Effective August 25, 2006, the period of annual leave for full-time teaching members of the faculty shall be from the day subsequent to the spring commencement of each college until the third day, excluding Saturday and Sunday, preceding the thirtieth of August that follows such commencement, or an equivalent consecutive period.

14.2    (a)    For purposes of this section, service shall be deemed to include full-time paid leave, except that staff members who have announced their intention to retire shall not accrue annual leave or earn or use unscheduled holidays while exhausting accrued Annual Leave and Travia Leave prior to retirement. Pro-rata service credit shall be granted for any approved partial leaves of absence.

   (b)    For persons hired after January 1, 1988, and appointed on or after the second day of any month, the second and all subsequent years of service shall be deemed to commence on the first day of the month following the anniversary date.

31

A.79

14.3 (a)   For persons employed full-time in the College Laboratory Technician title series, the HEO title series, and the Business Manager title series prior to January 1, 1988, and all persons employed as Research Associates there shall be 25 work days per year of annual leave.

Persons employed full-time in the College Laboratory Technician title series, the HEO title series, and as Research Assistants on or after January 1, 1988, shall accrue annual leave at the following rates:

| | |
|---|---|
| During the 1st year of service | 15 days |
| During the 2nd through 11th year of service and thereafter | 15 days plus one additional day for each year of service to a maximum of 25 days |

(b)   For members of the instructional staff who, prior to January 1, 1988, are employed full-time as Librarians or in the Registrar series and who continue to be employed as Librarians or in the Registrar series there shall be 30 work days of annual leave.

Members of the instructional staff who are employed full-time as Librarians on or after January 1, 1988 shall accrue annual leave at the following rates through the end of the 2015-2016 academic year:

| | |
|---|---|
| During the 1st year of service | 20 days |
| During the 2nd through 11th year of service and thereafter | 20 days plus one additional day for each year of service to a maximum of 30 days |

Effective with the start of the 2016-2017 academic year, members of the instructional staff who are employed full-time as Librarians shall accrue 40 work days of annual leave annually.

(c) 1.   Effective August 25, 2006, for instructional staff members who, prior to September 1, 1998 were appointed or assigned full-time as Counselors or to other student personnel assignments, except those in the Higher Education Officer series, the period of annual leave shall be from the day subsequent to the spring commencement of each college until the third day, excluding Saturday and Sunday, preceding the thirtieth of August that follows such commencement, or an equivalent consecutive period.

2.   Effective August 25, 2006, instructional staff members who, on or after September 1, 1998, were appointed or assigned full-time as Counselors or to other student personnel assignments, except those in the Higher Education Officer series, will have the same number of annual leave days as instructional staff members appointed or assigned full-time as Counselors or to other student personnel assignments prior to September 1, 1998. The period of annual leave for such employees shall be from the day subsequent to the

32

A.80

spring commencement of each college until the third day, excluding Saturday and Sunday, preceding the thirtieth of August that follows such commencement or, in the discretion of the college, shall be scheduled in no less than four-week periods, except for the last of such periods, which shall consist of the remaining number of days of annual leave. The number of annual leave days shall be equivalent to the number of days, excluding Saturdays, Sundays and legal holidays, between the day after the spring commencement of the college until the third day, excluding Saturday and Sunday, preceding the thirtieth of August that follows such commencement.

14.4 All employees in the College Laboratory Technician and HEO title series who were employed prior to September 1, 1969 shall suffer no loss or diminution of prior vacation privileges, except as provided in Sections 14.2a and 14.9 hereof.

14.5 All employees in the Business Manager and fiscal officer title series who were employed prior to the inclusion of these titles under the instructional staff shall suffer no loss or diminution of prior vacation privileges, except as provided in Section 14.9 hereof.

Members of the instructional staff who are employed full-time in the Registrar title series prior to January 1, 1988 and who continue in Registrar series titles after January 1, 1988 shall continue to accrue annual leave at the rate at which it was accrued on December 31, 1987, as long as they remain in Registrar series titles or a HEO series title, except that if the employee is appointed to a higher HEO series title in the rank of Higher Education Associate or full Higher Education Officer, the employee shall accrue annual leave as though such employee had been in a HEO series title on December 31, 1987.

14.6 For non-classroom personnel, attendance at professional conferences which are approved by the college and enhance the individual's professional performance and growth shall not be charged to annual leave.

14.7 For instructional staff personnel who are engaged in non-teaching functions and who work a 35-hour week (HEO, Research Series, Library Staff, College Laboratory Technicians, Registrar series, et al.):
Effective July 1, 1998, the regular holidays with pay shall be as follows:

(a) Independence Day - July 4
(b) Labor Day - First Monday in September
(c) Columbus Day - Second Monday in October
(d) Thanksgiving Holiday - Fourth Thursday in November, Friday following
(e) Christmas Holiday - December 24 and 25
(f) New Year's Holiday - December 31, January 1
(g) Martin Luther King, Jr.'s Birthday - Third Monday in January
(h) Lincoln's Birthday - February 12
(i) Presidents' Day - Third Monday in February
(j) Memorial Day - Last Monday in May

33

If a holiday falls on a Saturday or Sunday which is not a regular work day it shall be observed on the Friday before or Monday following as designated by the college or by the University or, at the option of the University, may be designated as an unscheduled holiday, to be taken following the holiday for which it is substituted but prior to the end of the annual leave year, with the prior approval of the employee's supervisor.  In addition, there shall be four unscheduled holidays in the period September 1 - August 31 to be taken within the annual leave year, September 1 - August 31.

14.8    Effective August 25, 2006, adjunct classroom teachers, teachers on multiple position assignments employed for a course, non-teaching adjuncts including full-time instructional staff on non-teaching multiple position assignments and adjunct College Laboratory Technicians including full-time instructional staff in adjunct college laboratory multiple position assignments may be excused for personal illness or personal emergencies including religious observance, death in the immediate family or similar personal needs which cannot be postponed for a period of 1/15 of the total number of clock hours in the particular session or semester.  Request for such leave, where possible, must be made in advance, in writing.  If it is not possible to make such a request in advance, the department chairperson or supervisor should be informed as soon as possible. The reason provided must be satisfactory to the chairperson or supervisor.  Effective August 25, 2016, request in advance is not expected in cases of a death in the immediate family, as defined in Article 14.10, but employees covered by this section are expected to give advance notice to their department chair or supervisor of the need for the leave.

14.9    It is the intention of the parties that all employees use their annual leave time within the annual leave year (September 1 through August 31) in which it is earned.  In order to realize this objective, the parties mutually agree as follows:

(a)    Effective August 31, 1988, the maximum accrual of annual leave for members of the non-teaching instructional staff shall not exceed forty-five (45) working days as of August 31 of any year; provided, however, that any staff member who as of August 31, 1987 has accumulated annual leave in excess of forty-five (45) working days shall have a personal accrual maximum equal to the number of days accrued as of August 31, 1987. The annual leave balance in excess of forty-five (45) working days or in excess of the personal accrual maximum as of August 31, 1987, will be deducted from the employee's accrual balance on each August 31, at the close of business, unless the procedure set forth below has been followed:

1.    Not later than March 1, any employee who will have an annual leave accumulation in excess of forty-five (45) days or in excess of the personal accrual maximum unless sufficient annual leave time is taken prior to August 31, shall submit to the head of the office a written request to use such excess annual leave before the end of the current annual leave year (September 1 through August 31). The office head shall, in writing, approve the annual leave request or, if the needs of the office so

34

require, offer an alternate annual leave schedule within the current annual leave year.

    2.    If the head of the office has denied the request and has not offered an alternative plan or has not acted by April 1, the employee shall submit a written request to the senior executive(s) designated by the President of the College who will, in writing within 30 calendar days of receipt of the employee's request, approve the annual leave, provide an alternate plan for use of the excess time, and, if there are compelling institutional reasons, approve a carry-over of excess annual leave time.

(b)    Should a staff member resign, retire, or die, the college will compensate the employee or the employee's estate for the actual balance on record as of the last date of employment. In the case of an employee whose original date of appointment to a full-time position on the instructional staff is January 1, 1988 or later, payment shall be for not more than forty-five (45) days or the actual accrual, whichever is less, unless an accrual in excess of 45 days has been approved in accordance with the provisions of Article 14.9.

14.10    Effective August 25, 2016, all full-time instructional staff members shall be entitled to up to four days of paid bereavement leave for a death in the immediate family (defined as spouse, domestic partner, parent, step-parent, father-in-law, mother-in-law, child, stepchild, sibling, grandparent or grandchild). Proof of bereavement shall be provided upon request made by the department chair, supervisor, or the College Human Resources Department. Instructional staff members shall notify their department chair or supervisor of the need for the leave as soon as possible.

## ARTICLE 15
## WORKLOAD

15.1    Workload for classroom teaching members of the Instructional Staff, excluding teachers in the Hunter College Elementary and High Schools and Early Childhood Centers:

(a)    The academic work year shall be from September 1 through August 31 inclusive of annual leave as currently provided in Article 14. Except for such periods of annual leave, classroom teaching members of the Instructional Staff shall be available for assignment to professional activities.

(b)    Employees on the teaching staff of the City University of New York shall not be required to teach an excessive number of contact hours, assume an excessive student load, or be assigned an unreasonable schedule, it being recognized by the parties that the teaching staff has the obligation, among others, to be available to students, to assume normal committee assignments, and to engage in research[5] and community service.

---

[5] It is understood that Lecturers and Teachers in the Hunter College Campus School shall not be required to have a research commitment.

(c)    The annual undergraduate teaching contact hour workload is governed by the Workload Settlement Agreement, pertinent sections of which are attached as Appendix A to this Agreement.

(d)    1.    Effective October 31, 2002, untenured Assistant Professors, Associate Professors and Professors, except faculty librarians and faculty counselors, who are initially appointed on or after September 1, 2002 and before September 1, 2006, will receive a total of 12 contact hours of reassigned time during their first three (3) annual appointments in order to engage in scholarly and/or creative activities related to their academic disciplines. Assignment of such reassigned time will be made by the college pursuant to guidelines designed to encourage scholarship.

    2.    Effective September 1, 2006, untenured Assistant Professors, untenured Associate Professors and untenured Professors employed as faculty counselors or as faculty librarians who were initially appointed to those titles on September 1, 2002, September 1, 2003, September 1, 2004, or September 1, 2005 and who continue in active pay status will receive the equivalent of 12 contact hours of reassigned time to be used during the 2006-2007, 2007-2008, and 2008-2009 academic years, regardless of tenure status, in order to engage in scholarly and/or creative activities related to their academic disciplines. Assignment of such reassigned time will be made by the college pursuant to guidelines designed to encourage scholarship.

(e)    1.    Effective September 1, 2006, untenured Assistant Professors, untenured Associate Professors and untenured Professors (including those employed as faculty counselors or as faculty librarians) who receive an initial appointment to a professorial title on or after September 1, 2006 will receive twenty-four (24) contact hours of reassigned time (inclusive of the reassigned time provided for in 15.1 (d) (1) above), to be used during their first five (5) annual appointments, in order to engage in scholarly and/or creative activities related to their academic disciplines. Assignment of such reassigned time will be made by the college pursuant to guidelines designed to encourage scholarship.

    2.    Effective with the 2020-2021 academic year, untenured Assistant Professors, untenured Associate Professors and untenured Professors (including those employed as faculty counselors or as faculty librarians) who receive an initial appointment to a professorial title on or after the start of the Fall 2020 semester will receive 18 contact hours of reassigned time to be used during their first five annual appointments, in order to engage in scholarly and/or creative activities related to their academic disciplines. In the event that such faculty member takes a leave during the specified five-year period, the period will be extended by one year. Upon receiving appointment with tenure, the faculty members specified above shall receive six (6) contact hours of reassigned time to be used during the

36

A.84

three (3) succeeding academic years, beginning with the year in which tenure becomes effective. In the event that such faculty member receives a fellowship leave or takes other leave during the specified three-year period, the period will be extended by one year. Assignment of such reassigned time will be made by the college pursuant to guidelines designed to encourage scholarship.

(f)    For the purpose of calculating the reassigned time provided in paragraphs (d) 2., (e) 1. and (e) 2. above to untenured Assistant Professors, untenured Associate Professors and untenured Professors employed as faculty counselors or as faculty librarians, 12 contact hours shall be equivalent to the number of clock hours that would be necessary to provide full reassigned time to a faculty counselor or a faculty librarian for 15 weeks. Assignment of such reassigned time will be made by the college pursuant to guidelines designed to encourage scholarship.

15.2    Workload for part-time members of the Instructional Staff:

(a)    A person appointed to an Adjunct title is not a full-time employee of The City University of New York. Employment in an adjunct position or a combination of adjunct positions shall not constitute a full-time position. Adjunct Lecturers or Adjuncts in other titles, excluding Graduate Assistants, shall not be assigned a total of more than nine (9) classroom contact hours during a semester in one unit of The City University of New York. In addition, such adjunct may be employed to teach a maximum of one course of not more than six (6) hours during a semester at another unit of The City University of New York.

(b)    1. Effective the start of the Spring 2020 semester,[6] employees in teaching adjunct titles—except teaching adjuncts in Medical series titles, Law School series titles, Resident series titles, Graduate School of Journalism series titles and Executive Programs in the Zicklin School of Business at Baruch College series titles—who are assigned to teach at least three (3) classroom contact hours per semester (at least 45 appointment hours) within the same college will be responsible for and paid for office hours in the amounts designated below. Adjuncts shall be paid for these hours at their full hourly rate. These hours are to be spent on campus—unless the course is offered entirely or partially through distance learning, in which case the office hours may be conducted online to a corresponding extent—and are to be formalized as directed by the department chair. The hours are to be spent engaged in or available for student contact, except that the colleges may direct that up to three (3) office hours per semester—or up to six (6) per semester for those who are responsible for and paid for more than 15 office hours—be used for required trainings (*e.g.*, Workplace Violence Prevention, Sexual Harassment Prevention, You Have a Right to Know, etc.); for professional development; for attendance at college orientation sessions; for meetings with the union pursuant to Section 208.4(b) of the NYS Civil Service Law, which

---

[6] For the period December 1, 2017, through the end of the Fall 2019 semester, the provisions of Article 15.2 (b) of the 2010-2017 collective bargaining agreement continued in effect.

may be conducted individually or in a group, as agreed to with the PSC; or as otherwise directed by the colleges.

2. Allocation of paid office hours per college:

   A total of fewer than 3 classroom contact hours:      0 paid office hours

   3 or more but fewer than 6 classroom contact hours:      15 paid office hours/semester

   6 or more but fewer than 9 classroom contact hours:      30 paid office hours/semester

   9 or more classroom contact hours:      45 paid office hours/semester

3. Consistent with Article 15.2(a), paid office hours will be capped at 45 per semester at any one college. If an adjunct teaches at two colleges, paid office hours will be capped at 45 at the first college and 30 at the second college.

4. Allocation of paid professional hours per college for teaching adjuncts assigned to teach one or more but fewer than 3 classroom contact hours in a single college: two (2) paid professional hours/semester to be used for required trainings (*e.g.*, Workplace Violence Prevention, Sexual Harassment Prevention, You Have a Right to Know, etc.); for professional development; for attendance at college orientation sessions; for meetings with the union pursuant to Section 208.4(b) of the NYS Civil Service Law, which may be conducted individually or in a group, as agreed to with the PSC; or as otherwise directed by the colleges.

5. Full-time employees who teach a course that represents an overload assignment and for which they are paid at the applicable hourly professorial rate, which corresponds to the teaching adjunct rates as set forth in Article 24, will be responsible for and paid at the applicable hourly professorial rate for the office hours specified above (paragraph (b) 1. through 4. above), in addition to any office hours for which they are normally responsible as part of their full-time assignment.

6. It is understood that paid office hours and paid professional hours for adjuncts shall not be counted toward the maximum adjunct teaching hours in Article 15.2(a) of this agreement.

15.3     Workload for Graduate Assistant:

Graduate Assistant A

Graduate students holding the title of Graduate Assistant A shall have an assignment of a maximum of 240 contact teaching hours or 450 hours of non-teaching assignments during the work year.

Graduate Assistant B

Graduate students holding the title of Graduate Assistant B shall have an assignment of a maximum of 120 classroom teaching hours or 225 hours of non-teaching assignments in the B title during the work year. If a Graduate Assistant B also holds an adjunct or other hourly position, his or her total combined assignment may not exceed 270 contact teaching hours or 450 hours of non-teaching assignment during the work year.

Graduate Assistant C

Graduate students holding the title Graduate Assistant C shall have an assignment of a maximum of 180 classroom teaching hours during the work year. If a Graduate Assistant C also holds an Adjunct teaching position, his or her total combined assignment may not exceed 270 contact teaching hours during the work year.

Graduate Assistant D

Graduate students holding the title Graduate Assistant D shall have an assignment of a maximum of 100 non-teaching hours during the work year. A Graduate Assistant D may also hold an appointment as an Adjunct Lecturer (Doctoral Student) or as a Non-Teaching Adjunct (Doctoral Student). If the Graduate Assistant D holds an Adjunct Lecturer (Doctoral Student) appointment, he/she may be appointed for a maximum of 180 contact hours in the Adjunct Lecturer (Doctoral Student) title (280 hours in the combined assignment). If a Graduate Assistant D also holds a Non-Teaching Adjunct (Doctoral Student) appointment, he/she may be appointed for a maximum of 225 non-teaching adjunct hours (a combined total not to exceed 325 hours of non-teaching assignments during the work year,)

15.4    Workload for non-classroom members of the Instructional Staff, including members of the Instructional Staff assigned to the libraries, Student Personnel Staff, Counselors, HEOs, Registrars, College Laboratory Technicians and Research Assistants:

The work year shall be September 1 through August 31, including periods of annual leave as provided in Article 14. (Except for periods of annual leave as provided in Article 14, student personnel staff, counselors and library staff, in academic titles, shall be available for assignment.)

(a)    Effective August 25, 2006, all members of the Instructional Staff assigned as Counselors or to other student personnel assignments, except those in the Higher Education Officer series, shall have a workweek of thirty (30) hours as assigned.

(b)    All other members of the non-classroom Instructional Staff, shall have a workweek of thirty-five (35) hours as assigned.

This workweek is to be scheduled in not more than five days in any week for employees in the College Laboratory Technician series.

39

A.87

Employees assigned to a non-air-conditioned facility shall end their work day one hour earlier than scheduled commencing on the Monday following the Spring commencement through August 29 of that year.

(c)     Employees on the non-classroom Instructional Staff of the City University of New York shall not be required to work an excessive number of hours, or be assigned an unreasonable schedule, it being recognized by the parties that members of the staff have the obligation to perform their responsibilities in keeping with the proper staffing of the day session, evening session, summer session, extension divisions and special programs of the University.

(d)     It is understood that split schedules do not meet the definition of a reasonable schedule. A split schedule is a schedule in which the hours assigned are not consecutive except for meal periods.

(e)     There shall be a labor management committee on each campus with two members designated by the President and two members designated by the PSC Chair to convene as needed to review complaints from instructional staff in College Laboratory Technician series titles concerning their workload and to make non-binding recommendations concerning these complaints to the President.

(f)     Effective with the start of the 2016-2017 academic year, there will be a labor management committee on each campus composed of three members designated by the President of the College and three members designated by the PSC. Responsibility for chairing the committee will alternate annually between labor and management representatives. The committee will hear concerns from individual employees in the Higher Education Officer series concerning workload. The Committee, as appropriate, may make non-binding recommendations to the President. The Committee will also provide the initial review of requests for an assignment differential in accordance with Section 22.5.[7]

15.5    Multiple Positions

Each faculty member must comply with the Board's rules and regulations pertaining to multiple positions or additional occupations or employment either within the University or outside of the University whether or not the faculty member receives any compensation in such additional occupation or employment.

---

[7] For the composition and responsibilities of the labor-management committee prior to the 2016-2017 academic year, see the provisions of section 15.4 (f) of the 2007-2010 collective bargaining agreement.

40

# ARTICLE 16
## TEMPORARY DISABILITY AND PARENTAL LEAVE

16.1  The term "temporary disability" for purposes of this Article shall be defined as any temporary physical or mental incapacity including pregnancy, complications of pregnancy and childbirth.

16.2  (a)  Employees covered by this Agreement shall be granted temporary disability leave of twenty (20) calendar days, exclusive of Saturdays, Sundays and authorized holidays and recesses during each year of service. The unused portions of such temporary disability leave shall be cumulative to a maximum of one hundred and sixty (160) calendar days during which the college is in regular session.

(b)  Effective August 27, 2008, full-time members of the instructional staff will be permitted to use up to three days of accrued temporary disability leave annually for the care of an ill family member, consistent with applicable rules and procedures.

16.3  Any absences in excess of the cumulative temporary disability leave accrued to the absentee shall be taken without pay, except that the Board may, in cases of protracted disability or unusual hardship, hear recommendations from the President that this provision be waived in exceptional instances, without thereby establishing a precedent.

(a)  For the purpose of computing the number of days of cumulative temporary disability leave this Article shall be deemed effective as of the date of the employee's appointment.

(b)  Temporary disability leave shall be computed commencing from the date of first absence from the assigned duties and shall include all additional calendar days, exclusive of Saturdays, Sundays and authorized holidays and recesses until such person's return.

(c)  Persons employed on fractional schedules shall have their temporary disability leave and accumulated temporary disability leave prorated.

(d)  Temporary disability leave shall be earned only after a full calendar month of service and no accruals or partial accruals shall be granted for service of less than a full calendar month.  A full calendar month of service shall represent service from the first working day through the last working day of a given month.

(e)  Any employee who is absent from duty because of a temporary disability shall promptly inform his or her department chairperson, who in turn shall inform the appropriate dean of the nature of the temporary disability and of the probable duration of the absence.

(f)  When any absence because of a temporary disability exceeds thirty (30) consecutive working days, the absentee shall present a statement from his or her physician explaining

41

A.89

the nature of his or her temporary disability and certifying that he or she is fully capable of returning to work. In the case of any such absence because of a temporary disability in excess of thirty (30) consecutive working days, the college may also require an examination by a physician in its employ or appointed by it, who shall certify his or her belief that the absentee is fully capable of returning to work. In cases in which there is a conflict of opinion, a third physician, acceptable to the absentee and to the President of the College, shall be called in and his or her judgment shall be accepted as conclusive. In the event that it is found that the condition of such person is such that he or she is incapable of resuming his or her normal duties, such person shall apply for such additional period of leave of absence as may be necessary. Failure to make such application for an additional period of leave of absence shall be deemed neglect of duty.

16.4 Persons who are members of a public retirement system and who meet the eligibility requirements for service retirement, and persons who are members of the optional retirement program and who meet similar eligibility requirements to those of the public retirement system, who announce their bona fide intention to retire and file the appropriate application to retire shall be granted a retirement leave of absence with full pay consisting of one-half of their accumulated unused temporary disability leave up to a maximum of one semester, or the equivalent number of school days. The terms and conditions relating to the counting of such days, intervening vacation periods, cancellation of such leave, reinstatement to active service, etc., shall be governed by Section 3107 of the State Education Law.

16.5 In addition to the provisions of this Article, employees entitled to disability insurance benefits shall receive paid temporary disability leave from the date of the commencement of their temporary disability up to the commencement of disability insurance benefit payments, only upon presentation to the Personnel Director of satisfactory evidence, provided by a duly-licensed physician, of illness and a prognosis that such illness is reasonably certain to result in a long-term disability that will last more than six consecutive months.

Upon the return of the employee to duty such advanced temporary disability leave that had been provided must be repaid through assignment of future accruals. In the event the employee resigns or voluntarily leaves the University, the remaining value of the advanced temporary disability leave shall be deducted from remaining paychecks or otherwise reimbursed to the University.

16.6 Leaves of absence without pay for temporary disability for periods of less than one (1) year may be recommended by the Board to the appropriate retirement system for credit as service for retirement. Increments may be recommended by the Board for the period during which an employee is on leave of absence without pay for temporary disability for periods less than one (1) year.

16.7 Employees who on September 1, 1969 were entitled to cumulative unused temporary disability leave in excess of one hundred sixty (160) calendar days shall retain the excess accumulation. However, thereafter, no temporary disability leave can be accumulated in excess of one hundred sixty (160) calendar days.

16.8     Special Leaves for Child Care

Special leaves for the purpose of caring for a newborn infant shall be granted to a member of the Instructional Staff upon notification to the President and application for such leave, provided the applicant has legal responsibility for the care and/or support of said child. Such leave shall, insofar as it is practicable, begin on February 1 or September 1 unless the date of the birth of the child is such as to render these times inappropriate. The duration of the leave shall ordinarily be for one full semester. In exceptional cases, the President may terminate such leave during the college term, provided there is an appropriate opening in which the applicant's service may be utilized. An extension of such leave shall be permitted on request for a period not in excess of one year from the end of the original leave. No further extension shall be permitted. Leaves for the purpose of caring for a newborn infant shall be granted without pay during the period of the leave, including the vacation period concomitant to the leave. If the leave is for one semester only, the loss of paid vacation shall be for one month only. If the leave is for two semesters, both months of vacation shall be without pay. If the duration of the leave is less than one calendar year, it shall be credited toward salary increments; if it is one calendar year or more, it shall not be credited toward salary increments.

16.9     When the service of a member of the Instructional Staff is interrupted by reason of absence on a leave for the purpose of caring for a newborn infant, the period of creditable service immediately preceding such absence shall be counted in computing the years of service required for the granting of tenure, a certificate of continuous employment, or for a certificate of continual administrative service in a Higher Education Officer series title.

16.10     Paid Parental Leave

Effective March 2009, a paid parental leave benefit is established for full-time members of the bargaining unit who have a minimum of one year of service with CUNY.[8]

1.     The paid parental leave benefit provides a continuous leave of absence for a period not to exceed eight (8) weeks to care for a newborn child or a newly adopted child, adopted at up to five years of age, and must be taken immediately upon the birth or adoption of the child.[9]

2.     Eligible employees will remain on payroll during paid parental leave and continue to be eligible for all applicable benefits.

---

[8] Persons employed as substitutes who do not have an underlying regular annual appointment are not eligible. Teaching faculty who have completed two continuous semesters of teaching and become parents during the period of annual leave, as defined in Article 14.1 above, are eligible for the paid parental leave benefit.

[9] Scheduling the leave and other applicable implementation issues, such as service credit, are addressed in greater detail in the March 19, 2009 letter of agreement between the parties and further modified by the December 8, 2011 letter agreement; both are available on the University's and PSC's websites. Paragraph 4 of the March 19, 2009 letter agreement was further modified by the Memorandum of Agreement between the parties for the 2017-2023 Collective Bargaining Agreement, also available on the parties' websites.

3. The employee is required to give written notice of her/his intent to take paid parental leave by filing an application form at least 90 days prior to the expected due date of the baby or 90 days prior to the expected placement of the child with his/her adoptive parents. After obtaining the signature of her/his department chair or unit head, the employee must file the application form with the Director of Human Resources.

16.11  The University has established a Dedicated Sick Leave Program and a Catastrophic Sick Leave Bank Program for full-time instructional staff.  The terms of these programs are set forth in Appendices F and G.[10]

# ARTICLE 17
## JURY DUTY

Employees who are required to serve on a jury, or are required to report to Court in person in response to a jury duty summons, or are required to report for jury examination, or to qualify for jury duty, shall receive their regular salary during such absences provided that they remit to the University an amount equal to the compensation received by them, if any, for jury duty.

# ARTICLE 18
## PROFESSIONAL EVALUATION

18.1  The evaluation of the professional activities of all employees in a public institution of higher education is essential to the maintenance of academic and professional standards of excellence. The purpose of professional evaluations shall be to encourage the improvement of individual professional performance and to provide a basis for decisions on reappointment, tenure and promotions. An evaluation of professional activities shall be based on total professional performance.  Written evaluation shall be on file for all employees.

18.2  (a)  Evaluation of a member of the teaching faculty shall be based on total academic performance, with special attention to teaching effectiveness, including, but not limited to, such elements as:

1. Classroom instruction and related activities;

2. Administrative assignments;

---

[10] These programs have been included as Appendices solely for ease of reference.  The parties acknowledge and agree that these are University programs, the terms of which were not bargained.  The parties accordingly agree that these are not subject to the terms of Article 20 of this Agreement, including the grievance process.

44

A.92

3. Research;[11]

4. Scholarly writing;

5. Departmental, college and university assignments;

6. Student guidance;

7. Course and curricula development;

8. Creative works in individual's discipline;

9. Public and professional activities in field of specialty.

(b) Teaching observation, as described below, is one factor in total evaluation of academic performance of the teaching staff.

1. Regardless of the mode of instruction, at least once during each academic semester, non-tenured and non-certificated members of the teaching staff shall be observed for a full classroom period. One observation shall take place during any scheduled class, except as specified below in Article 18.2(b) 3 for classes conducted wholly or in part through online technology, during the first ten weeks of a semester. Except as otherwise provided, the employee shall be given no less than 24 hours of prior notice of observation.

Tenured and certificated members of the teaching staff may be observed once each semester.

2. (a) Each department P & B committee shall designate a panel, the size to be specified by the chairperson, of department observers (which shall include members of the P & B committee). The department chairperson shall schedule the members of this panel to conduct observations as necessary. Each observer shall submit, through the department chairperson, a written observation report to the department P & B committee within one week of the observation. These observation reports shall be considered by the committee in its total evaluation of the employee.

(b) The department chairperson shall schedule the post-observation conference for the employee within two weeks after receipt of the written observation report. The post-observation conference shall include the employee and the observer. Either a member of the P & B committee or a member of the department with the rank of tenured Associate Professor or tenured Professor may be assigned by the chairperson to attend the post-observation conference at the request of the employee or the observer.

---

[11] It is understood that Lecturers and Teachers in the Hunter College Campus School shall not be required to have a research commitment.

45

A.93

(c) Following the post-observation conference, the assigned P & B representative or the assigned senior faculty member shall prepare a record of the discussion in memorandum form for submission to the chairperson. If the post-observation conference includes only the observer and the employee, then the observer shall prepare the record of the discussion in memorandum form. The original conference memorandum shall be placed in the employee's personal file. The employee may have a copy of this document provided a signed receipt is tendered. The observation report shall be placed in the personal file.

(d) In the event that the observation or post-observation conference is not held within the time stipulated herein, the employee shall, within ten (10) working days thereafter, file a request for an observation and/or conference with the chairperson. A copy of the request shall be sent to the appropriate dean and the Office of the President. Failure of the employee to file the request within the stipulated time shall bar the employee from subsequent complaint regarding such non-compliance with Article 18.2(b), 2b) or c). Upon the receipt of the request, the college shall cause appropriate remedial action to be taken, including, if necessary, scheduling of an observation and/or observation conference by the dean or President or their designee.

(e) After ten (10) semesters of service teaching observation for adjunct personnel shall be held at the request of the chairperson or the adjunct.

Effective the Fall 2008 semester, where an adjunct's continuous appointments are immediately followed by an appointment to a Substitute full-time position on the instructional staff with no break in service, and the period of Substitute service is immediately followed by continuous appointment to an adjunct title with no break in service, the period of adjunct service immediately preceding the Substitute appointment will be added to the continuous adjunct service immediately following the Substitute service, as though there were no break in adjunct service, for the purpose of determining eligibility for teaching observation at the request of the chairperson or the adjunct.

3. Teaching Observations for Online Courses

(a) For teaching observations of online or partially online courses, the parties intend to replicate as closely as possible the longstanding teaching observation practices established pursuant to this Agreement. Therefore, the provisions of Article 18.2(b) 2 shall apply except as specifically modified herein.

(b) In a fully online synchronous course (that is, a course that meets online for 100% of the semester's class meetings with a regularly scheduled class period during which students and the instructor are online at the same time), the designated observer shall be given limited access to the course platform, usually defined as "student" or "guest"

46

access but in no event "instructor" or "administrator" access, only for the scheduled class period to be observed. Via the method for announcements normally employed by the instructor in the course, the instructor shall inform the students that the teaching observation is occurring. In no event shall the classroom teaching observation memorandum refer to the conduct of course activities outside of the observation period.

(c) In a fully online asynchronous course (that is, a course conducted entirely online without a scheduled class period), the designated observer shall be given limited access to the course platform, usually defined as "student" or "guest" access but in no event "instructor" or "administrator" access, for no more than a 48-hour period that will commence at a specified time not earlier than seven calendar days after the notice of the teaching observation has been given to the instructor. Within 48 hours of receiving notice of the observation, the instructor shall inform the students of the teaching observation and its beginning and end time via the method for announcements normally employed by the instructor in the course.

(d) In a fully online mixed course (that is, a course conducted entirely online using both synchronous and asynchronous instruction), the teaching observation shall take place according to the procedures for a fully online synchronous course, as specified above. At the request of the instructor, and with the consent of the Department Chairperson, the teaching observation may be conducted as it would be for a fully online asynchronous course, as specified above.

(e) In a hybrid or blended course (that is, a course in which some face-to-face classroom periods are replaced by online instruction or any other modality that is not face-to-face), the following rules apply:

(i) If at least 50% of the class sessions are conducted in a traditional face-to-face classroom setting, the observation shall normally take place during a face-to-face classroom period as set forth in Article 18.2(b). At the request of the instructor, and with the consent of the Department Chairperson, the observation may be conducted during an online class session. In such cases, the observation shall be conducted according to the procedures for a fully online synchronous course or a fully online asynchronous course, as applicable.

(ii) If fewer than 50% of the class sessions are conducted in a traditional face-to-face classroom setting, the observation shall be conducted according to the procedures for a fully online synchronous course or a fully online asynchronous course, as applicable.

(iii) The Department Chairperson may decide that an instructor teaching a hybrid course who has been observed under this provision may have his or her next observation conducted in the other modality used for the course.

47

A.95

(f) For observations of other than a fully online synchronous course, the observer shall not review online activity that occurred more than seven calendar days prior to the 48-hour period of access to the course platform, nor shall the post-observation memorandum refer to any course activities that occurred more than seven calendar days prior to the 48-hour period of access.

(g) For a fully online course, the post-observation conference set forth in Article 18.2.b may be held, at the request of the instructor, in person, by telephone, or by video conference.

4. Classroom Teaching Observations by Other Departments or Programs

Effective with the start of the Fall 2019 semester, teaching members of the instructional staff who are assigned to teach a majority of their classes in any given semester in a department or program other than the one to which they are appointed may be observed by a member of the other department or program, if requested by the chairperson of the department to which the faculty member to be observed is appointed. Following such a request, if the faculty member to be observed does the majority of his/her teaching in another academic department, the chairperson of that department shall select the observer from that department's panel of observers. If the faculty member to be observed does the majority of his/her teaching in a program, the observer will be designated by the chairperson of the faculty member's appointing department, in consultation with the director of the program. The observer must be a teaching member of the instructional staff.

All other provisions of 18.2 (b) apply, and all references therein to "the department" shall be understood to mean the department in which the faculty member to be observed is appointed.

18.3 Annual Evaluations:

(a) Members of the teaching faculty: At least once each year, each employee other than tenured full professors shall have an evaluation conference with the department chairperson or a member of the departmental P & B committee to be assigned by the chairperson. Tenured full professors may be evaluated. At the conference, the employee's total academic performance and professional progress for that year and cumulatively to date shall be reviewed. Following this conference, the chairperson or the assigned member of the P & B shall prepare a record of the discussion in memorandum form for inclusion in the employee's personal file. Within ten (10) working days after the conference, a copy of the memorandum shall be given to the employee. If the overall evaluation is unsatisfactory, the memorandum shall so state. The employee in such case shall have the right to endorse on the memorandum a request to appear in person before the department P&B.

48

A.96

Effective with the 2019-2020 academic year, in evaluating members of the teaching instructional staff who, in a given academic year, teach the majority of their classes in a department or program other than the one to which they are appointed, their department chairperson or the members of the departmental P&B committee assigned by their chairperson to conduct the annual evaluations may consult with the director of the program or the chairperson of the other department in which the instructional staff members have taught the majority of their classes and may discuss the comments of the director of the program or the chairperson of the other department during the evaluation conference and reference the discussion in the evaluation memorandum.

(b) Members of the non-teaching staff, including Librarians, CLTs, Counselors, Student Personnel Services staff, Registrar series, HEO series and other non-teaching members of the Instructional Staff covered by this Agreement: Preferably once each semester, but at least once each year, each employee shall have an evaluation conference with the chairperson or supervisor to be designated by the appropriate dean or President. At the conference, the employee's total performance and professional progress shall be reviewed. Following this conference, the designated official shall prepare a record of the evaluation discussion in memorandum form for inclusion in the employee's personal file. A copy of the report shall be given to the employee within ten (10) working days following the conference.

(c) After four (4) semesters of service annual evaluation for adjunct personnel shall be held at the request of the chairperson or the adjunct, provided, however, that if such evaluations are conducted at the request of the adjunct, such evaluations may not be conducted more than once every four semesters.

(d) In the event that a date for yearly evaluation is not scheduled by March 1, the employee shall, within ten (10) working days thereafter, file a request for an observation and/or conference with the chairperson or supervisor. A copy of the request shall be sent to the appropriate dean and the Office of the President. Failure of the employee to file the request shall bar the employee from subsequent complaint regarding such non-compliance with the above-stated scheduling requirement. Upon receipt of the request, the dean or President shall cause appropriate remedial action to be taken to insure compliance with this provision.

(e) Effective with the start of the 2016-2017 academic year, in the event an evaluation conference is scheduled as provided for in subsections (a) or (b) above, and the employee fails to attend without reasonable cause, the conference shall be rescheduled. The employee shall be notified in writing of the date of the rescheduled conference. If the employee again fails to attend the evaluation conference without reasonable cause, the department chair/designated official may prepare an evaluation in memorandum form for inclusion in the employee's personal file without holding a conference. A copy of the memorandum shall be sent to the employee within 10 working days from the scheduled date of the rescheduled conference by regular mail at his/her address on file and by email to his/her college email address.

49

18.4    In those institutions that operate on a basis other than semester (such as trimester or quarter system) the observation and evaluation provisions of this Article, where applicable, shall apply only to two of the three trimesters or two of the four quarters.

18.5    In the Hunter College Campus Schools, the respective Principals of the Elementary School and High School may, in addition to the teaching observation set forth in Article 18.2(b), conduct unscheduled observations of members of the instructional staff.  If, following the observation, the principal wishes to prepare a record of the unscheduled observation, he/she shall within ten (10) days, excluding Saturdays, Sundays, and legal holidays, from the date of the observation, conduct a post-observation conference with the employee.  Following the post-observation conference, the principal shall within ten (10) days, excluding Saturdays, Sundays or legal holidays, prepare a record of the discussion in memorandum form for inclusion in the employee's personal personnel file.


## ARTICLE 19
## PERSONNEL FILES

19.1    Each unit within The City University shall maintain two personnel files for each employee.

19.2    There shall be a personal file which shall include but not be limited to the following:

(a)    Personnel information;

(b)    Information relating to the employee's academic and professional accomplishments submitted by the employee or placed in the file at his or her request;

(c)    Records generated by the college;

(d)    Memoranda of discussions with the employee relating to evaluations of the employee's professional performance;

(e)    Observation reports of the employee's academic and professional performance.

No materials shall be placed in the employee's file until the employee has been given the opportunity to read the contents and attach any comments he or she may so desire.  Each such document shall be initialed by the employee before being placed in his or her file as evidence of his or her having read such document.  This initialing shall not be deemed to constitute approval by the employee of the contents of such document.  If the employee refuses to initial any document after having been given an opportunity to read the same, a statement to that effect shall be affixed to the document.

50

A.98

(f)    Each non-tenured and non-certificated full-time member of the instructional staff should examine and initial his/her personal file prior to the end of each academic year. Such member should promptly report to the individual keeping the files any documents which he/she wishes to be included in the file and should furnish any such document not in the possession of the college.

Each year, each tenured and certificated full-time member of the instructional staff should examine and initial his/her personal file prior to the end of the fall semester. Such member should promptly report to the individual keeping the files any documents which he/she wishes to be included in the file and should furnish any such document not in the possession of the college.

The employee's personal file shall be available for examination by the employee at his or her request.

19.3    There shall be a separate administration file which shall contain only such materials requested by the unit of The City University or supplied by the employee in connection with the employee's employment, promotion or tenure.

The administration file shall be available only to the committee and individuals responsible for the review and recommendation of the employee with respect to appointment, reappointment, promotion or tenure.

## ARTICLE 20
## COMPLAINT, GRIEVANCE AND ARBITRATION PROCEDURE

20.1    Intent:

The parties agree to use their best efforts to encourage the informal and prompt settlement of complaints and grievances which may arise between the PSC, the employees, and the University. The orderly processes hereinafter set forth will be the sole method used for the resolution of all complaints and grievances.

20.2    Definitions:

A complaint is an informal claim by an employee in the bargaining unit or by the PSC of improper, unfair, arbitrary or discriminatory treatment.

A complaint may, but need not, constitute a grievance. Complaints shall be processed through the informal procedure herein set forth.

51

A.99

A grievance is an allegation by an employee or the PSC that there has been:

1.     a breach, misinterpretation or improper application of a term of this Agreement; or

2.     an arbitrary or discriminatory application of, or a failure to act pursuant to the Bylaws and written policies of the Board related to the terms and conditions of employment.

20.3   Informal Procedure for Handling Complaints:

Any employee in the bargaining unit may present and discuss his or her complaint either with or without a representative of the PSC.  Similarly, a representative of the PSC may present and discuss a complaint on behalf of any employee or group of employees with the head of the department involved.  This presentation and discussion shall be entirely informal.  Any settlement, withdrawal or disposition of a complaint at this informal stage shall not constitute a binding precedent in the settlement of similar complaints or grievances.

20.4   Formal Procedure for Handling Grievances:

Grievances may be filed by an employee in the bargaining unit on his or her behalf, by the PSC on its behalf, or by the PSC on behalf of any employee or group of employees in the bargaining unit.  Grievances involving employees in more than one College of the University may be filed by the PSC initially at Step 2 of the grievance procedure.

Except in the case of a grievance or arbitration brought by the PSC on its own behalf or on behalf of an employee or a group of employees, no member of this unit may represent another member of this unit at any level of the grievance or arbitration procedure.

A grievance must be filed by an employee or the PSC within thirty (30) days, excluding Saturdays, Sundays and legal holidays, after the PSC or the employee on whose behalf the grievance is filed became aware of the action complained of, except that grievances relating to reappointment or to appointment with a certificate of continuous employment shall be filed within thirty (30) days excluding Saturdays, Sundays, or legal holidays of the individual's scheduled date of notification as specified by Articles 10 and 13 of the Agreement.  Any grievance or informal complaint not processed in accordance with the time limits specified herein shall be deemed waived by the grievant.

A grievance must be stated in writing setting forth the basis therefor with reasonable particularity, including a designation of the Article of the Agreement, the Section of the Bylaws, or the written policy of the Board relied upon, and the remedy requested.

Step 1. Grievances shall be filed with the President of the College affected or the President's designee. The President or the designee shall, within fifteen (15) days excluding Saturdays, Sundays, or legal holidays, of the receipt of the grievance, meet with the grievant and a representative of the PSC for the purpose of discussing the grievance. The

52

A.100

President or the designee shall, within fifteen (15) days, excluding Saturdays, Sundays, or legal holidays, after the grievance meeting, issue a decision with reasons in writing to the grievant and the PSC.

Step 2. If the grievance has not been settled at Step 1, then within twenty (20) days, exclusive of Saturdays, Sundays, and legal holidays, after receipt of the written decision of the President of the College or the President's designee, or the expiration of the time limits for making such decision, the grievant or the PSC may submit the grievance in writing to the Chancellor or the Chancellor's designee, together with a copy of the decision of the President of the College affected, or the designee. The Chancellor or the Chancellor's designee shall, within twenty (20) days, exclusive of Saturdays, Sundays, or legal holidays, of the receipt of the grievance, meet with the grievant and a representative of the PSC for the purpose of discussing the grievance. In the event the Step I decision was not received by the PSC at least fifteen (15) calendar days prior to the scheduled Step 2 meeting, the Chancellor or his/her designee shall, upon request by the PSC, direct the College to present its arguments first at the Step 2 meeting and shall grant the PSC, upon its request, an adjournment of no greater than fifteen (15) calendar days for the presentation of the grievance at Step 2. It is understood that nothing herein shifts the burden of proof with respect to the allegations contained in the grievance. The Chancellor or the designee shall, within twenty (20) days, exclusive of Saturdays, Sundays, or legal holidays, after the grievance meeting, mail the disposition with reasons in writing to the PSC and to the grievant or grievants affected by certified mail, return receipt requested.

Step 3. If the grievance has not earlier been settled, or if the Chancellor's disposition has not been issued within the time limits above set forth, the person or persons who submitted the grievance at Step 2 may appeal the Step 2 decision to arbitration by serving written notice to that effect by certified mail, return receipt requested, directed to the Chancellor or the Chancellor's designee and to the American Arbitration Association (hereinafter "AAA") within twenty (20) days, exclusive of Saturdays, Sundays, or legal holidays, after mailing of the Step 2 decision, or the last date for the mailing thereof. Arbitration shall be conducted in accordance with the rules of the American Arbitration Association and the laws of the State of New York, subject to the provisions of paragraph 20.5 hereof. Legal holidays referred to above shall be those holidays so designated by the State of New York.

20.5    Special Arbitration Provisions:

(a)     Effective with the start of the 2016-2017 academic year, the parties shall mutually agree on a panel of arbitrators. An arbitrator from the panel shall be designated to serve in any case submitted to arbitration in accordance with this Section. The designation of the arbitrator to be assigned in a particular case shall be made by the American Arbitration Association ("AAA") or by such other method as agreed to by the parties to the collective bargaining agreement. Such designation shall be made in rotation order for cases submitted for arbitration in accordance with this Section. The arbitrator shall be authorized at any time during the course of the proceedings, on the basis of the

A.101

proceedings to date, to issue preliminary or interim awards, including awards as to arbitrability, which shall determine the further course of the proceedings.[12]

(b)    For purposes of this sub-paragraph, "academic judgment" shall mean the judgment of academic authorities including faculty, as defined by the Bylaws, and the Board (1) as to the procedures, criteria and information to be used in making determinations as to appointment, reappointment, promotions, and tenure and (2) as to whether to recommend or grant appointment, reappointment, promotions and tenure to a particular individual on the basis of such procedures, criteria and information. In the arbitration of any grievance or action based in whole or in part upon such academic judgment, the Arbitrator shall not review the merits of the academic judgment or substitute his or her own judgment therefor, provided that the Arbitrator may determine (i) that the action violates a term of this agreement or (ii) that it is not in accordance with the Bylaws or written policies of the Board, or (iii) that the claimed academic judgment in respect of the appointment, reappointment, promotion or tenure of a particular individual in fact constituted an arbitrary or discriminatory application of the Bylaws or written policies of the Board.

(c) 1.    In cases involving the failure to appoint, promote or reappoint an employee in which the Arbitrator sustains the grievance, except as specifically provided by sub-paragraph (d) below, the Arbitrator shall not, in any case, direct that a promotion, appointment or reappointment with or without tenure be made, but upon his or her finding that there is a likelihood that a fair academic judgment may not be made on remand if normal academic procedures are followed, the Arbitrator shall remand the matter to a select faculty committee of three tenured full or associate professors of The City University of New York, to be selected from a panel jointly chosen by the Chancellor and the President of the PSC of, when possible, 100 tenured full or associate professors, or in a case involving members of the non-classroom instructional staff, from a panel of, when possible, 40 Higher Education Officers, Higher Education Associates, Registrars, Associate Registrars, Chief CLTs and Senior CLTs. The composition of the said panel shall be subject to review and/or replacement annually. Members of a select faculty committee selected to serve on said committee following the adoption of the 2017-2023 Agreement by the Board of Trustees shall receive a $600 stipend for their service.[13] The University shall pay $300 and the PSC shall pay $300 to each select faculty committee member following receipt of the committee's decision.

The selection of the members of a select faculty committee shall be made in the following manner: The Chancellor shall submit to the PSC the names of 4 persons from the panel established pursuant to paragraph 20.5.c.1 to serve on the committee. The PSC may reject one name. In the event the PSC does not reject one name the Chancellor shall select the 3 persons to serve on the committee.

---

[12] For the special arbitration provisions preceding the 2016-2017 academic year, see section 20.5 (a) of the 2007-2010 collective bargaining agreement.

[13] The Board of Trustees adopted the Agreement on December 16, 2019.

The committee to whom such remand is made for the making of the academic judgment shall (1) have access to the same materials to which the College President had access with respect to the action from which the grievance arose, except as modified by the arbitrator's award, (2) shall meet to deliberate on the assigned case, (3) be subject to the regular rules of confidentiality of faculty proceedings, and (4) shall be constituted within a reasonable time after the Arbitrator's Award is rendered and shall render its decision within twenty (20) days thereafter. The authority of the committee is limited to rendering the academic judgment on the action from which the grievance arose. The committee recommendation shall be in conformity with the Bylaws and policies of the Board and with the Agreement. The recommendation of the committee shall be in the form:

> "The committee recommends (does not recommend)
> (a) appointment, (b) reappointment or (c) promotion"

The committee shall not make recommendations as to any other matter, including but not limited to period of employment or compensation or other benefit of employment.

On receipt of a positive decision which conforms with this Agreement, the Chancellor shall recommend approval of the select committee decision to the Board of Trustees. In the event that the committee decision does not conform with the Agreement, the committee shall be disbanded and a new committee established. The deliberations and decision of the select committee shall not be grievable.

2. In cases which arise from actions on reappointment with tenure or a CCE or promotion, the grievant who has been awarded retroactive tenure, CCE or promotion as a result of the recommendation of a select faculty committee adopted by The Board shall receive the salary exclusive of fringe benefits which would have been payable from the effective date of the tenure, CCE or promotion less any amounts earned and other legal offsets attributable to the period between the date of tenure, CCE or promotion and the effective date of the implementation of the remedy.

In cases which arise from actions on reappointment for a prescribed period of time, and the grievant is reappointed as a result of the recommendation of a select faculty committee adopted by The Board, the sole remedy shall consist of reappointment for a prospective equivalent period of time.

Grievances which arise from action on reappointments with tenure, CCE, Certificate of Continual Administrative Service or promotion shall be given priority in processing in the grievance procedure including scheduling for arbitration.

(d) 1. In cases involving the failure to reappoint an employee in which the arbitrator sustains the grievance upon a finding of a failure to comply with, or an arbitrary or discriminatory application of, procedures such that no academic judgment could have been made with respect to the reappointment of such employee, and a further period of service is necessary

55

A.103

to correct the failure to comply with, or the arbitrary or discriminatory use of, procedure, the arbitrator may recommend the prospective reappointment of such employee for a period not to exceed one academic year. The Board shall appoint the employee in accordance with the arbitrator's recommendation. In no event shall such reappointment confer or result in the granting of tenure, a certificate of continuous employment, or a multiple-year appointment.

2. If an employee who has been appointed upon an arbitrator's recommendation is thereafter reappointed pursuant to established procedures for the next academic year in a tenure or certificate-bearing title, or in a multiple-year reappointment situation, the service pursuant to the appointment recommended by the arbitrator shall be counted as service toward tenure or a certificate of continuous employment, or a multiple-year appointment, as the case may be.

20.6   In no event shall the Arbitrator have authority to add to, subtract from, modify or amend the provisions of this Agreement or the Bylaws of the Board. Such decision or award shall be binding upon the PSC, the University and the employees affected thereby. The costs of arbitration shall be borne equally by the parties. When arbitrations are not initiated by the PSC, the American Arbitration Association shall require the employee or employees submitting the same to file with the Association adequate security to pay the cost of arbitration. Expenses for witnesses, however, shall be borne by the party who calls them.

20.7   A grievance filed by the PSC pursuant to this article may be resolved by settlement only if agreed to in writing by the Office of Labor Relations and by the PSC Central Office.

# ARTICLE 21
# DISCIPLINARY ACTIONS

The provisions set forth in Appendix H supersede the provisions in Article 21 below during a pilot period starting with the 2016-2017 academic year and extending through the end of the 2023-2024 academic year.

21.1   Members of the Instructional Staff may be disciplined by removal, suspension with or without pay, or any lesser form of discipline for one or more of the following reasons, except that staff in HEO series titles shall be subject to discharge as provided in Article 21.9, and Adjuncts shall be subject to discharge as provided in Article 21.11:

(a)     Incompetent or inefficient service;

(b)     Neglect of duty;

(c)     Physical or mental incapacity;

56

A.104

(d)     Conduct unbecoming a member of the staff. This provision shall not be interpreted so as to constitute interference with academic freedom.

21.2    Disciplinary proceedings shall be initiated by the President of the college by the service of a written notice of intent to prefer charges upon the employee, which shall set forth:

(a)     the proposed charges against the employee, and

(b)     the proposed penalty.

21.3    Within seven (7) calendar days of service of the written notice of intent to prefer charges, a meeting shall be conducted by the President or his or her designee with the employee, who may be accompanied by an attorney or representative of the Professional Staff Congress, to discuss the notice, the proposed charges, the proposed penalty, and the basis of the charges.

21.4    Within fourteen (14) calendar days of the meeting described in Section 21.3, the President shall either:

(a)     Withdraw the notice of intent to prefer charges; or

(b)     Prefer charges, including a recommended penalty.

21.5    Within fourteen (14) calendar days of service of the President's written statement of charges and recommended penalty, the employee may:

(a)     Acquiesce to the charges and accept the recommended penalty by written notification to the President; or

(b)     Request a hearing before the Chancellor's Designee.

If no acquiescence to the charges and acceptance of the penalty is received and if no request for a hearing is made by the employee, the matter shall proceed in accordance with Section 21.6 below.

21.6    Within fourteen (14) calendar days of receipt of the President's statement of charges, unless the penalty has been accepted by the employee, the Chancellor's Designee shall schedule a hearing and within fourteen (14) calendar days of the hearing investigate the matter and render a decision including the determination of penalty.

21.7    The penalty recommended by the Chancellor's Designee shall be implemented after fourteen (14) calendar days, unless within fourteen (14) calendar days of the receipt of the decision of the Chancellor's Designee the employee elects to appeal by proceeding to disciplinary arbitration in accordance with Section 21.8 below.

57

A.105

21.8    Disciplinary Arbitration

    (a)    The City University and the PSC shall jointly agree on a panel of disciplinary arbitrators. Each member of the panel shall be assigned a number in rotation and, in the event of disciplinary arbitration, the first arbitrator in order who is available to conduct a hearing within ten (10) calendar days shall serve as the arbitrator.

    (b)    The procedure for disciplinary arbitration is as follows:

        1.    Notice of appeal to disciplinary arbitration shall be filed by service upon the Vice Chancellor for Legal Affairs.  A copy of the appeal shall be sent simultaneously to the College President.

        2.    The case shall be assigned to an arbitrator to be selected in accordance with Section 21.8 (a) above.

        3.    The disciplinary arbitrator shall hold a disciplinary arbitration hearing within ten (10) calendar days of designation, or on such other date as may be mutually agreed upon by the parties.  The disciplinary arbitrator shall render a decision within five (5) calendar days of the close of the hearing.  The arbitrator shall follow AAA procedures.

        4.    The disciplinary arbitrator shall be limited to determinations of guilt or innocence and the sufficiency of grounds for the penalty.  The arbitrator shall not consider alleged violations of any other provision or article of this Agreement, or of the University Bylaws or written policies, which shall be subject, as applicable, only to the provisions of Article 20 of this Agreement.  The disciplinary arbitrator shall not add to, subtract from, or modify the provisions of this Agreement.  The disciplinary arbitrator's decision regarding guilt or innocence and the sufficiency of grounds for the penalty shall be final and binding upon the parties. The disciplinary arbitrator may approve or disapprove the penalty or impose other penalties warranted under the circumstances.

21.9    Employees in titles in the Higher Education Officer Series shall be subject to immediate discharge for just cause.

    (a)    Disciplinary proceedings shall be initiated by the President of the college by service, personally or by certified mail, of a written Notice of Intent for Immediate Discharge upon the employee, which set forth:

        1.    the charges against the employee, and
        2.    the proposed penalty of immediate discharge.

<div align="center">58</div>

<div align="center">A.106</div>

(b)     Within three (3) days, exclusive of Saturdays, Sundays, and legal holidays, of service of the written notice of Intent for Immediate Discharge, a meeting shall be conducted by the President or his or her designee with the employee, who may be accompanied by an attorney or a representative of the Professional Staff Congress, to discuss the notice, the basis of the charge, and the proposed penalty.

(c)     If the employee fails to appear at the meeting, the President may issue a Notice of Immediate Discharge which shall be effective immediately.

(d)     Within twenty-four (24) hours of the meeting described in Section 21.9(b), the President shall either:

1.     Withdraw the Notice of Intent for Immediate Discharge;
2.     Issue a Notice of Immediate Discharge which shall be effective immediately; or
3.     Issue a Notice of Intent to Prefer Charges under Section 21.2 seeking a lesser penalty than dismissal.

(e)     Within fourteen (14) calendar days of service of the Notice of Immediate Discharge, the employee may appeal the immediate discharge to the Chancellor's Designee.

(f)     Within fourteen (14) calendar days of receipt of the appeal, the Chancellor's Designee shall schedule a hearing and within fourteen (14) calendar days of the hearing review the matter and render a decision sustaining, modifying, or overturning the immediate discharge.

(g)     Within fourteen calendar days of the receipt of the decision of the Chancellor's Designee, the employee may appeal by proceeding to disciplinary arbitration in accordance with Section 21.8.

21.10   Any person against whom charges have been made may, at any time during the pendency of the charges, be suspended by the president of the college. Such suspension shall be without loss of pay.

A person suspended with pay shall be available for all procedures mandated by Article 21. Upon suspension with pay, notwithstanding any other provision of this Agreement, any request to be absent from any aspect of these procedures must be approved in advance by the Senior Vice Chancellor for Labor Relations upon the recommendation of the President. Failure to be available for any Article 21 proceeding without said approval of a request to be absent for the period specified in the approval of the request shall result in loss of pay status for a period of three weeks. Such period of non-pay status shall be discontinued as of the date of the proceeding if a proceeding under this article is scheduled and held within that three-week period. If, however, the person continues to be unavailable, the person shall be subject to further removal from pay status for successive three-week periods until such time as the proceeding is scheduled

59

A.107

and held. Said loss of pay status cannot be charged to annual leave, temporary disability leave, or other paid leave.

21.11   Adjuncts shall be subject to discharge for just cause, subject to the Grievance and Arbitration article and not to Article 21 of this Agreement.

21.12   The procedures provided by this Article 21 are modified and expedited as follows for disciplinary charges brought against instructional staff members who have been convicted of a felony:

   (a)   Disciplinary proceedings shall be initiated by the President of the College by preferment of charges, rather than service of a notice of intent to prefer charges upon the employee. Charges will be preferred via overnight mail. The recommended penalty will be discharge.

   (b)   Within three (3) calendar days of receipt of the President's statement of charges, unless the penalty has been accepted by the employee, notice of appeal to disciplinary arbitration shall be filed by service upon the Vice Chancellor for Legal Affairs. A copy shall be sent simultaneously to the College President.

   (c)   The case shall be assigned to an arbitrator to be selected in accordance with Section 21.8.a. These cases will be given priority for assignment.

   (d)   The disciplinary arbitrator shall hold a disciplinary arbitration hearing within ten (10) calendar days of designation. The disciplinary arbitrator shall render a decision within five (5) calendar days of the close of the hearing.

   (e)   Any person convicted of a felony against whom disciplinary charges have been made may, at any time during the pendency of the charges, be suspended without pay by the president of the college.

   (f)   Conviction of a felony shall create a presumption of conduct unbecoming a member of the staff. The employee may argue to the arbitrator that there were extenuating circumstances that would permit the arbitrator to conclude that a less severe penalty is warranted.

   (g)   Should a court of final jurisdiction overturn the conviction, there shall be a right to a hearing before an arbitrator upon application for restoration to service. The issue in the hearing will be whether grounds for discharge pursuant to Article 21.1 existed, notwithstanding the reversal of the conviction.

   (h)   The parties recognize that an employee may be convicted of a felony after charges have been preferred and that the disciplinary procedures in Article 21 may have commenced prior to the conviction. In such a case, the procedures outlined above will replace Article

60

A.108

21 procedures at the appropriate stage to which the charges had progressed immediately prior to the conviction.

21.13 A disciplinary proceeding brought pursuant to this article may be resolved by settlement only if agreed to in writing by the Office of Labor Relations and by the PSC Central Office.

## ARTICLE 21A
## MEDICAL SEPARATION LEAVE PROCEDURE

1. Effective August 25, 2016, the following procedures provide an alternative to the use of the Article 21 disciplinary process for employees who are unable to perform the duties of their positions by reason of a physical or mental incapacity. CUNY, in its discretion, may either commence disciplinary proceedings in accordance with Article 21 or may place an employee on a medical leave of absence ("medical leave") according to the following procedures.

2. When in the judgment of CUNY an employee is unable to perform the duties of his or her position by reason of a physical or mental incapacity, including any such incapacity caused by substance abuse, and CUNY opts to follow the Medical Separation Leave procedures in lieu of Article 21, the president of the employee's college, or his or her designee, having consulted with CUNY, shall send written notice of the facts providing the basis for CUNY's judgment that the employee is not fit to perform the duties of his or her position ("the notice"), along with a copy of the employee's job description, to the employee, the PSC, CUNY's Office of the General Counsel and the PSC-CUNY Welfare Fund ("Welfare Fund") at least fourteen (14) calendar days prior to the commencement of the medical leave. Such notice, stating the start date of the medical leave, shall be sent to the employee's college email address, as well as to the employee's home address on file by first class mail.

3. An employee who wishes to contest the placement on leave may, within fourteen (14) calendar days of the date of the notice, request an independent medical examination in accordance with paragraph 5 below, by written notice to the Welfare Fund, with copies to the PSC and to CUNY's Office of the General Counsel. As a condition precedent to an independent medical examination, the employee must meet requirements regarding waivers, release forms and other documents specified by the Welfare Fund. Failure to do so will result in forfeiture of the opportunity to receive an independent medical examination.

4. The Welfare Fund Board of Trustees shall select and enter into a contract with a third-party vendor ("the provider") that will provide Board-certified medical practitioners in appropriate areas of practice, including, but not limited to, psychiatry, neurology, orthopedic medicine and internal medicine, to conduct independent medical examinations in accordance with the terms of this Article.

Should the Welfare Fund fail to retain a provider—either within 90 calendar days of the ratification date of the successor to the 2007-2010 collective bargaining agreement or as needed

61

A.109

in the future—the medical separation procedures set forth in this Article shall be considered null and void in their entirety.

5.  Upon receipt of a written request from an employee seeking an independent medical examination, the Welfare Fund shall direct the provider to appoint a medical practitioner from an appropriate area of practice to conduct the examination and shall furnish the provider with a copy of CUNY's notice and the employee's job description referred to in paragraph 2.  Within 60 calendar days of the Welfare Fund's receipt of the employee's request for a medical examination, the Welfare Fund shall deliver to CUNY's Office of the General Counsel, with notice to the PSC of said delivery, a copy of the medical practitioner's report regarding the employee's fitness to perform the duties of his or her position and copies of the medical practitioner's diagnoses, test results, observations and other data relied upon, if any. The Welfare Fund shall also provide copies of the report and the above-cited materials to the employee. The Welfare Fund shall maintain the originals in a confidential file.

    (a) If the medical practitioner certifies that the employee is fit to perform the duties of his or her position, the employee shall be removed from medical leave and returned to active status within seven (7) calendar days following CUNY's receipt of the medical practitioner's report.

    (b) If the medical practitioner certifies that the employee is not fit to perform the duties of his or her position, CUNY shall continue the employee's medical leave of absence.  CUNY shall send the employee and the PSC written notice of the continuation of the leave.  The notice of continuation shall also inform the employee of his or her rights under Section 6 of these procedures.

6.  Within fourteen (14) calendar days from receipt by the employee of medical certification that the employee is not fit to perform the duties of his or her position, the PSC may file a demand for arbitration on the question of the employee's fitness for duty by serving written notice to that effect by certified mail, return receipt requested, directed to the Chancellor or the Chancellor's designee. The parties shall designate an individual arbitrator to hear cases under this provision from among those mutually agreed to under Article 20.5 of the collective bargaining agreement, and the arbitration will be conducted in accordance with American Arbitration Association rules. The parties shall schedule a hearing to be held within 45 calendar days and completed within 90 calendar days of the University's receipt of the demand for arbitration, and a decision shall be rendered by the Arbitrator within 45 calendar days of the close of the hearing. Closing arguments shall be made orally at the last day of the hearing; closing briefs will not be submitted. The Arbitrator shall determine, based on the evidence, whether the employee is fit to perform the duties of his or her position.  Should the Arbitrator determine that the employee is not fit to perform the duties of his or her position, CUNY shall continue the employee's medical leave of absence. Should the Arbitrator determine that the employee is fit to perform the duties of his or her position, the employee shall be removed from medical leave and returned to active status. The burden of proving mental or physical fitness shall be upon the employee. The costs of arbitration shall be borne equally by the parties.

62

A.110

7. A medical leave under this section shall be for one year from the start date of the Medical Separation Leave in the notice in paragraph 2. The employee shall remain in paid status for the first six months of the leave and thereafter may utilize his or her temporary disability leave and/or annual leave accruals, if any, and may apply for long-term disability to the extent available through the Welfare Fund, or to use the Catastrophic Sick Leave Bank or the Dedicated Sick Leave Program, in accordance with the terms of those policies, to the extent that he or she is eligible. An employee who is contesting his or her placement on medical leave or seeking to return to duty will not be eligible for the Sick Leave Bank or Dedicated Sick Leave Program, inasmuch as both programs require an acknowledgement from the employee that he or she is catastrophically ill (for the Sick Leave Bank) or seriously ill (for the Dedicated Sick Leave Program) and both require supporting medical documentation. Should the employee exhaust available accruals prior to the expiration of the medical leave, the remainder of the medical leave shall be unpaid.

8. An employee placed on medical leave may seek to return to duty by making a written application to the Welfare Fund, with copies to the PSC and to CUNY's Office of the General Counsel, for a medical examination by a medical practitioner selected by the provider, who should be different from the medical practitioner who conducted the initial medical examination under paragraph 5 above, to the extent a different practitioner is available. Such application may be made no earlier than 120 days from the commencement of the medical leave and no later than one year from the commencement of the leave.

   The procedures and time frames for the appointment of a medical practitioner and issuance of a report shall be the same as those in paragraph 5 above. If the medical practitioner certifies that such employee is fit to perform the duties of his or her position, the employee shall be removed from medical leave and returned to active status within seven (7) calendar days following CUNY's receipt of the medical practitioner's report. An arbitration filed in accordance with paragraph 6 above that is still pending at the time the employee applies for a return-to-duty medical examination under this paragraph 8 shall be deemed to be withdrawn with prejudice as of the date of receipt by the Welfare Fund of the medical practitioner's report regarding the employee's fitness to return to duty. The PSC shall notify the Arbitrator of the withdrawal.

9. After an employee has been on medical leave for one year, he or she shall be separated from employment at CUNY. No such separation shall occur if any proceedings to establish the employee's fitness under these procedures are pending. When proceedings are completed, the employee shall either be separated from employment or returned to active status, according to the outcome.

10. Following any determination under section 5(a), section 6, or section 8 above that an employee is fit to perform the duties of his or her position or in the event that the report regarding the employee's fitness is not delivered to CUNY within 60 calendar days of the Welfare Fund's receipt of the employee's request for an independent medical exam, CUNY may terminate the employee's medical leave and commence disciplinary proceedings in accordance with Article 21.

63

A.111

11. To fund the establishment and administration of this program, CUNY shall deposit $35,000 per year into a dedicated fund with the Welfare Fund, from which the Welfare Fund may draw up to $5,000 per year in administrative costs. On or before July 31 of each year, the Welfare Fund shall provide CUNY with an annual accounting of the expenditures with regard to any or all independent medical examinations, including any medical tests conducted and administrative costs incurred during the prior fiscal year (July 1 through June 30). In addition to the annual accounting, the Welfare Fund shall notify CUNY in writing at such point in time as it has encumbered $25,000 of the funds dedicated to this program. Any funds remaining in one fiscal year shall be credited against CUNY's contribution in the next fiscal year. Any shortfall in a given year shall be reimbursed by CUNY in the next fiscal year. Such reimbursement shall be made by September 30, provided that timely written notice of reaching the $25,000 threshold was given to CUNY. If the medical separation process is declared null and void pursuant to paragraph 4 above, or for any other reason, unexpended funds shall be returned to CUNY.

## ARTICLE 22
## INCREASED PROMOTIONAL OPPORTUNITIES

22.1    In order to increase promotional opportunities for members of the Instructional Staff in the titles Professor, Associate Professor, Assistant Professor and Instructor, and in an effort to reach goals of 30-30-30-10 expressed in Article XXX of the expired contract between the Board and Legislative Conference, the University agrees that budgetary considerations shall not constitute a ground for withholding promotions of qualified persons recommended for promotion to such titles in accordance with established criteria and procedures.

22.2    (a)    In order to increase promotional opportunities for members of the Instructional Staff in the College Laboratory Technician titles, and in an effort to reach goals in each college of 10% in the Chief College Laboratory Technician title, 25% in the Senior College Laboratory Technician title and 65% in the College Laboratory Technician title, the University agrees that budgetary considerations shall not constitute a ground for withholding promotions to qualified persons recommended for promotion to such titles in accordance with established criteria and procedures, up to that percentage.

      (b)    There shall be University-wide labor management committee composed of two members designated by the Chancellor and two members designated by the PSC to review the promotion procedures applicable to instructional staff in the College Laboratory Technician series. The committee will conclude its work by issuing a non-binding report to the Chancellor and the President of the PSC no later than October 30, 2002.

22.3    Qualified members of this unit in adjunct titles who are recommended for reappointment and promotional reclassification in accordance with established criteria and procedures shall be so reclassified, subject to Board approval.

64

A.112

22.4    The University agrees that budgetary considerations shall not constitute a ground for withholding appointment to the rank of Assistant Professor of a certificated Lecturer who has earned a doctorate and has been recommended as qualified for such appointment in accordance with established criteria and procedures.

22.5    In recognition of the non-promotional status of the Higher Education Officer series titles, the parties agree that:

(a)     Upon the recommendation of the appropriate supervisory personnel in recognition of excellence in performance or increased responsibilities, a member of the instructional staff in any of such titles may, upon approval of the Board, be granted an additional Movement within Schedule in the same title.

(b)     Effective August 25, 2016, Assistants to HEO, HEO Assistants or HEO Associates who have completed one or more years of service at the top salary step in their respective salary schedules shall be eligible for a discretionary assignment differential of $2,500, to be added to their annual base salary, based upon excellence in performance or increased responsibilities within the title. Eligible employees may be nominated by their supervisors or may nominate themselves to receive the differential.[14]  Initial review of nominations shall be performed by the labor-management committee as constituted in Section 15.4 (f). Positive recommendations from the labor management committee shall be forwarded to the College HEO Committee; positive recommendations from the College HEO Committee shall then be forwarded to the President or the President's designee for decision, subject to approval of the Board.

(c)     Eligible employees who submit completed applications to the college HR office by January 1 of each year shall receive notification of the President's decision no later than the following June 30.  Eligible employees who submit completed applications to the college HR office by July 1 of each year shall receive notification of the President's decision no later than the following January 15.

## ARTICLE 23
## DISTINGUISHED PROFESSORSHIP

23.1    Distinguished Professors shall be nominated by a college in accordance with the procedures in the College P & B Committee and Board Bylaws for appointments. The number of such positions shall not exceed 175 prior to the start of the 2016-2017 academic year; thereafter the number of such positions shall not exceed 250.  Effective with the 2019-2020 academic year, the number of positions shall not exceed 300.  A side letter concerning appointments to the Distinguished Professor title is attached as Appendix I.

---

[14] A pilot program will be established January 1, 2020 through June 30, 2023 for the University to set aside funds to supplement the funding provided by the colleges for discretionary HEO assignment differentials.  See Appendix O.

23.2    Faculty members holding the rank of professor at the college and other distinguished scholars in the academic world shall be eligible for consideration as a Distinguished Professor.  A member of the administration holding the rank of professor also may be considered for a Distinguished Professorship provided that he or she returns to his or her non-administrative duties for the acceptance of the Distinguished Professorship.

23.3    The appointment of a Distinguished Professor ordinarily shall be for a specific period. Tenure in the title of Distinguished Professor shall not be granted, but with no prejudice towards tenure of a Distinguished Professor in the title of Professor.

23.4    Compensation for employees in this title shall consist of the salary in the base title plus $28,594 per annum.

# ARTICLE 24
## SALARY SCHEDULES

24.1    Salary Schedules. The "salary schedule" for each title listed in this Article is the appropriate schedule of annual salary rates in effect on the dates indicated.  Employees will be placed laterally on the appropriate step of the schedule on the dates indicated.

24.2    Movement within Schedule. "Movement within Schedule" of a person covered by this Article is movement from one schedule step to the next higher step of this same schedule.  Except as otherwise specified in this Agreement, Article XII of the Bylaws shall govern movement within schedule.

Except as otherwise noted in this Agreement, for HEO series employees, the movement within schedule shall take place on the January first or July first following completion of at least eleven (11) full months of service.  For all other members of the Instructional Staff the movement within schedule shall take place on the January first of each succeeding year following completion of at least ten (10) full months of service.

(a)    The last two steps on the salary schedules for employees in the titles Professor, Associate Professor, Assistant Professor, Lecturer, Lecturer Doctoral Schedule, Higher Education Officer, Higher Education Associate, Higher Education Assistant, and Assistant to Higher Education Officer, in the Registrar title series, and in the CLT title series are an exception to the preceding paragraph.  The penultimate step on the salary schedules for these employees, designated in the schedule by bold print and an asterisk, is known as the "five-year step."  Employees in the titles listed above shall be eligible to receive the "five-year step" not later than upon completion of five years of service at the preceding step, known as the "last one-year step."  Following the "five-year step" in the salary schedules for employees in the titles listed above is the "seven-year step," designated in the salary schedules by bold print and two asterisks.  Employees in the titles listed above shall be

66

A.114

eligible to receive the "seven-year step" not later than upon completion of two years of service at the five-year step.

In all cases, time served shall be counted in accordance with the established rules applicable to determining movement within schedule.

Lecturers who hold doctoral degrees from an accredited university in a field related to the discipline taught or the job duties performed by the Lecturer shall receive a differential. This differential is included in the salaries listed under the title "Lecturer Doctoral Schedule."

(b)    An Adjunct in a teaching or non-teaching title who on July 1, shall have served six semesters University-wide over a period of the preceding three years and who has not received a movement within schedule during that period shall receive a movement within schedule to the next higher dollar amount. For the purpose of this paragraph, a semester shall include summer session. As of August 25, 2022, the language in this provision concerning movement within schedule and subsections 24.2 (b) 1. (i) and (ii) will not apply to teaching adjuncts.

    1.  (i)  Effective August 25, 2006, where an adjunct's continuous appointments in a teaching or non-teaching title are immediately followed by an appointment to a Substitute full-time position on the instructional staff with no break in service, and the period of Substitute service is immediately followed by continuous appointment to an adjunct teaching or non-teaching title with no break in service, the period of adjunct service immediately preceding the Substitute appointment will be added to the continuous adjunct service immediately following the Substitute service, as though there were no break in adjunct service, for the purposes of determining eligibility for a movement within schedule.

      (ii)  Effective the Fall 2008 semester, Substitute service immediately preceded by and immediately followed by adjunct service shall be counted as continuous adjunct service for the purpose of determining eligibility for movement within schedule. Substitute service in academic year 2007-2008 shall be considered qualifying toward this benefit.

    2.  The college shall notify each adjunct instructional staff member of his/her title and hourly rate of pay in his/her appointment letter. If the adjunct instructional staff member believes that the hourly rate of pay is incorrect, he/she will so notify the college's Office of Human Resources. If the adjunct notifies the college's Office of Human Resources within 30 days of the first day of the semester, any adjustment in the hourly rate of pay will be made retroactive to the first day of the semester.

(c)    Effective at the start of the Fall 2022 semester (*i.e.*, August 25, 2022), the salary steps in teaching adjunct titles, except Medical series titles and Resident series titles, shall be

<div align="center">67</div>

<div align="center">A.115</div>

eliminated and replaced with a single hourly rate, as reflected in the salary schedules in Article 24.6.

24.3   The following are the applicable salary schedule changes and salary increases for the period December 1, 2017 through February 28, 2023:

(a)   1.   (i)   For employees in the full-time titles of Professor, Associate Professor, Assistant Professor,   Instructor and Instructor Nursing Science, Research Assistant, College Physician, Higher Education Officer, Higher Education Associate, Higher Education Assistant, Assistant Teacher, Associate Registrar and Assistant Registrar, and for Graduate Assistants A, B, C, and D:  effective on October 1, 2018, October 31, 2019, November 15, 2020, November 15, 2021, and November 1, 2022, each employee shall move to the step of the salary schedule paralleling the step on which the employee was being paid on the day preceding implementation of the appropriate salary schedule.

(ii)   For employees in the full-time titles of Lecturer, Lecturer Doctoral Schedule, full-time CUNY Start Instructor and full-time CUNY Language Immersion Program (CLIP) Instructor:  effective on October 1, 2018, October 31, 2019, November 15, 2020, April 1, 2021, November 15, 2021, and November 1, 2022, each employee shall move to the step of the salary schedule paralleling the step on which the employee was being paid on the day preceding implementation of the appropriate salary schedule.

(iii)   For employees in the full-time titles of Chief Laboratory Technician, Senior College Laboratory Technician, and College Laboratory Technician: effective on October 1, 2018, October 31, 2019, January 1, 2020, November 15, 2020, November 15, 2021, and November 1, 2022, each employee shall move to the step of the salary schedule paralleling the step on which the employee was being paid on the day preceding implementation of the appropriate salary schedule.

(iv)   For employees in the full-time title of Assistant to HEO:  effective on October 1, 2018, October 31, 2019, November 15, 2020, February 1, 2021, November 15, 2021, and November 1, 2022, each employee shall move to the step of the salary schedule paralleling the step on which the employee was being paid on the day preceding implementation of the appropriate salary schedule.

(v)   For employees in adjunct and hourly titles: effective on October 1, 2018, October 31, 2019, November 15, 2020, and November 15, 2021, each employee shall move to the step of the salary schedule paralleling the step on which the employee was paid on the day preceding implementation of the appropriate salary schedule. The November 1, 2022 2% wage increase shall apply to the hourly rates for all non-teaching adjuncts, adjunct CLTs and CETs,

68

A.116

including those in the schools and programs named in section b) below. The November 1, 2022 2% wage increase shall not apply to teaching adjunct series titles and hourly professorial salary schedules except as set forth in subsections a) and b) below.

a) The November 1, 2022 2% wage increase shall apply to the hourly rates for individuals employed in the following teaching adjunct titles whose hourly rate of pay as of August 25, 2022, as a result of previous CUNY employment as a teaching adjunct, exceeds the hourly rate of pay resulting from the application of a single hourly rate of pay for their title effective August 25, 2022: Adjunct Lecturer, Adjunct Lecturer (H), Adjunct Lecturer Doctoral and Instructor (H); Adjunct Assistant Professor and Adjunct Assistant Professor (H); Adjunct Associate Professor and Adjunct Associate Professor (H); and Adjunct Professor and Adjunct Professor (H).

b) The November 1, 2022 2% wage increase shall apply to the hourly rates for teaching adjuncts in Medical series titles, Law School series titles, Resident series titles, Graduate School of Journalism series titles, and Executive Programs in the Zicklin School of Business at Baruch College series titles, whose compensation and workload shall continue consistent with past practices and the collective bargaining agreement.

2. Retroactive pay will be paid to employees for such time as they were in active pay status during the periods specified in this paragraph, as follows:

(i) For the period October 1, 2018, to the date upon which the new salary schedules are implemented, employees will receive retroactive salary on the September 30, 2018 salary rate equal to 2.00% per annum.

(ii) For the period October 31, 2019, to the date upon which the new salary schedules are implemented, employees will receive retroactive salary on the October 30, 2019 salary rate, as increased pursuant to Article 24.3 (a) (2) (i), equal to 2.00% per annum.

(iii) In calculating the retroactive pay provided for in Article 24.3 (a) (2) (i), and (ii), the January 1 and July 1 step increases that employees may have received will be adjusted by the appropriate percentage increases.

(b) 1. The salary of each employee who is in a title for which there is no step schedule and who was in active pay status on September 30, 2018, shall be paid at a salary rate which is 2.00% more than the September 30, 2018 rate during the period October 1, 2018, through October 30, 2019.

2.  The salary rate of each employee who is in a title for which there is no step schedule and who was in active pay status on October 30, 2019, shall be paid at a salary rate which is 2.00% more than the October 30, 2019 rate during the period October 31, 2019, through November 14, 2020.

3.  The salary rate of each employee who is in a title for which there is no step schedule and who was in active pay status on November 14, 2020 shall be paid at a salary rate which is 2.00% more than the November 14, 2020 salary rate during the period November 15, 2020, through November 14, 2021.

4.  The salary rate of each employee who is in a title for which there is no step schedule and who was in active pay status on November 14, 2021, shall be paid at a salary rate which is 2.00% more than the November 14, 2021 salary rate during the period November 15, 2021, through October 31, 2022.

5.  The salary rate of each employee who is in a title for which there is no step schedule and who was in active pay status on October 31, 2022, shall be paid at a salary rate which is 2.00% more than the October 31, 2022 salary rate effective November 1, 2022.

24.4  Summer Salaries for Department Chairpersons

(a)  Effective Summer 2004 and every summer thereafter, Department Chairpersons shall be compensated according to the following formula for any and all hours of work performed as Department Chairpersons during their annual leave period: (annual salary divided by 9) multiplied by (number of hours worked divided by 120 hours).

(b)  Discussions between the Department Chairperson and the President or the President's designee regarding the number of hours and the amount of work the college is prepared to compensate, if any, will be concluded by April 30 of each year.

(c)  This provision shall not affect existing agreed-upon practices concerning coverage of the Department Chairperson's duties when he/she is unavailable to perform them. Under such circumstances, coverage shall be paid in accordance with the provisions of paragraph (a) above.

(d)  All other provisions in the Collective Bargaining Agreement regarding annual leave and Department Chairpersons shall remain in full force and effect.

24.5  Hunter College Campus Schools

(a)  The provisions of Section 6216 of the New York State Education Law relating to salaries of persons employed in the Hunter College Campus Schools shall be applicable.

70

A.118

(b)    The Hunter College Campus Schools may hire persons to teach on an hourly basis when full-time teaching service is not warranted. Hourly service may be required for instruction in highly specialized areas or when there is a shortage of regularly licensed teachers in particular licensed areas. Hourly teachers shall be hired for not more than three contact hours per day.  A contact hour shall be not less than 45 minutes for purposes of this Article.  The hourly rate is .13 of the daily rate.  Effective January 1, 2020, the hourly rate is .20 of the daily rate.  The daily rate is 1/180 of the annual salary rate based upon the Board of Education's salary schedule, C1 through C2 + PD, up to the maximum step, 4A.

Incumbent half-time employees as of September, 1987, shall retain a fractional salary rate for the duration of their employment as long as such employment is continuous.

(c)    Incumbents in the title Assistant Teacher as of August 31, 1990 shall be paid in accordance with the salary schedule established effective November 1, 1990. Incumbents in this title will be eligible to receive a movement within schedule on January 1, 1995 and the January first of each succeeding year following completion of at least ten (10) full months of service. The salary rates are set forth in the schedule in Article 24.  Effective September 6, 2016, each employee in the Assistant Teacher title shall move to the step of the salary schedule paralleling the step on which the employee was being paid on the day preceding implementation of the September 6, 2016 salary schedule. Effective January 1, 2020, each employee in the Assistant Teacher title shall move to the step of the salary schedule paralleling the step on which the employee was being paid on the day preceding implementation of the January 1, 2020 salary schedule.

71

A.119

24.6 Salary Schedules

## PROFESSOR

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|-----------|-----------|-----------|-----------|-----------|
| $77,490 | $79,040 | $80,621 | $82,233 | $83,878 |
| $80,550 | $82,161 | $83,805 | $85,481 | $87,190 |
| $83,732 | $85,406 | $87,115 | $88,857 | $90,634 |
| $86,657 | $88,390 | $90,158 | $91,961 | $93,800 |
| $89,245 | $91,030 | $92,850 | $94,707 | $96,602 |
| $92,688 | $94,542 | $96,433 | $98,362 | $100,329 |
| $96,133 | $98,056 | $100,017 | $102,017 | $104,057 |
| $99,581 | $101,572 | $103,604 | $105,676 | $107,789 |
| $103,064 | $105,125 | $107,228 | $109,372 | $111,560 |
| $106,550 | $108,681 | $110,855 | $113,072 | $115,333 |
| $110,857 | $113,074 | $115,335 | $117,642 | $119,995 |
| $115,163 | $117,466 | $119,816 | $122,212 | $124,656 |
| $119,462 | $121,852 | $124,289 | $126,774 | $129,310 |
| **$122,859** | **$125,316** | **$127,823** | **$130,379** | **$132,987***  |
| **$131,055** | **$133,676** | **$136,349** | **$139,076** | **$141,858**** |

## ASSOCIATE PROFESSOR

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|-----------|-----------|-----------|-----------|-----------|
| $62,622 | $63,874 | $65,152 | $66,455 | $67,784 |
| $65,087 | $66,389 | $67,717 | $69,071 | $70,453 |
| $67,650 | $69,003 | $70,384 | $71,791 | $73,227 |
| $70,577 | $71,988 | $73,428 | $74,897 | $76,395 |
| $73,157 | $74,621 | $76,113 | $77,635 | $79,188 |
| $76,612 | $78,144 | $79,707 | $81,301 | $82,928 |
| $80,047 | $81,647 | $83,280 | $84,946 | $86,645 |
| $83,492 | $85,162 | $86,865 | $88,602 | $90,375 |
| $86,372 | $88,099 | $89,861 | $91,658 | $93,491 |
| $89,245 | $91,030 | $92,850 | $94,707 | $96,602 |
| $92,688 | $94,542 | $96,433 | $98,362 | $100,329 |
| $96,133 | $98,056 | $100,017 | $102,017 | $104,057 |
| $99,581 | $101,572 | $103,604 | $105,676 | $107,789 |
| **$102,215** | **$104,260** | **$106,345** | **$108,472** | **$110,641***  |
| **$108,834** | **$111,011** | **$113,231** | **$115,496** | **$117,805**** |

72

A.120

## ASSISTANT PROFESSOR

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $48,287 | $49,253 | $50,238 | $51,242 | $52,267 |
| $50,177 | $51,180 | $52,204 | $53,248 | $54,313 |
| $52,149 | $53,191 | $54,255 | $55,340 | $56,447 |
| $54,731 | $55,826 | $56,942 | $58,081 | $59,243 |
| $57,659 | $58,812 | $59,988 | $61,188 | $62,411 |
| $59,726 | $60,921 | $62,139 | $63,382 | $64,649 |
| $61,964 | $63,203 | $64,467 | $65,757 | $67,072 |
| $64,889 | $66,187 | $67,511 | $68,861 | $70,238 |
| $67,133 | $68,476 | $69,846 | $71,242 | $72,667 |
| $69,718 | $71,112 | $72,535 | $73,985 | $75,465 |
| $73,157 | $74,621 | $76,113 | $77,635 | $79,188 |
| $76,612 | $78,144 | $79,707 | $81,301 | $82,928 |
| $80,047 | $81,647 | $83,280 | $84,946 | $86,645 |
| $83,492 | $85,162 | $86,865 | $88,602 | $90,375 |
| **$86,041** | **$87,762** | **$89,517** | **$91,307** | **$93,134*** |
| **$91,952** | **$93,791** | **$95,667** | **$97,580** | **$99,532**** |

## INSTRUCTOR AND INSTRUCTOR (NURSING SCIENCE)

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $44,373 | $45,261 | $46,166 | $47,089 | $48,031 |
| $46,106 | $47,028 | $47,969 | $48,928 | $49,907 |
| $47,911 | $48,870 | $49,847 | $50,844 | $51,861 |
| $50,837 | $51,854 | $52,891 | $53,948 | $55,027 |
| $53,423 | $54,491 | $55,581 | $56,692 | $57,826 |
| $55,487 | $56,597 | $57,729 | $58,883 | $60,061 |
| $58,417 | $59,586 | $60,778 | $61,993 | $63,233 |
| $60,485 | $61,695 | $62,929 | $64,187 | $65,471 |
| $62,552 | $63,803 | $65,079 | $66,380 | $67,708 |
| $64,618 | $65,910 | $67,229 | $68,573 | $69,945 |
| $66,680 | $68,014 | $69,374 | $70,762 | $72,177 |
| $68,750 | $70,125 | $71,528 | $72,958 | $74,417 |
| $73,506 | $74,976 | $76,476 | $78,005 | $79,566 |

73

A.121

## LECTURER

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 4/1/2021 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|
| $46,665 | $47,598 | $48,550 | $50,050 | $51,051 | $52,072 |
| $48,449 | $49,418 | $50,406 | $51,906 | $52,944 | $54,003 |
| $50,301 | $51,307 | $52,333 | $53,833 | $54,910 | $56,008 |
| $53,303 | $54,369 | $55,457 | $56,957 | $58,096 | $59,258 |
| $55,959 | $57,078 | $58,220 | $59,720 | $60,914 | $62,133 |
| $58,078 | $59,239 | $60,424 | $61,924 | $63,163 | $64,426 |
| $61,088 | $62,310 | $63,556 | $65,056 | $66,357 | $67,684 |
| $63,211 | $64,476 | $65,765 | $67,265 | $68,610 | $69,983 |
| $65,334 | $66,641 | $67,974 | $69,474 | $70,863 | $72,280 |
| $67,454 | $68,803 | $70,179 | $71,679 | $73,112 | $74,575 |
| $69,574 | $70,966 | $72,385 | $73,885 | $75,363 | $76,870 |
| $71,699 | $73,133 | $74,595 | $76,095 | $77,617 | $79,170 |
| $73,820 | $75,297 | $76,803 | $78,303 | $79,869 | $81,466 |
| $75,943 | $77,462 | $79,011 | $80,511 | $82,121 | $83,764 |
| **$78,937** | **$80,516** | **$82,126** | **$83,626** | **$85,298** | **$87,004*** |
| **$84,363** | **$86,050** | **$87,771** | **$89,271** | **$91,057** | **$92,878**** |

### LECTURER DOCTORAL SCHEDULE[#]

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 4/1/2021 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|
| $51,052 | $52,073 | $53,115 | $54,615 | $55,707 | $56,821 |
| $53,053 | $54,114 | $55,197 | $56,697 | $57,831 | $58,987 |
| $55,134 | $56,237 | $57,361 | $58,861 | $60,039 | $61,239 |
| $58,138 | $59,301 | $60,487 | $61,987 | $63,226 | $64,491 |
| $60,801 | $62,017 | $63,258 | $64,758 | $66,053 | $67,374 |
| $62,918 | $64,176 | $65,460 | $66,960 | $68,299 | $69,665 |
| $65,927 | $67,245 | $68,590 | $70,090 | $71,492 | $72,922 |
| $68,045 | $69,406 | $70,794 | $72,294 | $73,740 | $75,215 |
| $70,172 | $71,575 | $73,007 | $74,507 | $75,997 | $77,517 |
| $72,288 | $73,734 | $75,209 | $76,709 | $78,243 | $79,808 |
| $74,408 | $75,896 | $77,414 | $78,914 | $80,492 | $82,102 |
| $76,535 | $78,065 | $79,627 | $81,127 | $82,749 | $84,404 |
| $78,654 | $80,227 | $81,832 | $83,332 | $84,999 | $86,698 |
| $80,779 | $82,394 | $84,042 | $85,542 | $87,253 | $88,998 |
| **$83,776** | **$85,451** | **$87,160** | **$88,660** | **$90,433** | **$92,242*** |
| **$89,381** | **$91,168** | **$92,992** | **$94,492** | **$96,381** | **$98,309**** |

[#]See provisions of Article 24.2(a)

74

A.122

## DISTINGUISHED LECTURER

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $46,665 | $47,598 | $48,550 | $49,521 | $50,512 |
| To | to | to | to | to |
| $131,055 | $133,676 | $136,349 | $139,076 | $141,858 |

## CLINICAL PROFESSOR

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $46,665 | $47,598 | $48,550 | $49,521 | $50,512 |
| To | to | to | to | to |
| $131,055 | $133,676 | $136,349 | $139,076 | $141,858 |

## RESEARCH ASSOCIATE

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $50,511 | $51,522 | $52,552 | $53,603 | $54,675 |
| To | to | to | to | to |
| $131,055 | $133,676 | $136,349 | $139,076 | $141,858 |

## RESEARCH ASSISTANT

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $39,693 | $40,487 | $41,297 | $42,123 | $42,965 |
| $41,243 | $42,068 | $42,909 | $43,767 | $44,642 |
| $42,854 | $43,711 | $44,586 | $45,477 | $46,387 |
| $45,817 | $46,734 | $47,668 | $48,622 | $49,594 |
| $48,427 | $49,395 | $50,383 | $51,391 | $52,418 |
| $50,511 | $51,522 | $52,552 | $53,603 | $54,675 |
| $51,208 | $52,232 | $53,277 | $54,342 | $55,429 |
| $53,879 | $54,957 | $56,056 | $57,177 | $58,321 |

75

A.123

## COLLEGE PHYSICIAN

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $38,162 | $38,926 | $39,704 | $40,498 | $41,308 |
| $39,649 | $40,442 | $41,251 | $42,076 | $42,918 |
| $41,195 | $42,019 | $42,859 | $43,716 | $44,591 |
| $44,125 | $45,008 | $45,908 | $46,826 | $47,763 |
| $46,708 | $47,642 | $48,595 | $49,567 | $50,558 |
| $48,769 | $49,745 | $50,740 | $51,754 | $52,789 |
| $49,809 | $50,805 | $51,821 | $52,857 | $53,914 |
| $50,837 | $51,854 | $52,891 | $53,948 | $55,027 |
| $51,875 | $52,913 | $53,971 | $55,050 | $56,151 |
| $52,906 | $53,965 | $55,044 | $56,145 | $57,268 |
| $53,940 | $55,018 | $56,119 | $57,241 | $58,386 |
| $57,060 | $58,201 | $59,365 | $60,552 | $61,763 |

## HIGHER EDUCATION OFFICER

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $77,490 | $79,040 | $80,621 | $82,233 | $83,878 |
| $80,550 | $82,161 | $83,805 | $85,481 | $87,190 |
| $83,732 | $85,406 | $87,115 | $88,857 | $90,634 |
| $86,657 | $88,390 | $90,158 | $91,961 | $93,800 |
| $89,245 | $91,030 | $92,850 | $94,707 | $96,602 |
| $92,688 | $94,542 | $96,433 | $98,362 | $100,329 |
| $96,133 | $98,056 | $100,017 | $102,017 | $104,057 |
| $99,581 | $101,572 | $103,604 | $105,676 | $107,789 |
| $103,064 | $105,125 | $107,228 | $109,372 | $111,560 |
| $106,550 | $108,681 | $110,855 | $113,072 | $115,333 |
| $110,857 | $113,074 | $115,335 | $117,642 | $119,995 |
| $115,163 | $117,466 | $119,816 | $122,212 | $124,656 |
| $119,462 | $121,852 | $124,289 | $126,774 | $129,310 |
| **$122,859** | **$125,316** | **$127,823** | **$130,379** | **$132,987***  |
| **$131,055** | **$133,676** | **$136,349** | **$139,076** | **$141,858*** |

A.124

## HIGHER EDUCATION ASSOCIATE

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $62,622 | $63,874 | $65,152 | $66,455 | $67,784 |
| $65,087 | $66,389 | $67,717 | $69,071 | $70,453 |
| $67,650 | $69,003 | $70,384 | $71,791 | $73,227 |
| $70,577 | $71,988 | $73,428 | $74,897 | $76,395 |
| $73,157 | $74,621 | $76,113 | $77,635 | $79,188 |
| $76,612 | $78,144 | $79,707 | $81,301 | $82,928 |
| $80,047 | $81,647 | $83,280 | $84,946 | $86,645 |
| $83,492 | $85,162 | $86,865 | $88,602 | $90,375 |
| $86,372 | $88,099 | $89,861 | $91,658 | $93,491 |
| $89,245 | $91,030 | $92,850 | $94,707 | $96,602 |
| $92,688 | $94,542 | $96,433 | $98,362 | $100,329 |
| $96,133 | $98,056 | $100,017 | $102,017 | $104,057 |
| $99,581 | $101,572 | $103,604 | $105,676 | $107,789 |
| **$102,215** | **$104,260** | **$106,345** | **$108,472** | **$110,641*** |
| **$108,834** | **$111,011** | **$113,231** | **$115,496** | **$117,805**** |

## HIGHER EDUCATION ASSISTANT

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $48,287 | $49,253 | $50,238 | $51,242 | $52,267 |
| $50,177 | $51,180 | $52,204 | $53,248 | $54,313 |
| $52,149 | $53,191 | $54,255 | $55,340 | $56,447 |
| $57,659 | $58,812 | $59,988 | $61,188 | $62,411 |
| $59,726 | $60,921 | $62,139 | $63,382 | $64,649 |
| $62,825 | $64,081 | $65,363 | $66,670 | $68,004 |
| $64,889 | $66,187 | $67,511 | $68,861 | $70,238 |
| $67,133 | $68,476 | $69,846 | $71,242 | $72,667 |
| $69,718 | $71,112 | $72,535 | $73,985 | $75,465 |
| $73,157 | $74,621 | $76,113 | $77,635 | $79,188 |
| $76,612 | $78,144 | $79,707 | $81,301 | $82,928 |
| $80,047 | $81,647 | $83,280 | $84,946 | $86,645 |
| $83,492 | $85,162 | $86,865 | $88,602 | $90,375 |
| **$86,041** | **$87,762** | **$89,517** | **$91,307** | **$93,134*** |
| **$91,952** | **$93,791** | **$95,667** | **$97,580** | **$99,532**** |

77

A.125

## ASSISTANT TEACHER

| 10/1/2018 | 10/31/2019 | 1/1/2020 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|
| $29,080 | $29,662 | $31,162 | $31,785 | $32,421 | $33,069 |
| $29,996 | $30,596 | $32,096 | $32,738 | $33,393 | $34,061 |
| $31,923 | $32,561 | $34,061 | $34,743 | $35,437 | $36,146 |

## ASSISTANT TO HIGHER EDUCATION OFFICER

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 2/1/2021 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|
| $40,068 | $40,869 | $41,686 | $42,686 | $43,540 | $44,411 |
| $41,631 | $42,464 | $43,313 | $44,313 | $45,199 | $46,103 |
| $43,255 | $44,120 | $45,003 | $46,003 | $46,923 | $47,861 |
| $45,194 | $46,098 | $47,020 | $48,020 | $48,980 | $49,960 |
| $46,876 | $47,814 | $48,770 | $49,770 | $50,765 | $51,781 |
| $49,174 | $50,158 | $51,161 | $52,161 | $53,204 | $54,268 |
| $52,176 | $53,220 | $54,284 | $55,284 | $56,390 | $57,517 |
| $54,833 | $55,930 | $57,048 | $58,048 | $59,209 | $60,394 |
| $56,954 | $58,093 | $59,255 | $60,255 | $61,460 | $62,689 |
| $59,963 | $61,162 | $62,385 | $63,385 | $64,653 | $65,946 |
| $62,086 | $63,328 | $64,595 | $65,595 | $66,907 | $68,245 |
| $64,208 | $65,492 | $66,802 | $67,802 | $69,158 | $70,541 |
| $66,329 | $67,655 | $69,008 | $70,008 | $71,408 | $72,837 |
| $68,448 | $69,817 | $71,213 | $72,213 | $73,658 | $75,131 |
| $70,572 | $71,983 | $73,423 | $74,423 | $75,911 | $77,430 |
| $72,693 | $74,147 | $75,630 | $76,630 | $78,163 | $79,726 |
| **$74,528** | **$76,019** | **$77,539** | **$78,539** | **$80,110** | **$81,712*** |
| **$78,663** | **$80,237** | **$81,841** | **$82,841** | **$84,498** | **$86,188**** |

A.126

## ASSOCIATE REGISTRAR

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $55,451 | $56,560 | $57,692 | $58,845 | $60,022 |
| $57,633 | $58,786 | $59,961 | $61,161 | $62,384 |
| $59,896 | $61,094 | $62,316 | $63,563 | $64,834 |
| $62,825 | $64,081 | $65,363 | $66,670 | $68,004 |
| $64,889 | $66,187 | $67,511 | $68,861 | $70,238 |
| $67,133 | $68,476 | $69,846 | $71,242 | $72,667 |
| $69,718 | $71,112 | $72,535 | $73,985 | $75,465 |
| $73,157 | $74,621 | $76,113 | $77,635 | $79,188 |
| $76,612 | $78,144 | $79,707 | $81,301 | $82,928 |
| $80,047 | $81,647 | $83,280 | $84,946 | $86,645 |
| $83,492 | $85,162 | $86,865 | $88,602 | $90,375 |
| **$86,041** | **$87,762** | **$89,517** | **$91,307** | **$93,134*** |
| **$91,952** | **$93,791** | **$95,667** | **$97,580** | **$99,532**** |

## ASSISTANT REGISTRAR

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $45,539 | $46,450 | $47,379 | $48,326 | $49,293 |
| $47,323 | $48,269 | $49,235 | $50,219 | $51,224 |
| $49,174 | $50,158 | $51,161 | $52,184 | $53,228 |
| $52,176 | $53,220 | $54,284 | $55,370 | $56,477 |
| $54,833 | $55,930 | $57,048 | $58,189 | $59,353 |
| $56,954 | $58,093 | $59,255 | $60,440 | $61,649 |
| $59,963 | $61,162 | $62,385 | $63,633 | $64,906 |
| $62,086 | $63,328 | $64,595 | $65,887 | $67,204 |
| $64,208 | $65,492 | $66,802 | $68,138 | $69,501 |
| $66,329 | $67,655 | $69,008 | $70,388 | $71,796 |
| $68,448 | $69,817 | $71,213 | $72,638 | $74,090 |
| $70,572 | $71,983 | $73,423 | $74,891 | $76,389 |
| $72,693 | $74,147 | $75,630 | $77,143 | $78,686 |
| **$74,528** | **$76,019** | **$77,539** | **$79,090** | **$80,672*** |
| **$78,663** | **$80,237** | **$81,841** | **$83,478** | **$85,148**** |

79

A.127

## GRADUATE ASSISTANT A

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|-----------|-----------|-----------|-----------|-----------|
| $23,426 | $23,895 | $24,373 | $24,860 | $25,357 |
| $24,323 | $24,809 | $25,306 | $25,812 | $26,328 |
| $25,257 | $25,762 | $26,278 | $26,803 | $27,339 |
| $26,583 | $27,115 | $27,657 | $28,210 | $28,775 |
| $28,091 | $28,653 | $29,226 | $29,810 | $30,406 |
| $29,149 | $29,732 | $30,326 | $30,933 | $31,551 |
| $30,653 | $31,266 | $31,891 | $32,529 | $33,180 |
| $31,713 | $32,347 | $32,994 | $33,654 | $34,327 |
| $32,777 | $33,432 | $34,101 | $34,783 | $35,479 |
| $34,859 | $35,556 | $36,267 | $36,992 | $37,732 |

## GRADUATE ASSISTANT B

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|-----------|-----------|-----------|-----------|-----------|
| $12,208 | $12,453 | $12,702 | $12,956 | $13,215 |
| $12,657 | $12,910 | $13,169 | $13,432 | $13,701 |
| $13,126 | $13,389 | $13,657 | $13,930 | $14,208 |
| $13,781 | $14,057 | $14,338 | $14,625 | $14,917 |
| $14,538 | $14,829 | $15,125 | $15,428 | $15,736 |
| $15,071 | $15,372 | $15,679 | $15,993 | $16,313 |
| $15,833 | $16,150 | $16,473 | $16,803 | $17,139 |
| $16,364 | $16,691 | $17,025 | $17,365 | $17,713 |
| $16,898 | $17,236 | $17,581 | $17,933 | $18,291 |
| $17,952 | $18,311 | $18,677 | $19,051 | $19,432 |

A.128

## GRADUATE ASSISTANT C

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|-----------|------------|------------|------------|-----------|
| $17,820 | $18,177 | $18,540 | $18,911 | $19,289 |
| $18,492 | $18,861 | $19,239 | $19,623 | $20,016 |
| $19,188 | $19,572 | $19,963 | $20,363 | $20,770 |
| $20,182 | $20,585 | $20,997 | $21,417 | $21,845 |
| $21,315 | $21,741 | $22,176 | $22,620 | $23,072 |
| $22,112 | $22,554 | $23,005 | $23,465 | $23,934 |
| $23,241 | $23,706 | $24,180 | $24,663 | $25,156 |
| $24,037 | $24,518 | $25,008 | $25,509 | $26,019 |
| $24,834 | $25,331 | $25,837 | $26,354 | $26,881 |
| $26,406 | $26,934 | $27,473 | $28,022 | $28,582 |

## GRADUATE ASSISTANT D

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|-----------|------------|------------|------------|-----------|
| $5,373 | $5,481 | $5,590 | $5,702 | $5,816 |
| $5,665 | $5,778 | $5,894 | $6,012 | $6,132 |
| $5,976 | $6,096 | $6,218 | $6,342 | $6,469 |
| $6,303 | $6,429 | $6,557 | $6,688 | $6,822 |

81

A.129

## CHIEF COLLEGE LABORATORY TECHNICIAN

| 10/1/2018 | 10/31/2019 | 1/1/2020 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|
| $56,088 | $57,210 | $58,710 | $59,884 | $61,081 | $62,303 |
| $58,118 | $59,280 | $60,780 | $61,996 | $63,235 | $64,500 |
| $60,231 | $61,436 | $62,936 | $64,194 | $65,478 | $66,788 |
| $62,748 | $64,003 | $65,503 | $66,813 | $68,150 | $69,513 |
| $64,937 | $66,236 | $67,736 | $69,091 | $70,473 | $71,882 |
| $67,917 | $69,275 | $70,775 | $72,191 | $73,634 | $75,107 |
| $69,526 | $70,917 | $72,417 | $73,865 | $75,342 | $76,849 |
| $72,038 | $73,478 | $74,978 | $76,478 | $78,007 | $79,568 |
| $75,375 | $76,882 | $78,382 | $79,950 | $81,549 | $83,180 |
| $78,730 | $80,304 | $81,804 | $83,440 | $85,109 | $86,811 |
| $82,062 | $83,703 | $85,203 | $86,907 | $88,646 | $90,418 |
| **$84,404** | **$86,092** | **$87,592** | **$89,344** | **$91,131** | **$92,953*** |
| **$89,355** | **$91,142** | **$92,642** | **$94,495** | **$96,385** | **$98,313**** |

## SENIOR COLLEGE LABORATORY TECHNICIAN

| 10/1/2018 | 10/31/2019 | 1/1/2020 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|
| $49,578 | $50,570 | $52,570 | $53,621 | $54,693 | $55,787 |
| $51,339 | $52,365 | $54,365 | $55,453 | $56,562 | $57,693 |
| $53,170 | $54,233 | $56,233 | $57,358 | $58,505 | $59,675 |
| $55,350 | $56,457 | $58,457 | $59,626 | $60,819 | $62,035 |
| $57,241 | $58,386 | $60,386 | $61,594 | $62,826 | $64,082 |
| $59,829 | $61,026 | $63,026 | $64,286 | $65,572 | $66,883 |
| $61,503 | $62,733 | $64,733 | $66,028 | $67,348 | $68,695 |
| $63,172 | $64,435 | $66,435 | $67,764 | $69,119 | $70,501 |
| $64,851 | $66,148 | $68,148 | $69,511 | $70,901 | $72,319 |
| $66,520 | $67,851 | $69,851 | $71,248 | $72,673 | $74,126 |
| $68,186 | $69,550 | $71,550 | $72,981 | $74,440 | $75,929 |
| **$69,575** | **$70,967** | **$72,967** | **$74,426** | **$75,915** | **$77,433*** |
| **$73,098** | **$74,560** | **$76,560** | **$78,091** | **$79,653** | **$81,246**** |

A.130

## COLLEGE LABORATORY TECHNICIAN

| 10/1/2018 | 10/31/2019 | 1/1/2020 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|
| $41,440 | $42,268 | $44,768 | $45,664 | $46,577 | $47,509 |
| $42,863 | $43,721 | $46,221 | $47,145 | $48,088 | $49,050 |
| $44,347 | $45,233 | $47,733 | $48,688 | $49,662 | $50,655 |
| $46,105 | $47,027 | $49,527 | $50,518 | $51,528 | $52,559 |
| $47,642 | $48,595 | $51,095 | $52,117 | $53,159 | $54,222 |
| $49,731 | $50,726 | $53,226 | $54,290 | $55,376 | $56,484 |
| $51,070 | $52,092 | $54,592 | $55,684 | $56,797 | $57,933 |
| $52,406 | $53,454 | $55,954 | $57,073 | $58,214 | $59,378 |
| $53,746 | $54,821 | $57,321 | $58,467 | $59,637 | $60,829 |
| $55,083 | $56,185 | $58,685 | $59,858 | $61,056 | $62,277 |
| $56,755 | $57,890 | $60,390 | $61,598 | $62,830 | $64,086 |
| $58,427 | $59,595 | $62,095 | $63,337 | $64,604 | $65,896 |
| $60,099 | $61,301 | $63,801 | $65,077 | $66,379 | $67,707 |
| $61,772 | $63,008 | $65,508 | $66,818 | $68,154 | $69,517 |
| **$63,075** | **$64,336** | **$66,836** | **$68,173** | **$69,536** | **$70,927\*** |
| **$66,311** | **$67,637** | **$70,137** | **$71,540** | **$72,971** | **$74,430\*\*** |

## <u>ADJUNCT AND HOURLY RATES</u>

## CHIEF COLLEGE LABORATORY TECHNICIAN,
## ADJUNCT CHIEF COLLEGE LABORATORY TECHNICIAN

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $41.32 | $42.15 | $42.99 | $43.85 | $44.73 |
| $42.97 | $43.83 | $44.71 | $45.60 | $46.51 |
| $44.70 | $45.59 | $46.50 | $47.43 | $48.38 |
| $49.90 | $50.90 | $51.91 | $52.95 | $54.01 |
| $57.07 | $58.21 | $59.37 | $60.56 | $61.77 |

83

A.131

## SENIOR COLLEGE LABORATORY TECHNICIAN,
## ADJUNCT SENIOR COLLEGE LABORATORY TECHNICIAN

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|-----------|------------|------------|------------|-----------|
| $35.57 | $36.28 | $37.00 | $37.74 | $38.50 |
| $37.00 | $37.74 | $38.49 | $39.26 | $40.05 |
| $38.43 | $39.20 | $39.99 | $40.79 | $41.60 |
| $41.54 | $42.38 | $43.22 | $44.09 | $44.97 |
| $47.18 | $48.12 | $49.08 | $50.06 | $51.06 |

## COLLEGE LABORATORY TECHNICIAN,
## ADJUNCT COLLEGE LABORATORY TECHNICIAN

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|-----------|------------|------------|------------|-----------|
| $28.85 | $29.42 | $30.01 | $30.61 | $31.22 |
| $29.97 | $30.57 | $31.18 | $31.80 | $32.44 |
| $31.19 | $31.82 | $32.45 | $33.10 | $33.76 |
| $35.31 | $36.02 | $36.74 | $37.47 | $38.22 |
| $41.68 | $42.51 | $43.36 | $44.23 | $45.11 |

84

A.132

## ADJUNCT AND HOURLY PROFESSORIAL RATES

### INSTRUCTOR, LECTURER, ADJUNCT LECTURER, ADJUNCT LECTURER (DOCTORAL STUDENT)

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 8/25/2022* |
|-----------|------------|------------|------------|------------|
| $73.02 | $74.48 | $75.97 | $77.49 | $91.67 |
| $75.93 | $77.45 | $79.00 | $80.58 | $91.67 |
| $79.01 | $80.59 | $82.20 | $83.85 | $91.67 |
| $82.53 | $84.18 | $85.86 | $87.58 | $91.67 |
| $90.90 | $92.72 | $94.57 | $96.47 | $96.47 |

**\* A single hourly rate of $91.67 will be in effect starting 8/25/2022 for these titles, except that incumbents earning $96.47 as of 8/25/2022, as a result of previous CUNY employment teaching in an hourly or adjunct capacity, will continue to receive that rate until 11/1/2022, at which time their hourly rate will increase to $98.40. (See Article 24.2 (c) and Article 24.3 (a) 1. (v) a))**

*N.B.: Pursuant to Article 24.2 (c) and Article 24.3 (a) 1. (v) a): Effective at the start of the Fall 2022 semester (i.e., August 25, 2022), the salary steps in teaching adjunct titles, except Medical series titles and Resident series titles, shall be eliminated and replaced with a single hourly rate, as reflected in the salary schedules in Article 24.6. As of August 25, 2022, the language concerning movement within schedule and subsections 24.2 (b) 1. (i) and (ii) will not apply to teaching adjuncts.*

*The November 1, 2022 2% wage increase does not apply to teaching adjunct series titles and hourly professorial salary schedules except as follows:*

*The November 1, 2022 2% wage increase shall apply to the hourly rates for individuals employed in the following teaching adjunct titles whose hourly rate of pay as of August 25, 2022, as a result of previous CUNY employment as a teaching adjunct, exceeds the hourly rate of pay resulting from the application of a single rate of pay for their title effective August 25, 2022: Adjunct Lecturer, Adjunct Lecturer (H), Adjunct Lecturer Doctoral and Instructor (H); Adjunct Assistant Professor and Adjunct Assistant Professor (H); Adjunct Associate Professor and Adjunct Associate Professor (H); and Adjunct Professor and Adjunct Professor (H).*

85

A.133

## ASSISTANT PROFESSOR, ADJUNCT ASSISTANT PROFESSOR

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 8/25/2022* |
|-----------|------------|------------|------------|------------|
| $82.82 | $84.48 | $86.17 | $87.89 | $100.00 |
| $86.13 | $87.85 | $89.61 | $91.40 | $100.00 |
| $89.59 | $91.38 | $93.21 | $95.07 | $100.00 |
| $98.31 | $100.27 | $102.28 | $104.32 | $104.32 |

**\* A single hourly rate of $100.00 will be in effect starting 8/25/2022 for these titles, except that incumbents earning $104.32 as of 8/25/2022, as a result of previous CUNY employment teaching in an hourly or adjunct capacity, will continue to receive that rate until 11/1/2022, at which time their hourly rate will increase to $106.41. (See Article 24.2 (c) and Article 24.3 (a) 1. (v) a))**

*N.B.: Pursuant to Article 24.2 (c) and Article 24.3 (a) 1. (v) a): Effective at the start of the Fall 2022 semester (i.e., August 25, 2022), the salary steps in teaching adjunct titles, except Medical series titles and Resident series titles, shall be eliminated and replaced with a single hourly rate, as reflected in the salary schedules in Article 24.6. As of August 25, 2022, the language concerning movement within schedule and subsections 24.2 (b) 1. (i) and (ii) will not apply to teaching adjuncts.*

*The November 1, 2022 2% wage increase does not apply to teaching adjunct series titles and hourly professorial salary schedules except as follows:*

*The November 1, 2022 2% wage increase shall apply to the hourly rates for individuals employed in the following teaching adjunct titles whose hourly rate of pay as of August 25, 2022, as a result of previous CUNY employment as a teaching adjunct, exceeds the hourly rate of pay resulting from the application of a single rate of pay for their title effective August 25, 2022: Adjunct Lecturer, Adjunct Lecturer (H), Adjunct Lecturer Doctoral and Instructor (H); Adjunct Assistant Professor and Adjunct Assistant Professor (H); Adjunct Associate Professor and Adjunct Associate Professor (H); and Adjunct Professor and Adjunct Professor (H).*

A.134

## ASSOCIATE PROFESSOR, ADJUNCT ASSOCIATE PROFESSOR

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 8/25/2022* |
|-----------|------------|------------|------------|------------|
| $89.29 | $91.08 | $92.90 | $94.76 | $108.33 |
| $92.87 | $94.73 | $96.62 | $98.56 | $108.33 |
| $96.61 | $98.55 | $100.52 | $102.53 | $108.33 |
| $100.17 | $102.18 | $104.22 | $106.31 | $108.33 |
| $109.43 | $111.61 | $113.85 | $116.12 | $116.12 |

**\* A single hourly rate of $108.33 will be in effect starting 8/25/2022 for these titles, except that incumbents earning $116.12 as of 8/25/2022, as a result of previous CUNY employment teaching in an hourly or adjunct capacity, will continue to receive that rate until 11/1/2022, at which time their hourly rate will increase to $118.45. (See Article 24.2 (c) and Article 24.3 (a) 1. (v) a))**

*N.B.:    Pursuant to Article 24.2 (c) and Article 24.3 (a) 1. (v) a): Effective at the start of the Fall 2022 semester (i.e., August 25, 2022), the salary steps in teaching adjunct titles, except Medical series titles and Resident series titles, shall be eliminated and replaced with a single hourly rate, as reflected in the salary schedules in Article 24.6.   As of August 25, 2022, the language concerning movement within schedule and subsections 24.2 (b) 1. (i) and (ii) will not apply to teaching adjuncts.*

*The November 1, 2022 2% wage increase does not apply to teaching adjunct series titles and hourly professorial salary schedules except as follows:*

*The November 1, 2022 2% wage increase shall apply to the hourly rates for individuals employed in the following teaching adjunct titles whose hourly rate of pay as of August 25, 2022, as a result of previous CUNY employment as a teaching adjunct, exceeds the hourly rate of pay resulting from the application of a single rate of pay for their title effective August 25, 2022: Adjunct Lecturer, Adjunct Lecturer (H), Adjunct Lecturer Doctoral and Instructor (H); Adjunct Assistant Professor and Adjunct Assistant Professor (H); Adjunct Associate Professor and Adjunct Associate Professor (H); and Adjunct Professor and Adjunct Professor (H).*

87

A.135

# PROFESSOR, ADJUNCT PROFESSOR

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 8/25/2022* |
|-----------|------------|------------|------------|------------|
| $99.05 | $101.03 | $103.05 | $105.11 | $112.50 |
| $102.99 | $105.05 | $107.15 | $109.29 | $112.50 |
| $107.13 | $109.27 | $111.46 | $113.69 | $113.69 |
| $110.68 | $112.89 | $115.15 | $117.45 | $117.45 |
| $120.55 | $122.96 | $125.42 | $127.93 | $127.93 |

**\* A single hourly rate of $112.50 will be in effect starting 8/25/2022 for these titles, except that incumbents earning $113.69, $117.45 and $127.93 as of 8/25/2022, as a result of previous CUNY employment teaching in an hourly or adjunct capacity, will continue to receive those rates until 11/1/2022, at which time their hourly rates will increase to $115.96, $119.80 and $130.49 respectively. (See Article 24.2 (c) and Article 24.3 (a) 1. (v) a))**

*N.B.: Pursuant to Article 24.2 (c) and Article 24.3 (a) 1. (v) a): Effective at the start of the Fall 2022 semester (i.e., August 25, 2022), the salary steps in teaching adjunct titles, except Medical series titles and Resident series titles, shall be eliminated and replaced with a single hourly rate, as reflected in the salary schedules in Article 24.6. As of August 25, 2022, the language concerning movement within schedule and subsections 24.2 (b) 1. (i) and (ii) will not apply to teaching adjuncts.*

*The November 1, 2022 2% wage increase does not apply to teaching adjunct series titles and hourly professorial salary schedules except as follows:*

*The November 1, 2022 2% wage increase shall apply to the hourly rates for individuals employed in the following teaching adjunct titles whose hourly rate of pay as of August 25, 2022, as a result of previous CUNY employment as a teaching adjunct, exceeds the hourly rate of pay resulting from the application of a single rate of pay for their title effective August 25, 2022: Adjunct Lecturer, Adjunct Lecturer (H), Adjunct Lecturer Doctoral and Instructor (H); Adjunct Assistant Professor and Adjunct Assistant Professor (H); Adjunct Associate Professor and Adjunct Associate Professor (H); and Adjunct Professor and Adjunct Professor (H).*

A.136

# NON-TEACHING ADJUNCT I and II[#], NON-TEACHING ADJUNCT (DOCTORAL STUDENT) INSTRUCTOR, LECTURER

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|-----------|------------|------------|------------|-----------|
| $43.81 | $44.69 | $45.58 | $46.49 | $47.42 |
| $45.55 | $46.46 | $47.39 | $48.34 | $49.31 |
| $47.41 | $48.36 | $49.32 | $50.31 | $51.32 |
| $49.53 | $50.52 | $51.53 | $52.56 | $53.61 |
| $54.51 | $55.60 | $56.71 | $57.85 | $59.00 |

[#]Applicable to other titles described in Article 24.7, Assigned Overtime Rates

# NON-TEACHING ADJUNCT III[#], ASSISTANT PROFESSOR

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|-----------|------------|------------|------------|-----------|
| $49.69 | $50.69 | $51.70 | $52.74 | $53.79 |
| $51.69 | $52.73 | $53.78 | $54.86 | $55.95 |
| $53.76 | $54.84 | $55.94 | $57.05 | $58.20 |
| $58.99 | $60.17 | $61.37 | $62.60 | $63.85 |

[#]Applicable to other titles described in Article 24.7, Assigned Overtime Rates

# NON-TEACHING ADJUNCT IV[#], ASSOCIATE PROFESSOR

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|-----------|------------|------------|------------|-----------|
| $53.60 | $54.67 | $55.77 | $56.88 | $58.02 |
| $55.73 | $56.85 | $57.98 | $59.14 | $60.33 |
| $57.97 | $59.13 | $60.31 | $61.51 | $62.74 |
| $60.10 | $61.30 | $62.53 | $63.78 | $65.05 |
| $65.66 | $66.97 | $68.31 | $69.68 | $71.07 |

[#]Applicable to other titles described in Article 24.7, Assigned Overtime Rates

89

A.137

## NON-TEACHING ADJUNCT V[#], PROFESSOR

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $59.43 | $60.61 | $61.83 | $63.06 | $64.32 |
| $61.80 | $63.04 | $64.30 | $65.58 | $66.90 |
| $64.28 | $65.57 | $66.88 | $68.21 | $69.58 |
| $66.40 | $67.73 | $69.08 | $70.47 | $71.88 |
| $72.34 | $73.79 | $75.26 | $76.77 | $78.30 |

[#]Applicable to other titles described in Article 24.7, Assigned Overtime Rates

## ADJUNCTS IN THE CUNY GRADUATE SCHOOL OF JOURNALISM AND IN THE EXECUTIVE PROGRAMS IN THE ZICKLIN SCHOOL OF BUSINESS AT BARUCH COLLEGE

| | 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|
| Adjunct Lecturer | $73.02 to $145.33 | $74.48 to $148.24 | $75.97 to $151.20 | $77.49 to $154.22 | $79.04 to $157.31 |
| Adjunct Assistant Professor | $82.38 to $166.97 | $84.02 to $170.31 | $85.70 to $173.72 | $87.42 to $177.19 | $89.17 to $180.74 |
| Adjunct Assoc. Professor | $90.08 to $222.68 | $91.88 to $227.13 | $93.72 to $231.67 | $95.59 to $236.31 | $97.50 to $241.03 |
| Adjunct Professor | $102.92 to $306.16 | $104.98 to $312.29 | $107.08 to $318.53 | $109.22 to $324.90 | $111.40 to $331.40 |
| Non-Teaching Adjunct I | $61.75 to $183.69 | $62.99 to $187.37 | $64.25 to $191.11 | $65.53 to $194.94 | $66.84 to $198.83 |
| Non-Teaching Adjunct II | $54.02 to | $55.10 to | $56.20 to | $57.33 to | $58.47 to |

90

A.138

|  | | | | |
|---|---|---|---|---|
| | $133.62 | $136.29 | $139.02 | $141.80 | $144.63 |
| Non-Teaching Adjunct III | $49.42 to $100.18 | $50.41 to $102.19 | $51.42 to $104.23 | $52.44 to $106.32 | $53.49 to $108.44 |

## 24.7  Assigned Overtime Rates[15]

(a)  Counseling

Members of the non-classroom staff engaged in professional psychological counseling assignments shall be remunerated in accordance with the appropriate adjunct or hourly rate.

All other non-classroom staff engaged in counseling assignments shall be remunerated at the appropriate non-teaching adjunct or hourly rate.

(b)  Professional Library Staff

Associate Professors, Assistant Professors and Instructors shall be remunerated in accordance with the appropriate non-teaching adjunct/hourly schedule and in accordance with the stated guidelines.

(c)  Professional Registrar Staff

Associate Registrars and Assistant Registrars shall be remunerated in accordance with the appropriate non-teaching adjunct/hourly schedule and in accordance with the stated guidelines.

Associate Registrars who are reclassified to the title Higher Education Assistant or Assistant Registrars who are reclassified to the title Assistant to Higher Education Officer or appointed to the title Higher Education Assistant, while continuing to perform registrarial duties, shall continue to be remunerated in accordance with the foregoing paragraph and the practices in effect at the college of employment.

Both parties agree that the work required from these staffs during the registration period is an integral part of the total job. Thus, every effort shall be made to minimize compensable time for this group during registration periods. Necessary coverage is to be achieved through work schedule changes.

---

[15] The provisions set forth in Article 24.7 ("Assigned Overtime Rates") are effective August 25, 2022. For the period December 1, 2017, through August 24, 2022, the provisions of Article 24.7 of the 2010-2017 collective bargaining agreement continued in effect.

91

A.139

(d) Professional Business Management Staff

An employee who was converted from an Assistant Business Manager or Assistant to Business Manager title effective January 1, 1988, to a HEO series title and remains in the converted HEO series title performing the same duties performed in the former Business Manager series title shall be remunerated in accordance with the appropriate non-teaching adjunct/hourly schedule and in accordance with the stated guidelines.

Both parties agree that the work required from these staffs during peak periods, such as registration, budget preparation, etc., is an integral part of the total job. Thus, every effort shall be made to minimize compensable time for this group during these peak periods. Necessary coverage is to be achieved through work schedule changes.

(e) College Laboratory Technicians

College Laboratory Technicians shall be remunerated for work performed in special sessions (evening, summer evening) beyond their normal assignments at an hourly rate in accordance with the newly established schedules.

24.8 CLT Series/Assistant to HEO Differentials for Advanced Degrees

(a) Effective March 19, 2010, College Laboratory Technicians, Senior College Laboratory Technicians, Chief College Laboratory Technicians, and Assistants to Higher Education Officer who hold a master's degree from an accredited university in a field related to their job duties shall receive a $1,000 annual salary differential.

(b) Effective March 19, 2010, College Laboratory Technicians, Senior College Laboratory Technicians, Chief College Laboratory Technicians, and Assistants to Higher Education Officer who hold a doctoral degree from an accredited university in a field related to their job duties shall receive a $2,500 annual salary differential.

24.9 In addition to the existing ability of the colleges and the University to grant reassigned time or make payments on an hourly basis, the parties agree to enter into a pilot program that will give the colleges and the University the discretion to pay faculty via stipends for work on certain defined projects that are not part of the employee's normal responsibilities and that include a specific deliverable in a specified timeframe. See Appendix M.

# ARTICLE 25
# RESEARCH, FELLOWSHIP, AND SCHOLAR INCENTIVE AWARDS

92

A.140

25.1    The parties agree that the University shall provide funds for research and fellowship awards. The following sums shall be provided for PSC/CUNY Research Awards:

Effective July 1, 2014                              $3,884,218

25.2    PSC-CUNY Research Awards

(a)    Eligibility: It is the intention of the parties that the funds for research shall be available without restriction to all full-time members of the instructional staff, and the junior members of the faculty in particular, who are on the regular University payroll processed through the Office of the Comptroller of the City or State of New York. The parties further intend that research funding shall be used to support activities in the creative arts and all academically relevant research in the areas of natural science, social science and humanities, including but not limited to research related to curriculum development, improvement in teaching, adaptation of standard educational techniques to special clientele and the relationship between technical or occupational training and the liberal arts curriculum.

(b)    For the terms of the PSC-CUNY Research Awards, see the February 27, 2014 Letter Agreement.

25.3    Fellowship Awards

(a)    Eligibility: It is the intention of the parties that the funds for fellowship awards be limited to instructional staff members of the permanent instructional staff. Tenured members of the permanent instructional staff (including, for these purposes, instructional staff who have been approved for tenure effective the following September 1), and those holding the title Lecturer with certificates of continuous employment, who have completed six years of continuous paid full-time service with the University exclusive of non-sabbatical or fellowship leave, shall be eligible for a fellowship award. Individuals in professorial titles who are on leave from the title Lecturer with a certificate of continuous employment shall be eligible for a fellowship award. Service shall include service in a school or college maintained in whole or part with City funds immediately preceding service in a college or institution under the jurisdiction of the Board of Trustees, provided that credit for such prior service shall not exceed three (3) years. Fellowship leaves awarded for the Fall semester or for the full academic year shall begin on the day full-time teaching faculty are scheduled to return from annual leave under Section 14.1.

(b)    Applications:

1.    Applications for a fellowship award may be made for the following purposes:

(i)    Research (including study and related travel)

93

A.141

(ii)   Improvement of teaching
(iii)  Creative work in literature or the arts

2.   Such application shall also state that the applicant will continue to serve for at least one year after expiration of the term of his or her leave unless this provision is expressly waived by the Board of Trustees.

3.   The application in the form of a plan shall be submitted to the appropriate departmental committee and, if approved, to the college committee on faculty personnel and budget.  If the latter committee approves, it shall forward the application to the President with its endorsement.  Such endorsement must state that the work of the department in which the applicant serves can be so arranged as to be carried forward effectively during the period of the leave, and that the work the applicant intends to do is consonant with the principles of the fellowship leave.  The President shall transmit such application to the Board of Trustees, with his or her own recommendation.

4.   The Board of Trustees will consider the advantage of the applicant as a scholar and teacher to be expected from such a fellowship award, and the consequent advantage through his or her service to the college.  Special consideration shall be given to those applicants who have not had a sabbatical leave or fellowship in fourteen (14) or more years.

5.   Application may be for one of three types of fellowship leaves:

   ▪ a full year leave at 80% of the bi-weekly salary rate
   ▪ a one-half year leave at 80% of the bi-weekly salary rate
   ▪ a one-half year leave at full pay

There is an expectation that there will be a minimum of one half-year leave at full-pay every other year at each college.

Fellowship leaves received by members of the instructional staff who serve in the libraries will be of the same duration as those of other instructional staff. Members of the instructional staff who serve in libraries will not accrue annual leave during the period of the fellowship leave.

Members of the unit who receive a full-year fellowship leave at 80% of the bi-weekly salary rate may, at their option, upon written notice to the President no later than October 30 or March 30, whichever is applicable, terminate the fellowship leave after one-half year.

94

A.142

Where fellowships are terminated upon request under Section 25.3 (b) 5, such termination relieves the University of any obligation to further claims for the second half of the leave, but does not reduce the time period or other qualifications required for consideration for a subsequent fellowship leave.

(c) The University agrees to request the appropriate retirement system to credit the period of the fellowship as service for retirement purposes. The period of the fellowship leave shall be credited for increment purposes.

(d) Nothing contained in this Article shall be construed to diminish or impair the rights of an employee appointed prior to July 1, 1965, of the benefits of the Bylaws of the Board as they existed on July 1, 1965 with respect to sabbatical leaves of absence.

25.4 Professional Reassignments

The parties agree to establish a paid leave not to exceed five weeks during any year commencing September 1 and ending August 31 for the purpose of permitting members of the instructional staff who serve in the libraries to be reassigned for research, scholarly writing, and other recognized professional activities that enhance their contribution to City University. The reassignments shall be subject to approval by the personnel and budget committees of the respective library departments and appropriate college-wide committees. The parties accept as a goal the reassignment of 50 members of the instructional staff in the University libraries during a one-year period.

25.5 Scholar Incentive Awards

Scholar Incentive Awards of not less than one semester nor more than one year shall be established for full-time personnel in the following titles: Professor, Associate Professor, Assistant Professor, Instructor, Lecturer, University Professor, Distinguished Professor and Medical Series. The only purpose of these Awards shall be to facilitate bona fide and documented scholarly research. Other projects or proposals (*e.g.,* meeting of degree requirements, study, service outside the University) or reasons (*e.g.,* professional, career, personal) shall not be considered for these Awards.

The application in the form of a plan shall be submitted to the appropriate departmental committee and, if approved, to the college committee on faculty personnel and budget. If the latter committee approves, it shall forward the application to the President with its endorsement. Such endorsement must state that the work of the department in which the applicant serves can be so arranged as to be carried forward effectively during the period of the leave, and that the work the applicant intends to do is consonant with the principles of the Scholar Incentive Award. Upon positive recommendation of the President, the application shall be forwarded to the Chancellor for review and recommendation.

The following principles for such Scholar Incentive Awards shall apply:

95

A.143

1. A candidate shall be a full-time member of the instructional staff in one of the above titles.

2. A candidate shall have completed not less than one full year of continuous paid full-time service with the University before becoming eligible for a Scholar Incentive Award. A candidate shall be eligible for a subsequent Scholar Incentive Award after six years of creditable service with the University since the completion of the last Scholar Incentive Award. A Scholar Incentive Award may not be held concurrently with a Fellowship Leave.

3. If a Scholar Incentive Award is immediately preceded by full-time continuous service creditable for tenure or a Certificate of Continuous Employment or Fellowship Award and immediately followed by such full-time continuous service, the period of creditable service immediately preceding the Scholar Incentive Award shall be counted in computing the years of service required for the granting of tenure, Certificate of Continuous Employment or Fellowship Award.

4. A candidate may be compensated by the University for up to 25% of annual salary rate. The total amount of money earnable with outside support and the University salary may not exceed 100% of the annual salary rate that the person would have received without the leave. The amount may be less than 25% if the amount of any outside fellowship and grant support received would result in earnings above 100% of salary.

5. The University shall develop guidelines to be utilized in approving applications for Scholar Incentive Awards.

25.6 Effective February 1, 2021, the University will establish a research account at the CUNY Research Foundation for each department chair and Graduate Center executive officer represented by the PSC. The University will deposit $1,750 in the research account of each department chair and Graduate Center executive officer on February 1, 2021, and $3,000 on September 1, 2021, and on or before September 1 every year thereafter. The account is to be used to further the scholarly and/or creative activities of the department chair or executive officer and will be governed by the same guidelines that apply to the PSC-CUNY Research Awards Program. Unused funds may be rolled over to the subsequent year (including the year after the department chair or executive officer leaves office), but must be expended within that year. Any funds not expended within the subsequent year shall be returned by the CUNY Research Foundation to the PSC-CUNY Research Awards account. Funds in the amount of 10 percent of the total deposited in all department chair research accounts annually will be provided to the CUNY Research Foundation on February 1, 2021, September 1, 2021, and every September 1 thereafter to support administrative costs.

25.7 Complaint Procedure

Award decisions made under this Article shall be subject only to the informal complaint procedure specified in Article 20 hereof.

96

A.144

# ARTICLE 26
# WELFARE BENEFITS

26.1 The University shall make per capita per annum contributions to the PSC-CUNY Welfare Fund as set forth below. The specified amounts will be paid on a per capita pro-rated monthly basis to the PSC-CUNY Welfare Fund for all eligible members of the instructional staff and such other categories of employees on whose behalf the University has agreed to make contributions and who are included in the annual audit referenced in the agreement between the PSC, the PSC-CUNY Welfare Fund and the University dated May 26, 2004.

| | |
|---|---|
| Effective November 30, 2017 | $1,890 for all eligible full-time members of the instructional staff |
| Effective February 28, 2023 | $1,925 for all eligible full-time members of the instructional staff |
| Effective November 30, 2017 | $1,350.01 for all eligible active part-time members of the instructional staff |
| Effective February 28, 2023 | $1,375.01 for all eligible active part-time members of the instructional staff |

26.2 Determination of eligibility and benefits is made by the PSC-CUNY Welfare Fund. Adjunct instructional staff who are receiving health insurance through the New York City Health Benefits Program pursuant to the letter agreement between the University and the PSC dated July 30, 2014 ("Concluding Agreement") shall be eligible to receive welfare benefits. (See Appendix J.)

26.3 The parties agree that the PSC-CUNY Welfare Fund Trust Indenture entered into on July 30, 2007 (as modified and re-signed in June and July 2008) sets forth the structure of the PSC-CUNY Welfare Fund. The parties shall act to amend the PSC-CUNY Welfare Fund Trust Indenture to conform to the Concluding Agreement dated July 30, 2014.

26.4 The University shall contribute to the PSC-CUNY Welfare Fund the following annual amounts on a pro-rata basis for full-time instructional staff (a) who have separated from service subsequent to June 30, 1970, who were eligible to receive supplemental welfare benefits at the time of such separation, who remain primary beneficiaries of the New York City Health Benefits Program and are entitled to benefits paid for by the City through such program, or (b) who have separated from service subsequent to June 30, 1970, who were eligible to receive supplemental welfare benefits and who were covered by a welfare fund at the time of such separation pursuant to a separate agreement between the Board of Higher Education/CUNY and the certified union representing such employees, who were participants in the CUNY Optional Retirement Program (TIAA - CREF), who were employed by CUNY on a full-time basis for at least ten (10) years,

97

who are at least age 55 and who have elected to and are receiving an annuity benefit from the CUNY Optional Retirement Plan (TIAA - CREF) ("eligible individual or employee").

(i) Eligible full-time employees separated from service from July 1, 1970 through August 31, 1982.

| | |
|---|---|
| Effective November 30, 2017 | $1,625 |
| Effective February 28, 2023 | $1,660 |

(ii) Eligible full-time employees separated from service on or after September 1, 1982.

| | |
|---|---|
| Effective November 30, 2017 | $2,065 |
| Effective February 28, 2023 | $2,100 |

26.5    Effective May 1, 2006, recurring funds in the amount of $2,199,237 will be paid annually by the University to the PSC-CUNY Welfare Fund; a pro-rata share will be paid monthly.[16]

## ARTICLE 27
## RETIREMENT

27.1    At such time as the prohibition against pension negotiations is removed, the PSC and the University agree to meet and negotiate matters of pensions which require legislative action.

The University agrees to make available to participants in the TIAA retirement program "The Retirement Transition Benefit" which permits an individual participant to receive a lump sum payment of up to 10% of his/her TIAA/CREF accumulation if the participant is 55 or older at time of retirement.

The University shall continue to maintain and staff a University pension office for the purpose of providing informational services to the members of this unit.

Determination of pension eligibility and benefits are made by the appropriate retirement plan.

27.2    The parties agree to continue, subject to law, to implement a tax-free exchange of section 403(b) tax-sheltered annuity contracts for members of the New York City Teachers' Retirement System Tax Deferred Annuity Program with a different insurer as qualified under section 1035 of the Internal Revenue Code.

27.3    The University and the PSC agree that CUNY public retirement system retirees shall have the option of changing their previous choice of Health Plans and of providing for coverage of eligible

---

[16] In order to implement paragraph "5" of the Concluding Agreement on Adjunct Health Insurance, dated July 30, 2014, referenced in Appendix J, the University's contribution to the PSC-CUNY Welfare Fund for the period July 1, 2014 through June 30, 2015 will be reduced by $600,000, effective July 1, 2014, to $1,599,237.

98

A.146

dependents acquired subsequent to retirement, in accordance with the rules and regulations of the New York City Department of Personnel Health Insurance Division.

27.4 Effective September 1, 1985, or as soon thereafter as practicable, members of the Optional Retirement System (which at present is TIAA-CREF) who have separated from CUNY service and are collecting a retirement benefit based on their service at CUNY shall be eligible for coverage in the City Health Insurance Program, if and when the following additional qualifications are met:

(a) For instructional staff initially appointed to a full-time annual position on or before June 30, 1976:

    1. Separated from CUNY service at age 55 or over with at least ten (10) years of pensionable, continuous, full-time CUNY service,

    or

    2. Separated from CUNY service prior to age 55 with at least fifteen (15) years of pensionable, continuous, full-time CUNY service and attained the age of 55.

(b) For instructional staff initially appointed to a full-time annual position between July 1, 1976 and August 31, 1985:

    1. Separated from CUNY service with at least fifteen (15) years of pensionable, continuous, full-time CUNY service and attained the age of 62,

    or

    2. Separated from CUNY service with at least ten (10) years of pensionable, continuous, full-time CUNY service and no subsequent full-time employment in a college, university, or other institution of post-secondary education related to the duties performed while in active service at The City University or to duties normally performed by the instructional staff at the City University and attained the age of 62.

(c) For instructional staff initially appointed to a full-time annual position on or after September 1, 1985:

    1. Separated from CUNY service at age 62 or over with fifteen (15) years of pensionable, continuous, full-time CUNY service,

    or

    2. Separated from CUNY service prior to age 62 with fifteen (15) years of pensionable, continuous, full-time CUNY service and no subsequent full-time employment in a college, university, or other institution of post-secondary education related to the

99

A.147

duties performed while in active service at The City University or to duties normally performed by the instructional staff at The City University and attained the age of 62.

(d)     "Continuous service," as used in this section, shall not be broken by any approved leave of absence without pay. The period of such approved leave without pay shall not count toward the total number of years required for eligibility.

27.5    A member of the full-time instructional staff who participates in the Optional Retirement Program, who becomes disabled, and who is determined by the United States Social Security Administration or by the TIAA/CREF disability program or its successor under this Agreement, to be physically or mentally incapacitated for the performance of duty, shall be eligible to receive paid New York City Employee Benefits Program basic health benefits, provided that he or she had completed at least ten years of full-time service at The University immediately prior to being disabled; he or she is receiving a retirement benefit from the Optional Retirement Program; and he or she receives no basic health coverage from another source.

In the event that the United States Social Security Administration determines that the instructional staff member is not disabled, and the instructional staff member's disability claim has not been reviewed by TIAA/CREF or its successor, at the request of the instructional staff member, the Professional Staff Congress/CUNY and City University of New York shall designate a mutually acceptable physician to review the instructional staff member's claim that he/she is physically or mentally incapacitated for the performance of duty, applying standards and criteria identical to those of the New York City Teachers' Retirement Program. If the instructional staff member is determined by the designated physician to be physically or mentally incapacitated for the performance of duty, he/she shall be eligible for New York City Employee Benefits Program basic health benefits, provided that he/she had completed at least ten years of full-time service at The University immediately prior to being disabled, he/she is receiving a retirement benefit from the Optional Retirement Program, and he/she receives no basic health coverage from another source.

In the event that the disability is the result of a work-related injury, the length of service requirement is waived.

27.6    Each college will provide, upon request by a retiree, a college-retiree identification card, which will provide the retiree with library privileges at the college.

27.7    Members of the full-time instructional staff who retire shall have access to University electronic mail addresses, subject to compliance with the University's policies and procedures relating to electronic communications. The parties will meet to discuss issues regarding implementation of this access for retirees.

## ARTICLE 27A
## VOLUNTARY PHASED RETIREMENT PROGRAM

100

A.148

The University and the PSC entered into an agreement on April 26, 2013, implementing a three-year pilot program of Voluntary Phased Retirement effective from the 2013-2014 academic year through the 2015-2016 academic year and subsequently agreed to make the program permanent. The provisions relating to Phased Retirement are set forth in Appendix K.

The Program is available to tenured faculty, including Librarians and Counselors;[17] Lecturers with a Certificate of Continuous Employment ("CCE"); employees in Higher Education Officer ("HEO") series titles who hold a Certificate of Continual Administrative Service ("13.3b"); and tenured employees in the College Laboratory Technician ("CLT") series titles. To be eligible, employees must have attained the age of 65 years and must have completed 15 or more years of full-time, continuous service as of the start of their phasing period, and must be participants in the Optional Retirement Program, TIAA-CREF, including the alternative funding vehicles MetLife and Guardian. The decision to phase is irrevocable and is contingent upon an irrevocable commitment to retire at the end of the phasing period.

An eligible employee in a faculty title may phase for one, two, or three years—beginning on the first day of a fall semester—and will have a work commitment that is 50% of the contractual full-time workload for his/her title (50% of the teaching load and 50% of other professional responsibilities). A faculty member may specify either a) a 50% phasing workload for two semesters of the academic year, or b) a 100% phasing workload for one semester of the academic year. Salary will be 50% of the full-time salary.

An eligible HEO or CLT may phase for either six (6) months or one year—beginning on the first day of a fall or spring semester—and will have a work commitment that is 80% of the full-time contractual workload for his/her title. Salary will be 80% of the full-time salary.

A faculty member may elect to take Travia Leave during the final spring semester of his/her phasing period or to be paid his/her Travia Leave in a lump sum following the phasing period. An employee in a HEO or CLT title may elect to take Travia Leave after the phasing period or to be paid Travia Leave in a lump sum at the end of the phasing period. Whether taken as leave or in a lump sum, Travia Leave will be paid at 100% of the employee's full-time salary rate up to a maximum of one semester, for all employees (faculty, HEOs, or CLTs).

Phasing employees are entitled to the same health insurance and PSC-CUNY Welfare Fund benefits as full-time employees. For other rights and benefits during the phasing period, see Appendix K.

**ARTICLE 28
TRAVEL ALLOWANCES**

---

[17] For limitations pertaining to Department Chairs and faculty serving in predominantly administrative positions, see the April 26, 2013 side letter of agreement in Appendix K.

101

Case 1:23-cv-00321 Document 61-12 Filed 05/24/22 Page 154 of 279

Effective September 19, 2007, the University shall provide the sum of $931,618 annually for use by members of the bargaining unit for attendance at professional meetings and conferences.

Effective January 1, 2020, the University shall provide the sum of $1,863,236 annually for use by members of the bargaining unit for attendance at professional meetings and conferences. The allocation of travel funds at each college shall be made by the appropriate college official or college committees.

# ARTICLE 29
# WAIVER OF TUITION FEES

29.1     All full-time members of the instructional staff in this unit shall be granted a waiver of tuition fees for undergraduate credit-bearing courses offered by the University during the fall and spring semesters in accordance with the procedures for the waiver of undergraduate tuition fees for other groups of employees.

29.2     The parties agree to provide six credits per semester during the fall and spring semesters at the graduate level to full-time members of the instructional staff on a space-available, no-cost basis.

29.3     An adjunct who has taught one or more courses in the same department at the same college for ten consecutive semesters (not including summer session) and who is appointed to teach a course of not fewer than three contact hours per week in a Fall or Spring semester shall be granted tuition remission for up to one course in that semester. If the course offered is at the graduate level, it shall be available on a space-available basis. An adjunct who has established eligibility for this tuition waiver shall lose eligibility if in any two out of three academic years the adjunct teaches in only one semester of the year at that college. Effective August 25, 2006, where an adjunct's continuous appointments in a teaching title are immediately followed by an appointment to a Substitute full-time position on the instructional staff with no break in service, and the period of Substitute service is immediately followed by continuous appointment to an adjunct teaching title with no break in service, the period of adjunct service immediately preceding the Substitute appointment will be added to the continuous adjunct service immediately following the Substitute service, as though there were no break in adjunct service, for the purposes of determining eligibility for tuition remission.

Effective the Fall 2008 semester, Substitute service immediately preceded by and immediately followed by adjunct service shall be counted as continuous adjunct service for the purpose of determining eligibility for tuition remission. Substitute service in academic year 2007-2008 shall be considered qualifying toward this benefit.

Effective the Fall 2008 semester, an adjunct who has taught one or more courses at the same college for ten consecutive semesters (not including summer session) and who is appointed to teach a course of not fewer than three contact hours per week in a Fall or Spring semester shall be granted tuition remission for up to one course in that semester.

102

A.150

29.4    Effective with the start of the Spring 2020 semester, tuition at the Doctor of Philosophy Level 3 Resident rate shall be waived for up to four additional semesters (normally, years 6 and 7 of enrollment) for students who have completed 10 semesters of enrollment in a Doctor of Philosophy program and who are employed in a title recognized under Article 1 of the Collective Bargaining Agreement.  Students who meet the eligibility criteria above and whose tuition is at a higher rate than the Doctor of Philosophy Level 3 Resident rate shall have the portion of their tuition equivalent to the Doctor of Philosophy Level 3 Resident rate waived under the terms stated herein.

# ARTICLE 30
# FACILITIES AND SERVICES

30.1    The parties recognize the importance to the proper functioning of the University of providing adequate space, facilities and services for the instructional staff.

30.2    To the extent that suitable space is available, each full-time member of the instructional staff shall have a desk, a chair, a file cabinet, and a book shelf, and adjunct instructional staff shall have access to desk and file space.

30.3    Subject to appropriate governmental approval of Master Plans providing for the same, design specifications for the construction of new facilities for the use of members of the instructional staff shall provide for:

(a)    A minimum of 120 square feet of office space for the use of each full-time member of the faculty for whose use the facility is designed;

(b)    An office desk, chair, file drawers, a telephone and book shelves for each full-time member of the faculty;

(c)    Dining facilities and an Instructional Staff lounge on each campus; and

(d)    Appropriate facilities for adjuncts.  On campuses where capacity exists, teaching adjunct instructional staff will be provided with a CUNY e-mail address.  The colleges will use their best efforts to provide teaching adjunct instructional staff with voicemail and, where feasible, to include them in department directories.

# ARTICLE 31
# REHIRING OF PERSONS WHO ARE DISCONTINUED

103

31.1    Tenured Persons and Lecturers Holding CCEs

The provisions of subdivision eight of section 6212 of the Education Law shall be followed in the case of tenured persons. The provisions of the Board Bylaw Section 6.14[18] and the provisions of this Agreement shall be followed in the case of certificated persons.

The name of any such person shall be placed on an eligible list to be used in the filling of vacancies which may thereafter arise in the title and retrenchment unit of last employment. Rules and regulations shall be promulgated which include provision for the rehiring of such persons on a last- released first-rehired basis.

31.2    Non-Tenured Persons in the titles Professor, Associate Professor, Assistant Professor, College Laboratory Technician Series, Registrar Series, and Non-Certificated Lecturers

The name of any such person, except a person who received a notice of non-reappointment prior to being discontinued from his or her position, shall be placed on an eligible list to fill vacancies arising prior to the date which, in the absence of being discontinued, would have been the expiration date of the appointment or the expiration date of any reappointment in the title last held in the retrenchment unit of last employment, except that when an individual has received a recommendation for tenure or the CCE and is retrenched prior to the effective date of tenure or the CCE, the name of the individual shall be placed on an eligible list for a period of three years. Any person restored to a position pursuant to this paragraph shall receive notice of reappointment or non-reappointment no later than June 15.  The dates provided in Article 18 of this agreement for observations and evaluations shall not apply with respect to any reappointment or non-reappointment of a person restored to service pursuant to this paragraph.  When a person is restored to service pursuant to this paragraph, the period of creditable service prior to the discontinuance shall be added to creditable service after such restoration for purposes of computing years of service required for tenure, but an academic year in which such person did not serve a full continuous year shall not be included in computing the years of service required for tenure.  Rules and regulations shall be promulgated for the administration of these lists which include provision for the rehiring of persons on a last-released first-rehired basis except for special educational reasons.  Acceptance of a position in the same or in a higher title in another college shall cause a person's name to be removed from the eligible list.

31.3    Staff in Non-Tenure- and Non-Certificate-Bearing Titles

The name of any such person, except a person who has received a notice of non-reappointment prior to being discontinued from his or her position, shall be placed on an eligible list to fill vacancies for a position in his/her title, function, and retrenchment unit which may arise prior to the date which, in the absence of being discontinued, would have been the expiration date of the

---

[18] In accordance with the November 28, 2011 Board of Trustees Minutes of Proceedings (page 237), the provisions previously contained in Board Bylaw Section 6.14 relating to Lecturers holding CCEs have been incorporated as Section 7.4 of the University's Retrenchment Guidelines and such section shall be followed in the case of certificated persons.

104

A.152

appointment, or for three years, whichever period is shorter. Should such a position be reestablished, persons on the eligible list shall be restored to service in reverse order of discontinuance, except for special educational reasons, with respect to teaching personnel in these titles.

Any person restored to a position pursuant to this paragraph who would otherwise receive a notice of appointment or non-reappointment during that academic year shall receive such notice no later than June 15.

The dates provided in Article 18 of this agreement for observations and evaluations shall not apply to a reappointment or non-reappointment of a person restored to service pursuant to this paragraph.

31.4  Acceptance of a position in the same or in a higher title in another college shall cause a person's name to be removed from the eligible list.

31.5  CUNY agrees to publicize the functions of the University's Instructional Staff Referral Service and to extend its services to members of the PSC bargaining unit in both full-time and part-time positions.

The Instructional Staff Referral Service shall accept and periodically transmit to the colleges applications for positions from persons who were discontinued in full-time or part-time positions.


# ARTICLE 32
# DISCONTINUANCES

32.1  The term discontinuance as used in the Agreement means the termination in accordance with retrenchment procedures of an individual's service on dates other than those provided in Articles 9, 10 and 13 of the Agreement and through procedures other than those normally utilized in academic and administrative appointments, reappointments and non-reappointments.

32.2  Any discontinuance of employees in this unit during the term of this Agreement shall be undertaken only after other measures have been explored and implemented to the extent practicable consistent with the Board's responsibilities to govern the University, to carry out the academic programs of the University and to provide a safe and appropriate environment.


# ARTICLE 33
# FACULTY AND STAFF DEVELOPMENT

105

A.153

33.1   The University agrees to develop and implement with the PSC programs of professional development and/or retraining for tenured and certificated members of the instructional staff in the titles Professor, Associate Professor, Assistant Professor, Instructor, and Lecturer. Participation in the programs shall be voluntary.

33.2   The University, through its Office of Human Resources Management, agrees to develop and implement with the PSC programs of professional development and/or retraining for members of the non-classroom instructional staff.  The program shall be voluntary.  The University shall have the right to assign staff to the program only during the normally scheduled work day.

33.3   The Chancellor will consult with the President of the PSC regarding general guidelines for the development and implementation of the programs. These programs shall be developed on a no-cost basis.

33.4   Staff successfully completing a faculty or staff development program shall, upon their request, have acknowledgment of this fact placed in their personal personnel files.

33.5   Effective September 19, 2007, an annual sum of $547,442 University-wide will be allocated to provide opportunities for professional development for employees in Higher Education Officer series and College Laboratory Technician series titles.  Effective January 1, 2020, the annual sum of $807,442 and, effective February 1, 2021, and annually thereafter, the annual sum of $1,047,442 University-wide will be allocated to provide opportunities for professional development for employees in Higher Education Officer series, College Laboratory Technician series titles and Non-Teaching Adjunct titles.  Guidelines for the implementation of this provision are as follows:

(a)   During the first quarter of every fiscal year (July 1 to June 30), the University will forward to the PSC the funds set forth above.  These funds will be maintained by the PSC in a separate, interest-bearing account.

(b)   The PSC will establish a HEO/CLT Professional Development Committee that will be responsible for reviewing applications and making the professional development grants set forth herein. The Professional Development Committee will also be responsible for accounting to the PSC for the expenditure of the funds.

(c)   If the funds provided in any fiscal year are not fully expended in the fiscal year, they may be rolled over into the next fiscal year.  It is agreed, however, that if the funds available in any fiscal year exceed one million dollars ($1,000,000), the parties will meet to negotiate a mutually agreeable expenditure of the funds in excess of $500,000.

(d)   At the end of the fiscal year, the PSC will provide an accounting of the use of the funds to the Senior Vice Chancellor for Labor Relations.  This accounting will include the following information:  1) the name of each recipient, 2) the amount of the grant, 3) the specific purpose for which the grant was made, 4) an itemized accounting of other (i.e.,

106

A.154

administrative) expenditures, 5) the opening balance of the account and 6) the closing balance of the account.

(e)     Applications may be submitted and professional development grants will be made on a rolling basis during the fiscal year.

(f)     Full-time employees in Higher Education Officer Series and College Laboratory Technician Series titles will be eligible to apply for professional development grants as set forth herein. Employees in adjunct College Laboratory Technician titles and Non-Teaching Adjunct titles will also be eligible to apply, provided that they are working an average of 10 or more hours per week during the semester in which application is made and have worked an average of 10 or more hours per week for four consecutive semesters (not including summer sessions) immediately preceding the semester in which application is made. Eligible employees will apply by using the standard application form. The application will explain how the professional development activity is related to the employee's position at the University and to the employee's own professional development.

(g)     Applications must have the supervisor's approval before being submitted to the HEO/CLT Professional Development Committee. If the supervisor does not approve the application, the supervisor must provide an explanation for the disapproval.

(h)     Applications must be approved by the HEO/CLT Professional Development Committee before the professional development activity commences.

(i)     Funds will be disbursed to the employee only upon submission of documentation acceptable to the HEO/CLT Professional Development Committee.

(j)     The maximum award for professional development activities in any academic year is $3,000. Preference will be given to employees who have not previously received professional development funds as set forth herein.

(k)     Through December 31, 2019, up to $3,000 annually may be spent from the Fund to reimburse the PSC for administrative expenses incurred by the PSC in implementing the Fund. Effective January 1, 2020, the following provisions will replace the administrative reimbursement set forth above: A sum equal to 7.5 percent of the annual $807,442 allocation to the Fund (*i.e.*, $65,604) will be deducted by the PSC upon receipt of the funds to support administrative costs. Effective February 1, 2021, a sum equal to 7.5 percent of the annual $1,047,442 allocation to the Fund (*i.e.*, $78,558) will be deducted annually from the HEO/CLT Professional Development Fund by the PSC to support administrative costs. The PSC will provide an annual itemized accounting of these expenses.

107

A.155

(l)     Members of the HEO-CLT Professional Development Committee may receive a stipend from the HEO-CLT Professional Development Fund of up to $3,000 per person per annum.  The cost to the HEO-CLT Professional Development Fund for these stipends may not exceed $12,000 per annum.

33.6   Effective each of the following dates, the University will provide the sum of $500,000 to the Adjunct Professional Development Fund: September 28, 2008; October 5, 2009; and October 5, 2010.

Effective July 1, 2013, the University will make a one-time cash contribution of $250,000 to the Adjunct Professional Development Fund.

Effective August 25, 2016, CUNY will provide the sum of $160,000 annually to the Adjunct Professional Development Fund.

Effective January 1, 2020, the University will provide the sum of $660,000 annually to the Adjunct Professional Development Fund.  If the funds provided in any fiscal year are not fully expended in the fiscal year, they may be rolled over into the next fiscal year.  Guidelines for the implementation of this provision are contained in Appendix B.

33.7   This Article shall not be subject to Article 20.

# ARTICLE 34
# MEDICAL SERIES

108

A.156

34.1    Persons in the medical series shall be compensated as follows:

|  | 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|
| Medical | $100,473 | $102,483 | $104,532 | $106,623 | $108,755 |
| Professor | to | to | to | to | to |
| (Basic Sciences) | $143,374 | $146,242 | $149,167 | $152,150 | $155,193 |
| | | | | | |
| Assoc. Medical | $84,384 | $86,071 | $87,793 | $89,549 | $91,340 |
| Professor | to | to | to | to | to |
| (Basic Sciences) | $125,983 | $128,503 | $131,073 | $133,694 | $136,368 |
| | | | | | |
| Asst. Medical | $68,301 | $69,667 | $71,061 | $72,482 | $73,931 |
| Professor | to | to | to | to | to |
| (Basic Sciences) | $108,586 | $110,758 | $112,973 | $115,232 | $117,537 |
| | | | | | |
| Medical | $129,419 | $132,007 | $134,647 | $137,340 | $140,087 |
| Professor | to | to | to | to | to |
| (Clinical) | $192,088 | $195,930 | $199,849 | $203,846 | $207,923 |
| | | | | | |
| Assoc. Medical | $113,334 | $115,601 | $117,913 | $120,271 | $122,677 |
| Professor | to | to | to | to | to |
| (Clinical) | $160,773 | $163,989 | $167,269 | $170,614 | $174,026 |
| | | | | | |
| Asst. Medical | $100,473 | $102,483 | $104,532 | $106,623 | $108,755 |
| Professor | to | to | to | to | to |
| (Clinical) | $143,377 | $146,245 | $149,170 | $152,153 | $155,196 |
| | | | | | |
| Adj. Asst. Med. | $210.50 | $214.71 | $219.00 | $223.38 | $227.85 |
| Professor | $218.90 | $223.28 | $227.75 | $232.30 | $236.95 |
| (Clinical) | $227.66 | $232.22 | $236.86 | $241.60 | $246.43 |
| | $245.02 | $249.92 | $254.92 | $260.02 | $265.22 |
| | $262.43 | $267.67 | $273.03 | $278.49 | $284.06 |
| | | | | | |
| | | | | | |
| Adj. Assoc. Med. | $245.79 | $250.71 | $255.72 | $260.83 | $266.05 |
| Professor | $255.65 | $260.77 | $265.98 | $271.30 | $276.73 |
| (Clinical) | $265.86 | $271.18 | $276.60 | $282.14 | $287.78 |
| | $283.27 | $288.94 | $294.72 | $300.61 | $306.63 |

109

A.157

| | | | | |
|---|---|---|---|---|
| | $300.69 | $306.70 | $312.83 | $319.09 | $325.47 |

| | | | | | |
|---|---|---|---|---|---|
| Adj. Med. | $281.19 | $286.82 | $292.55 | $298.40 | $304.37 |
| Professor | $292.44 | $298.29 | $304.26 | $310.34 | $316.55 |
| (Clinical) | $304.15 | $310.24 | $316.44 | $322.77 | $329.23 |
| | $325.01 | $331.51 | $338.14 | $344.91 | $351.80 |
| | $349.26 | $356.24 | $363.37 | $370.64 | $378.05 |
| | | | | | |
| Adj. Asst. Med. | $130.14 | $132.74 | $135.40 | $138.11 | $140.87 |
| Professor | $135.32 | $138.03 | $140.79 | $143.61 | $146.48 |
| (Basic Sciences) | $140.75 | $143.56 | $146.44 | $149.36 | $152.35 |
| | $161.17 | $164.39 | $167.68 | $171.04 | $174.46 |
| | $175.48 | $178.99 | $182.57 | $186.22 | $189.95 |
| | | | | | |
| Adj. Assoc. Med. | $165.46 | $168.77 | $172.15 | $175.59 | $179.10 |
| Professor | $172.09 | $175.54 | $179.05 | $182.63 | $186.28 |
| (Basic Sciences) | $178.97 | $182.55 | $186.20 | $189.92 | $193.72 |
| | $196.35 | $200.28 | $204.28 | $208.37 | $212.54 |
| | $213.79 | $218.07 | $222.43 | $226.88 | $231.42 |
| | | | | | |
| Adj. Med. | $200.83 | $204.84 | $208.94 | $213.12 | $217.38 |
| Professor | $208.90 | $213.07 | $217.34 | $221.68 | $226.12 |
| (Basic Sciences) | $217.22 | $221.56 | $225.99 | $230.51 | $235.13 |
| | $238.03 | $242.79 | $247.64 | $252.60 | $257.65 |
| | $262.43 | $267.67 | $273.03 | $278.49 | $284.06 |
| | | | | | |
| Medical | $66,736 | $68,070 | $69,432 | $70,820 | $72,237 |
| Lecturer | to | to | to | to | to |
| | $103,253 | $105,318 | $107,424 | $109,572 | $111,764 |
| | | | | | |
| Adj. Medical | $36.08 | $36.80 | $37.53 | $38.29 | $39.05 |
| Lecturer | to | to | to | to | to |
| | $56.12 | $57.24 | $58.39 | $59.56 | $60.75 |

## Distinguished Lecturer – Medical Series[19]

---

[19]With the exception of the applicable salary ranges, the other terms and conditions of employment of Distinguished Lecturers – Medical Series shall be the same as those provided in Article 11.7(a).

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $66,736 | $68,070 | $69,432 | $70,820 | $72,237 |
| to | to | to | to | to |
| $192,088 | $195,930 | $199,849 | $203,846 | $207,923 |

### Clinical Professor – Medical Series[20]

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $66,736 | $68,070 | $69,432 | $70,820 | $72,237 |
| to | to | to | to | to |
| $192,088 | $195,930 | $199,849 | $203,846 | $207,923 |

34.2 The terms and conditions of employment for the above titles shall be those contained in the Bylaws of the Board and the written policies of the Board and, in addition, only the following provisions of this Agreement shall be applicable to the Medical Professorial titles:

| | |
|---|---|
| Article 3 | Unit Stability |
| Article 4 | Union Dues and Membership |
| Article 8 | Non-Discrimination |
| Article 20 | Complaint, Grievance and Arbitration Procedure |
| Article 21 | Disciplinary Actions |
| Article 21A | Medical Separation Leave Procedure |
| Article 24.3 | Application of Salary Increases |
| Article 24.4 | Summer Salaries for Department Chairpersons |
| Article 25.5 | Scholar Incentive Awards |
| Article 26 | Welfare Benefits |
| Article 27 | Retirement |
| Article 27A | Voluntary Phased Retirement Program |
| Article 38 | Workers' Compensation |
| Article 39 | Occupational Safety and Health |
| Article 40 | No Strike Pledge |
| Article 41 | Legislative Action |
| Article 42 | 2017-2023 Financial Provisions |

## ARTICLE 35
## CUNY LAW SCHOOL

---

[20] With the exception of the applicable salary ranges, the other terms and conditions of employment of Clinical Professors as provided in Article 11.7(b) shall apply to Clinical Professors in the Medical School.

35.1   Persons in the CUNY Law School series shall be compensated as follows:

|  | 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|
| Law School Professor | $102,996 to $166,473 | $105,055 to $169,803 | $107,157 to $173,199 | $109,300 to $176,663 | $111,486 to $180,196 |
| Law School Assoc. Professor | $87,698 to $136,136 | $89,452 to $138,859 | $91,241 to $141,636 | $93,065 to $144,469 | $94,927 to $147,358 |
| Law School Asst. Professor | $74,946 to $111,318 | $76,444 to $113,544 | $77,973 to $115,815 | $79,533 to $118,131 | $81,123 to $120,494 |
| Law School Instructor | $44,861 to $97,527 | $45,758 to $99,478 | $46,673 to $101,467 | $47,606 to $103,497 | $48,559 to $105,567 |
| Law School Lecturer (per month) | $5,147 to $13,914 | $5,250 to $14,192 | $5,355 to $14,476 | $5,462 to $14,765 | $5,571 to $15,061 |
| Law School Library Professor | $78,270 to $166,473 | $79,835 to $169,803 | $81,432 to $173,199 | $83,060 to $176,663 | $84,722 to $180,196 |
| Law School Library Assoc. Professor | $63,252 to $136,136 | $64,517 to $138,859 | $65,808 to $141,636 | $67,124 to $144,469 | $68,466 to $147,358 |
| Law School Library Asst. Professor | $48,773 to $111,318 | $49,749 to $113,544 | $50,744 to $115,815 | $51,759 to $118,131 | $52,794 to $120,494 |
| Law School Adjunct Professor | $102.92 to $306.16 | $104.98 to $312.29 | $107.08 to $318.53 | $109.22 to $324.90 | $111.40 to $331.40 |

112

A.160

| | | | | | |
|---|---|---|---|---|---|
| Law School | $90.08 | $91.88 | $93.72 | $95.59 | $97.50 |
| Adjunct | to | to | to | to | to |
| Assoc. Professor | $222.68 | $227.13 | $231.67 | $236.31 | $241.03 |
| | | | | | |
| Law School | $82.38 | $84.02 | $85.70 | $87.42 | $89.17 |
| Adjunct | to | to | to | to | to |
| Asst. Prof. | $166.97 | $170.31 | $173.72 | $177.19 | $180.74 |
| | | | | | |
| Law School | $49.42 | $50.41 | $51.42 | $52.44 | $53.49 |
| Non-Teaching | to | to | to | to | to |
| Adjunct III | $100.18 | $102.19 | $104.23 | $106.32 | $108.44 |
| | | | | | |
| Law School | $54.02 | $55.10 | $56.20 | $57.33 | $58.47 |
| Non-Teaching | to | to | to | to | to |
| Adjunct II | $133.62 | $136.29 | $139.02 | $141.80 | $144.63 |
| | | | | | |
| Law School | $61.75 | $62.99 | $64.25 | $65.53 | $66.84 |
| Non-Teaching | to | to | to | to | to |
| Adjunct I | $183.69 | $187.37 | $191.11 | $194.94 | $198.83 |

### Distinguished Lecturer – Law School[21]

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $44,861 | $45,758 | $46,673 | $47,606 | $48,559 |
| to | to | to | to | to |
| $166,473 | $169,803 | $173,199 | $176,663 | $180,196 |

35.2    Individuals employed in the title Law School Lecturer shall not be employed more than five consecutive months in one academic year.

---

[21]With the exception of the applicable salary ranges, the other terms and conditions of employment of Distinguished Lecturers – Law School shall be the same as those provided in Article 11.7 (a).

113

A.161

35.3 Individuals employed in the title Law School Library Professor, Law School Library Associate Professor or Law School Library Assistant Professor shall have 30 work days of annual leave, shall work a 35-hour week and shall have regular holidays with pay as follows:

(a) Independence Day
(b) Labor Day - first Monday in September
(c) Thanksgiving Holiday - fourth Thursday in November, Friday following
(d) Christmas Holiday - December 24 and 25
(e) New Year's Holiday - December 31, January 1
(f) Martin Luther King, Jr.'s Birthday - Third Monday in January
(g) Memorial Day - The last Monday in May
(h) In addition, there shall be three unscheduled holidays in the period September 1 - August 31 each year.

If a holiday falls on a Saturday or Sunday which is not a regular work day it shall be observed on the Friday before or the Monday following as designated by the Law School or by the University or, at the option of the University, may be designated as an unscheduled holiday, to be taken following the holiday for which it is substituted but prior to the end of the fiscal year, with the prior approval of the employee's supervisor. Professional Law School Library Staff shall be required to work Election Day, Lincoln's Birthday and Presidents' Day, for which they shall be remunerated in accordance with the assigned overtime rate.

The assigned overtime rates for the Professional Law School Library Staff shall be the Non-teaching Adjunct rate listed in Article 24.

35.4 In accordance with the special nature of the instructional program of the Law School, individuals in HEO titles only in the Law School may be assigned teaching duties as a part of their regular 35-hour per week assignment. Individuals so assigned shall be released from their regular HEO duties for the number of classroom contact hours taught weekly and, in addition, a number of hours equal to the number of classroom contact hours taught per week.

35.5 The terms and conditions of employment for the titles in the CUNY Law School series shall be those contained in the Bylaws applicable to the Law School and the written policies of the University applicable to the Law School, and, in addition, only the following provisions of this agreement shall be applicable to the CUNY Law School Professorial Series:

114

A.162

Article 3             Unit Stability
Article 4             Union Dues and Membership
Article 8             Non-Discrimination
Article 20            Complaint, Grievance and Arbitration Procedure
Article 21            Disciplinary Actions
Article 21A           Medical Separation Leave Procedure
Article 23.1          Distinguished Professor**
        23.4          (Compensation for Distinguished Professors**)
Article 24.3          Application of Salary Increases
Article 26            Welfare Benefits
Article 27            Retirement
Article 27A           Voluntary Phased Retirement Program
Article 38            Workers' Compensation
Article 39            Occupational Safety and Health
Article 40            No Strike Pledge
Article 41            Legislative Action
Article 42            2017-2023 Financial Provisions

** Article 23.1 and 23.4 - Law School Professors shall be eligible for nomination as Distinguished Professors.

**ARTICLE 36**
**RESIDENT SERIES**

115

A.163

36.1    Persons in the Resident Series shall be compensated at per credit hour rates as follows:

**RESIDENT SERIES**

|  | 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|
| Resident | $2,971 | $3,031 | $3,091 | $3,153 | $3,216 |
| Professor | $3,092 | $3,153 | $3,217 | $3,281 | $3,346 |
|  | $3,216 | $3,280 | $3,346 | $3,413 | $3,481 |
| Resident | $2,522 | $2,573 | $2,624 | $2,677 | $2,730 |
| Associate | $2,622 | $2,675 | $2,728 | $2,783 | $2,839 |
| Professor | $2,729 | $2,783 | $2,839 | $2,896 | $2,953 |
| Resident | $2,078 | $2,119 | $2,162 | $2,205 | $2,249 |
| Assistant | $2,159 | $2,203 | $2,247 | $2,292 | $2,337 |
| Professor | $2,247 | $2,292 | $2,338 | $2,385 | $2,432 |
| Resident | $1,783 | $1,819 | $1,855 | $1,892 | $1,930 |
| Instructor | $1,854 | $1,891 | $1,929 | $1,968 | $2,007 |
|  | $1,930 | $1,968 | $2,008 | $2,048 | $2,089 |
| Resident | $1,783 | $1,819 | $1,855 | $1,892 | $1,930 |
| Lecturer | $1,854 | $1,891 | $1,929 | $1,968 | $2,007 |
|  | $1,930 | $1,968 | $2,008 | $2,048 | $2,089 |

(a)    To be eligible for appointment to these titles a person must be a member of the Instructional Staff of The City University of New York at the time of application for the position, at least 55 years of age and eligible for service or age retirement, and must retire prior to the appointment to the position.

(b)    To be eligible to receive appointment in these titles the individual meeting the above requirements shall have first exhausted retirement leave benefits under Section 3107 of the Education Law.  Appointment to these titles shall be discretionary with the Board of Trustees on recommendation of the college and be made only where educationally and financially advantageous to the instructional unit and college.

(c)    Incumbents in this title series will be eligible to receive a movement within schedule on the January first of each year following completion of at least ten (10) full months of service.  The salary rates are set forth in the salary schedule of section 36.1.

36.2    The title assigned to the individual shall correspond to the title held prior to retirement:

116

A.164

| Professor | Resident Professor |
| Associate Professor | Resident Associate Professor |
| Assistant Professor | Resident Assistant Professor |
| Instructor | Resident Instructor |
| Lecturer | Resident Lecturer |

36.3   Appointment in the Resident Series shall be for a semester or academic year. The duration of employment in the resident series titles shall not exceed three years.

36.4   The conditions of such employment shall be as follows:

(a)   Persons holding a title in the Resident Series may teach no more than the lesser of two courses or six credit hours during each academic year.

(b)   The assignment of courses shall be within the discretion of the departmental chairperson and/or other properly authorized college official.

(c)   The assignment of courses shall be within the range of offerings previously taught by the Resident staff member, but no resident staff member shall have a claim to teach a particular course.

(d)   Appointment to Resident Series Titles shall be subject to sufficiency of student enrollment and financial ability.

(e)   Disputes arising under the provisions of this resolution for early retirement shall be subject to section 20.3 hereof, with an appeal permitted to the Chancellor or the Chancellor's designee.

(f)   An individual who accepts early retirement under this plan shall retain faculty prerogatives under the Bylaws, except that no such person may serve as chairperson, in an excluded management title, or serve on a departmental personnel and budget committee or other personnel committee.

(g)   Acceptance of a Resident series title shall not preclude the individual from receiving benefits under the PSC-CUNY Welfare Fund to which he/she is otherwise entitled as a retiree.


# ARTICLE 37
## ACADEMIC CALENDAR

117

A.165

Prior to the implementation of academic calendar changes emanating from the Board of Higher Education Calendar Number 10, April 5, 1976, the impact of such change shall be negotiated by the parties with respect to matters covered by this agreement.

## ARTICLE 38
## WORKERS' COMPENSATION

The parties agree that Workers' Compensation shall be made applicable.

## ARTICLE 39
## OCCUPATIONAL SAFETY AND HEALTH

39.1 The City University shall furnish to each of its employees who is covered by this agreement a place of employment which is free from recognized hazards that are causing or are likely to cause death or serious harm to its employees and shall comply with occupational safety and health standards promulgated under the Occupational Safety and Health Act of 1970. An alleged violation of this provision may be grieved up to and including Step 2 of the formal procedure for handling grievances provided by Article 20.4 of the collective bargaining agreement. If the PSC deems it necessary and appropriate to file such a grievance, a written "stop-the-clock" request will be made along with the filing of the grievance in order to allow the cooperative CUNY-PSC health and safety mechanism to operate without interference from the grievance procedures.

39.2 The University and the PSC agree to establish a joint committee on health and safety.

## ARTICLE 40
## NO STRIKE PLEDGE

CUNY and the PSC agree that disputes which may arise between them shall be settled without resort to strike or lockout and that the requirements of the law in this regard will not be violated. The University

118

A.166

agrees it will not lock out any or all employees during the term of Agreement and the PSC agrees on behalf of itself and its membership that there shall be no strikes, slow-downs or interference with the normal operation of The City University during the term of this Agreement.

## ARTICLE 41
## LEGISLATIVE ACTION

IT IS AGREED BY AND BETWEEN THE PARTIES THAT ANY PROVISION OF THIS AGREEMENT REQUIRING LEGISLATIVE ACTION TO PERMIT ITS IMPLEMENTATION BY AMENDMENT OF LAW OR BY PROVIDING THE ADDITIONAL FUNDS THEREFOR, SHALL NOT BECOME EFFECTIVE UNTIL THE APPROPRIATE LEGISLATIVE BODY HAS GIVEN APPROVAL.

## ARTICLE 42
## 2017-2023 FINANCIAL PROVISIONS

The financial provisions of this Agreement are within the funding guidelines mandated by the City of New York and the State of New York and were negotiated in accordance with applicable law.

## ARTICLE 43
## DURATION

43.1   This Agreement shall become effective December 1, 2017 upon its adoption by the Board of Trustees, and its ratification by the membership of the Professional Staff Congress.

119

A.167

43.2    Only the Chancellor or his/her designee together with the President of the PSC or his/her designee may agree to waive a provision of this Agreement.

43.3    This Agreement shall be in effect through February 28, 2023.


          Dated:  October 21, 2019
               New York, New York


          The City University of New York


          Professional Staff Congress/CUNY

Witnessed By:


**APPENDIX A**


120


A.168

**PERTINENT SECTIONS OF THE WORKLOAD SETTLEMENT AGREEMENT**[22]

1.   This Agreement is applicable to all full-time classroom teaching members of the instructional staff for undergraduate courses.[23]

2.*  The annual undergraduate teaching contact hour** workload shall be as follows, it being understood that the term "undergraduate teaching contact hour workload" includes reassigned time assigned to the individual and approved in the college:

| Title/ College | Academic Year 2017-2018 | Academic Year 2018-2019 | Academic Year 2019-2020 | Academic Year 2020-2021 and thereafter |
|---|---|---|---|---|
| Professors, Associate Professors, Assistant Professors (Senior Colleges) | 21 hours | 20 hours | 19 hours | 18 hours |
| Professors, Associate Professors, Assistant Professors (Community Colleges) | 27 hours | 26 hours | 25 hours | 24 hours |
| Instructors and Lecturers | 27 hours | 26 hours | 25 hours | 24 hours |

In order to avoid the loss of teaching hours due to difficulties in scheduling, the annual undergraduate teaching contact hour workload shall be managed over a three-year period. The intent of this provision is to ensure that classroom contact hours not scheduled in one year because the courses assigned to the faculty member do not permit an exact correspondence with the stated workload may be scheduled in a subsequent year within the three-year period. Calculated over the three-year period, the average annual undergraduate teaching contact hour workload of every faculty member shall equal the hours specified above.

The annual undergraduate teaching contact hour workload of faculty in Substitute titles shall be three hours greater than the annual undergraduate teaching contact hour workload stated herein for the equivalent rank.

---

[22] In the Memorandum of Agreement dated June 16, 2016, the University and the Professional Staff Congress ("PSC") expressed a shared goal of reducing the annual undergraduate teaching contact hour workload for full-time classroom teaching members of the instructional staff by three (3) teaching contact hours. A plan for implementing the three (3) teaching contact hour reduction was agreed to by the parties on December 8, 2017. As of Academic Year 2020-2021, the teaching contact hour workload reduction plan has been fully implemented as reflected above.

[23] The parties have agreed to a five-year pilot program, beginning with the 2019-2020 academic year and continuing through the end of the 2023-2024 academic year, concerning Baruch College executive master's degree, dual master's degree and international executive master's degree cohort programs. See Appendix N.

121

A.169

\*  This provision does not apply to instructional situations involving supervision of students in other than organized classes: appropriate multiples in these and related areas shall be determined by the colleges based on past experience and practices.

\*\*  For purposes of this Agreement, an undergraduate teaching contact hour is defined as an organized class which meets at a regularly scheduled time during the semester, quarter or session for one fifty-minute period or its approved equivalent period.

3.  (a)  The concepts of Mode I and Mode II as defined in the opinion and Award in Case No. 1339-0979-76, dated February 3, 1982, are inapplicable.

    (b)  In those colleges of the University which have a practice of contact hour multiples for specified courses during the 1981-82 academic year, such practice may be continued.

    (c)  The parties agree that some degree of flexibility in terms of class size and in total student load will be required by the University for the purpose of implementing this Agreement.

    (d)  Other than as provided in Article 6 and Article 15.1 (d), (e) and (f) of the Collective Bargaining Agreement, determination of the adjustment and assignment of reassigned time shall remain discretionary with the University both as to the amount of reassigned time and as to the identity of the individual member of the Instructional Staff to whom such reassigned time is granted.

**APPENDIX B**

**GUIDELINES FOR THE IMPLEMENTATION OF THE**

122

A.170

## ADJUNCT PROFESSIONAL DEVELOPMENT FUND

1. Effective September 1, 2006, the PSC will establish an Adjunct Professional Development Selection Committee that will be responsible for reviewing applications and making the professional development grants from the Adjunct Professional Development Fund. Applications will be received and grants awarded on a rolling basis pursuant to the availability of funds under Article 33.6.

2. The Adjunct Professional Development Selection Committee will be responsible for accounting to the PSC for the expenditure of the funds. At the end of each CUNY fiscal year (*i.e.*, June 30), the PSC will provide an accounting of the use of the funds to the President of the PSC and the Senior Vice Chancellor for Labor Relations. This accounting will include the following information: 1) the name of each recipient, 2) the amount of the grant, 3) the specific purpose for which the grant was made, 4) an itemized accounting of other (i.e., administrative) expenditures, 5) the opening balance of the account and 6) the closing balance of the account.

3. An adjunct faculty member who is teaching six or more classroom contact hours in the semester and has taught one or more courses for the two most recent consecutive semesters (not including summer session) shall be eligible to apply for a grant from the Adjunct Professional Development Fund. To be eligible for a grant that would be used during an intersession or summer session period when not otherwise employed at the college, an adjunct must meet the above stated eligibility requirements and in addition must have been notified of reappointment for the next consecutive semester. Continuing Education Teachers who are appointed to a position that will continue for a period of more than six months and that requires them to teach a minimum of 20 hours per week and who have taught in such an appointment for the two most recent consecutive semesters (not including summer session) shall also be eligible to apply for a grant from the Adjunct Professional Development Fund.

4. Eligible employees will apply by using a standard application form. The application will explain how the professional development activity is related to the employee's position at the University and to the employee's own professional development. A grant for a professional development activity that conflicts with the employee's teaching responsibilities will not be awarded.

5. Applications must have the approval of one chairperson of a department that is employing the adjunct before being submitted to the Adjunct Professional Development Selection Committee. If the chairperson does not approve the application, he/she must provide an explanation for the disapproval.

6. Applications must be approved by the Adjunct Professional Development Selection Committee before the funded professional development activity commences. Funds will be disbursed to the employee only upon submission of documentation acceptable to the Adjunct Professional Development Selection Committee.

7. The maximum award for professional development activities in any academic year to an individual is $3,000. Preference will be given to employees who have not previously received

123

A.171

professional development funds and to employees with long service to the University. Through December 31, 2019, up to $3,000 annually may be spent from the Fund to reimburse for administrative expenses. Effective January 1, 2020, a sum equal to 7.5 percent of the annual $660,000 allocation to the Adjunct Professional Development Fund (*i.e.* $49,500) will be deducted from the Fund annually by the PSC to support administrative costs. The PSC will provide an annual itemized accounting of these expenses.

**APPENDIX C**

**SETTLEMENT AGREEMENT: SALARIES ABOVE BASE**

124

A.172

Agreement made this 25 day of June, 2002 between The City University of New York and The Professional Staff Congress/CUNY.

The parties hereby agree as follows:

1.  CUNY may pay base salaries in excess of the base salary schedules contained in the CUNY-PSC collective bargaining agreement to members of the PSC bargaining unit for purposes of recruitment and retention, up to 165% of the last step of the applicable base salary schedule (hereinafter referred to as the 7-year step), for the titles Professor, Associate Professor, Assistant Professor, Higher Education Officer, Higher Education Associate, and Higher Education Assistant, which excess base salary shall become a part of base salary.

2.  The base salary flexibility described in Paragraph 1 above refers to additions to the base salary contained in the schedules. All other applicable provisions of the CUNY-PSC collective bargaining agreement, the multiple position policy, Board Bylaws and other University policies and procedures continue to apply.

3.  When a college President intends to make a base salary offer to recruit or retain a bargaining unit member in excess of the base salary schedules contained in the CUNY-PSC collective bargaining agreement, he/she shall convene an *ad hoc* committee of faculty members, if the offeree is being hired or retained in a faculty title, or an *ad hoc* committee of individuals in Higher Education Officer series titles, if the offeree is being hired or retained in a Higher Education Officer series title. The *ad hoc* committee, based on its academic judgment regarding the qualifications and duties of the individual to whom an offer is being contemplated by the President, shall make a non-binding recommendation to the President that the proposed base salary should be within the range of one of the following tiers:

    | Tier I: | 101% - 115% of the 7-year step for the title |
    |---|---|
    | Tier II: | 116% - 140% of the 7-year step for the title |
    | Tier III: | 141% - 165% of the 7-year step for the title[24] |

    The President will then forward his/her recommendation to the Chancellor. If the Chancellor approves, the recommended salary will be submitted for approval to the Board of Trustees via the Chancellor's or University Report.

4.  The PSC hereby withdraws or discontinues with prejudice the following:

    - The grievance concerning the recruitment/retention initiative that it filed by letter dated July 2, 2001;
    - PERB Charge No. U-22891;

---

[24] Effective August 25, 2016, the permissible salary in excess of the base salary shall be increased to 180% of the last step of the applicable base salary schedule for all eligible titles.

125

A.173

- The grievance filed on behalf of "all bargaining unit members" alleging "improper payment of salary increases beyond those contractually stipulated. Failure to negotiate proposed salary increases with the Professional Staff Congress/CUNY," filed by letter dated December 28, 2001;
- PERB Charge No. U- (Re: Zicklin School memo); and
- Barbara Bowen as President of PSC-CUNY v. City University of New York, Index No. 104015/2002, New York County Supreme Court.

5.    CUNY will advise the colleges that all increases to base salary shall be granted in accordance with the CUNY-PSC collective bargaining agreement and with this letter.

For the City University of New York        For the Professional Staff Congress/CUNY


/s/ _____        /s/ _____

_____

Date June 26, 2002                         Date June 25, 2002


## ADDENDA TO SETTLEMENT AGREEMENT

Effective June 26, 2006, the settlement agreement dated June 25, 2002 is made applicable to the following titles:

> Medical Professor (Basic Sciences)
> Associate Medical Professor (Basic Sciences)
> Assistant Medical Professor (Basic Sciences)
> Medical Professor (Clinical)
> Associate Medical Professor (Clinical)
> Assistant Medical Professor (Clinical)
> Law School Professor
> Law School Associate Professor
> Law School Assistant Professor
> Law School Library Professor
> Law School Library Associate Professor
> Law School Library Assistant Professor

Effective August 25, 2016, the settlement agreement dated June 25, 2002 is made applicable to the title Research Associate.

126

A.174

Effective with the adoption of the 2017-2023 Agreement by the Board of Trustees,[25] the settlement agreement dated June 25, 2002, is made applicable to the following titles:

> Distinguished Lecturer
> Clinical Professor

For titles listed above that do not have a seven-year step, the percentage increases specified in the settlement agreement will be applied to the maximum salary in the salary range for the title.


## PILOT PROGRAM

Under a pilot program from the 2016-17 academic year through the end of the 2023-24 academic year, the Chancellor or his/her designee shall be entitled to recommend annually the appointment of up to 10 instructional staff employees in the titles referenced in Appendix C at a salary above base, not to exceed 50 appointments University-wide at any one time. The Chancellor or his/her designee shall convene an *ad hoc* committee from the relevant department/unit situated within the college where the faculty member will be appointed to review the salary recommendation. The *ad hoc* committee's recommendation shall be forwarded to the University-wide Provost for review. These appointments shall not be subject to the limits on salary above base included in Appendix C.


## APPENDIX D

## CUNY START and CUNY LANGUAGE IMMERSION PROGRAM ("CLIP") INSTRUCTORS

---

[25] The Board of Trustees adopted the Agreement on December 16, 2019.

127

A.175

The following terms and conditions apply to the full-time CUNY Start Instructor and CLIP Instructor titles, established Fall 2016. Eligible incumbent hourly teachers were moved to the equivalent CUNY Start Instructor and CLIP Instructor titles effective February 12, 2017.

1. <u>Applicable Provisions</u>: The CUNY Start Instructor and CLIP Instructor titles will be included in the PSC bargaining unit but excluded from the provisions of the collective bargaining agreement with the exception of Articles 3, 4, 5, 7, 8, 17, 20, 33.5, 38, 39, 40, 41, 42 and 43.

2. <u>Salary</u>:
   a. CUNY Start Instructors
      - CUNY Start Instructors will have an annualized salary schedule equivalent to the Lecturer salary schedule, based on a workload of 1,230 hours per year (including teaching and program days) exclusive of paid holidays.

   b. CLIP Instructors
      - CLIP Instructors will have an annualized salary schedule equivalent to the Lecturer salary schedule, except the minimum annual salary rate for CLIP Instructors will be a new salary step added to the bottom of the Lecturer salary schedule ($43,387) effective 2/12/17, based on a workload of 1,014 hours per year (including teaching and program days) exclusive of paid holidays.
      - CLIP Instructors who work additional hours during the summer session will be paid for such work at the appropriate CLIP hourly rate in the CLIP Instructor salary schedule.

   c. CUNY Start Instructors with the functional title of Lead Instructor will receive a salary differential in the amount of $5,300.

   d. CUNY Start Instructors and CLIP Instructors will receive a January 1st movement in schedule (i.e., step increase) after at least ten full months of service.

   e. For employees newly hired to teach in the CUNY Start and CLIP programs on or after 2/12/17:

      - Newly hired teachers in the CLIP program will be hired in a six-month appointment in the hourly Continuing Education Teacher title and will be paid the hourly rate of the CLIP Instructor minimum salary. After such teachers work a complete Fall or Spring semester, if they are reappointed in the CLIP program, they must be appointed to the full-time CLIP Instructor title.
      - Newly hired teachers in the CUNY Start program will be hired as cooperating teachers in a six-month appointment in the hourly Continuing Education Teacher

128

A.176

("CET") title and will be paid at the CET minimum hourly rate. (See CET Supplemental Agreement.) After such teachers work a complete Fall or Spring semester, if they are to be appointed in the CUNY Start program, they will be appointed to the full-time CUNY Start Instructor title, unless required to serve one additional semester as a cooperating teacher based upon the Program's evaluation of the employee.

3. Time and Leave:
   a. Workload:
      - CUNY Start Instructors will have a workload of 1,230 hours per year (including teaching and program days), exclusive of paid holidays. (Annual appointment periods will begin in August, except at Kingsborough and LaGuardia Community Colleges, where they may begin in September.)
      - CLIP Instructors will have a workload of 1,014 hours per year (including teaching and program days), exclusive of paid holidays, to be worked during the Fall and Spring semesters (Fall, Winter and Spring at Kingsborough and LaGuardia Community Colleges). (Annual appointment periods will begin in August, except at Kingsborough and LaGuardia Community Colleges, where they may begin in September.)

   b. Annual and Sick Leave:
      - Annual leave will not accrue but will be taken when programs are not in session.
      - CUNY Start Instructors will accrue 20 days of sick leave per year.
      - CLIP Instructors will accrue 16 days of sick leave per year. CLIP Instructors who work during the summer session will accrue an additional 4 days of sick leave per year.
      - The sick leave cap for employees in both titles will be 60 days.
      - Employees in both titles will be eligible to participate in the Dedicated Sick Leave and Catastrophic Sick Leave Bank programs, in accordance with the terms of those policies.

4. Benefits:
   a. Employees in both titles will have annualized health insurance and participate in the PSC-CUNY Welfare Fund and per capita per annum contributions (pro-rated on a monthly basis) shall be made to the PSC-CUNY Welfare Fund on their behalf.

129

A.177

b. Employees in both titles may participate in the HEO/CLT Professional Development Fund, set forth in Article 33.5.

c. The parties will discuss Travia Leave and retiree health insurance benefits for members of the optional retirement program.

5. Observations/Evaluations:

a. The existing observation/evaluation process (as of 2017-2018) for teachers in the CUNY Start program shall remain in effect for CUNY Start Instructors.

b. A teaching observation and/or an evaluation may be conducted at the request of the Campus Director or the CLIP Instructor, provided, however, that if such observation/evaluation is conducted at the request of the CLIP Instructor, such observation/evaluation may not be conducted more than once a year.

c. There shall be a personal personnel file which shall include but not be limited to the following:

- Information relating to the employee's academic and professional accomplishments submitted by the employee or placed in the file at his or her request;

- Personnel information and records generated by the college;

- Formal evaluations of the employee's professional performance.

No materials shall be placed in the employee's file until the employee has been given the opportunity to read the contents and attach any comments he/she may so desire. Each such document shall be initialed by the employee before being placed in his/her file as evidence of his/her having read such document. This initialing shall not be deemed to constitute approval by the employee of the contents of such document. If the employee refuses to initial any document after having been given an opportunity to read the same, a statement to that effect shall be affixed to the document.

CLIP and CUNY Start Instructors' personal personnel files will be maintained in the college Human Resources Office and an employee may make an appointment with the Human Resources Office to review his/ her file.

6. Discipline: Employees in both titles shall be subject to discharge for just cause subject to the grievance and arbitration process set forth in Article 20 herein.

130

A.178

7. CLIP and CUNY Start Instructors hired on an annual basis shall receive written notice of reappointment or non-reappointment on or before July 1.

## CUNY START INSTRUCTOR

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 4/1/2021 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|
| $50,301 | $51,307 | $52,333 | $53,833 | $54,910 | $56,008 |
| $53,303 | $54,369 | $55,457 | $56,957 | $58,096 | $59,258 |
| $55,959 | $57,078 | $58,220 | $59,720 | $60,914 | $62,133 |
| $58,078 | $59,239 | $60,424 | $61,924 | $63,163 | $64,426 |
| $61,088 | $62,310 | $63,556 | $65,056 | $66,357 | $67,684 |
| $63,211 | $64,476 | $65,765 | $67,265 | $68,610 | $69,983 |
| $65,334 | $66,641 | $67,974 | $69,474 | $70,863 | $72,280 |
| $67,454 | $68,803 | $70,179 | $71,679 | $73,112 | $74,575 |
| $69,574 | $70,966 | $72,385 | $73,885 | $75,363 | $76,870 |
| $71,699 | $73,133 | $74,595 | $76,095 | $77,617 | $79,170 |
| $73,820 | $75,297 | $76,803 | $78,303 | $79,869 | $81,466 |
| $75,943 | $77,462 | $79,011 | $80,511 | $82,121 | $83,764 |
| **$78,937** | **$80,516** | **$82,126** | **$83,626** | **$85,298** | **$87,004\*** |
| **$84,363** | **$86,050** | **$87,771** | **$89,271** | **$91,057** | **$92,878\*\*** |

131

A.179

## CUNY LANGUAGE IMMERSION PROGRAM ("CLIP") INSTRUCTOR
## ANNUAL RATE

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 4/1/2021 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|
| $44,919 | $45,817 | $46,733 | $48,233 | $49,198 | $50,182 |
| $46,665 | $47,598 | $48,550 | $50,050 | $51,051 | $52,072 |
| $48,449 | $49,418 | $50,406 | $51,906 | $52,944 | $54,003 |
| $50,301 | $51,307 | $52,333 | $53,833 | $54,910 | $56,008 |
| $53,303 | $54,369 | $55,457 | $56,957 | $58,096 | $59,258 |
| $55,959 | $57,078 | $58,220 | $59,720 | $60,914 | $62,133 |
| $58,078 | $59,239 | $60,424 | $61,924 | $63,163 | $64,426 |
| $61,088 | $62,310 | $63,556 | $65,056 | $66,357 | $67,684 |
| $63,211 | $64,476 | $65,765 | $67,265 | $68,610 | $69,983 |
| $65,334 | $66,641 | $67,974 | $69,474 | $70,863 | $72,280 |
| $67,454 | $68,803 | $70,179 | $71,679 | $73,112 | $74,575 |
| $69,574 | $70,966 | $72,385 | $73,885 | $75,363 | $76,870 |
| $71,699 | $73,133 | $74,595 | $76,095 | $77,617 | $79,170 |
| $73,820 | $75,297 | $76,803 | $78,303 | $79,869 | $81,466 |
| $75,943 | $77,462 | $79,011 | $80,511 | $82,121 | $83,764 |
| **$78,937** | **$80,516** | **$82,126** | **$83,626** | **$85,298** | **$87,004\*** |
| **$84,363** | **$86,050** | **$87,771** | **$89,271** | **$91,057** | **$92,878\*\*** |

132

A.180

# CUNY LANGUAGE IMMERSION PROGRAM ("CLIP") INSTRUCTOR HOURLY RATE

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $44.30 | $45.18 | $46.09 | $47.01 | $47.95 |
| $46.02 | $46.94 | $47.88 | $48.84 | $49.82 |
| $47.78 | $48.73 | $49.71 | $50.70 | $51.72 |
| $49.60 | $50.59 | $51.61 | $52.64 | $53.69 |
| $52.57 | $53.62 | $54.69 | $55.79 | $56.90 |
| $55.18 | $56.29 | $57.41 | $58.56 | $59.73 |
| $57.27 | $58.42 | $59.59 | $60.78 | $61.99 |
| $60.24 | $61.45 | $62.67 | $63.93 | $65.21 |
| $62.34 | $63.59 | $64.86 | $66.16 | $67.48 |
| $64.43 | $65.72 | $67.04 | $68.38 | $69.74 |
| $66.52 | $67.85 | $69.21 | $70.60 | $72.01 |
| $68.62 | $69.99 | $71.39 | $72.82 | $74.27 |
| $70.71 | $72.12 | $73.56 | $75.03 | $76.53 |
| $72.80 | $74.25 | $75.74 | $77.25 | $78.80 |
| $74.90 | $76.40 | $77.92 | $79.48 | $81.07 |
| $77.85 | $79.40 | $80.99 | $82.61 | $84.26 |
| $83.20 | $84.87 | $86.56 | $88.29 | $90.06 |

# APPENDIX E

# MULTI-YEAR APPOINTMENT FOR TEACHING ADJUNCTS

133

A.181

1. The parties will enter into a pilot program beginning with the 2016-2017 academic year through the end of the 2023-2024 academic year. Three-year appointments made within the pilot period shall remain in effect for the term of each appointment. The parties will meet no later than June 30, 2023, to determine whether to continue the pilot program as specified in this Agreement or to modify the pilot program. If the parties are unable to agree to continue or to modify the pilot program, the terms regarding adjunct appointments will revert to those expressed in the 2007-2010 collective bargaining agreement.

2. An employee who has served as a teaching adjunct and who has taught at least six (6) contact teaching hours per semester within the same department of the college for the 10 most recent consecutive semesters (excluding summer sessions) preceding the effective date of the three-year appointment shall be considered for a three-year appointment, subject to the comprehensive review and assessment referenced in paragraph "4" below. Up to four semesters of substitute service in a teaching title within the same department of the college may be counted as qualifying service. The first three-year appointments shall begin in the Fall 2017 semester and three-year appointments will continue to be available starting in each fall semester through Fall 2023. Adjuncts shall be notified on or before May 15th concerning appointment or non-reappointment for a three-year period.

   With the start of the Fall 2019 semester, the following eligibility criteria, in addition to the criteria in the paragraph above, shall be in effect. An employee who has served as a teaching adjunct and who has taught at least six (6) contact teaching hours per semester within the same department of the college for at least 10 of the 12 most recent consecutive semesters (excluding summer sessions) preceding the effective date of the three-year appointment shall be considered for a three-year appointment, subject to the comprehensive review and assessment referenced in paragraph "4" below, provided that the adjunct was initially assigned to teach at least six (6) contact hours in the semester(s) resulting in the lack of continuity and that the adjunct lost no more than one course owing to insufficient enrollment or reassignment of the course to another faculty member and/or that the adjunct lost one or more courses owing to medical reasons in the semester(s) at issue. A teaching adjunct who believes that his or her service in at least 10 of the 12 most recent semesters counts as qualifying service as set forth herein must self-identify to the college Human Resources Office and the department chair no later than the end of the second week of the Spring semester in which he or she would be considered for the three-year appointment; the college shall determine whether the adjunct meets the eligibility criteria set forth herein for consideration for a three-year appointment and shall notify the adjunct whether he/she is eligible to receive consideration for such appointment.

   In rare instances in which a department Personnel and Budget Committee determines that an eligible adjunct will not be reappointed to a three-year appointment but could benefit from a one-year appointment and additional guidance, the adjunct shall be appointed to a one-year appointment. At the end of the one-year appointment, the adjunct must be considered for a three-year appointment.

<center>134</center>

<center>A.182</center>

3. As a one-time transition due to the implementation of this pilot program, those adjuncts who have taught at least six (6) classroom contact hours per semester within the same department at the same college for 14 out of the last 18 consecutive semesters (excluding summer sessions) preceding the 2016-17 academic year—including the four semesters (excluding summer sessions) immediately preceding the 2016-17 academic year—and who are eligible for a two-semester appointment for the Fall 2016 and Spring 2017 semesters under Article 10.1.(a)3.,— shall receive a two-year appointment for the 2016-17 and 2017-18 academic years, without the necessity of a comprehensive review, but subject to sufficiency of registration and changes in curriculum. Up to four semesters of substitute service in a teaching title within the same department of the college may be counted as qualifying service. An adjunct who believes that he/she meets the eligibility requirements for this two-year appointment must file a notice of interest with his/her department chair no later than October 15, 2016. Filing a notice of interest shall be a pre-condition to receiving consideration for a two-year appointment. It is understood that adjuncts who receive these initial two-year appointments will receive a comprehensive review during said period and will be considered for a three-year appointment effective beginning in the 2018-19 academic year, on the same basis as other adjuncts, as set forth in paragraph "4" below. Adjuncts who file a notice of interest shall be notified on or before February 1, 2017, confirming their appointment to a two-year appointment or notifying them of their lack of eligibility therefor.

4. To receive a three-year appointment, an adjunct who meets the service requirements must receive the positive recommendation of his/her department P&B committee and of the college President, or his/her designee [*e.g.*, Provost, Dean]. The recommendations shall be based upon a comprehensive review of the adjunct's performance and the fiscal and programmatic needs of the department and/or the college.

5. Adjuncts who receive three-year appointments shall be considered for a subsequent three-year appointment, subject to a comprehensive review of the adjunct's performance and an assessment of the fiscal and programmatic needs of the department and/or the college, as referenced in paragraph "4" above. Consistent with paragraph "2" above, if an adjunct serving in a three-year appointment is appointed to teach as a substitute in the same department of the college within the three-year period, such substitute appointment shall not serve to disqualify the adjunct from consideration for another three-year appointment as an adjunct at the conclusion of the current three-year appointment period or thereafter, if the substitute appointment continues beyond the conclusion of the current three-year appointment period but ends within the pilot period. Consistent with section 6.4.d of the Bylaws of the Board of Trustees, there is no presumption of continuous appointments. Adjuncts shall be notified on or before May 15th of the third year of their current three-year appointment concerning reappointment or non-reappointment for a successive three-year period.

6. During the three-year appointment period, the adjunct shall follow existing departmental policies regarding student evaluations; it is understood that the weight to be accorded student evaluations in the comprehensive review process is a matter of academic judgment. At least one 50-minute teaching observation shall be conducted during the three-year period.

135

A.183

7.  During the three-year appointment period, the adjunct shall be assigned a minimum of six (6) classroom contact hours in each Fall and Spring semester, but shall have no entitlement to a particular course(s) or schedule.

8.  Should a department be unable to offer an adjunct a minimum of six (6) classroom contact hours in a given semester, the department chair shall offer the adjunct either: A) an academically appropriate non-teaching adjunct appointment in the current semester for an equivalent number of hours at the non-teaching rate; or B) an additional teaching assignment of the number of hours of the contact hour deficit within the following two semesters or summer session.  For those adjuncts who receive their primary health insurance by virtue of their adjunct employment at the college and who would lose the health insurance if their assignment at the college fell below six (6) contact hours in any given semester, department chairs shall make every effort to give such adjunct a non-teaching assignment in the same semester as the contact hour deficit sufficient to maintain health insurance; for these purposes only, one non-teaching hour shall be deemed equivalent to 0.4 teaching contact hour.

    A semester in which an adjunct's workload falls below six (6) contact hours for reasons other than his/her declination to teach continues to count as 6 contact teaching hours of service toward eligibility for the following: subsequent three-year adjunct appointments; movement in salary schedule (Article 24.2.(b)); waiver of tuition (Article 29.3); Adjunct Professional Development Fund (Appendix B).

9.  An adjunct may discuss with his/her department chair his/her course and scheduling preferences. The department chair may consider the adjunct's expressed preferences—just as the expressed preferences of full-time faculty are considered—but the department chair retains the final authority to determine who will be assigned to teach which courses and when the courses will be offered. If an adjunct declines to teach more than one course as assigned by the department chair during the three-year period, the three-year appointment shall be considered null and void.

    Notwithstanding the above, an adjunct serving in a three-year appointment may seek to be excused for up to one semester upon the submission of documentation satisfactory to the college's Office of Human Resources establishing the need for such owing to 1) the adjunct's own illness; 2) the need to care for an ill member of the adjunct's immediate family; 3) the need to care for a newborn child or a newly adopted child, adopted at up to five (5) years of age; or 4) receipt of an academic grant or fellowship that involves full-time commitment or absence.  If approved, such one-semester break in service shall not serve to disqualify the adjunct from consideration for another three-year appointment at the conclusion of the current three-year appointment.

10. Adjuncts who receive a two-year or three-year appointment under this provision will earn 12 contact hours per year of personal illness/emergency leave, which may be accrued up to a maximum of 36 contact hours. Adjuncts who are reappointed to a three-year appointment may carry over up to 36 contact hours of leave. An adjunct is not entitled to carry over the leave to an

136

A.184

appointment other than a three-year appointment, nor is an adjunct entitled to receive a payout for unused days.

11. Adjuncts who receive a three-year appointment continue to be subject to discharge for just cause, subject to the Grievance and Arbitration article (Article 20) and not to Article 21 of the collective bargaining agreement.

12. The second paragraph of section 10.1(a)3. of the collective bargaining agreement, regarding two-semester appointments, remains in effect.

## APPENDIX F

## DEDICATED SICK LEAVE PROGRAM

137

A.185

This program has been included as an Appendix solely for ease of reference. The parties acknowledge and agree that this is a University program, the terms of which were not bargained. The parties accordingly agree that it is not subject to the terms of Article 20 of this Agreement, including the grievance process.

I. Program Description

The Dedicated Sick Leave Program enables individuals who are employed full-time on an annual salary basis to donate sick leave and/or annual leave for use as sick leave by a seriously ill or injured eligible employee who has been designated by the donor. Eligible recipients may receive up to one-hundred and twenty (120) days or six (6) months of paid sick leave, whichever is greater, in any one (1) program year (September 1 – August 31), inclusive of the annual leave period for teaching faculty. Donated leave may be approved in increments not exceeding two (2) months. The Dedicated Sick Leave Program permits donations of annual leave and/or sick leave across campuses and across titles.

II. Criteria For Recipient Eligibility

1. An employee must be in a full-time title employed on an annual salary basis and have at least two (2) years of continuous full-time service with the University. Those employed in substitute titles with no underlying regular annual appointment are not eligible to receive donated leave.

2. An employee's illness or injury must not be job-related and must require an absence of at least thirty (30) continuous working days. Absence due to illness or injury must be supported by medical documentation acceptable to the recipient's college. The recipient's college will determine whether requests by eligible employees to receive dedicated sick leave will be approved, based solely upon the nature and severity of the illness or injury. Employees whose requests have been denied may appeal in writing to CUNY's Appeals Panel, as set forth in Section VI., paragraph 2 herein.

3. All annual leave, sick leave, compensatory time balances, and sick leave advancements, to the extent applicable, must have been exhausted.

4. Dedicated sick leave may not be used to supplement or supplant income benefits under any applicable collectively-bargained or union-provided short-term or long-term disability program. If the employee has already received income benefits under any applicable union provided short-term or long-term disability program, those benefits must be reimbursed.

5. The number of hours that comprise a day for the recipient is determined by the title of the recipient.

6. (a) The time that an employee is on a paid parental leave, paid Family and Medical Leave Act ("FMLA") leave, paid Fellowship leave, or any other applicable paid leave will count towards service in calculating whether the employee has met the two (2) years of full-time continuous CUNY service required for recipient eligibility.

138

A.186

    (b) The time that an employee is on an unpaid child care leave, unpaid Family and Medical Leave Act ("FMLA") leave, or on a Scholar Incentive Award leave will serve to bridge service which immediately precedes and follows such leave in calculating whether the employee has met the two (2) years of full-time continuous CUNY service required for recipient eligibility.

7.  A prospective recipient's College may deny his/her request to use dedicated sick leave if he/she is on a disciplinary suspension.

## III. Criteria For Donating Dedicated Leave

An employee who wishes to donate annual leave and/or sick leave to a specific individual must meet the following criteria:

1.  The employee must be in a full-time title, employed on an annual salary basis.

2.  Donations must be made in increments of one (1) day, with a minimum donation of one (1) day of annual leave or sick leave. The number of hours that comprise a day for the donor is determined by the title of the donor.

3.  Employees with fewer than five (5) years of full-time continuous CUNY service may donate only annual leave. There is no minimum length of service required to donate annual leave and no cap on the amount that may be donated. Employees with five (5) or more years of full-time continuous CUNY service may donate annual leave (without limitation) and/or sick leave up to ten (10) sick leave days per program year. In order to donate sick leave, an employee must maintain a sick leave balance of at least twenty-four (24) days.

4.  (a) The time that an employee is on a paid parental leave, paid Family and Medical Leave Act("FMLA") leave, paid Fellowship leave or any other applicable paid leave will count towards service in calculating whether the employee has met the five (5) years of full-time continuous CUNY service required for donating dedicated sick leave.

    (b) The time that an employee is on an unpaid child care leave, unpaid Family and Medical Leave Act ("FMLA") leave, or on a Scholar Incentive Award leave will serve to bridge service which immediately precedes and follows such leave in calculating whether the employee has met the five (5) years of full-time continuous CUNY service required for donating dedicated sick leave.

## IV. Program Requirements

1.  There is no enrollment period. Donations are made on an "as-needed" basis.

2.  All dedicated leave is irrevocable.

139

A.187

3. All dedicated leave is to run concurrently with FMLA leave, i.e., a recipient's use of dedicated sick leave shall be counted towards his/her FMLA leave entitlement as though he/she were using his/her own sick leave.

4. The number of dedicated sick leave days will be extended by any CUNY observed holiday contained in a recipient employee's collective bargaining agreement or CUNY policy that is observed during the period of the recipient employee's approved dedicated leave.

5. If the number of days dedicated is more than the number of days actually used by the recipient, the unused days will be transferred by the recipient's College Office of Human Resources, via notice to the University Benefits Office, to the Catastrophic Sick Leave Bank after one (1) year elapses from the date of the recipient's return to work. (The transfer of such leave shall not, however, qualify a donor for participation in the Catastrophic Sick Leave Bank.) In the event of a medically documented recurrence of the original illness or injury during this one (1) year period, the recipient will be permitted, upon approval of his/her respective College Human Resources Office, to utilize the unused balance, provided that all other leave balances have been exhausted.

6. Each day of leave donated will be debited from the donor's leave balance as one (1) full day; however, each day of sick leave donated will be credited to the recipient as one-half (1/2) day. Each day of annual leave donated will be credited to the recipient as one (1) full day.

7. Dedicated sick leave will be granted to the recipient retroactive to the first day of absence without pay. A recipient utilizing dedicated sick leave is deemed to be in active pay status as though the employee were using his/her own sick leave. Annual leave and sick leave will therefore be accrued while using dedicated sick leave, as otherwise appropriate, but will not be credited until the employee returns to work.

8. A determination regarding a prospective recipient's eligibility should be made, and his/her consent should be obtained, before efforts are made to secure donations of leave. Every reasonable effort will be made to maintain confidentiality of employee medical information and the identity of donors.

V. Procedures For Donating Dedicated Sick Leave

1. An employee who wishes to donate annual leave and/or sick leave to a designated employee must complete Form No. [DSL to Donate 001_2010], "Application to Dedicate Sick Leave," and return it to his/her respective College Office of Human Resources as soon as possible. The application shall include an attestation by the donor that he/she understands that the decision to donate sick leave and/or annual leave to another employee is irrevocable and that the donated

140

A.188

leave will not be returned to the donor, unless the intended recipient is deemed ineligible to receive the dedicated leave. The donor's attestation shall also provide that the donor has not been coerced and is not receiving any benefit, express or implied, in return for the donated sick leave and/or annual leave. The donor's identity is confidential and may not be released to the recipient by the college.

2. The following steps are to be taken when the employee dedicating leave and the employee receiving leave are employed in the same CUNY college:

Upon receipt of an application to dedicate leave, the College Office of Human Resources must review the application, determine the accuracy of all the statements in accordance with college personnel and payroll records, and complete the appropriate section. The application must be returned to the applicant with the disposition within five (5) working days of receipt. If the employee is deemed eligible to donate leave, and the recipient has been approved to receive donated leave in accordance with Section II above, then the College Office of Human Resources shall make the appropriate adjustments in time and leave records and shall notify the donor and the recipient, respectively, of the number of days to be debited or credited and when such debit or credit will occur. In the event the recipient is determined to be ineligible to receive donated leave, the College Office of Human Resources will so notify the intended donor.

3. The following steps are to be taken when the employee dedicating leave and the employee receiving leave are employed in different CUNY colleges:

Upon receipt of an application to donate dedicated leave, the donor's College Office of Human Resources must review the application, determine the accuracy of all the statements in accordance with college personnel and payroll records, and complete the appropriate section. The application must be returned to the applicant with the disposition within five (5) working days of receipt. If the employee is deemed eligible to donate leave then the donor's College Office of Human Resources shall send a copy of the approved application to the Office of Human Resources of the recipient's college within two (2) working days of the approval. The recipient's college must notify the donor's college whether the recipient has been approved to receive dedicated sick leave. If approved, the donor's Office of Human Resources will make the appropriate adjustment in the time and leave records to debit the donor's leave balances and notify him/her of the number of days to be debited and when such debit will occur. In the event the recipient is determined to be ineligible, the donor's Office of Human Resources will so notify the intended donor.

VI. <u>Procedures For Receiving Dedicated Sick Leave</u>

1. The employee must complete Form No. [DSL to Receive 002_2010], "Application to Receive Sick Leave," include medical documentation, and forward the application to his/her College Office of Human Resources. The application will include a release by the intended recipient permitting the College Office of Human Resources or a physician retained by the College to seek clarification or additional information from the employee's physician concerning the medical

141

A.189

documentation submitted by the intended recipient. The release shall also provide that the employee shall submit to an examination by a physician retained by the College if deemed necessary. Where practicable, applications should be submitted when the employee has been absent for twenty (20) continuous working days and anticipates being absent in excess of thirty (30) continuous working days, and will not have sufficient leave to cover the projected period of his/her absence.

2. The College Office of Human Resources must review the application, determine the accuracy of all statements in accordance with college personnel and payroll records, and complete the appropriate section. All discrepancies must be resolved with the employee before a determination is made, based solely upon the nature and severity of the illness or injury as indicated by the medical documentation. The College Office of Human Resources shall consult with the Senior Vice Chancellor for Labor Relations or designee, prior to rendering a determination as to whether the applicant's condition qualifies for this benefit. Dedicated Sick Leave approvals will be made in increments not to exceed two (2) months. Employees needing more than two (2) months of Dedicated Sick Leave will be required to submit additional medical documentation for each subsequent two (2) month period, up to a maximum of one-hundred and twenty (120) days or six (6) months of paid leave, whichever is greater. The application of an employee who has been granted or denied approval to receive leave should be returned to the applicant with the disposition within five (5) working days of receipt by the College Office of Human Resources, to the extent feasible. The College Office of Human Resources must inform an employee whose request has been denied that denial of the request may be appealed in writing to CUNY's Appeals Panel, in care of the University Benefits Office, 395 Hudson Street, New York, New York 10014, within fifteen (15) working days of the employee's receipt of the denial. The CUNY Appeals Panel will be constituted as follows:

a) For classified staff, the appeals panel shall consist of the Vice Chancellor for Human Resources Management, the Senior Vice Chancellor for Labor Relations, or their respective designees, and a classified staff union representative;

b) For instructional staff, the appeals panel shall consist of the Vice Chancellor for Human Resources Management, the Senior Vice Chancellor for Labor Relations, or their respective designees, and a PSC union representative;

c) For classified managerial staff, executive compensation staff, and other non-represented employees, appeals shall be decided by the Vice Chancellor for Human Resources Management or designee;

All decisions issued by CUNY's Appeals Panel shall be final and shall not be subject to any further appeal by way of employee collective bargaining agreement or otherwise.

3. Following approval of an eligible employee's application to receive sick leave from the Dedicated Sick Leave Program, the College Office of Human Resources will match the application to any approved request(s) to dedicate leave to the employee that have been

142

A.190

forwarded to the recipient's college. If the employee is to receive dedicated leave, the College Office of Human Resources shall make the appropriate adjustments in his/her time and leave records and shall inform him/her of the number of days to be credited and when such credit will occur.

**APPENDIX G**

**CATASTROPHIC SICK LEAVE BANK PROGRAM**

143

A.191

This program has been included as an Appendix solely for ease of reference. The parties acknowledge and agree that this is a University program, the terms of which were not bargained. The parties accordingly agree that it is not subject to the terms of Article 20 of this Agreement, including the grievance process.

I. Program Description

The Catastrophic Sick Leave Bank ("CSLB") is a pool of sick leave and annual leave voluntarily donated by individuals who are employed full-time on an annual salary basis for potential use as sick leave by eligible full-time employees who are also donors to the bank. Eligible recipients may receive up to ninety (90) days of paid CSLB leave in any one (1) program year (September 1 – August 31). CSLB leave may be approved in increments not to exceed one (1) month. The Catastrophic Sick Leave Bank will be administered centrally by the University's Office of Shared Services.

II. Criteria for Recipient Eligibility

1. An employee must be in a full-time title employed on an annual salary basis and have at least two (2) years of continuous full-time service with the University. Those employed in substitute titles with no underlying regular annual appointment are not eligible to receive donated leave.

2. Employees must have donated at least one (1) day of sick leave or annual leave for the program year in which leave is needed.

3. An employee's illness or injury must not be job-related and must require an absence of at least thirty (30) continuous working days. Absence due to illness or injury must be supported by medical documentation acceptable to the University Office of Shared Services. The University Office of Shared Services will determine whether requests by eligible employees to receive leave from the Catastrophic Sick Leave Bank will be approved, based solely upon the nature and severity of the illness or injury. An employee whose request has been denied may appeal in writing to CUNY's Appeals Panel, as set forth in Section VI.3. below.

4. All annual leave, sick leave, compensatory time balances, and sick leave advancements, to the extent applicable, must have been exhausted.

5. CSLB leave may not be used to supplement or supplant income benefits under any applicable collectively bargained or union provided short-term or long-term disability program. If the employee has already received income benefits under any applicable union provided short-term or long-term disability program, those benefits must be reimbursed.

6. The number of hours that comprise a day for the recipient is determined by the title of the recipient.

7. (a) The time that an employee is on a paid parental leave, paid Family and Medical Leave Act

144

A.192

("FMLA") leave, paid Fellowship leave, or any other applicable paid leave will count towards service in calculating whether the employee has met the two (2) years of full-time continuous CUNY service required for recipient eligibility.

(b) The time that an employee is on an unpaid child care leave, unpaid Family and Medical Leave Act ("FMLA") leave, or on a Scholar Incentive Award leave will serve to bridge service which immediately precedes and follows such leave in calculating whether the employee has met the two (2) years of full-time continuous CUNY service required for recipient eligibility.

8. The University Office of Shared Services may deny a prospective recipient's request to use CSLB leave if he/she is on a disciplinary suspension.

9. In the event that an employee is deemed eligible to receive donated leave from the Dedicated Sick Leave Program (DSL) and the Catastrophic Sick Leave Bank Program (CSLB), such usage shall not exceed a combined total of 160 DSL and CSLB days in any program year.

## III. Criteria for Donating Leave

An employee who wishes to donate annual leave and/or sick leave to the Catastrophic Sick Leave Bank must meet the following criteria:

1. The employee must be in a full-time title, employed on an annual salary basis.

2. Donations must be made in increments of one (1) day, with a minimum donation of one (1) day of annual leave or sick leave per program year. The number of hours that comprise a day for the donor is determined by the title of the donor.

3. Employees with fewer than five (5) years of full-time continuous CUNY service may donate only annual leave. There is no minimum length of service required to donate annual leave and no cap on the amount that may be donated. Employees with five (5) or more years of full-time continuous CUNY service may donate annual leave (without limitation) and/or sick leave up to ten (10) sick leave days per program year. In order to donate sick leave, an employee must maintain a sick leave balance of at least twenty-four (24) days. Please note that as set forth in Paragraph IV., Section 11 (Program Requirements) of the CSLB Program, CUNY reserves the right to limit the number of CSLB days employees are allowed to donate to the bank per program year and/or the number of donated CSLB days that may be kept on reserve in the bank.

4. (a) The time that an employee is on a paid parental leave, paid Family and Medical Leave Act ("FMLA") leave, paid Fellowship leave or any other applicable paid leave will count towards service in calculating whether the employee has met the five (5) years of full-time continuous CUNY service required for donating sick leave.

145

(b) The time that an employee is on an unpaid child care leave, unpaid Family and Medical Leave Act ("FMLA") leave, or on a Scholar Incentive Award leave will serve to bridge service which immediately precedes and follows such leave in calculating whether the employee has met the five (5) years of full-time continuous CUNY service required for donating sick leave.

IV. <u>Program Requirements</u>

1. An open enrollment period for leave donations will be held for one (1) month each program year (September 1 through August 31) and may be extended or reopened at the discretion of the Vice Chancellor for Human Resources Management. The enrollment period is each October of the program year.

2. After the initial enrollment period, deductions of the type and amount of leave will automatically continue on an annual basis, unless the employee requests a change. Any request to withdraw from the Catastrophic Sick Leave Bank Program or to make any changes in the amount and/or type of leave to be donated must be submitted in writing to the University Office of Shared Services during the annual open enrollment period; changes may not be made at any other time.

3. If the sick leave balance of an employee who has elected to donate sick leave has fallen below twenty-four (24) sick leave days at the time the deduction is made, the type of leave deducted will be converted to annual leave.

4. All leave donated to the bank is irrevocable.

5. The use of CSLB leave runs concurrently with FMLA leave, *i.e.*, a recipient's use of leave from the bank shall be counted towards his/her FMLA leave entitlement as though he/she were using his/her own sick leave.

6. An employee's use of CSLB leave days will be extended by any CUNY observed holiday contained in a recipient employee's collective bargaining agreement or CUNY policy that is observed during the period of the recipient employee's approved CSLB leave.

7. No withdrawal of leave will be approved which will result in a negative balance to the CSLB. The University Office of Shared Services may consider the amount of leave remaining in the CSLB in order to make an equitable distribution of leave among medically qualified applicants, if there is insufficient leave in the CSLB to grant each applicant the amount of leave required.

8. Leave withdrawn from the CSLB in excess of the amount actually used by a recipient is to be returned to the CSLB. The Office of Human Resources of the recipient's college must notify the University Office of Shared Services of the number of days to be restored to the CSLB no later than two (2) weeks from the date of the employee's return to work.

9. Each day of leave donated to the bank will be debited from the donor's leave balance as one (1) full day. However, each day of sick leave donated by an eligible employee will be credited to

146

A.194

the CSLB as one-half (1/2) of a day. Each day of annual leave donated will be credited to the bank as one (1) full day.

10. CSLB leave will be granted to the recipient retroactive to the first day of absence without pay. A recipient utilizing CSLB leave is deemed to be in active pay status as though the employee were using his/her own sick leave. Annual leave and sick leave will therefore be accrued while using CSLB leave, but will not be credited until the employee returns to work.

11. The University reserves the right to limit the number of CSLB days employees are allowed to donate to the bank per program year and/or the number of donated CSLB days that may be kept on reserve in the bank.

## V. Procedures For Donating Leave To The Catastrophic Sick Leave Bank

1. An employee who wishes to donate annual leave and/or sick leave to the Catastrophic Sick Leave Bank must complete CUNY Form No. 001 CSLB-2013, "Application to Donate Leave to the Catastrophic Sick Leave Bank," and return it to the College's Office of Human Resources during the enrollment period.

2. The College Office of Human Resources will review the application and determine the accuracy of all statements in accordance with the donor's personnel and payroll records, and will notify the employee within five (5) working days of receipt of the application whether he/she is eligible or ineligible. If the employee is determined to be eligible, the College Office of Human Resources will make the appropriate adjustment to the employee's time and leave records and will notify the employee of the type of leave and number of days to be debited and when the debit will occur. The College Office of Human Resources will send a copy of the approved application to the University Office of Shared Services to determine the appropriate number of days to be credited to the CSLB. The application shall include an attestation by the donor that he/she understands that the decision to donate sick leave and/or annual leave to the CSLB is irrevocable and that the donated leave will not be returned to the donor, unless it is determined that the donor is ineligible to donate leave. The donor's attestation shall also provide that the donor has not been coerced and is not receiving any benefit, express or implied, in return for the donated sick leave and/or annual leave, other than the ability to participate in the bank.

3. The College Office of Human Resources will continue to make automatic deductions from the employee's time and leave record—which shall be deducted on a yearly basis during the month following the enrollment period—provided that the employee maintains eligibility and has not withdrawn from the CSLB program or has not made any changes to the type or amount of leave to be donated. The College Office of Human Resources will notify the employee and the University Office of Shared Services of the continued donation or of any changes thereto.

4. The University Office of Shared Services shall keep a record of employees who are members of the CSLB program, updating its records following each enrollment period.

147

A.195

## VI. Procedures For Receiving Leave From The Catastrophic Sick Leave Bank

1. The employee must complete Form No. 002 CSLB-2013, "Application to Receive Leave From the Catastrophic Sick Leave Bank," include medical documentation, and forward the application to the College Office of Human Resources. The application will include a release by the intended recipient permitting the University Office of Shared Services or CUNY's Appeals Panel (should an appeal become necessary)—or a physician retained by either of them—to seek clarification or additional information from the employee's physician concerning the medical documentation submitted by the intended recipient. The release shall also provide that the employee shall submit to an examination by a physician retained by the University Office of Shared Services, if deemed necessary. Where practicable, applications should be submitted when the employee has been absent for twenty (20) continuous working days, but anticipates being absent in excess of thirty (30) continuous working days and will not have sufficient leave to cover the projected period of absence beyond the thirty (30) days.

2. The College Office of Human Resources must review the application, determine the accuracy of all statements in accordance with college personnel and payroll records, and complete the appropriate section.

   The application of an employee who has been deemed ineligible to receive donated leave should be returned to the applicant with the disposition within five (5) working days of receipt by the College Office of Human Resources, to the extent feasible. The application of an employee who has been deemed eligible to receive donated leave must be forwarded to the University Office of Shared Services by the College Office of Human Resources within five (5) working days of its determination, to the extent feasible.

   To the extent feasible, the University Office of Shared Services will return the application within five (5) working days from receipt to the College Office of Human Resources, stating whether the employee's application to receive donated leave will be approved. Thereafter, the College Office of Human Resources will advise the employee of the decision issued by the University Office of Shared Services concerning the CSLB leave. All discrepancies must be resolved with the employee before a determination is made.

   The determination made by the University Office of Shared Services will be based solely upon the nature and severity of the illness or injury of the employee, as indicated by the medical documentation submitted. CSLB leave will be made in increments not to exceed one (1) month. Employees needing more than one (1) month of CSLB leave may be required to submit additional medical documentation for each subsequent one (1) month period, up to a maximum of ninety (90) days of paid CSLB leave. The University Office of Shared Services will notify the College Office of Human Resources of the amount of CSLB leave the employee will receive. Upon notification, the College Office of Human Resources will make the appropriate adjustment in the recipient's time and leave records and inform the recipient in writing when such CSLB leave will be credited to the employee.

148

3. An employee whose request has been deemed ineligible by the College Office of Human Resources or denied by the University Office of Shared Services, may submit an appeal in writing, along with additional medical documentation, if any, to CUNY's Appeals Panel, in care of the Office of Vice Chancellor for Human Resources Management, 205 East 42nd Street, New York, New York 10017, within fifteen (15) working days of the employee's receipt of the denial. The CUNY Appeals Panel will be constituted as follows:

   a) For represented classified staff, the appeals panel shall consist of the Vice Chancellor for Human Resources Management, the Senior Vice Chancellor for Labor Relations or their respective designees, and a classified staff union representative;

   b) For represented instructional staff, the appeals panel shall consist of the Vice Chancellor for Human Resources Management, the Senior Vice Chancellor for Labor Relations or their respective designees, and a PSC representative; and

   c) For classified managerial staff and executive compensation staff, and other non-represented employees, appeals shall be decided by the Vice Chancellor for Human Resources Management or designee.

All decisions issued by CUNY's Appeals Panel shall be final and will not be subject to any further appeal by way of employee collective bargaining agreements or otherwise.

**APPENDIX H**

**ARTICLE 21 PILOT PROGRAM**

149

21.1   (a)   Members of the Instructional Staff may be disciplined by removal, suspension with or without pay, or any lesser form of discipline for one or more of the following reasons, except that staff in HEO series titles shall be subject to discharge as provided in Article 21.8, and Adjuncts shall be subject to discharge as provided in Article 21.10:

        (i)   Incompetent or inefficient service;

        (ii)   Neglect of duty;

        (iii)   Physical or mental incapacity;

        (iv)   Conduct unbecoming a member of the staff. This provision shall not be interpreted so as to constitute interference with academic freedom.

    (b)   No disciplinary proceeding shall be initiated against a member of the instructional staff more than 24 months after discovery by the college or unit of CUNY of the occurrence of the latest incident forming the basis of the discipline. In the event that such member of the instructional staff has been non-reappointed and a grievance has been filed challenging that non-reappointment, CUNY shall have 120 days from the date that the grievance is finally resolved to initiate a disciplinary proceeding against such employee. If a member of the instructional staff is placed on medical leave under the Medical Separation Procedure, and the medical leave is terminated and the bringing of Article 21 disciplinary charges is permitted under that procedure, CUNY shall have 120 days from the date that the medical leave is terminated to initiate a disciplinary proceeding against such employee.

21.2   Disciplinary proceedings shall be initiated by the President of the college by the service of written charges upon the employee, with a copy to the PSC, which shall set forth:

    (a)   the charges against the employee, including a description of each violation charged; and

    (b)   the proposed penalty.

21.3   Within fourteen (14) calendar days of service of the charges, a meeting shall be conducted by the President or his or her designee with the employee, who may be accompanied by an attorney or representative of the Professional Staff Congress, to discuss the charges, the proposed penalty, and the basis of the charges.

21.4   Within fourteen (14) calendar days of the meeting described in Section 21.3, the President shall either:

    (a)   Withdraw the charges, or

    (b)   State his/her intention to proceed with the charges, including a recommended penalty.

150

A.198

21.5    If the President states an intention to proceed with the charges within seven (7) days of service of that notice the employee shall be provided with copies of the primary non-privileged documents relied upon in preparing the charges and a list describing the documents withheld due to claims of privilege. Nothing herein affects the PSC's or the employee's right to seek additional information under this Agreement and the applicable law.

21.6    Within fourteen (14) calendar days of service of the President's written statement to proceed with the charges and recommended penalty, the employee may:

    (a)    Acquiesce to the charges and accept the recommended penalty by written notification to the President; or

    (b)    Appeal by proceeding to disciplinary arbitration in accordance with Section 21.7.

21.7    Disciplinary Arbitration

    (a)    The procedures for selecting an arbitrator and scheduling the arbitration hearing shall be governed by Article 20.5(a), except that (1) the first arbitrator in order who is available to conduct a hearing within sixty (60) calendar days shall serve as the arbitrator; and (2) the notice of appeal to disciplinary arbitration shall be filed by service upon the Vice Chancellor for Legal Affairs and the American Arbitration Association. A copy of the appeal shall be sent simultaneously to the College President.

    (b)    The disciplinary arbitrator shall hold a disciplinary arbitration hearing within sixty (60) calendar days of designation, or on such other date as may be mutually agreed upon by the parties. The disciplinary arbitrator shall render a decision within thirty (30) calendar days of the close of the hearing. The arbitrator shall follow AAA procedures.

    (c)    The disciplinary arbitrator shall be limited to determinations of guilt or innocence and the sufficiency of grounds for the penalty. The arbitrator shall not consider alleged violations of any other provision or article of this Agreement, or of the University Bylaws or written policies, which shall be subject, as applicable, only to the provisions of Article 20 of this Agreement. The disciplinary arbitrator shall not add to, subtract from, or modify the provisions of this Agreement. The disciplinary arbitrator's decision regarding guilt or innocence and the sufficiency of grounds for the penalty shall be final and binding upon the parties. The disciplinary arbitrator may approve or disapprove the penalty or impose other penalties warranted under the circumstances.

21.8    Employees in titles in the Higher Education Officer Series shall be subject to immediate discharge for just cause.

    (a)    Disciplinary proceedings shall be initiated by the President of the college by service, personally or by certified mail, of a written Notice of Intent for Immediate Discharge upon the employee, with a copy to the PSC, which set forth:

151

A.199

1. the charges against the employee, and

2. the proposed penalty of immediate discharge.

(b)     Within three (3) days, exclusive of Saturdays, Sundays, and legal holidays, of service of the written notice of Intent for Immediate Discharge, a meeting shall be conducted by the President or his or her designee with the employee, who may be accompanied by an attorney or a representative of the Professional Staff Congress, to discuss the notice, the basis of the charge, and the proposed penalty.

(c)     If the employee fails to appear at the meeting, the President may issue a Notice of Immediate Discharge which shall be effective immediately.

(d)     Within twenty-four (24) hours of the meeting described in Section 21.8(b), the President shall either:

1.   Withdraw the Notice of Intent for Immediate Discharge;

2.   Issue a Notice of Immediate Discharge which shall be effective immediately; or

3.   Issue a Notice of Charges under Section 21.2 seeking a lesser penalty than dismissal.

4.   If the President issues a notice of immediate discharge or notice of charges within seven (7) days of service of that notice the employee shall be provided with copies of the primary non-privileged documents relied upon in preparing the charges, and a list describing the documents withheld due to claims of privilege. Nothing herein affects the PSC's or the employee's right to seek additional information under this Agreement and the applicable law.

(e)     Within fourteen (14) calendar days of service of the Notice of Immediate Discharge, the employee may appeal by proceeding to disciplinary arbitration in accordance with Section 21.7.

21.9   Any person against whom charges have been made may, at any time during the pendency of the charges, be suspended by the president of the college. Such suspension shall be without loss of pay.

A person suspended with pay shall be available for all procedures mandated by Article 21. Upon suspension with pay, notwithstanding any other provision of this Agreement, any request to be absent from any aspect of these procedures must be approved in advance by the Senior Vice Chancellor for Labor Relations upon the recommendation of the President. Failure to be available for any Article 21 proceeding without said approval of a request to be absent for the period specified in the approval of the request shall result in loss of pay status for a period of three weeks. Such period of non-pay status shall be discontinued as of the date of the proceeding if a proceeding under this article is scheduled and held within that three-week period. If, however, the person continues to be unavailable, the person shall be subject to further removal from pay status for successive three-week periods until such time as the proceeding is scheduled and held.

Said loss of pay status cannot be charged to annual leave, temporary disability leave, or other paid leave.

21.10   Adjuncts shall be subject to discharge for just cause, subject to the Grievance and Arbitration article and not to Article 21 of this Agreement.

21.11   The procedures provided by this Article 21 are modified and expedited as follows for disciplinary charges brought against instructional staff members who have been convicted of a felony:

(a)   Disciplinary proceedings shall be initiated by the President of the College by preferment of charges upon the employee, with a copy to the PSC. The Charges will be preferred via overnight mail. The recommended penalty will be discharge.

(b)   Within three (3) calendar days of receipt of the President's statement of charges, unless the penalty has been accepted by the employee, notice of appeal to disciplinary arbitration shall be filed by service upon the Vice Chancellor for Legal Affairs and the American Arbitration Association. A copy shall be sent simultaneously to the College President.

(c)   The case shall be assigned to an arbitrator to be selected in accordance with Section 21.7.a. These cases will be given priority for assignment.

(d)   The disciplinary arbitrator shall hold a disciplinary arbitration hearing within ten (10) calendar days of designation. The disciplinary arbitrator shall render a decision within five (5) calendar days of the close of the hearing.

(e)   Any person convicted of a felony against whom disciplinary charges have been made may, at any time during the pendency of the charges, be suspended without pay by the president of the college.

(f)   Conviction of a felony shall create a presumption of conduct unbecoming a member of the staff. The employee may argue to the arbitrator that there were extenuating circumstances that would permit the arbitrator to conclude that a less severe penalty is warranted.

(g)   Should a court of final jurisdiction overturn the conviction, there shall be a right to a hearing before an arbitrator upon application for restoration to service. The issue in the hearing will be whether grounds for discharge pursuant to Article 21.1(a) existed, notwithstanding the reversal of the conviction.

(h)   The parties recognize that an employee may be convicted of a felony after charges have been preferred and that the disciplinary procedures in Article 21 may have commenced prior to the conviction. In such a case, the procedures outlined above will replace Article 21 procedures at the appropriate stage to which the charges had progressed immediately prior to the conviction.

21.12   A disciplinary proceeding brought pursuant to this article may be resolved by settlement only if agreed to in writing by the Office of Labor Relations and by the PSC Central Office.

153

A.201

**APPENDIX I**

**DISTINGUISHED PROFESSOR SIDE LETTER**

154

A.202

March 18, 2016

Dr. Barbara Bowen
President
Professional Staff Congress/CUNY
61 Broadway, 15th floor
New York, NY 10006

Dear Dr. Bowen:

This is to confirm the parties' understanding that appointments to the Distinguished Professor title are expected to contribute to the University's commitment to recruit and retain an excellent faculty representing a rich diversity of gender, ethnicity and race. Your signature on the line set forth below confirms the Union's agreement with this principle.

Sincerely,


/s/
Pamela S. Silverblatt
Vice Chancellor for Labor Relations


/s/_____
AGREED: For the Professional Staff Congress/CUNY        Date


# APPENDIX J

## ADJUNCT HEALTH INSURANCE ELIGIBILITY

Effective October 1, 2014, the eligibility criteria for health insurance through the New York City Health Benefits Program, as set forth in the Concluding Agreement on Adjunct Health Insurance, dated July 30, 2014, are as follows:

a) In order to qualify for health insurance benefits:

- Teaching Adjuncts—must be teaching six or more contact hours in the semester, or an equivalent combination of teaching and non-teaching hours, and must have taught one or more courses for the two consecutive preceding semesters (not including Summer Sessions).

- Non-Teaching Adjuncts—who are working fifteen or more hours per week in the semester, or an equivalent combination of teaching and non-teaching hours, and who have worked fifteen or more hours per week for the two consecutive preceding semesters (not including Winter or Summer Sessions). (For the purpose of determining eligibility for health insurance only, one non-teaching hour shall be deemed equivalent to 0.4 teaching contact hour.)

- Substitute service immediately preceded by and immediately followed by adjunct service shall be counted as continuous adjunct service for the purpose of determining eligibility for health insurance benefits under this section.

- Adjuncts who receive health insurance for the Fall semester only will receive coverage for the period from the first day of the Fall semester through the following February 28 (February 29 in a leap year). The first day of the Fall semester is the day after the end of the teaching faculty annual leave period as calculated pursuant to Article 14.1 of the PSC-CUNY Collective Bargaining Agreement. Adjuncts who receive health insurance for the Spring semester only will receive coverage for the period from the first day of the Spring semester through the following July 31. Adjuncts who receive health insurance coverage during both the Fall and Spring semesters of a given academic year will continue to receive coverage through the end of the annual leave period as defined in Article 14.1 of the PSC-CUNY Collective Bargaining Agreement.

- Eligibility as provided in this section shall be based on CUNY-wide service.

b) Adjuncts are not eligible for City Health Benefits if they are eligible to receive other primary health care insurance provided by or through another source. Adjuncts must certify each semester that they are not eligible to receive other primary health care insurance provided by or through another source.

Doctoral student employees who are eligible to receive primary health care insurance through NYSHIP will not be eligible for City Health Benefits.

156

A.204

c)  Adjuncts who establish eligibility for health insurance benefits shall be eligible to receive benefits in the third consecutive semester. An adjunct shall lose eligibility if, in any semester, he/she teaches for fewer than six contact hours or works for fewer than 15 non-teaching hours per week, or a combined equivalent.

Even though coverage may be lost for a semester because current hours are too low, the two-semester continuity requirement will be deemed to have been met until there is a semester in each of two out of three consecutive academic years wherein a previously eligible individual is not employed as an adjunct by CUNY. Then a break occurs and the initial eligibility requirements, including the two-semester continuity requirement, must be re-established in order to be covered for benefits.

Effective with the start of the 2016-2017 academic year, adjuncts who previously held Graduate Assistant appointments with coverage under the New York State Health Insurance Program and who were subsequently appointed as adjuncts without a break in service shall be eligible to elect health coverage under the New York City Health Benefits Program without the prior two-consecutive-semester service requirement, provided that they meet all other eligibility requirements.

**APPENDIX K**

**VOLUNTARY PHASED RETIREMENT PROGRAM**

The following provisions will govern this program:

157

A.205

1. The Phased Retirement Program is open only to eligible participants in the Optional Retirement Program; that is, TIAA-CREF, including the alternative funding vehicles MetLife and Guardian. It is the employee's decision to participate in the Phased Retirement Program; the program is voluntary.

2A. Tenured faculty, including Librarians and Counselors, and Lecturers with a Certificate of Continuous Employment ("CCE") who will have attained the age of 65 years and will have completed 15 or more years of full-time, continuous service as of the start of their phasing period are eligible to participate, subject to the provisions of paragraphs 4A and 6A below, and subject to the provisions herein regarding Department Chairs and faculty serving in predominantly administrative positions, such as Directors of Institutes/Centers. A faculty member currently serving as a Department Chair or as an Executive Officer of a Ph.D. program is not eligible to participate while serving in such position; he/she may apply to participate and, upon approval of his/her phased retirement application, he/she must submit his/her resignation from the Department Chair/Executive Officer position by April 1, to be effective the June 30 preceding the beginning of his/her phasing period. If he/she has been approved to enter phased retirement and fails to submit his/her resignation by April 1, he/she will be deemed to have resigned from the position effective June 30. A faculty member who wishes to phase and is serving in a predominantly administrative position shall be subject to the terms in the attached side-letter.

2B. During the phasing period, a faculty member's work commitment shall be 50% of the contractual full-time workload for his/her title at his/her college (that is, 50% of the teaching load and 50% of other professional responsibilities), and the salary shall be 50% of the full-time salary.

2C. The Phased Retirement Program is not intended to result in an overall diminution of the number of tenured and/or tenure-track full-time teaching faculty. During the period of the pilot, the University will fill as many full-time teaching positions as were vacated owing to phased retirement. When the University decides on the placement of full-time teaching position(s), the staffing needs of colleges and departments from which phasing teaching faculty have retired or will retire will be given consideration.

3A. Employees in the Higher Education Officer title series with 13.3b status and tenured employees in the College Laboratory Technician title series who will have attained the age of 65 years and will have completed 15 or more years of full-time continuous service as of the start of their phasing period are eligible to participate, subject to the provisions of paragraphs 4B and 6B below.

3B. During the phasing period, the work commitment of an employee in a title in the Higher Education Officer or College Laboratory Technician title series shall be 80% of the contractual full-time workload for his/her title, and the salary shall be 80% of the full-time salary.

158

A.206

3C.    The parties acknowledge the critical role of professional staff in the work of the University and have designed the relevant portions of the Phased Retirement Program to reflect that understanding.

4A.    An employee in a faculty title may elect to phase for one, two, or three years. Such employee may elect to take Travia Leave in the final spring semester of the phasing period or may elect to be paid out for his/her Travia Leave in a lump sum following the phasing period. If the employee elects to take Travia Leave in the final spring semester of the phasing period, he/she will have a workload during the preceding fall semester equal to 25% of the annual contractual full-time workload with a salary equal to 50% of the biweekly salary rate through the day preceding the start of the spring semester. Such employees will be paid at 100% of the full-time biweekly salary rate during Travia Leave.[26] Employees who elect to be paid Travia Leave in a lump sum will be paid for one-half of their accumulated temporary disability leave up to a maximum of one semester or the equivalent number of school days, at 100% of the full-time salary rate for their title, and will receive said payment following the end of the annual leave period following the last year of their phasing period. In no event may the combined period of phasing and Travia Leave exceed three years.

4B.    Eligible employees in HEO or CLT titles may elect to phase for either six (6) months or one year. The employee may elect either to take Travia Leave after the phasing period or to be paid Travia Leave in a lump sum at the end of the phasing period. Such employees will be paid at 100% of their full-time biweekly salary rate during Travia Leave or shall be paid in a lump sum for one-half of their accumulated temporary disability leave up to a maximum of one semester or the equivalent number of school days at 100% of their full-time salary rate.

5.    The decision to phase is irrevocable and is contingent upon an irrevocable commitment to retire at the end of the phasing period (or the combined phasing and Travia Leave period). The commitment to retire supersedes any right the employee may otherwise have had to return during or following Travia Leave. An employee who fails to retire at the end of his/her phasing period (or combined phasing and Travia Leave period) shall be deemed to have resigned as of the end-date of his/her phasing period (or combined phasing and Travia leave period).

During the phasing period, an employee may choose to retire sooner than originally planned (so long as he/she has completed his/her full phasing workload commitment for any given year), but he/she may not decide to retire later. Regardless of the length of the phasing period, all phasing for faculty members will begin on the first day of the Fall semester of the appropriate year; that is, on the third day, excluding Saturdays and Sundays, before August 30. An eligible employee in a HEO or CLT title may apply to phase starting on the first day of the Fall or Spring semester, to be approved as part of the approval process set forth in paragraph 6B.

6A.    A faculty member who wishes to phase will be required to submit to his/her Department Chair an application that specifies the length of the phasing period and how the faculty member plans

---

[26] If the employee's Travia Leave extends up to the annual leave period, then one (1) month of the annual leave period will be paid at 100% of the bi-weekly salary rate and one (1) month will be paid at 50% of the biweekly salary rate.

159

to configure his/her teaching load and other workload responsibilities in each year of the phasing period.

The faculty member may specify either:

(a) a 50% phasing workload for the two semesters of the academic year (*i.e.*, 25% of the annual contractual workload in each semester), or

(b) a 100% phasing workload for one semester of the academic year (*i.e.*, 50% of the annual contractual workload in a single semester).

The specified phasing workload need not be the same for each year of the phasing period. The workload for each year of the phasing period must, however, equal 50% of the annual contractual workload. The faculty member must also specify whether he/she is electing to take Travia Leave in the final Spring semester of the phasing period or to be paid out for his/her Travia Leave in a lump sum following the phasing period. (As noted above, if a phasing employee takes Travia Leave in a Spring semester, the employee must have carried a workload during the preceding Fall semester equal to 25% of the annual contractual full-time workload.)

The Department Chair shall review the application, including the faculty member's proposed workload configuration for the phasing period. Assuming the faculty member's proposed workload configuration would not impede the department's ability to meet its academic responsibilities—and assuming the faculty member is otherwise eligible—the Chair shall recommend approval to the President.

In the event that the Department Chair determines that the faculty member's proposed workload configuration would impede the department's ability to meet its academic responsibilities, the Chair may request that the faculty member consider an alternative configuration of the phasing workload. If the Chair and faculty member reach agreement on a revised workload configuration—and assuming the faculty member is otherwise eligible—the Chair shall recommend approval of the revised application to the President. If the faculty member and the Chair are unable to identify a mutually agreeable workload configuration for the phasing period, the faculty member may submit an appeal to the President regarding his/her initial proposed workload configuration. A Chair's failure to recommend approval of a faculty member's request to phase will not be grievable.

In the event that 1) the President does not approve the Chair's recommendation that a faculty member be permitted to phase in the upcoming academic year (based either on the faculty member's initial or revised workload configuration), or 2) the President denies a faculty member's appeal to phase in the upcoming academic year with the faculty member's initial proposed workload configuration, then the faculty member shall be afforded the opportunity to phase with the initial proposed workload configuration at the beginning of the following academic year (*i.e.*, one year later than initially requested).

160

A.208

The President's determination to defer an applicant's start-date by one year is final and will not be grievable. (In the event the request to phase is deferred, however, the faculty member retains his/her right to retire without phasing or to elect not to retire.)

Following approval of an application, any proposed changes to the faculty member's workload configuration will require the written approval of the Department Chair. The faculty member's course assignments and program arrangement will be determined consistent with Bylaw section 9.3.a2.

6B.     Employees in the Higher Education Officer title series and the College Laboratory Technician title series who wish to phase will be required to submit to their supervisor an application to phase that specifies 1) the length of the phasing period, (*i.e.,* six (6) months or one (1) year); 2) how the employee proposes to configure his/her workweek during the phasing period, with the understanding that his/her workload must equal 80% of the contractual workload defined in Article 15.4 of the 2007-2010 Collective Bargaining Agreement (*i.e.,* a phasing employee will have a workweek of 28 hours per week); and 3) whether the employee wishes to remain on payroll for the period of his/her Travia Leave or be paid out in a lump sum following the phasing period.

The employee's supervisor shall review the application, including the proposed workload configuration. If the supervisor determines that the employee may perform his/her job on less than a full-time basis during the proposed phasing period without adversely affecting the area or program, and if the supervisor approves the proposed workload configuration for the phasing period, the supervisor shall recommend approval of the request to the College Vice President for Administration, provided the employee is otherwise eligible to enter phased retirement (as defined in paragraphs 1 and 3 above).

If the employee's supervisor determines that the proposed workload configuration would adversely affect the area or program, the supervisor may propose an alternative workload configuration. If the supervisor and employee are unable to reach agreement on a mutually acceptable workload configuration or if the College Vice President for Administration does not approve the request, the employee may withdraw the request to phase, appeal to the President or his/her designee, or exercise his/her right to retire. The decision of a supervisor or of the College Vice President for Administration not to recommend approval of an employee's request to phase will not be grievable. The decision of the President or his/her designee on appeal is final and will not be grievable.

For employees in the titles Chief College Laboratory Technician and Higher Education Officer ("full HEO"), both the request to phase and the proposed phasing configuration are subject to approval by the College President or his/her designee, in recognition of the higher level responsibilities of these positions. The decision of the President or his/her designee will be final and will not be appealable or grievable.

161

7.  A phasing employee will continue to receive the movement within salary schedule provided for in Article 24.2 of the Collective Bargaining Agreement and will be eligible for any applicable contractual salary increases, on a 50% or 80% pro rata basis, pursuant to paragraph 2B or 3B, as applicable.  A phasing employee will continue to receive any existing salary above base, on a pro rata basis. A phasing employee will not be eligible for any other discretionary salary increases. Regardless of how the phasing employee's workload is distributed over the course of the year, salary will be paid out over the full year in equal biweekly payments (except that the amount will be different during Travia Leave, when employees will be paid at the rate of 100% of salary).

8.  Deductions from a phasing employee's biweekly paycheck that are based on a specified percentage of salary will be applied to the pro-rata salary, except as required by law. Other existing deductions, whether voluntary or involuntary, from the phasing employee's biweekly paychecks will remain at pre-phased retirement levels unless authorized adjustments are made by the employee through regular procedures.

9.  Pension contributions will continue to be made by the employer and the phasing employee, based on the employee's pro rata biweekly pay, during the phasing period.

10. The parties agree that it is in an employee's best interest to consult a financial professional and/or a retirement counselor before making the decision to phase.  Nothing in this agreement, however, shall be construed as an obligation on the part of CUNY or the PSC to provide such advice.

11. Phasing employees will be entitled to the same health insurance and PSC-CUNY Welfare Fund benefits as full-time employees, under the same terms as full-time employees.

12. Phasing employees will accrue temporary disability leave at 50% or 80% of the pre-phasing accrual rate, as applicable; the temporary disability leave accrual cap will not change.  Phasing employees may be eligible for FMLA leave, to the extent applicable. Phasing employees may apply for and receive sick leave days under the terms of the Dedicated Sick Leave policy for the balance of one semester.

13. The annual leave period for teaching faculty and faculty counselors who enter the phased retirement program will be identical to the annual leave period for the full-time position. Salary during the annual leave period for teaching faculty and faculty counselors who take their annual leave over the summer will continue to be paid at 50% of the full-time salary, except following any period of Travia Leave, in which case one (1) month will be paid at 100% of the biweekly salary rate and one (1) month will be paid at 50% of the bi-weekly salary rate during the annual leave period, if the employee's Travia Leave extends up to that period.

    While phasing, library faculty shall earn annual leave consistent with section 14.3 b) of the Collective Bargaining Agreement, at a 50% rate.

    Employees in HEO and CLT titles shall accrue annual leave during the phasing period, consistent with Article 14.3 a) of the Collective Bargaining Agreement, at an 80% rate.

162

A.210

At the end of an employee's phasing period, for employees in library faculty, HEO or CLT titles and consistent with section 14.9 of the Collective Bargaining Agreement, any unused annual leave accrued either during the phasing period or retained from pre-phasing accruals, up to the applicable accrual maximum, shall be paid out in a lump sum following the end of the phasing period or of Travia Leave, whichever is later.

14. A phasing faculty member may teach at CUNY for extra compensation, in addition to his/her 50% pay, during the summer and intersession periods, but not at other times. Employees in the HEO and CLT title series who taught at CUNY for extra compensation in the year preceding entering phased retirement may be permitted to continue to do so while phasing, consistent with existing University guidelines.

15. A phasing employee may work outside of CUNY, without limitation as to time or compensation, so long as the outside work does not conflict with the employee's CUNY assignment, except that if a faculty member elects to carry a full phasing workload for one semester of an academic year, he/she shall be subject to the limitations of the Multiple Position Policy during that semester and shall be required to submit a Multiple Position Report for that semester. Phasing faculty members remain subject to paragraphs 2.1i, 2.1iii, 2.1iv, and 2.1v of the Multiple Position Policy— pertaining to principles relating to outside work—throughout their phasing period.

16. Phasing faculty members are not eligible for Fellowship Leaves, Scholar Incentive Awards, or PSC-CUNY Research Awards. Phasing employees in HEO and CLT titles shall be eligible to apply for and receive grants from the HEO-CLT Professional Development Fund for activities to be undertaken while the employee is in the phasing period.

17. Phasing employees shall be granted a waiver of tuition fees pursuant to Article 29 of the Collective Bargaining Agreement.

18. Phasing employees will retain their rank while phasing.

19. Phasing employees will retain their tenure or CCE or 13.3 b status until they complete the phasing period.

20. Phasing employees will retain their departmental voting rights, except during any period of Travia Leave.

21. Contractual observations and professional evaluations, where applicable, will continue to apply during the phasing period.

22. Notification of intent to enter phased retirement shall be due no later than November 15 for the following academic year. Final arrangements shall be in place by February 1. In the case of HEOs or CLTs who intend to enter phased retirement at the start of the Spring semester,

163

notification shall be due no later than May 1 of the preceding year, and final arrangements shall be in place by October 1.

23. Phasing employees shall continue to have access throughout the phasing period to the following college facilities on the same basis on which they had access before entering Phased Retirement: college library, other CUNY libraries, electronic databases, use of college email address, college gymnasium and other sports facilities, and other college and CUNY buildings. Phasing faculty members shall be provided with office space during semesters in which they are teaching, and phasing professional staff shall be provided with an appropriate work space when working. To the extent practicable, phasing employees may retain access to their existing office space and may retain access to college resources such as parking and secretarial assistance as were provided before entering Phased Retirement. The decision of the College President regarding access to existing office space and these additional resources is final and will not be grievable.

## SIDE LETTER OF AGREEMENT CONCERNING FACULTY SERVING IN PREDOMINANTLY ADMINISTRATIVE POSITIONS

April 26, 2013

Barbara Bowen
President
Professional Staff Congress/CUNY
61 Broadway, 15th Floor
New York, NY 10007

Dear Dr. Bowen:

Pursuant to the Letter Agreement concerning the pilot program of voluntary Phased Retirement for eligible permanent full-time members of the instructional staff, dated April 26, 2013, it is the mutual understanding of the parties that a full-time faculty member who wishes to enter phased retirement and is serving in a predominantly administrative position, such as the position of Director of an Institute or Center, should consult with the College President or his/her designee to ascertain the feasibility of a mutually acceptable phasing arrangement of an appropriate configuration and duration, not to exceed the limits set forth in paragraphs 2B and 4A of the Letter Agreement. The decision of the College President is final and will not be appealable or grievable. Nothing in this Side-Letter diminishes the ability of an eligible faculty member serving in a predominantly administrative position to retire without phasing or to decide not to retire if no agreement is reached on a plan for phasing.

If agreement is reached on a plan for phasing, the applicable terms of the Letter Agreement shall apply to phasing faculty members in predominantly administrative positions, except paragraphs 2B and 6A.

164

A.212

Sincerely,

/s/
Pamela S. Silverblatt
Vice Chancellor for Labor Relations

/s/_____
Professional Staff Congress/CUNY      Date

# APPENDIX L

# LABOR-MANAGEMENT COMMITTEES

165

A.213

The parties agreed to establish the following labor-management committees:

## CUNY Language Immersion Program and CUNY Start

The Memorandum of Agreement provided: The parties agree to meet prior to March 1, 2020, to discuss language to be included in Appendix D concerning the location of, content of, and employees' access to their personal personnel files.[27]  The parties also agree to meet and discuss eligibility for Travia Leave and retiree health insurance benefits for CLIP and CUNY Start Instructors in the optional retirement program.

The parties agree to meet prior to January 1, 2020, to discuss CETs in the Math Start program who are appointed as full-time CUNY Start Instructors and their placement on the CUNY Start Instructor salary schedule.  The parties also agree to meet and discuss implementation of an hourly pay rate schedule that incorporates existing service increments for CETs teaching in the Math Start program.[28]

## Hunter Campus Schools Teachers

The Memorandum of Agreement provided: Effective January 1, 2020, $60,000 shall be available for enhancements to the terms and conditions of employment for employees serving in represented titles at the Hunter College Campus Schools.  The parties will meet prior to January 1, 2020, to discuss implementation.[29]

## Clinical Professor-Medical Series

The parties will establish a labor-management committee to discuss the existing limitations on service in the Clinical Professor-Medical series title under Section 11.7.

## Postdoctoral Fellow

The parties agree to establish a labor-management committee to discuss terms and conditions of employment for the Postdoctoral Fellow title following the appointment of individuals to the title.

## New York State Health Insurance Program

The University will make available up to $700,000 to enable doctoral students in their first five years of enrollment in a Ph.D. program who were not previously enrolled in the New York State Health Insurance Program (NYSHIP) and who have been admitted to a Ph.D. program on a tuition-only basis to receive

---

[27] The parties acknowledge that they have fulfilled their obligations under the terms of the Memorandum of Agreement to discuss language regarding the content of and employees' access to their personal personnel files as set forth in Appendix D of the collective bargaining agreement.

[28] The parties acknowledge that they have fulfilled their obligations under the terms of the Memorandum of Agreement.

[29] The parties acknowledge that they have fulfilled their obligations under the terms of the Memorandum of Agreement to discuss enhancements to the terms and conditions of employment for employees serving in represented titles at the Hunter College Campus Schools as reflected in the relevant language of Article 24.5 of the collective bargaining agreement.

health insurance through the New York State Health Insurance Program to the extent that such students are appointed to titles within the PSC bargaining unit and meet the eligibility requirements for New York State Health Insurance Program coverage.

The funds will be made available as follows: $175,000 effective January 1, 2020; $175,000 effective July 1, 2020; $200,000 effective February 1, 2021; and $150,000 effective July 1, 2021. A labor/management committee will be established no later than December 1, 2019, to discuss implementation of expanded access to the New York State Health Insurance Program for graduate employees.

The Committee established to discuss implementation of NYSHIP will also explore consideration of graduate employee teaching service as qualifying service for multi-year adjunct appointments and, by mutual agreement, other issues relevant to graduate employment.

## NYS Paid Family Leave[30]

The Parties agree to establish a Labor-Management Committee to work out implementation of Paid Family Leave for eligible part-time employees and for eligible full-time employees, if possible, modeled on the NY State statute and on applicable New York State/ New York City programs.

### Special Leaves for Child Care

The parties agree to update Article 16.8 and will meet following the implementation of New York State Paid Family Leave for that purpose.

### Educational Technology

Effective upon ratification and approval of the collective bargaining agreement, the Professional Staff Congress may designate two representatives to the CUNY Committee on Academic Technology.

### Obligation to Pay

The PSC's obligation to pay $9.76 million out of this settlement will be rolled forward and will become an obligation to be paid out of the settlement of the successor to this 2017-2023 agreement.

## APPENDIX M

## PAYMENT FOR DEFINED PROJECTS THROUGH STIPENDS

---

[30] The Parties acknowledge that they have fulfilled their obligations under the terms of the Memorandum of Agreement. Information regarding the University's Paid Family Leave program may be found on the University's and Union's websites at https://www.cuny.edu/about/administration/offices/hr/benefits/#1578589814416-ce35fef1-c885 and https://www.psc-cuny.org/benefits/paid-family-leave-frequently-asked-questions.

167

In addition to the existing ability of the colleges and the University to grant reassigned time or make payment on an hourly basis, the parties agree to enter into a pilot program that will give the colleges and the University the discretion to pay faculty via stipends for work on certain defined projects that are not part of the employee's normal responsibilities and that include a specific deliverable in a specified timeframe. The terms of the pilot program are as follows:

- The pilot program governing stipends will be for five academic years, beginning with the 2019-2020 academic year through the end of the 2023-2024 academic year.
- Eligibility for stipends will be limited to full-time faculty members who are on the regular University payroll and who have a continuing CUNY appointment.
- Stipends may not exceed $10,000 per project.
- Stipends will be taxable, pensionable and subject to normal payroll deductions.
- The amount of stipend pay will be determined by the scope and complexity of the project, not by the title or underlying salary of the recipient. It is understood that stipends will be awarded for projects that are not part of the faculty member's normal workload or responsibilities.
- Stipends will be paid for work on defined projects deliverable within a specified timeframe. Projects for which faculty are paid a stipend must be completed within a defined period of time that may not exceed one year.
- A letter specifying the terms of the stipend must be signed by both the faculty member and the President's designee.
- Projects for which stipends are paid will be limited to: University or college strategic initiatives, course development as part of a University or college initiative, and leadership roles in accreditation processes. Other defined projects may be stipended if approved by the Executive Vice Chancellor and University Provost or his/her designee.
- Stipends may not be used to replace reassigned time that is normally allocated for administrative leadership of departments, programs or schools.
- No stipend may be less than $500. Work requiring payment below $500 will continue to be paid at the appropriate non-teaching adjunct rate.
- Except to the extent, if any, that a stipend is awarded in an amount below $500 or above $10,000; that a stipend is awarded to someone who is not a full-time faculty member; that a stipend is awarded for a project that will exceed one year or is being used to replace reassigned time that is normally allocated for administrative leadership of departments, programs or schools; or that a college fails to pay an agreed-upon stipend, all decisions regarding stipends, including, but not limited to, assignments covered, the amount of the stipend, and the individual to whom the stipend is awarded, shall remain discretionary with the college and/or the University and are not subject to the provisions of Article 20.
- The Colleges will track the stipends awarded each year of the pilot, and the University's Office of Academic Affairs will provide the Union with a summary report at the end of each academic year.
- Ownership of any copyright in work paid for with a stipend as part of the pilot project shall be as follows:

168

A.216

1. If the work consists of creating scholarly or pedagogical work such as instructional materials, classroom presentations, curriculum, etc., then the faculty member shall own any copyright.

2. If the work is other than creating scholarly or pedagogical work, for example if the work consists of creating personnel manuals, written policies, administrative handbooks, etc., then the University shall own any copyright.

**APPENDIX N**

**BARUCH COLLEGE WORKLOAD CREDIT**

169

A.217

## IN EXECUTIVE DEGREE AND INTERNATIONAL MASTER'S PROGRAMS

The parties agree to a five-year pilot program, beginning with the 2019-2020 academic year and continuing through the end of the 2023-2024 academic year, as follows:

In the Baruch College executive master's degree, dual master's degree and international executive master's degree cohort programs listed below, in which instruction during the summer annual leave period as defined in Section 14.1 of the collective bargaining agreement is an intrinsic part of the program, tenured and certificated full-time faculty members who agree to teach courses during the summer annual leave period may elect to receive workload credit under Appendix A of the collective bargaining agreement or to be paid at the appropriate professorial hourly rate for such teaching contact hours during summer annual leave, subject to approval by their department chair. Members of the teaching faculty who receive workload credit for teaching contact hours during the period of summer annual leave shall receive no additional compensation for such teaching contact hours.

For purposes of managing the annual undergraduate teaching contact hour workload under Appendix A, teaching contact hours during the summer annual leave period for which workload credit is received shall be considered part of the annual workload in the academic year in which they occur; i.e., in the academic year starting with the previous Fall semester, unless the faculty member is in his/her final year of the three-year workload averaging period, in which case the workload credit for teaching during the summer annual leave period may be considered part of the annual workload in the following academic year. The workload credit received for such courses shall be identical to the workload credit that would have been received if such courses had been taught during the regular academic year.

The parties will meet and negotiate over inclusion of additional programs during the period of the pilot program, should any such programs be created by the college. It is the intention of the parties that such newly created programs be included in the pilot to the extent they comply with the criteria above.

**Baruch College Year-Round Cohort Programs**

<u>Zicklin School of Business</u>

- Executive Master of Business Administration (EMBA)
- EMBA in Health Care Administration
- Executive Master of Science (EMS) in Finance
- EMS in Information Systems (Data Analytics)
- EMS in Human Resources Management
- EMS in Finance in Sao Paulo, Brazil*
- EMS in Entrepreneurship in Sao Paulo, Brazil*
- MBA-MS in Entrepreneurship with College of Management in Israel
- MBA-MS in Finance with Peking University HSBC Business School (PHBS)
- MBA-MS in Finance with Renmin University of China (RUC)
- MBA-MS in Finance with University of Science and Technology Beijing (USTB)

170

A.218

- MBA-MS in Finance with Xi'an Jiaotong University (XJU)
- MBA-MS in Finance with Shanghai International Studies University (SISU)
- MSFA-MS in Finance with Free University of Bozen-Bolzano and University of Padua in Italy

*Inclusion of these programs is contingent upon their receiving final approval in a form consistent with the criteria above.

Weissman School of Arts & Sciences

- MA in Mental Health Counseling
- MS in Industrial/Organizational Psychology, Singapore program

Marxe School of Public and International Affairs

- Executive Master of Public Administration (EMPA)

**APPENDIX O**

171

A.219

## HEO DISCRETIONARY ASSIGNMENT DIFFERENTIAL PILOT PROGRAM

The pilot program will be effective January 1, 2020, through June 30, 2023, and the supplementary funding differentials to be awarded in accordance with Article 22.5 will be provided as follows:

| | |
|---|---|
| Effective January 1, 2020 | $ 71,946 |
| Effective July 1, 2020 | $143,893 |
| Effective July 1, 2021 | $143,893 |
| Effective July 1, 2022 | $143,893 |

Funds available January 1, 2020, shall be apportioned to each college on February 1, 2020, based upon the number of Assistant to HEOs, HEO Assistants and HEO Associates who have completed one or more years of service at the top salary step of their respective salary schedule as of October 1, 2019. Each subsequent apportionment shall be based on the number of eligible employees on the July 1st that the funds are available, which funds shall be apportioned to the colleges on the following dates:

August 1, 2020
August 1, 2021
August 1, 2022

It is understood that the decision as to how many, if any, assignment differentials to award in any year remains discretionary with the colleges. The colleges will track the number of differentials awarded, and the University will report annually to the PSC on the amounts of reimbursements awarded to each college and the number of differentials awarded by each college. Prior to February 1, 2023, the parties will meet to discuss continuation of the pilot and/or the use of any remaining funds.

## SUPPLEMENTAL AGREEMENTS

172

A.220

The following constitutes the Agreements between The City University of New York and the Professional Staff Congress/CUNY on Continuing Education and the Educational Opportunity Centers. These Agreements are supplementary to the Agreement between these parties for the period 2017-2023.

## SUPPLEMENTAL AGREEMENT ON CONTINUING EDUCATION

**1.    DEFINITION**

Continuing Education programs are programs, which are given under the aegis of a college, typically supported by funds processed through the income fund reimbursable account.

**2.    TITLE AND SALARY**

(a) 1.    Persons teaching Continuing Education shall be employed in the title Continuing Education Teacher for which the minimum hourly rate for new hires only shall be $36.64 effective December 1, 2017, $37.37 effective October 1, 2018, $38.12 effective October 31, 2019, $38.88 effective November 15, 2020, $39.66 effective November 15, 2021, and $40.45 effective November 1, 2022.[31]

Continuing Education Teachers assigned to teach in the CLIP Program will be paid the hourly rate of the CLIP Instructor minimum salary as set forth in the schedule entitled "CUNY Language Immersion Program ("CLIP") Instructor Annual and Hourly Rates" in Appendix D for the first semester (*i.e.,* complete Fall or Spring semester) of their employment.

The minimum hourly rate applicable to hourly teaching assignments and overload assignments for core, support and lead Instructors in the CUNY Start Program shall be $41.69 effective December 1, 2017, $42.52 effective October 1, 2018, $43.37 effective October 31, 2019, $44.24 effective November 15, 2020, $45.13 effective November 15, 2021 and $46.03 effective November 1, 2022.

2. (i)    Each person employed on or before September 30, 2018, as a Continuing Education Teacher shall be paid at an hourly rate which is 2.00% more than the employee's September 30, 2018 hourly rate during the period from October 1, 2018, through October 30, 2019.

(ii)    Each person employed on or before October 30, 2019, as a Continuing Education Teacher shall be paid at an hourly rate which is 2.00% more than the employee's

---

[31] Continuing Education Teachers appointed to teach in the CUNY Start Program as cooperating teachers shall be paid at the applicable minimum hourly rate for newly hired Continuing Education Teachers. After such teachers work a complete Fall or Spring semester, if they are to be appointed in the CUNY Start Program, they will be appointed to the full-time CUNY Start Instructor title, unless required to serve one additional semester as a cooperating teacher based upon the Program's evaluation of the employee.

October 30, 2019 hourly rate during the period from October 31, 2019, through November 14, 2020.

(iii)    Each person employed on or before November 14, 2020, as a Continuing Education Teacher shall be paid at an hourly rate which is 2.00% more than the employee's November 14, 2020 hourly rate for the period from November 15, 2020 through November 14, 2021.

(iv)    Each person employed on or before November 14, 2021, as a Continuing Education Teacher shall be paid at an hourly rate which is 2.00% more than the employee's November 14, 2021 hourly rate for the period from November 15, 2021 through October 31, 2022.

(v)    Each person employed on or before October 31, 2022, as a Continuing Education Teacher shall be paid at an hourly rate which is 2.00% more than the employee's October 31, 2022 hourly rate commencing November 1, 2022.

(b)    A person who is teaching a course for which degree credit is granted by the college upon successful completion of the course shall be compensated for such course on an hourly basis in accordance with the Adjunct and Hourly Professorial Rate provided in Article 24 of the PSC Agreement.

(c)    A person who has taught a course in Continuing Education during the period September 1, 1977 - August 31, 1978 who is employed to teach such course shall be paid not less than the hourly rate paid to such person during the period September 1, 1977 - August 31, 1978 provided such rate did not exceed the Adjunct and Hourly Professorial Rate in Article 24 of the 1977-78 PSC Agreement.

(d)    Any teacher who at least once in the period September 1, 1977 - August 31, 1978 taught a course and was paid a rate the same as a rate which appears under the heading "Adjunct and Hourly Professorial Rates, September 1, 1977" in Article 24 of the Agreement between the Board of Higher Education and the Professional Staff Congress/CUNY, 1977-78 for teaching a Continuing Education Course which continues to be offered shall be given first opportunity to teach such course.

(e)    Any teacher who at least once in the period February 1, 1977 - August 31, 1978 taught a course and was paid the same rate as a rate which appears under the heading "Adjunct and Hourly Professorial Rates, September 1, 1977" in Article 24 of the Agreement between the Board of Higher Education and the Professional Staff Congress/CUNY, 1977-78 for teaching a course which ceases to be offered shall be given first opportunity to teach such course if such course is offered within 18 months of the time that the course ceases to be offered.

174

A.222

(f)     1.      A Continuing Education Teacher who is appointed to a position that will continue for a period of more than six (6) months and requires teaching a minimum of twenty (20) hours per week will be entitled to additions to base pay on the second, fourth and sixth anniversary date of the initial qualifying appointment date, provided the Continuing Education Teacher is continuously employed in the assignment and provides full years of service. A full year of service shall be defined as 30 weeks of service with 30 hours worked per week, an annual total of 900 hours. The hourly rate for each addition to base pay will increase as below:

- Effective the second anniversary of employment, an amount per hour of $1.35

- Effective the fourth anniversary of employment, an additional amount per hour of $1.35

- Effective the sixth anniversary of employment, an additional amount per hour of $1.35

Qualifying service rendered before September 1, 2002 shall be included for the purpose of determining eligibility for additions to base pay effective September 1, 2002 or thereafter.

2.      Effective April 1, 2021, a Continuing Education Teacher who is appointed to teach in the Math Start Program and meets the eligibility requirements for additions to base pay as described in paragraph 2. (f) 1. above will be entitled to the following additions to base pay on the third and fifth anniversary date of the initial qualifying appointment date, provided the Math Start Continuing Education Teacher is continuously employed in and provides full years of service (an annual total of 900 hours) in the Math Start Program:

- Effective the third anniversary of employment, an additional amount per hour of $1.35.

- Effective the fifth anniversary of employment, an additional amount per hour of $1.35.

## 3.      ACADEMIC REPORT

A person who is teaching a course for which degree credit is granted by the college upon successful completion of the course shall receive an Academic Report once each year signed by the Director of Continuing Education or his/her designee. This report shall state that services are satisfactory or unsatisfactory. Where the report indicates unsatisfactory service, the reasons for concluding that services are unsatisfactory shall be set forth. The person may respond to the Academic Report and if such response is received it should be attached to the report.

175

A.223

Case 1:23-cv-00321 Document 51 Filed 06/12/2023 Page 228 of 279

This provision shall not apply to any person who is also a member of the full-time or adjunct teaching staff of the College. In such instances, the Director shall have access to the College's personnel files for the person.

4.    **COMPLAINT AND GRIEVANCE MACHINERY**

(a)    Intent:

The parties agree to use their best efforts to encourage the informal and prompt settlement of complaints and grievances which may arise between the PSC, the employees, and the University. The orderly processes hereinafter set forth will be the sole method used for the resolution of all complaints and grievances.

(b)    Definitions:

(1)    A complaint is an informal claim by an employee covered by this Agreement or by the PSC of improper, unfair, arbitrary or discriminatory treatment. A complaint may, but need not, constitute a grievance. Complaints shall be processed through the informal procedure herein set forth.

(2)    A grievance is an allegation that there has been a violation of the stated terms of this Agreement.

(c)    Informal Procedure for Complaints:

An employee covered by this Agreement may present and discuss his or her complaint either with or without a representative of the PSC with the Continuing Education Director of the unit involved. Similarly, a representative of the PSC may present and discuss a complaint on behalf of any employee or group of employees with the Continuing Education Director of the unit involved and such discussion shall be entirely informal. Any settlement, withdrawal or disposition of a complaint at this informal stage shall not constitute a binding precedent in the settlement of similar complaints or grievances.

(d)    Formal Procedure for Grievances:

Grievances may be filed by an employee in the bargaining unit, on his or her behalf, or by the Professional Staff Congress on its behalf, or by the Professional Staff Congress on behalf of any employee or group of employees in the bargaining unit. Grievances involving employees in more than one College of the University may be filed by the PSC initially at Step 2 of the grievance procedure.

A grievance must be filed by an employee or the PSC within thirty (30) days, excluding Saturdays, Sundays and legal holidays, after the PSC or the employee on whose behalf the grievance is filed became aware of the action complained of. Any grievance or

176

A.224

informal complaint not processed in accordance with the time limits specified herein shall be deemed waived by the grievant.

A grievance must be stated in writing setting forth the basis therefor with reasonable particularity, including a designation of the section of this Agreement relied upon, and the remedy requested.

Step 1. Grievances shall be filed at the college with the President's designee. The President or the designee shall, within fifteen (15) days, excluding Saturdays, Sundays or legal holidays, of the receipt of the grievance, meet with the grievant and a representative of the PSC for the purpose of discussing the grievance. The designee shall within fifteen (15) days, excluding Saturdays, Sundays, or legal holidays, after the grievance meeting, issue a decision in writing to the grievant and the PSC.

Step 2. If the grievance has not been settled at Step 1, then within fifteen (15) days, exclusive of Saturdays, Sundays, and legal holidays, after receipt of the written decision of the President's designee, or the expiration of the time limits for making such decision, the grievant or PSC may submit the grievance in writing simultaneously to the Senior University Executive Director of Labor Relations and the Executive Director of the PSC/CUNY, together with a copy of the decision of the President's designee of the College affected and with a copy of any statement and exhibits to be considered. The College affected shall then be asked to submit any statement and exhibits to be considered.

The Executive Director of the PSC/CUNY and the Senior University Executive Director of Labor Relations shall confer in an attempt to dispose of the grievance.

Step 3. If the grievance has not earlier been resolved the person or persons who submitted the grievance at Step 2 may appeal the grievance to Step 3 by serving notice to that effect by certified mail, return receipt requested to the Senior Vice Chancellor for Labor Relations.

(e)      As the need arises, the University and the PSC shall select an individual to review Step 3 grievances under this Agreement, and to issue a decision orally, or in writing as to the disposition of the grievance.

In no event shall such individual have authority to add to, subtract from, modify or amend the provisions of this Agreement or to appoint or direct an appointment of any person. Such decision or award shall be binding upon the PSC, the University and the employees affected thereby. The cost of this procedure shall be borne equally by the parties. Expenses for witnesses if utilized, however, shall be borne by the party who calls them. On issues of appointment such individual may make a financial award in an amount not to exceed the salary otherwise attributable to the appointment at issue.

177

A.225

5.   **BENEFITS**

The University and the PSC agree that qualified employees in the title Continuing Education Teacher who are appointed to a position that will continue for more than six (6) months and that requires them to teach a minimum of 20 hours per week shall be entitled to the following benefits:

(a)   coverage under the New York City Health Benefits Program, provided they meet all other eligibility requirements contained in the Summary Plan Description of the New York City Health Benefits Program; this benefit will be available only so long as such employees meet all the requirements specified above;

(b)   fourteen (14) days of sick leave per year or a pro-rata portion thereof (one day of sick leave for every 64 hours of service), which may be accrued up to a maximum of 28 days; accrual of this benefit will be available only so long as such employees meet all the eligibility requirements specified above. Effective August 27, 2008, up to three (3) days of accrued sick leave may be used annually for the care of an ill family member, consistent with applicable rules and procedures.

6.   **NON-CREDIT-BEARING REMEDIAL AND ESL PROGRAMS**

Notwithstanding paragraph 1 above, the Continuing Education Teacher title may be used to offer non-credit-bearing remedial and ESL instructional programs provided that

1.   No full-time instructional staff member employed as of September 1, 1998 and having taught in non-credit-bearing remedial and ESL instructional programs shall be non-reappointed or retrenched to effect the transfer of the teaching of such courses to Continuing Education Teachers; and

2.   Adjuncts teaching non-credit-bearing remedial or ESL instructional programs at a College in either of the two semesters immediately prior to the implementation of the decision to offer such courses by Continuing Education Teachers will be given priority consideration for appointment as Continuing Education Teachers to teach such courses at that College.

Nothing herein should be construed to alter existing college governance plans or University Bylaws, including faculty participation in curriculum matters.

7.   **ACCESS TO COLLEGE LIBRARY**

178

A.226

Continuing Education Teachers who have an appointment that will last at least six weeks will have library privileges on the campus on which they are working.

8.    **APPLICABLE PROVISIONS**

Persons and matters covered by this Agreement shall not be covered by any other articles of the Agreement with the PSC except Article 1 (Recognition), Article 3 (Unit Stability), Article 4 (Union Dues and Membership), Article 5 (Information and Data), Article 7 (Organizational Use of Facilities), Article 8 (Non-Discrimination), Article 17 (Jury Duty), Article 38 (Workers' Compensation), Article 39 (Occupational Safety and Health), Article 40 (No Strike Pledge), Article 41 (Legislative Action), and Article 43 (Duration).

**SUPPLEMENTAL AGREEMENT ON EDUCATIONAL OPPORTUNITY CENTERS**

179

A.227

Pursuant to an agreement entered into the 25th day of April, 1980 by and between The City University of New York and the Professional Staff Congress/CUNY.

## 1. RECOGNITION

The Professional Staff Congress/CUNY is recognized by the City University as the exclusive collective bargaining representative under the Public Employees' Fair Employment Act for the period beginning April 25, 1980 for persons employed at the Educational Opportunity Centers sponsored by the Borough of Manhattan Community College, New York City College of Technology, Bronx Community College and York College in the following titles:

EOC Adjunct Lecturer
EOC Adjunct College Laboratory Technician
EOC College Laboratory Technician
EOC Higher Education Officer
EOC Higher Education Associate
EOC Higher Education Assistant
EOC Assistant to Higher Education Officer
EOC Lecturer
EOC Substitute (full-time title)

Employees in the following functions or titles are excluded:

Director
Associate Director
Assistant Director
Coordinator (Number of Coordinators not to exceed those specified in contract between the State University of New York ("SUNY") and the individual college)

## 2. APPLICABLE PROVISIONS

The terms and conditions of employment for the above titles shall be those contained in the University's Bylaws and written policies of the Board for parallel titles, except that application of such Bylaws and policies may require modification because of the special organizational structure of the EOCs; the provisions of a) listed below; and, in addition, the following provisions of the 2017-2023 Agreement between The City University of New York and the Professional Staff Congress/CUNY (the "Master Agreement") set forth in b) below shall be applicable to EOC titles.

(a)   Effective September 1, 1988, for employees of the Bronx, Brooklyn and Manhattan Educational Opportunity Centers, and, effective July 1, 1999, for employees of the Queens Educational Opportunity Center, benefits will be provided.

A.228

1. Health Insurance:
   (i) Effective December 31, 2008, eligible active full-time EOC employees became eligible for coverage under the New York City Health Benefits Program as a result of the transition of EOC employees to the New York State and New York City payrolls.[32]
   (ii) Effective August 25, 2016, qualified EOC adjuncts shall be eligible to enroll in the New York City Health Benefits Program on the same basis as other qualified adjuncts, as defined in paragraphs a, b, and c of Appendix J.

2. Retirement: TIAA/CREF (Mandatory)

3. Supplemental Health Benefits:
   (i) Per capita per annum contributions shall be made to the PSC-CUNY Welfare Fund as set forth below. The specified amounts will be paid on a per capita pro-rated monthly basis to the PSC-CUNY Welfare Fund for all full-time eligible members of the instructional staff.

   | | |
   |---|---|
   | Effective November 30, 2017 | $1,890 |
   | Effective February 28, 2023 | $1,925 |

   Determination of eligibility and benefits is made by the PSC-CUNY Welfare Fund.

   (ii) Qualified EOC adjuncts eligible to participate in the New York City Health Benefits Program will also be provided with supplemental health benefits through the PSC-CUNY Welfare Fund effective August 25, 2016. The per capita per annum contributions set forth below will be paid on a pro-rated monthly basis to the PSC-CUNY Welfare Fund for all eligible EOC adjuncts.[33]

   | | |
   |---|---|
   | Effective November 30, 2017 | $1,350.01 |
   | Effective February 28, 2023 | $1,375.01 |

4. Workers' Compensation

(b) The following articles of the Master Agreement shall be applicable to employees of the EOCs except that application of such articles may require modification of the procedures and practices because of the special funding and organizational structure of the EOCs.

---

[32] Prior to December 31, 2008, health insurance was covered in a side agreement.

[33] Determination of eligibility and benefits is made by the PSC-CUNY Welfare Fund. EOC adjunct instructional staff who are receiving health insurance through the New York City Health Benefits Program pursuant to the letter agreement between the University and the PSC dated July 30, 2014 ("Concluding Agreement") shall be eligible to receive welfare benefits. (See Appendix J.)

181

A.229

Preamble

Article 1        Recognition

Article 2        CUNY-PSC Relationships

Article 3        Unit Stability

Article 4        Union Dues and Membership

Article 5        Information and Data

Article 6        Reassigned Time

Article 7        Organizational Use of Facilities

Article 8        Non-Discrimination

Article 9        Appointment and Reappointment except 9.6 and 9.8

Article 10       Schedule for Notification of Reappointment and Non-Reappointment except 10.1(b)

Article 11       Classification of Titles except for 11.1 (the last two (2) sentences), 11.2, 11.5, 11.6, 11.7

Article 12       Certificate of Continuous Employment except 12.6

Article 13       Appointments and Reappointments in the Higher Education Officer (HEO) Series, except that an employee who meets the qualifications in an EOC HEO series title shall gain a multiple-year appointment in that EOC upon recommendation to and approval by the Board of Trustees. Such appointment or service toward a multiple-year appointment is not transferable to any other EOC or unit of The City University.

Article 14       Leaves and Holidays, except that, effective August 25, 2006, the period of annual leave for EOC Lecturers shall be from the day after commencement at the Center until the third day, excluding Saturday and Sunday, preceding the thirtieth of August that follows such commencement, or an equivalent consecutive period. The annual leave period for EOC Lecturers appointed or assigned as counselors or to other student personnel assignments is governed by Article 14.3 c).

182

A.230

| Article 15 | Workload except 15.1(c), 15.3 |
|---|---|
| Article 16 | Temporary Disability and Parental Leave, except 16.5, 16.6 |
| Article 17 | Jury Duty |
| Article 18 | Professional Evaluation, to the extent applicable and practicable and in accordance with the organizational structure of the EOCs |
| Article 19 | Personnel Files |
| Article 20 | Complaint, Grievance and Arbitration Procedure |
| Article 21 | Disciplinary Actions |
| Article 22 | Increased Promotional Opportunities, except 22.1, 22.2, 22.3, 22.4 |
| Article 24 | Salary Schedules except that the salary schedules therein are not applicable to the EOCs and the schedules set forth in Section 3 "Salary Schedules" below shall be applicable. Effective March 19, 2010, employees serving in the titles EOC Assistant to Higher Education Officer and EOC College Laboratory Technician who hold a master's degree from an accredited university in a field related to their job duties shall receive a $1,000 annual salary differential, and those who hold a doctoral degree from an accredited university in a field related to their job duties shall receive a $2,500 annual salary differential. |
| Article 29 | Waiver of Tuition Fees |
| Article 30 | Facilities and Services |
| Article 31 | Rehiring of Persons Who Are Discontinued |
| Article 32 | Discontinuances |
| Article 33 | Faculty and Staff Development, except Article 33.5, which applies only to the extent set forth below in Sections 4 and 5. |
| Article 38 | Workers' Compensation |
| Article 39 | Occupational Safety and Health |
| Article 40 | No Strike Pledge |

183

A.231

Article 41          Legislative Action

Article 42          2017-2023 Financial Provisions

Article 43          Duration

**3.  SALARY SCHEDULES**

**EOC LECTURER**

184

A.232

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 4/1/2021 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|
| $46,665 | $47,598 | $48,550 | $50,050 | $51,051 | $52,072 |
| $48,449 | $49,418 | $50,406 | $51,906 | $52,944 | $54,003 |
| $50,301 | $51,307 | $52,333 | $53,833 | $54,910 | $56,008 |
| $53,303 | $54,369 | $55,457 | $56,957 | $58,096 | $59,258 |
| $55,959 | $57,078 | $58,220 | $59,720 | $60,914 | $62,133 |
| $58,078 | $59,239 | $60,424 | $61,924 | $63,163 | $64,426 |
| $61,088 | $62,310 | $63,556 | $65,056 | $66,357 | $67,684 |
| $63,211 | $64,476 | $65,765 | $67,265 | $68,610 | $69,983 |
| $65,334 | $66,641 | $67,974 | $69,474 | $70,863 | $72,280 |
| $67,454 | $68,803 | $70,179 | $71,679 | $73,112 | $74,575 |
| $69,574 | $70,966 | $72,385 | $73,885 | $75,363 | $76,870 |
| $71,699 | $73,133 | $74,595 | $76,095 | $77,617 | $79,170 |
| $73,820 | $75,297 | $76,803 | $78,303 | $79,869 | $81,466 |
| $75,943 | $77,462 | $79,011 | $80,511 | $82,121 | $83,764 |
| **$78,937** | **$80,516** | **$82,126** | **$83,626** | **$85,298** | **$87,004*** |
| **$84,363** | **$86,050** | **$87,771** | **$89,271** | **$91,057** | **$92,878**** |

## EOC LECTURER DOCTORAL SCHEDULE[#]

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 4/1/2021 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|

A.233

| | | | | | |
|---|---|---|---|---|---|
| $51,052 | $52,073 | $53,115 | $54,615 | $55,707 | $56,821 |
| $53,053 | $54,114 | $55,197 | $56,697 | $57,831 | $58,987 |
| $55,134 | $56,237 | $57,361 | $58,861 | $60,039 | $61,239 |
| $58,138 | $59,301 | $60,487 | $61,987 | $63,226 | $64,491 |
| $60,801 | $62,017 | $63,258 | $64,758 | $66,053 | $67,374 |
| $62,918 | $64,176 | $65,460 | $66,960 | $68,299 | $69,665 |
| $65,927 | $67,245 | $68,590 | $70,090 | $71,492 | $72,922 |
| $68,045 | $69,406 | $70,794 | $72,294 | $73,740 | $75,215 |
| $70,172 | $71,575 | $73,007 | $74,507 | $75,997 | $77,517 |
| $72,288 | $73,734 | $75,209 | $76,709 | $78,243 | $79,808 |
| $74,408 | $75,896 | $77,414 | $78,914 | $80,492 | $82,102 |
| $76,535 | $78,065 | $79,627 | $81,127 | $82,749 | $84,404 |
| $78,654 | $80,227 | $81,832 | $83,332 | $84,999 | $86,698 |
| $80,779 | $82,394 | $84,042 | $85,542 | $87,253 | $88,998 |
| **$83,776** | **$85,451** | **$87,160** | **$88,660** | **$90,433** | **$92,242** * |
| **$89,381** | **$91,168** | **$92,992** | **$94,492** | **$96,381** | **$98,309**\*\* |

[#] See provisions of Article 24.2(a)

# EOC HIGHER EDUCATION OFFICER

10/1/2018          10/31/2019    11/15/2020    11/15/2021    11/1/2022

A.234

| | | | | |
|---|---|---|---|---|
| $77,490 | $79,040 | $80,621 | $82,233 | $83,878 |
| $80,550 | $82,161 | $83,805 | $85,481 | $87,190 |
| $83,732 | $85,406 | $87,115 | $88,857 | $90,634 |
| $86,657 | $88,390 | $90,158 | $91,961 | $93,800 |
| $89,245 | $91,030 | $92,850 | $94,707 | $96,602 |
| $92,688 | $94,542 | $96,433 | $98,362 | $100,329 |
| $96,133 | $98,056 | $100,017 | $102,017 | $104,057 |
| $99,581 | $101,572 | $103,604 | $105,676 | $107,789 |
| $103,064 | $105,125 | $107,228 | $109,372 | $111,560 |
| $106,550 | $108,681 | $110,855 | $113,072 | $115,333 |
| $110,857 | $113,074 | $115,335 | $117,642 | $119,995 |
| $115,163 | $117,466 | $119,816 | $122,212 | $124,656 |
| $119,462 | $121,852 | $124,289 | $126,774 | $129,310 |
| **$122,859** | **$125,316** | **$127,823** | **$130,379** | **$132,987*** |
| **$131,055** | **$133,676** | **$136,349** | **$139,076** | **$141,858**** |

## EOC HIGHER EDUCATION ASSOCIATE

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|
| $62,622 | $63,874 | $65,152 | $66,455 | $67,784 |
| $65,087 | $66,389 | $67,717 | $69,071 | $70,453 |
| $67,650 | $69,003 | $70,384 | $71,791 | $73,227 |
| $70,577 | $71,988 | $73,428 | $74,897 | $76,395 |
| $73,157 | $74,621 | $76,113 | $77,635 | $79,188 |
| $76,612 | $78,144 | $79,707 | $81,301 | $82,928 |
| $80,047 | $81,647 | $83,280 | $84,946 | $86,645 |
| $83,492 | $85,162 | $86,865 | $88,602 | $90,375 |
| $86,372 | $88,099 | $89,861 | $91,658 | $93,491 |
| $89,245 | $91,030 | $92,850 | $94,707 | $96,602 |
| $92,688 | $94,542 | $96,433 | $98,362 | $100,329 |
| $96,133 | $98,056 | $100,017 | $102,017 | $104,057 |
| $99,581 | $101,572 | $103,604 | $105,676 | $107,789 |
| **$102,215** | **$104,260** | **$106,345** | **$108,472** | **$110,641*** |
| **$108,834** | **$111,011** | **$113,231** | **$115,496** | **$117,805**** |

## EOC HIGHER EDUCATION ASSISTANT

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|

187

A.235

| | | | | |
|---|---|---|---|---|
| $48,287 | $49,253 | $50,238 | $51,242 | $52,267 |
| $50,177 | $51,180 | $52,204 | $53,248 | $54,313 |
| $52,149 | $53,191 | $54,255 | $55,340 | $56,447 |
| $57,659 | $58,812 | $59,988 | $61,188 | $62,411 |
| $59,726 | $60,921 | $62,139 | $63,382 | $64,649 |
| $62,825 | $64,081 | $65,363 | $66,670 | $68,004 |
| $64,889 | $66,187 | $67,511 | $68,861 | $70,238 |
| $67,133 | $68,476 | $69,846 | $71,242 | $72,667 |
| $69,718 | $71,112 | $72,535 | $73,985 | $75,465 |
| $73,157 | $74,621 | $76,113 | $77,635 | $79,188 |
| $76,612 | $78,144 | $79,707 | $81,301 | $82,928 |
| $80,047 | $81,647 | $83,280 | $84,946 | $86,645 |
| $83,492 | $85,162 | $86,865 | $88,602 | $90,375 |
| **$86,041** | **$87,762** | **$89,517** | **$91,307** | **$93,134*** |
| **$91,952** | **$93,791** | **$95,667** | **$97,580** | **$99,532**** |

**EOC ASSISTANT TO HEO**

**10/1/2018          10/31/2019     11/15/2020     2/1/2021      11/15/2021    11/1/2022**

188

A.236

| | | | | | |
|---|---|---|---|---|---|
| $40,068 | $40,869 | $41,686 | $42,686 | $43,540 | $44,411 |
| $41,631 | $42,464 | $43,313 | $44,313 | $45,199 | $46,103 |
| $43,255 | $44,120 | $45,003 | $46,003 | $46,923 | $47,861 |
| $45,194 | $46,098 | $47,020 | $48,020 | $48,980 | $49,960 |
| $46,876 | $47,814 | $48,770 | $49,770 | $50,765 | $51,781 |
| $49,174 | $50,158 | $51,161 | $52,161 | $53,204 | $54,268 |
| $52,176 | $53,220 | $54,284 | $55,284 | $56,390 | $57,517 |
| $54,833 | $55,930 | $57,048 | $58,048 | $59,209 | $60,394 |
| $56,954 | $58,093 | $59,255 | $60,255 | $61,460 | $62,689 |
| $59,963 | $61,162 | $62,385 | $63,385 | $64,653 | $65,946 |
| $62,086 | $63,328 | $64,595 | $65,595 | $66,907 | $68,245 |
| $64,208 | $65,492 | $66,802 | $67,802 | $69,158 | $70,541 |
| $66,329 | $67,655 | $69,008 | $70,008 | $71,408 | $72,837 |
| $68,448 | $69,817 | $71,213 | $72,213 | $73,658 | $75,131 |
| $70,572 | $71,983 | $73,423 | $74,423 | $75,911 | $77,430 |
| $72,693 | $74,147 | $75,630 | $76,630 | $78,163 | $79,726 |
| **$74,528** | **$76,019** | **$77,539** | **$78,539** | **$80,110** | **$81,712*** |
| **$78,663** | **$80,237** | **$81,841** | **$82,841** | **$84,498** | **$86,188**** |

# EOC COLLEGE LABORATORY TECHNICIAN

| 10/1/2018 | 10/31/2019 | 1/1/2020 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|---|

189

A.237

| | | | | | |
|---|---|---|---|---|---|
| $41,440 | $42,268 | $44,768 | $45,664 | $46,577 | $47,509 |
| $42,863 | $43,721 | $46,221 | $47,145 | $48,088 | $49,050 |
| $44,347 | $45,233 | $47,733 | $48,688 | $49,662 | $50,655 |
| $46,105 | $47,027 | $49,527 | $50,518 | $51,528 | $52,559 |
| $47,642 | $48,595 | $51,095 | $52,117 | $53,159 | $54,222 |
| $49,731 | $50,726 | $53,226 | $54,290 | $55,376 | $56,484 |
| $51,070 | $52,092 | $54,592 | $55,684 | $56,797 | $57,933 |
| $52,406 | $53,454 | $55,954 | $57,073 | $58,214 | $59,378 |
| $53,746 | $54,821 | $57,321 | $58,467 | $59,637 | $60,829 |
| $55,083 | $56,185 | $58,685 | $59,858 | $61,056 | $62,277 |
| $56,755 | $57,890 | $60,390 | $61,598 | $62,830 | $64,086 |
| $58,427 | $59,595 | $62,095 | $63,337 | $64,604 | $65,896 |
| $60,099 | $61,301 | $63,801 | $65,077 | $66,379 | $67,707 |
| $61,772 | $63,008 | $65,508 | $66,818 | $68,154 | $69,517 |
| **$63,075** | **$64,336** | **$66,836** | **$68,173** | **$69,536** | **$70,927\*** |
| **$66,311** | **$67,637** | **$70,137** | **$71,540** | **$72,971** | **$74,430\*\*** |

## ADJUNCT AND HOURLY RATES

190

A.238

## EOC LECTURER, EOC ADJUNCT LECTURER

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 8/25/2022* |
|---|---|---|---|---|
| $73.02 | $74.48 | $75.97 | $77.49 | $91.67 |
| $75.93 | $77.45 | $79.00 | $80.58 | $91.67 |
| $79.01 | $80.59 | $82.20 | $83.85 | $91.67 |
| $82.53 | $84.18 | $85.86 | $87.58 | $91.67 |
| $90.90 | $92.72 | $94.57 | $96.47 | $96.47 |

**\* A single hourly rate of $91.67 will be in effect starting 8/25/2022 for these titles, except that incumbents earning $96.47 as of 8/25/2022, as a result of previous CUNY employment teaching in an hourly or adjunct capacity, will continue to receive that rate until 11/1/2022, at which time their hourly rate will increase to $98.40. (See Article 24.2 (c) and Article 24.3 (a) 1. (v) a))**

*N.B.: Pursuant to Article 24.2 (c) and Article 24.3 (a) 1. (v) a): Effective at the start of the Fall 2022 semester (i.e., August 25, 2022), the salary steps in teaching adjunct titles, except Medical series titles and Resident series titles, shall be eliminated and replaced with a single hourly rate, as reflected in the salary schedules in Article 24.6. As of August 25, 2022, the language concerning movement within schedule and subsections 24.2 (b) 1. (i) and (ii) will not apply to teaching adjuncts.*

*The November 1, 2022 2% wage increase does not apply to teaching adjunct series titles and hourly professorial salary schedules except as follows:*

*The November 1, 2022 2% wage increase shall apply to the hourly rates for individuals employed in the following teaching adjunct titles whose hourly rate of pay as of August 25, 2022, as a result of previous CUNY employment as a teaching adjunct, exceeds the hourly rate of pay resulting from the application of a single rate of pay for their title effective August 25, 2022: Adjunct Lecturer, Adjunct Lecturer (H), Adjunct Lecturer Doctoral and Instructor (H); Adjunct Assistant Professor and Adjunct Assistant Professor (H); Adjunct Associate Professor and Adjunct Associate Professor (H); and Adjunct Professor and Adjunct Professor (H).*

## EOC COLLEGE LABORATORY TECHNICIAN, EOC ADJUNCT COLLEGE LABORATORY TECHNICIAN

| 10/1/2018 | 10/31/2019 | 11/15/2020 | 11/15/2021 | 11/1/2022 |
|---|---|---|---|---|

191

A.239

| $28.85 | $29.42 | $30.01 | $30.61 | $31.22 |
| $29.97 | $30.57 | $31.18 | $31.80 | $32.44 |
| $31.19 | $31.82 | $32.45 | $33.10 | $33.76 |
| $35.31 | $36.02 | $36.74 | $37.47 | $38.22 |
| $41.68 | $42.51 | $43.36 | $44.23 | $45.11 |

4.    **PROFESSIONAL DEVELOPMENT EOC LECTURER SERIES**

Effective July 1, 2009, EOC Lecturers and EOC Lecturers (Doctoral Schedule) shall be eligible to participate in the HEO/CLT Professional Development Fund established pursuant to Article 33.5 of the PSC/CUNY collective bargaining agreement. Funding for such participation shall be capped up to a maximum of $45,000 per year.

5.    **PROFESSIONAL DEVELOPMENT IN THE EOC HIGHER EDUCATION OFFICER SERIES AND THE EOC COLLEGE LABORATORY TECHNICIAN SERIES**

Effective July 1, 2009, employees in the EOC Higher Education Officer series and the EOC College Laboratory Technician and EOC Adjunct CLT titles will be eligible to participate in the HEO/CLT Professional Development Fund established pursuant to Article 33.5 of the PSC/CUNY collective bargaining agreement.

6.    **TENURE PROVISIONS**

An employee who meets the qualifications shall be awarded tenure in a respective EOC upon recommendation to and approval by the Board of Trustees. Such tenure or service toward tenure is not transferable to any other EOC or unit of The City University.

7.    **WORKLOAD IN THE EOC LECTURER SERIES**

EOC Lecturers and EOC Lecturers on the Ph.D. schedule may be assigned three additional contact teaching hours per academic year. It is understood that, after consultation with the Lecturer, and as near to the beginning of the academic year as is feasible, the additional three teaching hours may be assigned as one contact hour in each trimester, as two contact hours in one trimester and one contact hour in another trimester, or as three contact hours in one trimester. In the event an EOC operates on a semester basis, rather than a trimester basis, in any given academic year, the three additional contact hours may be assigned as two in one semester and one in the other semester, or as three in one semester. In no event shall EOC Lecturers or EOC

Lecturers on the Ph.D. schedule be assigned more than three (3) additional contact hours per academic year or more than 18 contact hours in any one trimester or semester as a result of this provision. In no event shall the increase in teaching contact hours extend the overall work week beyond thirty hours.

8.    **LABOR MANAGEMENT COMMITTEES**

192

A.240

(a) There will be a labor management committee for the Educational Opportunity Centers composed of two members designated by the University and two members designated by the PSC to hear concerns from individual employees in EOC Higher Education Officer series titles concerning workload. The Committee, as appropriate, may make non-binding recommendations to the Director of the respective Educational Opportunity Center. The Committee may also consider requests from an individual member of the Higher Education Officer series for a reclassification of his/her position. If the Committee deems such a request to have merit, it will refer the matter for consideration to the Director of the respective Educational Opportunity Center.

(b) There will be a labor management committee for the four Educational Opportunity Centers, composed of five members designated by the PSC and five members designated by the University to develop non-binding proposals on further enhancements to the professional lives of the EOC instructional staff, including but not limited to a consideration of a promotional series and sabbaticals.

## 9. RETIREE IDENTIFICATION CARD

Each Educational Opportunity Center will provide, upon request by a retiree, a college-retiree identification card, which will provide the retiree with library privileges at the college with which the Educational Opportunity Center is affiliated.

## 10. PENSION CONTRIBUTIONS FOR FULL-TIME INSTRUCTIONAL STAFF WITH HOURLY OVERLOAD ASSIGNMENTS

Effective January 2, 2003, full-time EOC instructional staff members who, in addition to their regular full-time assignments, are assigned overloads on an hourly basis at a CUNY EOC, shall have employee and employer pension contributions made based upon the hourly earnings from the overload assignment.

## 11. RETIREE HEALTH INSURANCE BENEFIT

193

A.241

(a)    Effective December 31, 2008, eligible PSC-represented retirees of the EOCs shall be covered by the New York City Health Benefits Program for retiree health insurance benefits and by the PSC-CUNY Welfare Fund for supplemental health benefits.[34]

(b)    This Article 11 constitutes the entire agreement entered into by the parties in connection with the provision of health insurance to PSC-represented employees who retire at the EOCs, and it cannot be supplemented, amended, or modified in any manner, except in writing by agreement of the parties.

## 12.    LIMITATIONS

The City University's obligations to employees at each of the Educational Opportunity Centers covered by this agreement shall be subject to:

(a)    renewal of the agreement between The City University and the State University of New York;

(b)    provisions for the payment of such obligations in the budget of each Educational Opportunity Center approved by the State University of New York.

## 13.    EFFECTIVE DATE

This agreement shall become effective upon acceptance by The City University, the Professional Staff Congress/CUNY, and the State University of New York.

---

[34] See the 2007-2010 EOC Supplemental Agreement for the agreement providing for health insurance to certain eligible PSC-represented employees at the Educational Opportunity Centers (EOCs) who retired effective through December 30, 2008.

194

A.242

# Exhibit B

Memorandum of Agreement Between PSC and CUNY



Published on *PSC CUNY* (https://psc-cuny.org)

Home > Printer-friendly > Memorandum of Agreement 2019

# Memorandum of Agreement 2019 [1]

**MEMORANDUM OF AGREEMENT**

**FOR A SUCCESSOR COLLECTIVE BARGAINING AGREEMENT BETWEEN**

**THE CITY UNIVERSITY OF NEW YORK AND**

**THE PROFESSIONAL STAFF CONGRESS/CUNY**

**I. Term:**     12/01/2017-02/28/2023  (63 months)

**II. Across-the-Board Wage Increases:**

A. The following increases shall apply on the dates listed below, except as modified in II.B. below.

- 10/01/2018 – 2%
- 10/31/2019 – 2% compounded
- 11/15/2020 – 2% compounded
- 11/15/2021  – 2% compounded
- 11/01/2022  – 2% compounded*

*B. The 11/01/2022 2% wage increase does not apply to teaching adjunct series title and hourly professorial salary schedules—which salary schedules receive increases specified in IV below—except as follows:

The 11/01/2022 2% wage increase shall apply to the hourly rates for teaching adjuncts in Medical series titles, Law School series titles, Resident series titles, Graduate School of Journalism series titles and Executive Programs in the Zicklin School of Business at Baruch College series titles, whose compensation and workload shall continue consistent with past practices and the collective bargaining agreement.

C.1. The 11/01/2022 2% wage increase shall apply to the hourly rates for all non-teaching adjuncts, adjunct CLTs and CETs, including those in the schools and programs named in paragraph II. B. above.

2. The 11/01/2022 2% wage increase shall also apply to the hourly rates for individuals employed in the teaching adjunct titles specified in paragraph IV below whose hourly rate of pay as of 08/25/2022, as a result of previous CUNY employment as a teaching adjunct, exceeds the hourly rate of pay resulting from the application of a single rate of pay for their title effective 08/25/2022, as specified in paragraph IV below.

D. As of 08/25/2022, Article 24.2 (b) will not apply to teaching adjuncts.

### III. Additional Teaching Adjunct Pay:

1.　　Effective the start of the Spring 2020 semester, employees in teaching adjunct titles—except teaching adjuncts in Medical series titles, Law School series titles, Resident series titles, Graduate School of Journalism series titles and Executive Programs in the Zicklin School of Business at Baruch College series titles—who are assigned to teach at least three (3) classroom contact hours per semester (at least 45 appointment hours) within the same college will be responsible for and paid for office hours in the amounts designated below.  Adjuncts shall be paid for these hours at their full hourly rate. These hours are to be spent on campus—unless the course is conducted entirely or partially through distance learning, in which case the office hours may be conducted online to a corresponding extent—and are to be formalized as directed by the department chair. The hours are to be spent engaged in or available for student contact, except that the colleges may direct that up to three (3) office hours per semester—or up to six (6) per semester for those who are responsible for and paid for more than 15 office hours—be used for required trainings (*e.g.*, Workplace Violence Prevention, Sexual Harassment Prevention, You Have a Right to Know, etc.); for professional development; for attendance at college orientation sessions; for meetings with the union pursuant to Section 208.4(b) of the NYS Civil Service Law, which may be conducted individually or in a group, as agreed to with the PSC; or as otherwise directed by the colleges.

2.　　Allocation of paid office hours per college:

A total of fewer than 3 classroom contact hours: 0 paid office hours

- 3 or more but fewer than 6 classroom contact hours: 15 paid office hours/semester
- 6 or more but fewer than 9 classroom contact hours: 30 paid office hours/semester
- 9 or more classroom contact hours: 45 paid office hours/semester

3.　　Consistent with Article 15.2 (a), paid office hours will be capped at 45 per semester at any one college.  If an adjunct teaches at two colleges, paid office hours will be capped at 45 at the first college and 30 at the second college.

4.　　Allocation of paid professional hours per college for teaching adjuncts assigned to teach one or more but fewer than 3 classroom contact hours in a single college: two (2) paid professional hours/semester to be used for required trainings (*e.g.*, Workplace Violence Prevention, Sexual Harassment Prevention, You Have a Right to Know, etc.); for professional development; for attendance at college orientation sessions; for meetings with the union pursuant to Section 208.4 (b) of the NYS Civil Service Law, which may be conducted individually or in a group, as agreed to with the PSC; or as otherwise directed by the colleges.

5.　　Full-time employees who teach a course that represents an overload assignment and for which they are paid at the applicable hourly professorial rate, which corresponds to the teaching adjunct rates as set forth in paragraph II above and in paragraph IV below, will be responsible for and paid at the applicable professorial rate for the office hours specified above (paragraph III. 1. through 4. above), in addition to any office hours for which they are normally responsible as part of their full-time assignment.

6.　　Effective at the start of the Spring 2020 semester, the current language of Article 15.2 (b) will be replaced with the following sentence: "It is understood that paid office hours and paid professional hours for adjuncts shall not be counted toward the maximum adjunct teaching hours in section 15.2 of this Agreement."

### IV. Adjustment to Adjunct Salary Steps:

1. Effective at the start of the Fall 2022 semester (*i.e.,* August 25, 2022), the salary steps in teaching adjunct titles, except Medical series titles and Resident series titles, shall be eliminated and replaced with a single hourly rate. Individuals employed in teaching adjunct titles who receive the final 2% raise on 11/01/2022 shall be paid as specified in paragraph II.C.2. above, not at the single rates established below.

2. Effective August 25, 2022, hourly rates shall be as follows:

Adjunct Lecturer and related titles (Adjunct Lecturer (H), Adjunct Lecturer Doctoral & Instructor (H)): $91.67 per hour ($5,500 per semester for a three-contact hour course)

Adjunct Assistant Professor and Adjunct Assistant Professor (H): $100.00 per hour ($6,000 per semester for a three-contact hour course)

Adjunct Associate Professor and Adjunct Associate Professor (H): $108.33 per hour ($6,500 per semester for a three-contact hour course)

Adjunct Professor and Adjunct Professor (H): $112.50 per hour ($6,750 per semester for a three-contact hour course)

The PSC will withdraw the section of PERB charge U-36619 relating to the pay rate for Section 208.4 (b) meetings.

**Health Savings and Welfare Fund Contributions:**

The June 28, 2018, and August 31, 2018, letter agreements between the City of New York and the Municipal Labor Committee regarding health savings and welfare fund contributions pertain to CUNY and the PSC and are attached (Attachment 1). Article 26 will be amended to reflect the per capita contributions provided in the MLC letter agreements.

Effective February 28, 2023, Article 26 will also be amended to provide that the annual per capita contribution to the PSC-CUNY Welfare Fund on behalf of active and retired full-time employees will be increased by $35, and on behalf of eligible active part-time employees by the pro-rated amount: $25.

**College Laboratory Technician Title Series Salary Schedule (Article 24.6):**

Effective January 1, 2020, each step on the College Laboratory Technician salary schedule shall be increased by $2,500.

Effective January 1, 2020, each step on the Senior College Laboratory Technician salary schedule shall be increased by $2,000.

Effective January 1, 2020, each step on the Chief College Laboratory Technician salary schedule shall be increased by $1,500.

**Assistant to Higher Education Officer Salary Schedule (Article 24.6):**

Effective February 1, 2021, each step on the Assistant to Higher Education Officer salary schedule shall be increased by $1,000.

**Lecturer Title Series Salary Schedules (Article 24.6):**

Effective April 1, 2021, each step on the Lecturer, Visiting Lecturer and Lecturer Doctoral Schedule, CLIP Instructor and CUNY Start Instructor salary schedules shall be increased by $1,500.

**New York State Paid Family Leave**:

The parties agree to establish a Labor/Management Committee to work out implementation of Paid Family Leave for eligible part-time employees and for eligible full-time employees, if possible, modeled on the NY State statute and on applicable New York State/New York City programs.

**HEO Series Discretionary Assignment Differential:**

A pilot program will be established for the University to set aside funds to supplement the funding provided by the colleges for discretionary HEO assignment differentials. The pilot program will be effective January 1, 2020, through June 30, 2023, and the supplementary funding for differentials to be awarded in accordance with Article 22.5 will be provided as follows:

| | |
|---|---|
| Effective January 1, 2020 | $ 71,946 |
| Effective July 1, 2020 | $143,893 |
| Effective July 1, 2021 | $143,893 |
| Effective July 1, 2022 | $143,893 |

Funds available January 1, 2020, shall be apportioned to each college on February 1, 2020, based upon the number of Assistant to HEOs, HEO Assistants and HEO Associates who have completed one or more years of service at the top salary step of their respective salary schedule as of October 1, 2019. Each subsequent apportionment shall be based on the number of eligible employees on the July 1st that the funds are available, which funds shall be apportioned to the colleges on the following dates:

August 1, 2020

August 1, 2021

August 1, 2022

It is understood that the decision as to how many, if any, assignment differentials to award in any year remains discretionary with the colleges. The colleges will track the number of differentials awarded, and the University will report annually to the PSC on the amounts of reimbursements awarded to each college and the number of differentials awarded by each college. Prior to February 1, 2023, the parties will meet to discuss continuation of the pilot and/or the use of any remaining funds.

**Amend** Article 22.5 by adding a new subsection (c) as follows:

Eligible employees who submit completed applications to the college HR office by January 1 of each year shall receive notification of the President's decision no later than the following June 30. Eligible employees who submit completed applications to the college HR office by July 1 of each year shall receive notification of the President's decision no later than the following January 15.

**Payment for Defined Projects through Stipends:**

The parties agree to a pilot program as follows:

In addition to the existing ability of the colleges and the University to grant reassigned time or make payment on an hourly basis, the parties agree to enter into a pilot program that will give the colleges and the University the discretion to pay faculty via stipends for work on certain defined projects that

are not part of the employee's normal responsibilities and that include a specific deliverable in a specified timeframe.  The terms of this pilot program are as follows:

- The pilot program governing stipends will be for five academic years, beginning with the 2019-2020 academic year through the end of the 2023-2024 academic year.
- Eligibility for stipends will be limited to full-time faculty members who are on the regular University payroll and who have a continuing CUNY appointment.
- Stipends may not exceed $10,000 per project.
- Stipends will be taxable, pensionable and subject to normal payroll deductions.
- The amount of stipend pay will be determined by the scope and complexity of the project, not by the title or underlying salary of the recipient.  It is understood that stipends will be awarded for projects that are not part of the faculty member's normal workload or responsibilities.
- Stipends will be paid for work on defined projects deliverable within a specified timeframe. Projects for which faculty are paid a stipend must be completed within a defined period of time that may not exceed one year.
- A letter specifying the terms of the stipend must be signed by both the faculty member and the President's designee.
- Projects for which stipends are paid will be limited to: University or college strategic initiatives, course development as part of a University or college initiative, and leadership roles in accreditation processes.  Other defined projects may be stipended if approved by the Executive Vice Chancellor and University Provost or his/her designee.
- Stipends may not be used to replace reassigned time that is normally allocated for administrative leadership of departments, programs or schools.
- No stipend may be less than $500. Work requiring payment below $500 will continue to be paid at the appropriate non-teaching adjunct rate.
- Except to the extent, if any, that a stipend is awarded in an amount below $500 or above $10,000; that a stipend is awarded to someone who is not a full-time faculty member; that a stipend is awarded for a project that will exceed one year or is being used to replace reassigned time that is normally allocated for administrative leadership of departments, programs or schools; or that a college fails to pay an agreed-upon stipend, all decisions regarding stipends, including, but not limited to, assignments covered, the amount of the stipend, and the individual to whom the stipend is awarded, shall remain discretionary with the college and/or University and are not subject to the provisions of Article 20.
- The Colleges will track the stipends awarded each year of the pilot, and the University's Office of Academic Affairs will provide the Union with a summary report at the end of each academic year.
- Ownership of any copyright in work paid for with a stipend as part of the pilot project shall be as follows:
  1. If the work consists of creating scholarly or pedagogical work such as instructional materials, classroom presentations, curriculum, etc, then the faculty member shall own any copyright.
  2. If the work is other than creating scholarly or pedagogical work, for example if the work consists of creating personnel manuals, written policies, administrative handbooks, etc., then the University shall own any copyright.

### Educational Technology:

Effective upon ratification and approval of the collective bargaining agreement, the Professional Staff Congress may designate two representatives to the CUNY Committee on Academic Technology.

### Reassigned Time for Untenured Faculty:

**Amend** Article 15.1 (e) of the collective bargaining agreement by renumbering the current paragraph 15.1 (e) to make it 15.1 (e) 1. and adding the following as 15.1 (e) 2.:

A.248

Effective with the 2020-2021 academic year, untenured Assistant Professors, untenured Associate Professors and untenured Professors (including those employed as faculty counselors or as faculty librarians) who receive an initial appointment to a professorial title on or after the start of the Fall 2020 semester will receive 18 contact hours of reassigned time to be used during their first five annual appointments, in order to engage in scholarly and/or creative activities related to their academic disciplines. In the event that such faculty member takes a leave during the specified five-year period, the period will be extended by one year. Upon receiving appointment with tenure, the faculty members specified above shall receive six (6) contact hours of reassigned time to be used during the three (3) succeeding academic years, beginning with the year in which tenure becomes effective. In the event that such faculty member receives a fellowship leave or takes other leave during the specified three-year period, the period will be extended by one year. Assignment of such reassigned time will be made by the college pursuant to guidelines designed to encourage scholarship.

**Amend** Article 15.1 (f) as follows:

For the purpose of calculating the reassigned time provided in paragraphs (d) 2., (e) 1. and (e) 2. above to untenured Assistant Professors, untenured Associate Professors and untenured Professors employed as faculty counselors or as faculty librarians, 12 contact hours shall be equivalent to the number of clock hours that would be necessary to provide full reassigned time to a faculty counselor or a faculty librarian for 15 weeks. Assignment of such reassigned time will be made by the college pursuant to guidelines designed to encourage scholarship.

## Baruch College Workload Credit in Executive Degree and International Master's Programs:

The parties agree to a five-year pilot program, beginning with the 2019-2020 academic year and continuing through the end of the 2023-2024 academic year, as follows:

In the Baruch College executive master's degree, dual master's degree and international executive master's degree cohort programs listed below, in which instruction during the summer annual leave period as defined in Section 14.1 of the collective bargaining agreement is an intrinsic part of the program, tenured and certificated full-time faculty members who agree to teach courses during the summer annual leave period may elect to receive workload credit under Appendix A of the collective bargaining agreement or to be paid at the appropriate professorial hourly rate for such teaching contact hours during summer annual leave, subject to approval by their department chair. Members of the teaching faculty who receive workload credit for teaching contact hours during the period of summer annual leave shall receive no additional compensation for such teaching contact hours.

For purposes of managing the annual undergraduate teaching contact hour workload under Appendix A, teaching contact hours during the summer annual leave period for which workload credit is received shall be considered part of the annual workload in the academic year in which they occur; i.e., in the academic year starting with the previous Fall semester, unless the faculty member is in his/her final year of the three-year workload averaging period, in which case the workload credit for teaching during the summer annual leave period may be considered part of the annual workload in the following academic year. The workload credit received for such courses shall be identical to the workload credit that would have been received if such courses had been taught during the regular academic year.

The parties will meet and negotiate over inclusion of additional programs during the period of the pilot program, should any such programs be created by the college. It is the intention of the parties that such newly created programs be included in the pilot to the extent they comply with the criteria above.

## Baruch College Year-Round Cohort Programs

<u>Zicklin School of Business</u>

- Executive Master of Business Administration (EMBA)
- EMBA in Health Care Administration
- Executive Master of Science (EMS) in Finance
- EMS in IS (Information Systems)
- EMS in Human Resources Management
- EMS in Finance in Sao Paulo, Brazil*
- EMS in Entrepreneurship in Sao Paulo, Brazil*
- MBA-MS in Entrepreneurship with College of Management in Israel
- MBA-MS in Finance with Peking University HSBC Business School (PHBS)
- MBA-MS in Finance with Renmin University of China (RUC)
- MBA-MS in Finance with University of Science and Technology Beijing (USTB)
- MBA-MS in Finance with Xi'an Jiaotong University (XJU)
- MBA-MS in Finance with Shanghai International Studies University (SISU)
- MSFA-MS in Finance with Free University of Bozen-Bolzano and University of Padua in Italy

*Inclusion of these programs is contingent upon their receiving final approval in a form consistent with the criteria above.

<u>Weissman School of Arts & Sciences</u>

- MA in Mental Health Counseling
- MS in Industrial/Organizational Psychology, Singapore program

<u>Marxe School of Public and International Affairs</u>

- Executive Master of Public Administration (EMPA)

**<u>Multi-Year Appointments for Teaching Adjuncts</u>:**

**Amend** paragraph 1 of Appendix E of the collective bargaining agreement to provide that the pilot program will be extended through the end of the 2023-2024 academic year.

**Amend** paragraph 2 of Appendix E of the collective bargaining agreement as follows:

An employee who has served as a teaching adjunct and who has taught at least six (6) contact teaching hours per semester within the same department of the college for the 10 most recent consecutive semesters (excluding summer sessions) preceding the effective date of the three-year appointment shall be considered for a three-year appointment, subject to the comprehensive review and assessment referenced in paragraph "4" below. Up to four semesters of substitute service in a teaching title within the same department of the college may be counted as qualifying service. The first three-year appointments shall begin in the Fall 2017 semester, and <u>three-year appointments</u> will continue to be available starting in each fall semester through Fall <u>2023</u>. Adjuncts shall be notified on or before May 15th concerning appointment or non-reappointment for a three-year period.

<u>With the start of the Fall 2019 semester, the following eligibility criteria, in addition to the criteria in the paragraph above, shall be in effect. An employee who has served as a teaching adjunct and who has taught at least six (6) contact teaching hours per semester within the same department of the college for at least 10 of the 12 most recent consecutive semesters (excluding summer sessions) preceding the effective date of the three-year appointment shall be considered for a three-year appointment, subject to the comprehensive review and assessment referenced in paragraph "4" below, provided that the adjunct was initially assigned to teach at least six (6) contact hours in the semester(s) resulting in the lack of continuity and that the adjunct lost no more than one course owing to insufficient enrollment or reassignment of the course to another faculty member and/or that</u>

the adjunct lost one or more courses owing to medical reasons in the semester(s) at issue. A teaching adjunct who believes that his or her service in at least 10 of the 12 most recent semesters counts as qualifying service as set forth herein must self-identify to the college Human Resources Office and the department chair no later than the end of the second week of the Spring semester in which he or she would be considered for the three-year appointment; the college shall determine whether the adjunct meets the eligibility criteria set forth herein for consideration for a three-year appointment and shall notify the adjunct whether he/she is eligible to receive consideration for such appointment.

In rare instances in which a department Personnel and Budget Committee determines that an eligible adjunct will not be reappointed to a three-year appointment but could benefit from a one-year appointment and additional guidance, the adjunct shall be appointed to a one-year appointment. At the end of the one-year appointment, the adjunct must be considered for a three-year appointment.

### Expanding Access to the New York State Health Insurance Program for Graduate Employees:

The University will make available up to $700,000 to enable doctoral students in their first five years of enrollment in a Ph.D. program who were not previously enrolled in the New York State Health Insurance Program (NYSHIP) and who have been admitted to a Ph.D. program on a tuition-only basis to receive health insurance through the New York State Health Insurance Program to the extent that such students are appointed to titles within the PSC bargaining unit and meet the eligibility requirements for New York State Health Insurance Program coverage. The funds will be made available as follows: $175,000 effective January 1, 2020; $175,000 effective July 1, 2020; $200,000 effective February 1, 2021; and $150,000 effective July 1, 2021. A labor/management committee will be established no later than December 1, 2019, to discuss implementation of expanded access to the New York State Health Insurance Program for graduate employees.

### Graduate Employee Issues Labor/Management Committee:

The Committee established to discuss implementation of NYSHIP will also explore consideration of graduate employee teaching service as qualifying service for multi-year adjunct appointments and, by mutual agreement, other issues relevant to graduate employment.

### Graduate Assistant Appointment:

**Amend** the third paragraph of Article 11.2 as follows:

No persons shall be appointed to the title Graduate Assistant more than <u>five</u> years consecutively except when special permission is requested by the executive officer of the doctoral program in which the student is enrolled and the Chairperson of the department in which he or she is employed. In no instance shall such extensions be granted for more than two additional appointments. Appointments may be for less than one year.

### Graduate Assistant B Workload:

**Amend** the second sentence of Article 15.3, Section "Graduate Assistant B," as follows:

If a Graduate Assistant B also holds an adjunct or other hourly position, his or her total assignment may not exceed <u>270</u> contact hours or 450 hours of non-teaching assignment during the work year.

### Graduate Employee Tuition Waivers:

Effective with the start of the Spring 2020 semester, tuition at the Doctor of Philosophy Level 3 Resident rate shall be waived for up to four additional semesters (normally, years 6 and 7 of enrollment) for students who have completed 10 semesters of enrollment in a Doctor of Philosophy program and who are employed in a title recognized under Article 1 of the Collective Bargaining Agreement. Students who meet the eligibility criteria above and whose tuition is at a higher rate than the Doctor of Philosophy Level 3 Resident rate shall have the portion of their tuition equivalent to the Doctor of Philosophy Level 3 Resident rate waived under the terms stated herein.

## Non-Teaching Adjuncts and Adjunct CLTs, Professional Development:

**Amend** Article 33.5 (f) on the HEO/CLT Professional Development Fund as follows:

Full-time employees in Higher Education Officer Series and College Laboratory Technician Series titles will be eligible to apply for professional development grants as set forth herein. Employees in adjunct College Laboratory Technician titles and Non-Teaching Adjunct titles will also be eligible to apply, provided that they are working an average of 10 or more hours per week during the semester in which application is made and have worked an average of 10 or more hours per week for four consecutive semesters (not including summer sessions) immediately preceding the semester in which application is made. Eligible employees will apply by using the standard application form. The application will explain how the professional development activity is related to the employee's position at the University and to the employee's own professional development.

## Research Accounts for Department Chairs:

**Amend** Article 25 by including the following as 25.6 and renumbering the current 25.6 as 25.7:

Effective February 1, 2021, the University will establish a research account at the CUNY Research Foundation for each department chair and Graduate Center executive officer represented by the PSC. The University will deposit $1,750 in the research account of each department chair and Graduate Center executive officer on February 1, 2021, and $3,000 on September 1, 2021, and on or before September 1 every year thereafter. The account is to be used to further the scholarly and/or creative activities of the department chair or executive officer and will be governed by the same guidelines that apply to the PSC-CUNY Research Awards Program. Unused funds may be rolled over to the subsequent year (including the year after the department chair or executive officer leaves office), but must be expended within that year. Any funds not expended within the subsequent year shall be returned by the CUNY Research Foundation to the PSC-CUNY Research Awards account. Funds in the amount of 10 percent of the total deposited in all department chair research accounts annually will be provided to the CUNY Research Foundation on February 1, 2021, September 1, 2021, and every September 1 thereafter to support administrative costs.

## HEO/CLT Professional Development Fund:

**Amend** the first paragraph of Article 33.5 of the collective bargaining agreement as follows:

Effective January 1, 2020, the annual sum of $807,442 and, effective February 1, 2021, and annually thereafter, the annual sum of $1,047,442 University-wide will be allocated to provide opportunities for professional development for employees in Higher Education Officer series, College Laboratory Technician series titles, and Non-Teaching Adjunct titles. Guidelines for the implementation of this provision are as follows:

**Amend** Article 33.5 (k) to delete the first sentence and replace as follows:

A sum equal to 7.5 percent of the annual $807,442 allocation to the Fund (i.e., $65,604) will be deducted by the PSC upon receipt of the funds. Thereafter, a sum equal to 7.5 percent of the annual $1,047,442 allocation to the Fund (i.e., $78,558) will be deducted annually from the

A.252

HEO/CLT Professional Development Fund by the PSC to support administrative costs. The PSC will provide an annual itemized accounting of these expenses.

## Adjunct Professional Development Fund:

**Amend** Article 33.6 of the collective bargaining agreement to add the following paragraph:

Effective January 1, 2020, the University will provide the sum of $660,000 annually to the Adjunct Professional Development Fund. If the funds provided in any fiscal year are not fully expended in the fiscal year, they may be rolled over into the next fiscal year. Guidelines for the implementation of this provision are contained in Appendix B.

**Amend** Appendix B, section 7, by replacing the third sentence as follows:

A sum equal to 7.5 percent of the annual $660,000 allocation to the Adjunct Professional Development Fund (i.e., $49,500) will be deducted from the Fund annually by the PSC to support administrative costs.

## Travel Allowances:

**Amend** Article 28 of the collective bargaining agreement as follows:

Effective January 1, 2020, the University shall provide the sum of $1,863,236 annually for use by members of the bargaining unit for attendance at professional meetings and conferences. The allocation of travel funds at each college shall be made by the appropriate college official or college committees.

## Classroom Teaching Observations of Online Courses:

**Amend** Article 18.2 (b) 1 and **add** a new section, Section 18.2 (b) 3, as follows:

18.2 (b) 1. Regardless of the mode of instruction, at least once during each academic semester, non-tenured and non-certificated members of the teaching staff shall be observed for a full classroom period. One observation shall take place during any scheduled class, except as specified below in Article 18.2 (b) 3 for classes conducted wholly or in part through online technology, during the first ten weeks of the semester. Except as otherwise provided, the employee shall be given no less than 24 hours of prior notice of observation.

Tenured and certificated members of the teaching staff may be observed once each semester.

18.2 (b) 3. Teaching Observations for Online Courses:

a. For teaching observations of online or partially online courses, the parties intend to replicate as closely as possible the longstanding teaching observation practices established pursuant to this Agreement. Therefore, the provisions of Article 18.2 (b) 2 shall apply except as specifically modified herein.

b. In a fully online synchronous course (that is, a course that meets online for 100% of the semester's class meetings with a regularly scheduled class period during which students and the instructor are online at the same time), the designated observer shall be given limited access to the course platform, usually defined as "student" or "guest" access but in no event "instructor" or "administrator" access, only for the scheduled class period to be observed. Via the method for announcements normally employed by the instructor in the course, the instructor shall inform the students that the teaching observation is occurring. In no event shall the classroom teaching observation memorandum refer to the conduct of course activities outside of the observation period.

c. In a fully online asynchronous course (that is, a course conducted entirely online without a scheduled class period), the designated observer shall be given limited access to the course platform, usually defined as "student" or "guest" access but in no event "instructor" or "administrator" access, for no more than a 48-hour period that will commence at a specified time not earlier than seven calendar days after the notice of the teaching observation has been given to the instructor.  Within 48 hours of receiving notice of the observation, the instructor shall inform the students of the teaching observation and its beginning and end time via the method for announcements normally employed by the instructor in the course.

d. In a fully online mixed course (that is, a course conducted entirely online using both synchronous and asynchronous instruction), the teaching observation shall take place according to the procedures for a fully online synchronous course, as specified above.  At the request of the instructor, and with the   consent of the Department Chairperson, the teaching observation may be conducted as it would be for a fully online asynchronous course, as specified above.

e. In a hybrid or blended course (that is, a course in which some face-to-face classroom periods are replaced by online instruction or any other modality that is not face-to-face), the following rules shall apply:

   i. If at least 50% of the class sessions are conducted in a traditional face-to-face classroom setting, the observation shall normally take place during a face-to-face classroom period as set forth in Article 18.2(b).  At the request of the instructor, and with the consent of the Department Chairperson, the observation may be conducted during an online class session.  In such cases, the observation shall be conducted according to the procedures for a fully online synchronous course or a fully online asynchronous course, as applicable.

   ii. If fewer than 50% of the class sessions are conducted in a traditional face-to-face classroom setting, the observation shall be conducted according to the procedures for a fully online synchronous course or a fully online asynchronous course, as applicable.

   iii. The Department Chairperson may decide that an instructor teaching a hybrid course who has been observed under this provision may have his or her next observation conducted in the other modality used for the course.

f. For observations of other than a fully online synchronous course, the observer shall not review online activity that occurred more than seven calendar days prior to the 48-hour period of access to the course platform, nor shall the post-observation memorandum refer to any course activities that occurred more than seven calendar days prior to the 48-hour period of access.

g. For a fully online course, the post-observation conference set forth in Article 18.2.b may be held, at the request of the instructor, in person, by telephone, or by video conference.


## Classroom Teaching Observations by Other Departments or Programs:

**Amend** Article 18.2 (b) to add a new section, 18.2 (b) 4, as follows:

Effective with the start of the Fall 2019 semester, teaching members of the instructional staff who are assigned to teach a majority of their classes in any given semester in a department or program other than the one to which they are appointed may be observed by a member of the other department or program, if requested by the chairperson of the department to which the faculty member to be observed is appointed.  Following such request, if the faculty member to be observed does the majority of his/her teaching in another academic department, the chairperson of that department shall select the observer from that department's panel of observers.  If the faculty member to be observed does the majority of his/her teaching in a program, the observer will be designated by the chairperson of the faculty member's appointing department, in consultation with the director of the program.  The observer must be a teaching member of the instructional staff.

All other provisions of 18.2 (b) apply, and all references therein to "the department" shall be understood to mean the department in which the faculty member to be observed is appointed.

## Annual Evaluations involving other Departments or Programs:

**Amend** Article 18.3 (a) to add the following paragraph:

Effective with the 2019-2020 academic year, in evaluating members of the teaching instructional staff who, in a given academic year, teach the majority of their classes in a department or program other than the one to which they are appointed,  their department chairperson or the members of the departmental P&B committee assigned by their chairperson to conduct the annual evaluations may consult with the director of the program or the chairperson of the other department in which the instructional staff members have taught the majority of their classes and may discuss the comments of the director of the program or the chairperson of the other department during the evaluation conference and reference the discussion in the evaluation memorandum.

## Obligation to Pay:

The PSC's obligation to pay $9.76 million out of this settlement will be rolled forward and will become an obligation to be paid out of the settlement of the successor to this 2017-2023 agreement.

# Recognition:

The parties agree to amend Article 1.1 to add "Postdoctoral Fellow" to the list of titles for which the PSC is the exclusive collective negotiating representative, subject to reaching agreement on which contractual provisions will be applicable to this title. It is understood by the parties, however, that employees serving in the title Postdoctoral Fellow on the effective dates of across-the-board increases in paragraph III above shall receive those increases.

**Amend** Article 1.1 as follows:

**Add** "Associate Vice Chancellor" and "Executive Assistant to the Associate Vice Chancellor" to the list of excluded titles.

**Add** footnote "j" to the Associate Vice Chancellor title.  Footnote "j" shall provide as follows:

Not more than one excluded Executive Assistant per Associate Vice Chancellor and not more than four in total, provided that no incumbent Executive Assistant's representation status shall be changed.

**Amend** footnote "h" to provide as follows:

Not more than two members of the instructional staff in addition to the Dean of Executive Search and Evaluation.  Effective January 1, 2020, not more than three members of the instructional staff in addition to the Dean of Executive Search and Evaluation, provided that no incumbent employee's representation status shall be changed while he/she remains in his/her current position.

## Union Dues and Membership:

**Replace** Article 4 effective June 28, 2018,  as follows:

4.1      **Check-Off**:

a)      The University agrees to the principle of exclusive check-off of annual PSC dues on behalf of each represented employee who elects to join the union in amounts to be determined by the PSC in accordance with the forms and procedures approved by the appropriate offices of the City of New York or State of New York. Authorizations to withhold dues will be reported to the appropriate office of the University. The employer (or its designee) shall commence deduction of dues as soon as practicable, but in no case more than 30 days after receiving the report from PSC of a signed dues authorization card and shall ensure the prompt remission of dues to the PSC.

b)      The right to membership dues shall remain in effect until: 1) the employee is no longer employed at CUNY in a position represented by the PSC; or 2) the PSC notifies the University that the employee has revoked his/her dues check-off authorization.

i.      When an employee is re-employed at the same college within a period of one year in a title represented by the PSC, the employee shall continue to be covered by the same dues check-off authorization card and not be required to sign another authorization card. The University will issue appropriate administrative instructions to all colleges to insure compliance with this provision.

ii.      When an employee in a PSC title is promoted or reclassified to another title represented by the PSC, the dues check-off shall continue uninterrupted. The University will issue appropriate administrative instructions to all colleges regarding this provision.

iii.      When an employee in a PSC title returns from an approved leave of absence, with or without pay, or from a layoff, or is reappointed or temporarily appointed in the same or another title represented by the PSC, any dues check-off authorization in effect prior to the approved leave of absence or layoff shall be reactivated.

### 4.2     New Member Information and Orientations:

a)      Within thirty (30) days of an employee's first being employed, re-employed, newly promoted or transferred to the PSC bargaining unit, the University shall notify the PSC of the employee's name, job title, employing college or unit, CUNY ID number, last 4 digits of the Social Security number, department, work location, work email address, home address, and work phone number, to the extent that one has been designated in CUNYfirst.

b)      Where orientation kits are supplied to new employees, the PSC shall be permitted to have union literature included, provided such literature is acceptable to the University Office of Human Resources Management. Online orientation materials shall include an electronic link to the PSC website, and PSC membership cards provided to the colleges by the PSC shall be available in the college Human Resources offices.

c)      Within sixty (60) days of an employee's first being employed, re-employed, newly promoted or transferred to the PSC bargaining unit, the University shall allow a duly appointed representative of the PSC to meet with such employee for a reasonable amount of time during his or her work time, without charge to leave credits, provided that such meeting is scheduled in consultation with a designated representative of the college or constituent unit of the University to which the employee is appointed.  This requirement may be satisfied for employees attending a formal employee orientation program by allowing PSC representative/s a reasonable amount of time during the program to provide membership information to employees.

### **Information and Data**:

**Amend** Article 5.2 as follows

5.2     The University shall make available to the PSC:

(a)     Two copies of the proposed Annual University Budget immediately upon its receipt by the Board.

(b)     The name, title, salary, <u>CUNY ID number</u>, college, department and tenure status of each member of the negotiation unit<u>, and whether an employee is in a substitute title</u>.  Such data shall be made available in <u>electronically sortable format</u> once during each Fall and Spring semester,<u> by October 15 and March 15</u>.

The parties will enter into a side letter eliminating the University's reporting obligation under paragraph 16. of the Substitute Settlement Agreement.

### Appointment and Reappointment, Article 9.10 Appeals:

**Amend** Article 9.10 to provide that the pilot program referenced in the Article will extend through the end of the 2023-2024 academic year.

### Select Faculty Committee:

**Amend** the first paragraph in section 20.5 (c) 1. to add a sentence at the end of the paragraph as follows:

<u>Members of the Select Faculty Committee shall receive a $600 stipend for their service.  The University shall pay $300 and the PSC shall pay $300 to each Select Faculty Committee member following receipt of the committee's decision.</u>

### Notification of Appointment for Teaching Adjuncts:

**Amend** the first paragraph of Article 10.1 (a) 3. as follows:

Persons in adjunct titles hired on a semester basis shall receive such notice on or before December 1 in the Fall semester or May <u>15</u> in the Spring semester. Such notification of appointment shall be subject to sufficiency of registration and changes in curriculum, which shall be communicated to the employee as soon as they are known to the appropriate college authorities.

### Special Leaves for Childcare:

The parties agree to update Article 16.8 and will meet following the implementation of New York State Paid Family Leave for that purpose.

### Scheduling Options for Paid Parental Leave:

**Replace** Paragraph 4 of the Letter Agreement on Paid Parental Leave as follows:

4.   Full-time classroom teaching members of the Instructional Staff (hereinafter "teaching faculty" or "faculty")[1] may elect one of the options below in lieu of taking eight weeks of paid parental leave immediately following the birth or adoption of a child (or immediately following the expiration of approved use of temporary disability leave for the birth mother), as set forth in paragraph 3 above. The election shall be made at the time he/she files his/her notice of intent to take paid parental leave.

    a. In the event there are five or fewer weeks remaining in the semester at the time the faculty member becomes eligible to take paid parental leave (*i.e.,* upon the birth or adoption of the child or upon the expiration of the approved temporary disability leave for the birth mother), he/she may elect to take paid parental leave for the remainder of that semester and to receive a 3-contact-hour release in the next semester; if the faculty member does not so elect, she/he

12/29/21, 5:54 PM
Case 1:22-cv-01021-DLI-CLP Document 1-1 Filed 06/22/22 Page 262 of 279
Memorandum of Agreement 2019 page 261 of 279

will be entitled to take the remaining weeks of paid parental leave (*i.e.,* up to the full eight weeks) in the next semester.

b. A faculty member who becomes eligible for paid parental leave during the period of annual leave as set forth in section 14.1 of the PSC/CUNY collective bargaining agreement may elect either i) to take eight weeks of paid parental leave commencing effective with the first day of the Fall semester following the period of annual leave (or at the expiration of the approved period of temporary disability leave for a birth mother, to the extent that such period extends into the Fall semester), or ii) to receive a 6-contact-hour release to be taken in the Fall semester following the period of annual leave or in the following Spring semester, or to receive a 3-contact-hour release in each of those semesters. The scheduling option is subject to the approval of the department chair.

c. It is the intention of the parties that a faculty member not be on leave for two semesters; faculty, accordingly, are encouraged to utilize the course release option in subparagraph b) above, as appropriate.

## Disciplinary Actions, Article 21:

**Amend** the first paragraph of Article 21 as follows:

The provisions set forth in Appendix H supersede the provisions in Article 21 below during a pilot period starting with the 2016-2017 academic year and extending through the end of the 2023-2024 academic year.

## Distinguished Professors:

**Amend** Article 23.1 such that effective with the 2019-2020 academic year, the number of positions shall not exceed 300.

## Eligibility for Fellowship Award (Sabbatical):

**Amend** Article 25.3 (a) as follows:

Eligibility: It is the intention of the parties that the funds for fellowship awards be limited to instructional staff members of the permanent instructional staff. Tenured members of the permanent instructional staff (including, for these purposes, instructional staff who have been approved for tenure effective the following September 1), and those holding the title Lecturer with a certificate of continuous employment, who have completed six years of continuous paid full-time service with the University exclusive of non-sabbatical or fellowship leave shall be eligible for a fellowship award. Individuals in professorial titles who are on leave from the title Lecturer with a certificate of continuous employment shall be eligible for a fellowship award. Service shall include service in a school or college maintained in whole or part with City funds immediately preceding service in a college or institution under the jurisdiction of the Board of Trustees, provided that credit for such prior service shall not exceed three (3) years. Fellowship leaves awarded for the Fall semester or for the full academic year shall begin on the day full-time teaching faculty are scheduled to return from annual leave under Section 14.1.

## Clinical Professor - Medical Series:

The parties will establish a labor/management committee to discuss the existing limitations on service in the Clinical Professor - Medical series title under Section 11.7.

## Salaries above Base:

**Amend** the Pilot Program under Second Addendum to Settlement Agreement to provide that the pilot program will extend through the end of the 2023-24 academic year.

A.258

**Add** the following titles as eligible for a salary above base:

- Distinguished Lecturer
- Clinical Professor

## Non-Teaching Adjunct Rates and Assigned Overtime Rates:

**Amend** Article 24.2 (b) to delete the following sentence:

Salary schedules for Non-teaching Adjunct I - V have been added to Article 24, which contains rates applicable to employees who are remunerated at a rate of 60% of the adjunct or hourly rate.

**Amend** the following sentences in Article 24.7 ("Assigned Overtime Rates") effective 8/25/2022, as follows:

a. Counseling

All other non-classroom staff engaged in counseling assignments shall be remunerated at the appropriate non-teaching adjunct or hourly rate.

b. Professional Library Staff

Associate Professors, Assistant Professors and Instructors shall be remunerated in accordance with the appropriate non-teaching adjunct/hourly schedule and in accordance with the stated guidelines.

c. Professional Registrar Staff

Associate Registrars and Assistant Registrars shall be remunerated in accordance with the appropriate non-teaching adjunct/hourly schedule and in accordance with the stated guidelines.

d. Professional Business Management Staff

An employee who was converted from an Assistant Business Manager or Assistant to Business Manager title effective January 1, 1988, to a HEO series title and remains in the converted HEO series title performing the same duties performed in the former Business Manager series title shall be remunerated in accordance with the appropriate non-teaching adjunct/hourly schedule and in accordance with the stated guidelines.

## Continuing Education:

Salary increases in the Supplemental Agreement will conform to the terms of this MOA.

The parties agree to meet prior to January 1, 2020, to discuss CETs in the Math Start program who are appointed as full-time CUNY Start Instructors and their placement on the CUNY Start Instructor salary schedule.

The parties also agree to meet and discuss implementation of an hourly pay rate schedule that incorporates existing service increments for CETs teaching in the Math Start program.

## CLIP and CUNY Start Instructors:

**Amend** Appendix D to provide that CLIP and CUNY Start Instructors hired on an annual basis shall receive written notice of reappointment or non-reappointment on or before July 1.

The parties agree to meet prior to March 1, 2020, to discuss language to be included in Appendix D concerning the location of, content of, and employees' access to their personal personnel files.

The parties also agree to meet and discuss eligibility for Travia Leave and retiree health insurance benefits for CLIP and CUNY Start Instructors in the optional retirement program.

**Hunter Campus Schools Teachers:**

Effective January 1, 2020, $60,000 shall be available for enhancements to the terms and conditions of employment for employees serving in represented titles at the Hunter College Campus Schools. The parties will meet prior to January 1, 2020, to discuss implementation.

**Educational Opportunity Centers:**

Modifications to the terms and conditions of employment for employees of the Educational Opportunity Centers will be covered by a separate Memorandum of Agreement. EOC salaries will conform to the terms of this MOA.

**Legislative Action:** It is agreed by and between the parties that any provision of this agreement requiring legislative action to permit its implementation by amendment of law or by providing the additional funds therefor shall not become effective until the appropriate legislative body has given approval.

**Savings Clause:** In the event that any provision of this Memorandum of Agreement is found to be invalid, such invalidity shall not impair the validity and enforceability of the remaining provisions.

**Approval and Ratification:** This Memorandum of Agreement is subject to approval by the Board of Trustees of The City University of New York and ratification by the membership of the Professional Staff Congress/CUNY and is subject to State and City funding guidelines and the costing analyses of The State of New York and The City of New York.

**Enforceability:** It is agreed by and between the parties that this Memorandum of Agreement shall not become effective and is not enforceable until the appropriate governmental bodies provide adequate funding of the economic package.

For The City University of New York


_____/s/_____

Félix V. Matos Rodríguez                    Date

Chancellor



For the Professional Staff Congress/CUNY

_____/s/_____

Barbara Bowen                              Date

President

---

[1] It is understood and agreed that the provisions of this policy pertaining to teaching faculty also apply to faculty counselors hired prior to September 1, 1998.

**Source URL:** https://psc-cuny.org/contract/memorandum-agreement-2019

**Links:**
[1] https://psc-cuny.org/contract/memorandum-agreement-2019

A.261

# Exhibit C

PSC's Resolution in Support of the Palestinian People

## Resolution in Support of the Palestinian People
### June 10, 2021

Whereas, as an academic labor union committed to anti-racism, academic freedom, and international solidarity among workers, the PSC-CUNY cannot be silent about the continued subjection of Palestinians to the state-supported displacement, occupation, and use of lethal force by Israel; and

Whereas, beginning on May 15, 2021, the escalating violence against Palestinians in East Jerusalem and Gaza killed hundreds of Palestinians, injured thousands more, and destroyed entire neighborhoods, including hospitals, schools, and residences; and

Whereas, on May 18, 2021, Palestinian workers across the region staged a general "strike for dignity" as a demonstration of unity and support for the residents of targeted communities; and

Whereas, Israel's pattern and practice of dispossession and expansion of settlements, dating back to its establishment as a settler colonial state in 1948, has been found to be illegal under international law, international human rights organizations such as Human Rights Watch and B'Tselem have designated these practices of Israel as "apartheid" and a regime of legalized racial discrimination perpetrated against the Palestinian people; and the International Criminal Court has opened an investigation into these practices; and

Whereas, the PSC-CUNY condemns racism in all forms, including anti-Semitism, and recognizes that criticisms of Israel, a diverse nation-state, are not inherently anti-Semitic; and

Whereas, state-sponsored policies of settler colonialism link the Palestinian struggle for self-determination to the struggles of Indigenous people and people of color in the United States; and

Whereas, since World War II, Israel has been the largest overall recipient of U.S. foreign aid, including $3.8 billion in 2020, the vast majority of which was military assistance; and

Whereas, by failing to challenge the U.S. government's support for Israeli expansionism and violent incursions in the occupied territories, U.S. labor organizations have largely given approval to these policies; and

Whereas, in 2016, the PSC-CUNY "Resolution on the Freedom of Speech and Assembly for All Faculty, Staff and Students at the City University of New York" affirmed the right of faculty, staff, and students to advocate for campaigns of boycott, divestment, and sanctions without penalty, as protected freedom of speech; therefore be it

**RESOLVED,** that the PSC-CUNY condemns the massacre of Palestinians by the Israeli state; and be it further

**RESOLVED,** that in fall 2021, the PSC-CUNY facilitate discussions at the chapter level of the content of this resolution and consider PSC support of the 2005 call for Boycott, Divestment, and Sanctions (BDS)—a movement launched by 170 Palestinian unions, refugee networks, women's

1

A.263

47    organizations, professional associations and other Palestinian civil society organizations, which
48    calls on "people of conscience in the international community" to act as they did against
49    apartheid South Africa "in the spirit of international solidarity, moral consistency and resistance
50    to injustice and oppression"—and report back on these conversations to the Delegate Assembly
51    by the end of 2021; and be it further
52
53    **RESOLVED,** that the PSC-CUNY calls on the administration of U.S. President Joe Biden to
54    stop all aid funding human rights violations and an occupation that is illegal under international
55    law.

2

A.264

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVRAHAM GOLDSTEIN; MICHAEL GOLDSTEIN; FRIMETTE KASS-SHRAIBMAN; MITCHELL LANGBERT; JEFFREY LAX; MARIA PAGANO, <br><br> Plaintiffs, <br><br> v. <br><br> PROFESSIONAL STAFF CONGRESS/CUNY; CITY UNIVERSITY OF NEW YORK; JOHN WIRENIUS, in his official capacity as Chairperson of the New York Public Employee Relations Board; ROSEMARY A. TOWNLEY, in her official capacity as Member of the New York Public Employee Relations Board; ANTHONY ZUMBOLO, in his official capacity as Member of the New York Public Employee Relations Board; CITY OF NEW YORK; THOMAS P. DINAPOLI, in his official capacity as New York State Comptroller, <br><br> Defendants. | No. 22 Civ. 321 (PAE) (JEW) <br><br> **NOTICE OF MOTION BY STATE DEFENDANTS TO DISMISS THE COMPLAINT** |

**PLEASE TAKE NOTICE** that, upon the Complaint, dated January 12, 2022, the Declaration of Amanda Ciano, dated April 19, 2022, the exhibits annexed thereto, the accompanying Memorandum of Law, dated April 20, 2022, and all prior pleadings and proceedings herein, Defendants The City University of New York, John Wirenius, as Chair of the New York Public Employment Relations Board ("PERB"), Rosemary A. Townley and Anthony Zumbolo, as Members of PERB, and Thomas P. DiNapoli, as Comptroller of the State of New York (together, the "State Defendants"), by their attorney, Letitia James, Attorney General of New York, will move this Court before the Honorable Paul A. Engelmayer, at the United States Courthouse for the Southern District of New York, located at 40 Foley Square, New York, NY 10007, for an order, pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure, dismissing the Complaint as against them with prejudice and without leave to amend, for lack of subject matter jurisdiction and for failure to state a claim, together with such other and further relief as the Court deems just and proper.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Court's order dated March 9, 2022 (ECF 47), any opposing papers shall be served on or before May 24, 2022.

Dated:  New York, New York  
       April 20, 2022

LETITIA JAMES  
Attorney General  
State of New York  
*Attorney for State Defendants*  
By:  Jonathan A. Siegel          
Jonathan A. Siegel, Assistant Attorney General  
28 Liberty Street, New York, NY 10005  
Tel. (212) 416-8888; Jonathan.Siegel@ag.ny.gov

To: all counsel of record (by ECF)

A.266

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AVRAHAM GOLDSTEIN, et al.,

Plaintiffs,

v.

PROFESSIONAL STAFF CONGRESS/CUNY, et al.,
Defendants.

No. 22 Civ. 321 (PAE) (JEW)

**AFFIDAVIT OF
AMANDA CIANO**

AMANDA CIANO, declares under penalty of perjury that the following is true and correct, pursuant to 28 U.S.C. § 1746:

1.     I am a Payroll Analyst 4 in the Bureau of State Payroll Services at the Office of the New York State Comptroller ("OSC"). I have worked for OSC since October 23, 2014, and in my current title since September 16, 2021. As a Payroll Analyst 4, I am primarily responsible for oversight of payroll deductions, including deductions for union dues, retirement contributions and savings plans. I am fully familiar with the facts and circumstances herein based on my personal knowledge, discussions with staff members and a comprehensive review and analysis of the relevant records.

2.     I make this affidavit in support of the State Defendants' motion to dismiss the Plaintiffs' Complaint.

3.     Defendant Thomas P. DiNapoli is the Comptroller of the State of New York, the State's chief fiscal officer.

4.     OSC is responsible for processing the State's payroll, including processing required payroll deductions and authorized deductions (e.g., union dues) from the salaries of public employees.

5.     Plaintiffs Frimette Kass-Shraibman and Mitchell Langbert ("Plaintiffs") receive paychecks issued by OSC for services provided to the City University of New York ("CUNY"). Payment is made based on a certified payroll submitted by CUNY.

6.     Plaintiffs are former members of the Professional Staff Congress ("PSC"), a public

-1-

A.267

employee union certified to provide collective bargaining representation to State employees belonging to Plaintiffs' bargaining unit.

7.      Pursuant to Section 208(1)(b) of the Civil Service Law, OSC previously deducted union dues from Plaintiffs' paychecks based on their membership in PSC and transmitted the deducted funds to PSC.

8.      As set forth in OSC CUNY Bulletin No. CU-625.5, union membership information is maintained by the relevant union and any requests regarding the initiation, cessation or modification of union due deductions must be submitted by the unions themselves via electronic file submissions to OSC.

9.      OSC is not a party to the relationship between the unions and their members and has no role in administering the membership of a private union, including the process for initiating and severing union membership. Therefore, OSC must rely upon the unions for information necessary to determine whether and when a member/union relationship has been initiated, severed or otherwise changed.

10.     In this regard, PSC previously submitted requests to the State's payroll system to terminate the deductions of union dues from the wages of Plaintiffs. PSC's termination requests have been fully processed, and the deductions of union dues from Plaintiffs' wages have ceased, as briefly discussed below.

11.     Plaintiff Frimette Kass-Shraibman has three current employment records in the State's payroll system. She is employed as a full-time professor at CUNY – Brooklyn College. This full-time position is represented in the State's payroll system as "employment record 1." She is also employed as an adjunct professor at CUNY – Brooklyn College, which is represented in the State's payroll system as "employment record 2," and as an adjunct professor at the CUNY School of Professional Studies, which is represented in the State's payroll system as "employment record 3."

A.268

12.     The dues deductions for her full-time position were terminated effective November 18, 2021, as reflected on the payroll record attached as Exhibit 1.

13.     The dues deductions for her adjunct position at the School of Professional Studies were terminated effective December 30, 2021, as reflected on the payroll record attached as Exhibit 2.

14.     On March 10, 2022, PSC submitted a request to the State's payroll system to stop the dues deductions for Plaintiff Kass-Shraibman's adjunct position at Brooklyn College. Although she was not receiving any wages for this position at the time, the stop request took effect immediately. A copy of the payroll record reflecting the cessation of dues deductions for Plaintiff Kass-Shraibman's adjunct position at Brooklyn College is attached as Exhibit 3.

15.     Plaintiff Mitchell Langbert has one active employment record in the State's payroll system. The dues deductions for Plaintiff Langbert were terminated effective January 27, 2022, as reflected on the payroll record attached as Exhibit 4.

16.     The union dues deductions from the paychecks of Plaintiffs Kass-Shraibman and Langbert have been discontinued and will not resume unless and until Plaintiffs sign new membership cards authorizing the deduction of membership dues from their paychecks and the union submits the electronic file to OSC.

Executed on April 19, 2022 in Albany, New York.

_Amanda Ciano_
Amanda Ciano

-3-

A.269



Exhibit 1

General Deduction Data

## General Deduction

Empl ID N01300535 KASS-SHRAIBMAN,FRIMETTE

Empl Record 1

Primary Empl Record: ☑

Company CNY CITY UNIVERSITY OF NEW YORK

### General Deduction

1 of 11 | View All

*Deduction Code 274 PSC DUES

### Deduction Details

1 of 1 | View All

*Effective Date 11/18/2021

Calculation Routine Default to Deduction Table

Deduction End Date 11/18/2021

Goal Amount

Deduction Rate or %

Flat/Addl Amount

Current Goal Balance

☐ OSC/Agency Deduction Override

This data was last updated by System

Data last updated on 11/19/2021



**Exhibit 2**



Exhibit 3

**General Deduction Data**

## General Deduction

Empl ID N01300535 KASS-SHRAIBMAN,FRIMETTE

Empl Record 2

Primary Empl Record: ☐

Company CNY CITY UNIVERSITY OF NEW YORK

**General Deduction** 1 of 2 | View All

*Deduction Code 467 Adjunct Dues PSC

**Deduction Details** 1 of 1 | View All

*Effective Date 03/10/2022

Calculation Routine Default to Deduction Table

Deduction End Date 03/10/2022

Goal Amount

Deduction Rate or %

Flat/Addl Amount

Current Goal Balance

☐ OSC/Agency Deduction Override

This data was last updated by System

Data last updated on 03/11/2022



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
                                         :

AVRAHAM GOLDSTEIN; MICHAEL        :
GOLDSTEIN; FRIMETTE KASS-SHRAIBMAN;  :
MITCHELL LANGBERT; JEFFREY LAX; MARIA  :
PAGANO,                                :

                   Plaintiffs,        :   Civil Action No. 1:22-cv-321

            vs.                  :

PROFESSIONAL STAFF CONGRESS/CUNY;   :
CITY UNIVERSITY OF NEW YORK; JOHN    :
WIRENIUS, in his official capacity as Chairperson  :
of the New York Public Employee Relations Board;  :
ROSEMARY A. TOWNLEY, in her official capacity  :
as Member of the New York Public Employee   :
Relations Board; CITY OF NEW YORK; THOMAS  :
P. DiNAPOLI, in his official capacity as New York  :
State Comptroller,                        :

              Defendants.      :
                                           :
------------------------------------------------------------ x

## **DEFENDANT PROFESSIONAL STAFF CONGRESS/CUNY'S MOTION TO DISMISS THE COMPLAINT**

     PLEASE TAKE NOTICE that Defendant Professional Staff Congress/CUNY moves this

Court to dismiss Counts I and II against it pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure, dismiss Count III insofar as it seeks prospective relief pursuant to Rule 12(b)(1) of

the Federal Rules of Civil Procedure, and grant such other and further relief as the Court deems

just and proper.

     In support of this motion, we submit a Memorandum of Law and the affidavit of Denyse

Procope-Gregoire.

A.274

Dated: New York, New York
     April 20, 2022

/s/ Scott A. Kronland
Scott A. Kronland
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone: (415) 421-7151
skronland@altshulerberzon.com

/s/ Hanan B. Kolko
COHEN, WEISS AND SIMON LLP
900 Third Avenue, Suite 2100
New York, New York 10022
Telephone: (212) 356-0214
hkolko@cwsny.com

*Attorneys for Defendant Professional
Staff Congress/CUNY*