# No. 23-384

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**
————————

AVRAHAM GOLDSTEIN; MICHAEL GOLDSTEIN; FRIMETTE KASS-SHRAIBMAN;
MITCHELL LANGBERT; JEFFREY LAX; MARIA PAGANO,

*Plaintiffs-Appellants,*

v.

PROFESSIONAL STAFF CONGRESS/CUNY; CITY UNIVERSITY OF NEW YORK; JOHN
WIRENIUS, in his official capacity as Chairperson of the New York Public Employee
Relations Board; ROSEMARY A. TOWNLEY, in her official capacity as Member of the
New York Public Employee Relations Board; ANTHONY ZUMBOLO, in his official
capacity as Member of the New York Public Employee Relations Board; CITY OF
NEW YORK; THOMAS P. DINAPOLI, in his official capacity as New York State
Comptroller,

*Defendants-Appellees.*
————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
————————

**JOINT APPENDIX
VOLUME II OF II (Pages A.276–A.393)**

Nathan J. McGrath
Danielle R. Acker Susanj
THE FAIRNESS CENTER
500 North Third Street, Suite 600B
Harrisburg, Pennsylvania 17101
Telephone: 844.293.1001

Milton L. Chappell
William L. Messenger
Glenn M. Taubman
c/o National Right to Work Legal
Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Telephone: 703.321.8510

*Attorneys for Plaintiffs-Appellants*

*(cover continued on next page)*

Scott A. Kronland
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone: 415.421.7151

Hanan B. Kolko
COHEN, WEISS AND SIMON LLP
900 Third Avenue, Suite 2100
New York, New York 10022
Telephone: 212.563.4100

Peter Zwiebach
Professional Staff Congress
61 Broadway, Suite 1500
New York, New York 11105
Telephone: 212.354.1252

*Attorneys for Defendant-Appellee PSC-CUNY*

David Lawrence III
Office of the New York State
Attorney General
28 Liberty Street
New York, New York 10005
Telephone: 212.416.8023

*Attorneys for Defendants-Appellees City*
*University of New York,*
*Thomas DiNapoli, Rosemary Townley, John*
*Wirenius, and Anthony Zumbolo*

# JOINT APPENDIX TABLE OF CONTENTS

## VOLUME I OF II

**Page**

1. S.D.N.Y. Docket Report, Case No. 1:22-cv-00321-PAE .........................................A.1

2. Complaint (ECF No. 1) ...............................................................................................A.19

3. Exhibit A to Complaint—Collective Bargaining Agreement (ECF No. 1-1) ......A.45

4. Exhibit B to Complaint—Memorandum of Agreement (ECF No. 1-2) .......... A.243

5. Exhibit C to Complaint—Resolution (ECF No. 1-3) ........................................ A.262

6. State Defs.' Motion to Dismiss (ECF No. 53) .................................................... A.265

7. Affidavit in Support of State Defs.' Motion to Dismiss (ECF No. 54) ............. A.267

8. Exhibit 1 to Affidavit in Support of State Defs.' Motion to Dismiss
   (ECF No. 54-1) ...................................................................................................... A.270

9. Exhibit 2 to Affidavit in Support of State Defs.' Motion to Dismiss
   (ECF No. 54-2) ...................................................................................................... A.271

10. Exhibit 3 to Affidavit in Support of State Defs.' Motion to Dismiss
    (ECF No. 54-3) ...................................................................................................... A.272

11. Exhibit 4 to Affidavit in Support of State Defs.' Motion to Dismiss
    (ECF No. 54-4) ...................................................................................................... A.273

12. PSC's Motion to Dismiss (ECF No. 56) ............................................................. A.274

# VOLUME II OF II

13. Order Requesting Joint Letter on Count Three Claims (ECF No. 79) ............ A.276

14. Joint Letter Re. Count Three Claims (ECF No. 80) ............................................. A.277

15. Memo Endorsement from Judge Re. Joint Letter (ECF No. 81) ...................... A.279

16. Transcript Re. Oct. 26, 2022, Oral Argument on Motions to Dismiss
    (ECF No. 82) ................................................................................................................. A.281

17. Opinion and Order Granting Motions to Dismiss (ECF No. 95) ..................... A.353

18. Pls.' Motion for Entry of Final Judgment (ECF No. 111) .................................. A.383

19. Proposed Order Re. Pls.' Entry of Final Judgment (ECF No. 111-1) ............... A.387

20. Order—Final Judgment (ECF No. 112) .................................................................. A.389

21. Pls.' Notice of Appeal (ECF No. 113) ..................................................................... A.391

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AVRAHAM GOLDSTEIN, et al.,

                              Plaintiffs,

        -v-

PROFESSIONAL STAFF CONGRESS/CUNY, et al.,

                             Defendants.

22 Civ. 321 (PAE)

ORDER

---

PAUL A. ENGELMAYER, District Judge:

On November 3, 2022, the Court approved an offer of judgment as between defendant

City of New York and plaintiff Avraham Goldstein, pursuant to Federal Rule of Civil Procedure

68, in the amount of $233.35. *See* Dkt. 78. To assist the Court in determining which aspects of

Count Three remain live between the parties at this juncture, the Court orders the parties to file a

joint letter by November 11, 2022, informing the Court of the current scope of Count Three.


        SO ORDERED.

                                         *Paul A. Engelmayer*
                                Paul A. Engelmayer
                                United States District Judge


Dated: November 4, 2022
       New York, New York

November 11, 2022

V<small>IA</small> E<small>LECTRONIC</small> F<small>ILING</small>

The Honorable Paul A. Engelmayer
United States District Court
Southern District of New York
40 Foley Square, Room 2201
New York, New York 10007

      **Re:**    *Goldstein et al. v. Professional Staff Congress/CUNY et al.,*
                 **Case No. 1:22-cv-00321-PAE**

Dear Judge Engelmayer:

This joint letter addresses the status of the claims in Count 3 of the Complaint, as required by the Court's order of November 4, 2022, ECF No. 79.

Three plaintiffs have the following claim for retroactive relief in the form of money damages (along with interest, attorneys' fees, and costs) against the following defendants:

    (1) <u>Plaintiff Avraham Goldstein's claim for damages against Defendant PSC and Defendant City of New York under Count 3</u>

Judgment has been entered, so payment to Plaintiff Goldstein is outstanding, and Plaintiff will move for attorneys' fees and costs by or on November 17, 2022. Once Plaintiff Goldstein is paid the amount of the judgment and the attorneys' fees and costs the Court determines he is due, he will no longer have a Count III claim against Defendant PSC.

    (2) <u>Plaintiff Frimette Kass-Shraibman's and Plaintiff Mitchell Langbert's claims for damages against Defendant PSC under Count 3</u>

Plaintiffs Kass-Shraibman and Langbert have live claims for money damages against Defendant PSC for dues and/or interest that they alleged were deducted from their wages after the date of their resignation from union membership.

There are no outstanding claims against State Defendants under Count 3.

                      Respectfully submitted,

                      **s/ Nathan J. McGrath**
                      Nathan J. McGrath (*pro hac vice*)
                      Email: njmcgrath@fairnesscenter.org
                      Danielle R. Acker Susanj (*pro hac vice*)
                      Email: drasusanj@fairnesscenter.org
                      THE FAIRNESS CENTER
                      500 North Third Street, Suite 600B
                      Harrisburg, Pennsylvania 17101

Telephone: 844.293.1001
Facsimile: 717.307.3424

Milton L. Chappell (*pro hac vice*)
Email: mlc@nrtw.org
William L. Messenger (*pro hac vice*)
Email: wlm@nrtw.org
c/o National Right to Work Legal
Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Telephone: 703.321.8510
Facsimile: 703.321.9319

*Attorneys for Plaintiffs*

**s/ Hanan B. Kolko**
Hanan B. Kolko
COHEN, WEISS AND SIMON LLP
900 Third Avenue, Suite 2100
New York, New York 10022-4869
Telephone: (212) 356-0214
hkolko@cwsny.com

*Counsel for Defendant, The Professional Staff
Congress/CUNY*

**s/ John F. Walpole**
John F. Walpole
Assistant Corporation Counsel
100 Church Street, Room 2-187
New York, NY 10007 (212) 356-2470
jwalpole@law.nyc.gov

*Attorney for Defendant City of New York*

**s/ Jonathan A. Siegel**
Jonathan A. Siegel, Assistant Attorney
General
28 Liberty Street
New York, NY 10005
Tel. (212) 416-8888
Jonathan.Siegel@ag.ny.gov

*Attorney for State Defendants*

A.278

November 11, 2022

VIA ELECTRONIC FILING

The Honorable Paul A. Engelmayer
United States District Court
Southern District of New York
40 Foley Square, Room 2201
New York, New York 10007

> Re:   ***Goldstein et al. v. Professional Staff Congress/CUNY et al.,***
>        **Case No. 1:22-cv-00321-PAE**

Dear Judge Engelmayer:

This joint letter addresses the status of the claims in Count 3 of the Complaint, as required by the Court's order of November 4, 2022, ECF No. 79.

Three plaintiffs have the following claim for retroactive relief in the form of money damages (along with interest, attorneys' fees, and costs) against the following defendants:

(1) Plaintiff Avraham Goldstein's claim for damages against Defendant PSC and Defendant City of New York under Count 3

Judgment has been entered, so payment to Plaintiff Goldstein is outstanding, and Plaintiff will move for attorneys' fees and costs by or on November 17, 2022. Once Plaintiff Goldstein is paid the amount of the judgment and the attorneys' fees and costs the Court determines he is due, he will no longer have a Count III claim against Defendant PSC.

(2) Plaintiff Frimette Kass-Shraibman's and Plaintiff Mitchell Langbert's claims for damages against Defendant PSC under Count 3

Plaintiffs Kass-Shraibman and Langbert have live claims for money damages against Defendant PSC for dues and/or interest that they alleged were deducted from their wages after the date of their resignation from union membership.

There are no outstanding claims against State Defendants under Count 3.

Respectfully submitted,

**s/ Nathan J. McGrath**
Nathan J. McGrath (*pro hac vice*)
Email: njmcgrath@fairnesscenter.org
Danielle R. Acker Susanj (*pro hac vice*)
Email: drasusanj@fairnesscenter.org
THE FAIRNESS CENTER
500 North Third Street, Suite 600B
Harrisburg, Pennsylvania 17101

Telephone: 844.293.1001
Facsimile: 717.307.3424

Milton L. Chappell (*pro hac vice*)
Email: mlc@nrtw.org
William L. Messenger (*pro hac vice*)
Email: wlm@nrtw.org
c/o National Right to Work Legal
Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Telephone: 703.321.8510
Facsimile: 703.321.9319

*Attorneys for Plaintiffs*

s/ **Hanan B. Kolko**
Hanan B. Kolko
COHEN, WEISS AND SIMON LLP
900 Third Avenue, Suite 2100
New York, New York 10022-4869
Telephone: (212) 356-0214
hkolko@cwsny.com

*Counsel for Defendant, The Professional Staff
Congress/CUNY*

s/ **John F. Walpole**
John F. Walpole
Assistant Corporation Counsel
100 Church Street, Room 2-187
New York, NY 10007 (212) 356-2470
jwalpole@law.nyc.gov

*Attorney for Defendant City of New York*

s/ **Jonathan A. Siegel**
Jonathan A. Siegel, Assistant Attorney
General
28 Liberty Street
New York, NY 10005
Tel. (212) 416-8888
Jonathan.Siegel@ag.ny.gov

*Attorney for State Defendants*

The Court appreciates this update from the parties.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge
November 14, 2022

A.280

MAQ6OLC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     AVRAHAM GOLDSTEIN; MICHAEL
3    GOLDSTEIN; FRIMETTE
     KASS-SHRAIBMAN; MITCHELL
4    LANGBERT; JEFFREY LAX; MARIA
     PAGANO,
5
                    Plaintiffs,
6
            v.                          22 CV 321(PAE)
7
     PROFESSIONAL STAFF
8    CONGRESS/CUNY; CITY UNIVERSITY
     OF NEW YORK; et al.,
9
                    Defendants.
10   ------------------------------x
                                        New York, N.Y.
11                                      October 26, 2022
                                        2:00 p.m.
12
     Before:
13
                    HON. PAUL A. ENGELMAYER,
14
                                        District Judge
15
                         APPEARANCES
16
     THE FAIRNESS CENTER
17        Attorneys for Plaintiffs
     BY:  NATHAN J. MCGRATH
18        DANIELLE SUSANJ

19   NATIONAL RIGHT TO WORK LEGAL DEFENSE FOUNDATION, INC.
          Attorney for Plaintiffs
20   BY:  MILTON CHAPPELL

21
     ALTSHULER BERZON LLP
22        Attorney for Defendant PSC
     BY:  SCOTT A. KRONLAND
23

24

25

[T1] A.281

MAQ6OLC

1                         APPEARANCES (Continued)

2    OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL
          Attorney for Defendants City University of New York, et
3    al.
     BY:  JONATHAN ADAM SIEGEL
4
     NEW YORK CITY LAW DEPARTMENT
5         Attorney for Defendant City of New York
     BY:  JOHN FRANCIS WALPOLE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

[T2] A.282

 1          DEPUTY CLERK:  Counsel, please state your appearance

 2   starting with the front table, please.

 3          MR. MCGRATH:  Good afternoon.  Nathan McGrath for the

 4   plaintiffs.

 5          THE COURT:  Good afternoon.

 6          MS. SUSANJ:  Danielle Acker Susanj.

 7          THE COURT:  Speak into the microphone, please.

 8          MS. SUSANJ:  Danielle Acker Susanj also for the

 9   plaintiffs.

10          MR. CHAPPELL:  Good afternoon.  Melton Chappell for

11   plaintiffs.

12          THE COURT:  Good afternoon to you.  You may be seated.

13          For the defense, let me organize this, for the

14   PSC/CUNY who do I have?

15          MR. KRONLAND:  Scott Kronland for the Professional

16   Staff Congress.

17          THE COURT:  Good afternoon.

18          And for CUNY and the individual defendants who do I

19   have?

20          MR. SIEGEL:  Jonathan Siegal, your Honor.

21          THE COURT:  Good afternoon.

22          And for the City of New York, who do I have?

23          MR. WALPOLE:  Good afternoon, John Walpole for the

24   city.

25          THE COURT:  To begin with, let me apologize for

1    starting a bit late.  We had a monthly board of, you know, just

2    lunch which ran late and I was the last presenter.  So I had no

3    way to get out.  Here we are.

4         Thank you, counsel, for a very high-qualify briefing

5    by all parties.  I benefited a lot by the very thoughtful

6    attention everyone has given to the complicated and important

7    issues in the case.

8         I have a number of questions that are smaller

9    questions, housekeeping questions for you in a few moments.  I

10   want to begin with those to see what we can do to clear those

11   away before we turn to the larger issues in the case.

12        At the outset I want to ask defense counsel, what, if

13   any, arrangements you have made amongst yourselves to divide

14   issues.  I do not want, obviously, multiple people getting up

15   and making the same point.

16        I'll turn to you, Mr. Kronland.  I'll assume there's

17   been some arrangement among you as to who owns what issue.

18        MR. KRONLAND:  I think we worked out that I would

19   start for the defendants.

20        THE COURT:  That's fine, but I don't want two

21   arguments.  Will you be making a particular argument to the

22   exclusion of your fellow defendants, have you divided up the

23   arguments, I guess is the point.

24        MR. KRONLAND:  No, we haven't divided up the

25   arguments.  I was going to cover everything that involved the

MAQ6OLC

1   union.

2           THE COURT:  All right, look, I had in mind starting

3   with something about a half hour or a little more for the back

4   table, and then about the same for the front table.  I've got

5   the latitude to go somewhat longer, but I'd like to impose some

6   order on this.

7           I'm mindful from the briefs, there are significant

8   common threads of argument and with respect, I'd rather there

9   be efficiency.  So I'm happy when we get to that to start with

10  you.

11          At the front table, who will be taking the lead?

12          MR. MCGRATH:  I will, your Honor.

13          THE COURT:  Very good.  Let me take care of a handful

14  of housekeeping matters, first.

15          Let's begin with Count Three.  Thank you to the

16  parties for the narrowed -- the letter explaining the narrowed

17  scope of what survives as Count Three.  It appears that all

18  that remains of that count is essentially a claim between two

19  plaintiffs and the PSC for retroactive relief.

20          Now, Plaintiff, is there any change to the scope of

21  that claim from what was described in the recent letter?

22          MR. MCGRATH:  No, your Honor, I think that's where

23  we're still at.

24          THE COURT:  Okay.

25          MR. MCGRATH:  I don't know if you want us to speak to

MAQ6OLC

```
 1   the Rule 68 at all.

 2             THE COURT:  I'm about to get to that.

 3             MR. MCGRATH:  All right.

 4             THE COURT:  The problem with the Rule 68 judgment on

 5   the docket is that you all filed it effectively, but it's

 6   unsigned.  You need to work with the clerk's office.

 7             As soon as a properly docketed one is filed, I'm

 8   delighted to execute it, but until the clerk's office accepts

 9   it, I can't.  So it's on counsel to work with the clerk's

10   office to attend to the technical defect.

11             Now, the remaining portion of Count Three, between the

12   two plaintiffs and the PSC for retroactive relief, does not

13   appear to me to be the subject of any motion to dismiss.

14             Just a yes or no, Mr. Kronland; is that correct?

15             MR. KRONLAND:  That is correct.

16             THE COURT:  All right.  So I take it that regardless

17   of what becomes of the remaining claims in the case, that claim

18   after the resolution of the pending motion to dismiss proceeds

19   to discovery; is that correct, Mr. Kronland?

20             MR. KRONLAND:  If discovery is necessary, yes.  It

21   would proceed to summary judgment.  I'm not sure it's actually

22   going to be a dismissal.

23             THE COURT:  Right.  But to the extent that someone

24   believes discovery is necessary even in a truncated expedited

25   form, we nevertheless have to go through that discovery to get
```

MAQ6OLC

1  to summary judgment.

2      MR. KRONLAND:  Yes, your Honor.

3      THE COURT:  Anyone have a different view on that

4  discreet issue?

5      MR. MCGRATH:  No, your Honor.

6      THE COURT:  Next issue by way of housekeeping -- and

7  may I just ask, I'll ask you, Mr. Kronland, what, if any,

8  discovery do you envision on that claim?

9      MR. KRONLAND:  We don't envision any discovery,

10  your Honor.  The reason we didn't move to dismiss is the

11  complaint does not include what we regard as the relevant fact,

12  which is that the plaintiffs signed cards authorizing the

13  deductions that were made for them.

14      THE COURT:  Okay, that's essentially the critical data

15  point that is not evident on the pleadings, but on which you

16  would rely at summary judgment?

17      MR. KRONLAND:  Yes.

18      THE COURT:  Mr. McGrath, without arguing the point,

19  what, if any, discovery would you be seeking to adduce with

20  respect to the narrowed Count Three?

21      MR. MCGRATH:  If anything, your Honor, it would be

22  very narrow -- oh, sorry.

23      If anything, your Honor, it would be very narrow, just

24  to documents and, you know, trying to figure out when they

25  resigned, setting dates, those types of things.  Just getting

MAQ6OLC

 1    what type of money is at issue, I don't think there would be

 2    much.

 3              THE COURT:  Let me suggest this.  Since it's

 4    inevitable that that claim will survive motion to dismiss,

 5    since it's not the subject of a motion to dismiss, soon after

 6    this conference may I ask counsel to meet and confer to agree

 7    on an expedited mechanism for such discovery as anybody

 8    believes is necessary for Count Three to get done?

 9              Okay.  Counsel?

10              MR. KRONLAND:  Yes, your Honor.

11              MR. MCGRATH:  Yes, your Honor.

12              THE COURT:  I will trust you will have had that

13    conversation such that whenever my decision on the motions that

14    have been made issues, I will know that you've already got a

15    mechanism in place to quickly do what discovery is needed on

16    Count Three.

17              All right.  The next question involves a question that

18    I wanted to direct to Mr. Siegel.  CUNY and the four individual

19    defendants whom you represent moved to dismiss under both

20    12(b)(6) and 12(b)(1).  The other defendants move just under

21    12(b)(6).  It looks to me as if the 12(b)(1) was directed

22    solely at dimensions of Count Three that are no longer with us,

23    to wit, portions of Count Three that at the time were seeking

24    prospective relief and as to which you contended there was no

25    standing.

1      Is that the only scope you intended of the 12(b)(1)
2  motion to dismiss?
3      MR. SIEGEL:  Yes, your Honor.
4      THE COURT:  With the narrowing of the scope of
5  Count Three to what it is, are you at this point making any
6  motion to dismiss under 12(b)(1)?
7      MR. SIEGEL:  Well --
8      THE COURT:  It doesn't appear so.
9      MR. SIEGEL:  Not as to Counts One and Two.
10 Count Three, I assume, will be dismissed against the only state
11 defendant to that claim, which is Comptroller DiNapoli.  I
12 assume it will be dismissed or either withdrawn under 12(b)(1).
13     THE COURT:  I will get to that in a moment.
14     But is there -- okay, in other words, the notion is
15 because that defendant will be dismissed, not only will there
16 be no 12(b)(1), there will be no you?  Is that what you're
17 saying?
18     MR. SIEGEL:  There will be no Count Three against any
19 state defendant, yes, your Honor.
20     THE COURT:  Well, let me be clear about this.  Your
21 motion to dismiss as to Counts One and Two is under 12(b)(6)
22 only.
23     MR. SIEGEL:  Yes, your Honor.
24     THE COURT:  The claim under Count Three, as it
25 involved 12(b)(1) is moot, it's dismissed, right?

MAQ6OLC

1          MR. SIEGEL:  I believe so, but I -- there's no order

2     of the Court that it's actually dismissed.  It has not been

3     withdrawn yet.

4          THE COURT:  Among other things I'm waiting for you

5     to -- I would have expected people to pick up the clerk's

6     office notice that the Rule 68 judgment was defective.  I will

7     take care of all that.  I'm waiting on the proper filings to be

8     made.

9          But once we attend to that, you're out of Count Three.

10          MR. SIEGEL:  Yes, your Honor.

11          THE COURT:  Okay.  Now, let's folks on the City of

12     New York, that's Mr. Walpole.  As I understand it, the City of

13     New York was not a defendant in Counts One and Two, even though

14     you move to dismiss them.  And the narrowing of Count Three

15     appears to eliminate the City of New York as a defendant on

16     that count.

17          Mr. Walpole, is the City of New York still a defendant

18     in this case?

19          MR. WALPOLE:  No, your Honor.

20          THE COURT:  Plaintiff, do you disagree?

21          MR. MCGRATH:  No, your Honor.

22          THE COURT:  Okay.  So for the purposes of the balance

23     of this argument, no disrespect, Mr. Walpole, but have you

24     anything to offer today?

25          MR. WALPOLE:  By what do you mean offer?

1    THE COURT:  In other words, it appears to be common

2    ground that there are no claims against your client, right?

3    MR. WALPOLE:  Correct.

4    THE COURT:  I take it you're not proposing to argue as

5    amicus in a case your client has no stake in.

6    MR. WALPOLE:  No, your Honor.

7    THE COURT:  I'm delighted to have you here, but as it

8    relates to the allocation of responsibility at the back table,

9    it sounds like such allocation as may be made is really between

10    Mr. Kronland and Mr. Siegel.

11    MR. WALPOLE:  That is correct, your Honor.

12    THE COURT:  Thank you.  So that takes care of all of

13    that housekeeping.  There's really no oral argument to be had

14    on Count Three, so we are really limited to Counts One and Two.

15    With that, I'd welcome argument on the motion to dismiss.

16    And, Mr. Kronland, I understand you are taking the

17    lead.  It's, you know, a few minutes before 2:30.  I'd like to

18    pivot to the plaintiffs if possible around 3:00.  So as you and

19    Mr. Siegel think about the points you want to make, try to

20    manage towards that target.

21    The floor is yours.

22    MR. KRONLAND:  Please cut me off when your Honor has

23    heard enough.  We'd be happy to have a few minutes for rebuttal

24    at the end.

25    May it please the Court.  *Knight* forecloses the claim

1     that exclusive representation by itself on unconstitutionally

2     compels 1st Amendment association.  The plaintiffs say that

3     this case is different from the dozens of other cases that have

4     uniformly rejected 1st Amendment challenges to exclusive

5     representation as foreclosed by *Knight*.  So I want to focus on

6     what they urge are the three distinctions and whether they make

7     a difference.

8          So the first argument they make concerns 2018

9     amendment of the Taylor Law that deals with the duty of fair

10    representation.  And they point out correctly that the Supreme

11    Court has referred to the duty of fair representation as a

12    necessary concomitant of an exclusive representation system.

13         But here, the Taylor Law amendments leaves the duty of

14    fair representation coextensive with exclusive representation.

15    The union is still required to represent nonmembers in

16    negotiation and enforcement of the terms of an agreement with

17    the public employer.

18         THE COURT:  Let me cut in on that.  I understood this

19    case predominantly to be about the 1st Amendment rights

20    asserted by the plaintiff.  Is your -- is the argument you're

21    making right now is that there's no breach of the duty of fair

22    representation by effectively stripping from PSC's

23    obligatory -- PSC's obligations the duty to represent

24    nonmembers of the bargaining group in grievances, right?

25         Essentially, you're making an argument that the duty

MAQ6OLC

1    of fair representation is not breached as opposed to an

2    argument sounding in the 1st Amendment.

3              MR. KRONLAND:  As I understand their argument, they're

4    arguing that exclusive representation violates the

5    1st Amendment because the union doesn't have a duty of fair

6    representation in grievance proceedings when the nonmember can

7    represent him or herself and be represented by their own

8    advocate.

9              THE COURT:  And in that respect, the two issues are

10   twin, they are interrelated?

11             MR. KRONLAND:  Exactly.  And my argument is that

12   because there is still a duty of fair representation when the

13   union is the exclusive representative, there isn't a

14   Constitutional issue that's been raised.  We acknowledge that

15   if the union in a certain capacity was the exclusive

16   representative but didn't have a duty to nonmembers, they would

17   be unable to protect their own interests.

18             THE COURT:  Right.

19             MR. KRONLAND:  And they would argue that there's a

20   Constitutional problem.

21             THE COURT:  Is there case law that squarely says that

22   the duty of fair representation doesn't run to representation

23   in individualized grievance proceedings?

24             MR. KRONLAND:  Well, there's no case law that

25   addresses directly the argument they're making here, but it is

1    anticipated in *Janus* itself.

2                THE COURT:  No, I understand it's anticipated.  But on

3    this particular point involving the recent amendment, 209-a.2,

4    that's not controlled by *Knight*.  That is, for better or worse,

5    a wrinkle that's unaddressed by *Knight*.  Correct?

6                MR. KRONLAND:  That's exactly right.

7                THE COURT:  So then the issue becomes, it appears,

8    whether or not carving out the duty to represent -- the

9    obligation of representing members in individualized grievances

10   is inconsistent with the duty of fair representation.  I

11   understand.  I've read *Janus*.  I understand your point about

12   the dicta there.  It's not a holding, it's dicta.

13               But is there on-point case authority that speaks to

14   whether or not an entity in PSC's situation has a duty to

15   represent members of the bargaining unit, not in their

16   collective capacity but in individualized grievances?

17               MR. KRONLAND:  There isn't anything that discusses the

18   2018 amendment since --

19               THE COURT:  No.  But has that issue come up elsewhere

20   in the country, for example?

21               MR. KRONLAND:  I'm not aware of another case that's

22   raised the 1st Amendment challenge to exclusive representation

23   on the theory that the duty of fair representation is too

24   narrow.

25               THE COURT:  But what about if not framed in this

MAQ6OLC

1    1st Amendment posture?  Are there cases that litigate the scope

2    of the duty of fair representation, and tell us whether

3    representing individual members of the bargaining unit in

4    individualized grievances, it's within or without that duty?

5          MR. KRONLAND:  Yes, you know, in our brief, we've

6    cited certain state statutes that explicitly say the duty of

7    fair representation doesn't include having to represent

8    nonmembers.

9          I know there's a Nevada Supreme Court decision that

10    says unions can charge nonmembers for grievance processing.

11          THE COURT:  This is a state law issue, this is not a

12    National Labor Relations Act issue?

13          MR. KRONLAND:  Correct, these are public employees.

14    The states can do what they want.

15          THE COURT:  And, therefore, from your perspective,

16    New York, if it's a matter of state law, it follows that upon

17    the enactment of the 2018 amendment, New York law carves out

18    this as part of the defined duty of fair representation.  And

19    the issue is whether that can sit comfortably alongside the

20    1st Amendment.

21          MR. KRONLAND:  Correct.  And in that regard I want to

22    push back on the idea that it's just dicta in *Janus*.  Because

23    part of the Court's calculus in *Janus* was that there was a less

24    restrictive means, meaning, less of a burden on the nonmembers

25    associational rights than requiring agency fees.  And that

[T15] A.295

MAQ6OLC

1   lesser burden was by not requiring the union to carry

2   grievances for nonmembers.

3            And, in fact, the issue came up at the oral arguments.

4   And Justice Alito directly asked plaintiff's counsel who were

5   represented by one of the same organizations that represents

6   the plaintiffs here -- it's on Pages 11 and 12 of the argument

7   transcript -- does the Constitution require the state to

8   require unions to handle grievances for nonmembers.

9            And the answer was no.  It doesn't.  And that then

10  became part of the premise of the *Janus* decision about why you

11  don't need agency fees.

12           THE COURT:  Look, I appreciate that.  While I think it

13  is formally dicta, it was certainly squarely part of the chain

14  of reasoning.

15           But is there any case law that takes on that issue as

16  really the matter to be decided?

17           MR. KRONLAND:  No.  I think that this is the first

18  case, but what I would -- I'd also point out about this case is

19  that the plaintiffs don't allege here that there are situations

20  in which their interests are unprotected.  They don't allege

21  that they want the union to represent them.

22           In fact, they allege the opposite in Paragraph 63 of

23  their complaint.  They say they don't think the union can

24  adequately represent their interests.  And they don't allege

25  that the union won't represent them in these proceedings if

1   they want the union to.  Their argument is the opposite.

2          THE COURT:  What would be the paradigmatic type of

3   grievance proceeding that's at issue?

4          MR. KRONLAND:  It would be an individual disciplinary

5   grievance in which the nonmember can choose, if the nonmember

6   wants, to be represented by his or her own lawyer, which some

7   nonmembers choose.

8          THE COURT:  Okay.  So that's distinction number one

9   that -- you were about to list three distinctions that the

10  plaintiffs draw, the first is that the amendment of the Taylor

11  Law impedes plaintiff's 1st Amendment right.

12         MR. KRONLAND:  Right. And I would finally, last point

13  on that, is that the plaintiffs don't dispute that if there

14  were some flaw in the 2018 amendment, the remedy would be to

15  strike down that part of the 2018 amendment, not to hold that

16  the entire preexisting New York State system of exclusive

17  representation that covers a million public employees is

18  unconstitutional.

19         THE COURT:  Is that, to the extent the argument is

20  based on the 2018 amendment, is the challenge as applied or

21  facial?

22         MR. KRONLAND:  Their challenge is facial, and it's

23  really --

24         THE COURT:  Is that right, though, from your

25  perspective in thinking about that particular issue, is it

1    right to think of it as a facial challenge.

2            MR. KRONLAND:  I think it is.  They don't allege any

3    facts to show it makes a difference to them.  Their argument is

4    it brings down the whole system of exclusive representation.

5            THE COURT:  But to challenge a facial, something

6    facially under the 1st Amendment, requires, does it not, that

7    in all applications it's unconstitutional.

8            MR. KRONLAND:  Yes, it does.

9            THE COURT:  So from your point of view, and I'm not

10   meaning to put words in your mouth but it sounds that way, so I

11   want you to push back if I'm misunderstanding your argument.

12           Is something you're saying that insofar as plaintiffs

13   make a facial challenge based on the 2018 amendment, one reason

14   they can't prevail here is because they have not shown, from

15   your perspective, that stripping PSC's representation impedes

16   the 1st Amendment rights of the members in all applications.

17           There might hypothetically be some, you say, you might

18   concede, but as long as there are some in which leaving the

19   members to their own devices in grievance procedures is

20   permissible, the facial challenge would have to fail?

21           MR. KRONLAND:  Yes.  And the way I put it, we

22   certainly wouldn't concede there's any problem with the

23   statute.  What I would say is we're not asking the Court to

24   foreclose the possibility that someone could bring an

25   as-applied challenge to some aspect of the 2018 amendment and

1 ask that that aspect be struck down.

2          THE COURT:  But on the pleadings here, none of the

3 individual plaintiffs have made a claim specific to some

4 grievance proceeding of their own, so that component of the

5 analysis has to be viewed as a facial attack.

6          MR. KRONLAND:  Yes.

7          THE COURT:  Okay.  Tell me what the second distinction

8 is.

9          MR. KRONLAND:  The second distinction is they say they

10 are alleged -- they allege they are compelled to associate with

11 the other bargaining unit members, not just with the union.

12 But there aren't any facts alleged to show any compelled

13 association, they don't have to say or do anything to associate

14 with their fellow CUNY faculty members.  And not only don't

15 they have to say or do anything, but reasonable outsiders would

16 understand that not all CUNY professors necessarily agree with

17 each other about anything.

18          THE COURT:  Is that a question taken up in *Knight*?

19          MR. KRONLAND:  It's taken up with respect to the

20 union.

21          THE COURT:  Right.  That's, I take it, your third

22 argument which we're getting to, right?

23          MR. KRONLAND:  Yeah.  With respect to the union, and

24 it necessarily follows from *Knight* that the government can have

25 a bargaining unit because otherwise you couldn't have an

[T19] A.299

1    exclusive representative.

2           THE COURT:  But *Knight* doesn't, in as many words, take

3    up the association of the nonunion member who's part of the

4    bargaining unit with the union members who are part of the

5    bargaining unit, right?

6           MR. KRONLAND:  Correct.

7           THE COURT:  So is that an open question under

8    precedent if *Knight* doesn't squarely deal with that fact

9    pattern?

10          MR. KRONLAND:  It's not an open question in the sense

11   that the Court would effectively be overruling *Knight*, you

12   know.  *Knight* presupposes that it's not a problem to have a

13   bargaining unit because it upholds exclusive representation

14   bargaining.  And the claim of the structures in *Knight* was they

15   didn't share the same interests as their fellow instructors and

16   didn't want to be part of a union.

17          So they didn't say in so many words that we're being

18   compelled to associate with the other instructors.

19          THE COURT:  In other words, *Knight* on its face deals

20   with the association with the bargaining unit representative,

21   the PSC figure here, the union.  But what you're saying is the

22   nature of the structure is that, by definition in all these

23   situations, you're going to have to other members of the unit

24   who may be eclectic and so it had to be within the Court's

25   field of vision in *Knight* even if it was not the issue decided.

1          MR. KRONLAND:  Yes.  And the Court expressly said the

2    instructors associational rights in *Knight* were not impaired.

3    They're free to associate or not associate with whomever they

4    pleased, including the exclusive representative.

5          THE COURT:  What does *Janus* tell us about this

6    argument, anything?

7          MR. KRONLAND:  Well, what *Janus* tells us is the Court,

8    assume that exclusive representation would continue to exist,

9    that you didn't need agencies for it and the Court emphasized

10   that it wasn't overturning fundamental principals of modern

11   labor law.

12         THE COURT:  I mean, *Janus* seems to presuppose that by

13   absenting yourself from the union, you are, for 1st Amendment

14   purposes, disassociating yourself from the other members of the

15   union, no?

16         MR. KRONLAND:  Yes.  And I agree, if there was an

17   inherent association, it would exist in *Janus*, it would exist

18   in *Knight*.  And so those cases presuppose that you can have a

19   bargaining unit.

20         THE COURT:  Let me give you a hypothetical.  And I'm

21   going to give you a similar variant of it when we get to the

22   posture of the union.

23         But let's just suppose -- and I'm going to take the

24   facts here and extend them to the ultimate extreme -- but let

25   us imagine that all the other members of the bargaining unit,

[T21] A.301

MAQ6OLC

1    all of whom are members of the union, are collectively speaking

2    in a way that is as noxious as possible or a plaintiff who has

3    absented himself or herself from the union, but is still part

4    of the bargaining unit.  And let us imagine the speech is not

5    merely a political speech about current events in the Middle

6    East, but just to go to the most extreme possible, is pro-Nazi,

7    vicious anti-Semitic speech of the worst kind.

8           What's wrong with the argument of that bargaining unit

9    member that I don't want to associate with people who say

10   things like that.  I mean, as a matter of just intuition,

11   what's wrong with the idea that by lumping them into the

12   bargaining unit, they are associating?

13          MR. KRONLAND:  Well, they would be CUNY faculty

14   members whether there was a union or not.  And one could make

15   the same argument I don't want to be on the faculty with a

16   bunch of people that are all pro-Nazi.  There isn't any

17   compelled association with the union in the first place because

18   they don't have to say or do anything to support the union.

19   They don't have to be members, don't have to financially

20   support it.

21          And there isn't imputed association because reasonable

22   people wouldn't think that in any democratic system that

23   everyone would agree with the speech of the representative just

24   like they wouldn't agree with other faculty members.

25          So however noxious it is, they're not being associated

1    with it in a 1st Amendment sense.

2           THE COURT:  In a sense if I'm a member of a university

3    faculty, I may disagree with what 99 percent of the rest of the

4    faculty thinks, people understand that I'm a free agent?

5           MR. KRONLAND:  Yes, it's the same thing.  With living

6    in a city, all the people in the city may think a certain way,

7    but reasonable people understand that --

8           THE COURT:  But the problem, though, becomes more

9    acute when we move into the next issue, right, which is it's

10   one thing to say the world doesn't associate me with my fellow

11   judges in this district, each of them has their own points of

12   view on things, the world doesn't associate a professor of

13   political science with the other professors in that department

14   or that faculty.

15          But when someone is acting as a representative of a

16   group of faculty members -- here the issue is the association

17   with PSC -- why is it, as an intuitive matter, fair to say you

18   exist to represent my negotiating rights.  Don't say stuff like

19   that, it rubs off on me.  What's wrong with that lament by a

20   person in the plaintiff's situation?

21          MR. KRONLAND:  Well, the plaintiffs are entitled to

22   have the lament, but it's a feature of any democratic system;

23   the parents' association at a public school, the alumni

24   association at a public university.  They may say things that

25   other parents disagree with.

1    THE COURT:  Sure, but then I can resign from the

2  parents' association, but the parents' association doesn't have

3  the right to negotiate my child's tuition.  The difference is

4  that, in this case, if I'm a member of the bargaining unit, I'm

5  in the caboose of a very big train, and it's being driven by

6  someone who is saying things that I find abhorrent.

7    What's wrong with the intuitive argument by the

8  plaintiffs here that the law is forcing them essentially to be

9  driven around in a train which says on the outside noxious --

10  conveys on the outside a noxious message?

11    MR. KRONLAND:  It's several things.  First of all,

12  it's not alleged that there's any problem with respect to the

13  actual performance of collective bargaining duties.  There are

14  numerous laws that protect against religious discrimination

15  with regard to the duties.  And *Janus* itself understood that

16  this would be an issue.

17    You know, Justice Alito said in his majority opinion

18  that even within the collective bargaining arrangement, unions

19  speak out on what he called sensitive political topics such as

20  climate change, the Confederacy, sexual orientation and gender

21  identity, evolution and minority religions.

22    So this was understood in *Janus* that unions may take

23  positions that some bargaining unit members don't want to be

24  associated with.  But they're not associated with them in a

25  1st Amendment sense.  Being included in the same contract isn't

MAQ6OLC

1   1st Amendment association.

2           THE COURT:  Look, we can all understand why a union

3   would take a position on an issue that affects the economic

4   interests of the people it is bargaining for, whether members

5   or not.  And maybe there's a world in which that even involves

6   things like climate change, as in we only want green equipment

7   in the schools or whatever in which we work.  Or something like

8   that.

9           But when one starts talking about Middle Eastern

10  politics, why is the -- understanding that a union, like a

11  corporation, has 1st Amendment rights, why are they exercising

12  those rights, if you will, on issues that are way beyond the

13  charter they have as a negotiating representative?  I mean,

14  it's a recipe to alienate people whose negotiating interests

15  they're charged with, what's the union doing popping off about

16  the Middle East?

17          MR. KRONLAND:  I appreciate your Honor's question.

18  Certainly not here to defend the line between permissible

19  criticism of Israel, policy and anti-Semitism.

20          As your Honor said, unions have 1st Amendment rights,

21  more particularly the members of the union have 1st Amendment

22  rights.  It's a voluntary association --

23          THE COURT:  Does the union itself have a 1st Amendment

24  right to -- because here now we're talking no longer about the

25  individual members whom the plaintiff would associate with, but

[T25] A.305

1    a union -- does the union itself have a 1st Amendment right to

2    put out a circular that expresses a view on each world leader?

3    　　　　MR. KRONLAND:  They certainly do, just like the union

4    endorses presidential candidates.  And people who don't like

5    it, they don't have to be members.  Just like any other

6    voluntary advocacy organization.

7    　　　　THE COURT:  Right.  I guess the question is, and I

8    realize it's not the issue here, but it does leap out at one,

9    if ultimately the point of the union is to represent the

10   collective interests of either its members or the people whom

11   it is charged with bargaining for, it raises a question of why

12   the union is choosing to go beyond an interest based -- basis

13   for what its speaking out on and just opine on extrinsic issues

14   that have the capacity to alienate members of the bargaining

15   unit.

16   　　　　I appreciate the 1st Amendment may allow the union to

17   do it.  It raises the question of why is a union speaking way

18   out of its area of competence when it's going to stick a thumb

19   in the eye of some of its members.

20   　　　　MR. KRONLAND:  I understand, and, you know, that may

21   be a prudent thing to do.  I would suggest as a historical

22   matter, unions have always taken positions on political issues.

23   　　　　THE COURT:  Sure.  But if you're choosing who your

24   president or senator or congressmen are, the responsibilities

25   of those offices easily take in issues that affect the

1    membership and, no, you're not going to get unanimity among the

2    membership on politicized issues like that.

3           On the other hand, if the issue is what do we think of

4    a situation that is half a world away that does not in any

5    coherent way implicate the union's responsibilities, it raises

6    the question of gratuitousness and insensitivity.  Those are

7    not Constitutional considerations, but it leaps off the page as

8    to why they're creating that degree of discomfort.  That's why

9    we have this case.

10          MR. KRONLAND:  I understand, your Honor.  And I'm not

11   here to defend the resolution which just says certain issues

12   should be discussed at the chapter level.  It doesn't have to

13   endorse anything.  But there wouldn't be a principled way to

14   draw a line.  There would have been unions that were calling

15   for Martin Luther King, Junior to be released from jail or

16   otherwise protesting about civil rights problems in the south.

17   There have been unions that were calling for immigration by

18   Soviet Jews, there were unions that were active in terms of

19   what was going on in Northern Ireland.

20          The history of the United States and unions is that --

21   is voluntary associations.  They took positions on

22   controversial subjects, even subjects that arguably were not

23   within the cant of what might be argued were the core functions

24   of the union.  And that there would be no way to draw a

25   principled line between what the union members should be

1    concerned about and what they shouldn't be or to control their

2    1st Amendment activity.

3          And the issue is really in the 1st Amendment sense,

4    are people being associated with it -- if they don't have to

5    join, if they don't have to support the union, if people

6    understand how democracy works, it's like the law schools in

7    *Rumsfeld v Fair* case.  They didn't want the military recruiters

8    on campus.  They really didn't want them and the Supreme Court

9    said, you know, reasonable people understand you don't

10   necessarily endorse the policies in the military.  What they

11   objected to at the time was antigay policies in the military.

12   And the strength of your interest or your feelings doesn't

13   create a 1st Amendment problem, you're trying to stretch

14   doctrines beyond where they will go.

15         And, likewise, the strength of the plaintiff's views

16   doesn't create an infringement on their associational rights.

17   They may feel that psychically this is bad, but it doesn't mean

18   their 1st Amendment rights are being impaired.

19         THE COURT:  Is this issue controlled by *Knight* in your

20   view?

21         MR. KRONLAND:  In our view, it is controlled by

22   *Knight*.  The Supreme Court expressly said that the university

23   treated the union as expressing the official collective

24   position, but it understood that not everyone agreed with the

25   instructor's views.  The instructors in *Knight* didn't agree

MAQ6OLC

```
1    with the union either.  They may not have put it in as stark
2    terms, but it's necessarily foreclosed by the holding in Knight
3    that there was a compelled 1st Amendment association.
4          THE COURT:  What about bowing out of the union?  What,
5    if any, other steps can the professor who wants to disassociate
6    as much as possible from the union speech, but who's a member
7    of the bargaining unit, what in practice is available to that
8    professor?
9          MR. KRONLAND:  They have the same 1st Amendment rights
10   as any other citizen to join other organizations to speak as
11   they please.  Some of the plaintiffs have written op-eds.  They
12   can join other organizations.  They can encourage their fellow
13   faculty members to join another group that takes another
14   position.  They could join the union and seek to, you know,
15   democratically reverse any positions they don't like.
16         It's an issue with any kind of democratic issue that
17   you can resign and disassociate yourself.  Or you can
18   participate and try to gain the majority.
19         THE COURT:  Historically has there been any scenario
20   under which a competing bargaining unit has sprung up to
21   represent the interests of people who have opted out of the
22   union?  Or I realize that's intentioned with the idea of the
23   exclusive bargaining representative for a public employee
24   union, but historically has that always been followed that way?
25         MR. KRONLAND:  There's a procedure in New York for
```

[T29] A.309

MAQ6OLC

1  decertifying the union.  Get the majority of the bargaining

2  unit to vote to get rid of the union and pick a different one.

3          THE COURT:  May I ask you, is that something, if I'm a

4  member of the union and the union starts taking positions that

5  offend me and I drop out of the union and I'm still part of the

6  bargaining unit, do I have the same rights as a member of the

7  union to move to or seek to decertify?

8          MR. KRONLAND:  Yes.

9          THE COURT:  In other words, the decertification right

10 runs with membership in the bargaining unit, not in the union.

11         MR. KRONLAND:  Correct.  Just like choosing the union

12 runs with the bargaining unit and not with members of the

13 union.

14         THE COURT:  What controls do the members of the union

15 have over the union's behavior that a member of the bargaining

16 unit who has opted out of the union does not have?

17         MR. KRONLAND:  The members of the union vote for the

18 union's leaders.  For instance, at the Professional Staff

19 Congress there's a very large delegate assembly of chapter we

20 used for different colleges.  You can use your democratic

21 organizations that can vote out the delegates that voted the

22 wrong way, they can vote out the union's leaders.  That's the

23 check in any democratic organization.  There are many

24 organizations that have changed policies in response to

25 objections from their members.

[T30] A.310

MAQ6OLC

1          THE COURT:  But the line here is that if you have

2     opted out of the union, you are using your vote over the

3     internal affairs of the union, including its leadership or the

4     message that the leadership may be authorized to articulate,

5     but you're not surrendering your right to move to decertify the

6     union as the representative of a particular bargaining group.

7     Is that about right?

8          MR. KRONLAND:  And *Knight* deals directly with the

9     issue.  Knight says that any pressure that the nonmember

10    instructors may feel to join the union in order to influence

11    its policies is not an unconstitutional impingement on

12    associational rights.  It's not different in kind from the --

13    what the pressure of the members in the minority always feel to

14    join the majority organization.

15         THE COURT:  So I'm an associate professor at a city

16    university, and I'm stuck in this bargaining unit which --

17    whose union says things that offend me.

18         Is there anything I can do to get out of the

19    bargaining unit, or is the bargaining unit essentially drawn by

20    job title such that unless I want to go become an athletic

21    coach if I'm a poli-sci professor I'm just stuck in there.

22         MR. KRONLAND:  The bargaining unit is the bargaining

23    unit.  But, again, that's not a 1st Amendment issue.

24         THE COURT:  I'm just trying to understand as a

25    practical matter what the recourse is for a person finding

[T31] A.311

MAQ6OLC

 1    themselves in this awkward situation.  Do they have any way of

 2    getting out of the bargaining unit without changing their line

 3    of work or their employer?

 4          MR. KRONLAND:  No.  They don't.  But that's true of

 5    anyone in a union.  It's also true that without a union, the

 6    employer often sets terms and conditions of employment

 7    unilaterally, take-it-or-leave-it basis, and if you don't like

 8    it, you would have to change jobs.  There's a collective

 9    bargaining agreement that sets out terms and conditions of

10    employment that protect everyone.  But people who don't want to

11    work under the collective bargaining agreement, they don't have

12    to, just like people don't have to take any job.

13          THE COURT:  Couple more questions.

14          *Janus*, at a very high level, reflects a greater force

15    to the 1st Amendment in the context of exclusive bargaining

16    units than we had seen before.  That said, *Janus* appears to

17    draw exactly the line you've been defending here.  But one

18    might imagine the trend of doctrine continuing to move past

19    *Janus*.  I note that there's been a lot of ferment in the

20    circuit case law since *Janus*, including cases raising exactly

21    the issues here.

22          Is there any case law that is an outlier, is there any

23    case law that you have identified that post-*Janus* that

24    identifies a broader girth for 1st Amendment rights as against

25    the union for a member of the bargaining unit who disagrees

1   with a member, then, that is evident in, say, *Knight*?

2           MR. KRONLAND:  No, your Honor.  Every judge of every

3   court to consider a challenge to exclusive representation has

4   rejected the challenge the Supreme Court has denied at least

5   ten times in cases asking the Court to overturn *Knight*.

6           THE COURT:  Within the Second Circuit we have the

7   unpublished opinion in *Jarvis*.  But we don't have, unlike the

8   Third Circuit and other circuits, a post-*Janus* decision on this

9   point, correct?  It is in that sense, if one defines the

10   universe as post-*Janus* law, it's an open field within the

11   Second Circuit.

12           MR. KRONLAND:  That's correct.  But it would be

13   strange to think that *Janus* makes any difference on this issue

14   when not only does *Janus* overrule *Knight, but Janus* expressly

15   says several times where the Court's drawing the line, and that

16   states can keep their bargaining systems exactly as they are.

17   And they can use the same system as the federal government

18   which is exclusive representation and were not overturning

19   fundamental principals of labor law.

20           And *Janus* is also based in part on the premise that we

21   have functioning collective bargaining systems that don't

22   involve agency fees.  A lot of states have -- at the time of

23   *Janus*, we don't have functioning collective bargaining systems

24   in the United States that don't involve exclusive

25   representation.  And we have, you know, 40 states that allow

MAQ6OLC

 1    collective bargaining.  They're all based on the principle of

 2    exclusive representation, and that was part of the premise of

 3    *Janus*.

 4          So it would be strange to see *Janus* as in any way

 5    altering the law on this issue.  The Second Circuit did issue a

 6    published decision in Virgin Atlantic Airways which is

 7    inconsistent with the plaintiff's argument because the Court

 8    held that there wasn't the 1st Amendment right not to be

 9    represented by a union that people didn't want to represent

10    them.  And in *Jarvis*, the Second Circuit didn't consider this

11    even, you know, a significant enough issue to publish because

12    it was controlled by *Knight*.

13          THE COURT:  Let me ask you, you had identified three

14    points of distinction.  I took you off course.  What was the

15    third point?

16          MR. KRONLAND:  The third one was the allegations of

17    the anti-Semitism by the union and the bargaining unit and I

18    think I've covered that.

19          THE COURT:  To the point being that it's anti-Semitic

20    speech, but there's no allegation of distinguishing or

21    discriminating against Jewish members of the bargaining unit in

22    the discharge of the duty of fair representation?

23          MR. KRONLAND:  That would be actionable under state

24    law.  There isn't a problem with the state law, and it's not an

25    issue of 1st Amendment association because they're not required

MAQ6OLC

1    to associate with the union or the bargaining unit members.

2    It's just an issue of their feelings, which they're entitled to

3    have, but that's not a 1st Amendment flaw.

4          THE COURT:  Got it.  Let me ask -- thank you,

5    Mr. Kronland, very helpful and thoughtful.

6          Excuse me, Mr. McGrath.

7          No, sorry, that's Mr. Kronland.  Thank you very much.

8    I'm sorry.  Looking at my chart here.  Thank you, Mr. Kronland,

9    very responsive and helpful.

10         Mr. Siegel, do you have anything to add?

11         MR. SIEGEL:  No, unless your Honor has any question.

12         THE COURT:  I don't have questions specific to you

13   beyond the ones we took up earlier, nothing from you.

14         MR. SIEGEL:  Nothing.

15         THE COURT:  Thank you, Counsel, for finding a way to

16   efficiently share the responsibility as it happened with

17   Mr. Kronland.

18         Mr. McGrath, over to you.

19         MR. MCGRATH:  Thank you, your Honor.  Just to pick up

20   very quickly on your questions about practically what can

21   nonmembers do to try to escape further the bargaining unit.

22         The decertification process, true, it is there.  But

23   the actual process of it typically is you have to get a

24   petition signed by 30 percent of the bargaining unit, and you

25   turn that in to the labor board.

MAQ6OLC

1          THE COURT:  Is that a federal or state law standard?

2          MR. MCGRATH:  That's typically state by state.

3          THE COURT:  The 30 percent threshold.

4          MR. MCGRATH:  The 30 percent is typically the

5     threshold.  And so in a bargaining unit of 30,000 people, that

6     means my clients would have to get -- I'm not great at math, I

7     went to law school -- about 9,000 people to sign a petition to

8     then get a vote to decertify the union.  This isn't an easy

9     process by where they just say, you know what, I'm incredibly

10    offended.  I want as far away as possible, I'm just going to

11    decertify the union and find a new way forward.  So just

12    practically speaking, sure, decertification exists but --

13         THE COURT:  Under what circumstances historically has

14    it happened?

15         MR. MCGRATH:  Very rarely.  Typically, what happens is

16    it's a small bargaining unit.  So, for instance, like a small

17    school district where you have maybe 60, 70 teachers who are

18    frustrated with their union.  Or, you know, like a small

19    waterworks facility where they have 20 people, you know, that

20    typically is where you can run an employee -- a couple

21    employees get upset and they have success in decertification.

22    A bargaining unit of 30,000 spread across many campuses

23    realistically --

24         THE COURT:  I take it part of the problem here is that

25    this situation likely comes up where it is a distinct minority

MAQ6OLC

1    of the bargaining unit that has the strongly-held political

2    views that are offended by what the union does.  In the

3    structure of the problem, you're relatively less likely to have

4    a critical mass of people who would care enough about the issue

5    in order to decertify on that ground.

6        MR. MCGRATH:  Very rarely is it the majority.  It's

7    the minority that's feeling oppressed or whatever they don't

8    like, and they can never clear that hurdle of 30,000.

9        THE COURT:  If you're a member of the union and, let's

10   say, the union itself, union as opposed to individuals or

11   individual leaders using their own -- speaking for themselves,

12   if the union itself is engaging in noxious speech and you're a

13   member of the unit, union, what is the internal machinery to

14   get them to stop or to get rid of the people who are making

15   statements like that on behalf of the union?

16       MR. MCGRATH:  If you're a member of the union?

17       THE COURT:  If you're a member, so you're not stuck

18   with decertification as your option.

19       MR. MCGRATH:  So a member of the union could also try

20   to decertify.

21       THE COURT:  Right.

22       MR. MCGRATH:  But there could be consequences such as,

23   you know, unbecoming actions as a member of a union.

24       THE COURT:  But be that as it may --

25       MR. MCGRATH:  So you can run for office to try to oust

MAQ6OLC

1    leadership.

2            THE COURT:  Are there mechanisms sort of akin to the

3    referendum or is it sort of an issue-specific way of putting a

4    particular issue or problem to the other site through the

5    membership?

6            MR. MCGRATH:  Well, each union, at least in my

7    experience, they have separate bylaws and constitutions.  It

8    could vary union to union.  Perhaps someone could try to

9    introduce something like at a convention, a biannual or annual

10   convention, a resolution we're not going to do X, Y and Z.  But

11   that would mean getting the delegates on board.  I don't think

12   there's much an individual union or a small group of union

13   members would be able to do effectively.

14           THE COURT:  Let me put a few questions to you that

15   would be helpful in situating your position in the context of

16   the current state of the law.

17           Is there a case on point that squarely does what

18   you're asking me to do?

19           MR. MCGRATH:  We don't believe there is, your Honor.

20   We believe that this, as we've talked about in our briefing and

21   even at the initial conference, we believe that you can really

22   actually distinguish this matter from *Knight*.  And it's, you

23   know, even some of your discourse with attorney Kronland, this

24   is kind of new territory in some ways.

25           THE COURT:  Explain to me, just articulate as clearly

MAQ6OLC

```
1    as you can, let's focus first on Knight, and then we'll talk
2    about the recent post -- the last several years of Knight
3    progeny, if you will, in the circuit, but focus on Knight
4    itself.
5           What's the clean line that distinguishes this case
6    from Knight?
7           MR. MCGRATH:  I think that you can go two different
8    ways.  The first would be the Supreme Court has already had
9    kind of an uneasy acceptance of exclusive representation.  But
10   what they've said, Steele, Vaca, even Janus is that we will
11   allow for this impingement on Constitutional rights if, but
12   only if, there's this full and robust duty of fair
13   representation.
14          THE COURT:  But Steele is really getting at the issue
15   of discriminating in the discharge of the duty of fair
16   representation.  In other words, if you're giving good jobs to
17   white people and bad jobs to black people, putting aside
18   anything in the 1st Amendment, you're squarely violating their
19   duty.
20          MR. MCGRATH:  Through their process of collective
21   bargaining they're discriminating; that's correct.
22          THE COURT:  Right.  That's a different paradigm
23   because there's no allegation here that your clients are being
24   differentially harmed in their pay or their benefits or their
25   tenure relative to people who hold different views.  Your
```

 1   clients are offended by having to associate with speech they
 2   find repulsive.
 3             MR. MCGRATH:  Well, based on perhaps their religious
 4   beliefs, but there are allegations in here about poor
 5   representation, not agreeing with positions in collective
 6   bargaining.
 7             THE COURT:  Not agreeing with positions in collective
 8   bargaining or breaching the duty of fair representation?
 9   People disagree with stuff all day long.
10             MR. MCGRATH:  I don't think that duty of fair rep, an
11   allegation of duty of fair rep is specifically made.
12             THE COURT:  I agree with you.
13             MR. MCGRATH:  Yeah.
14             THE COURT:  So --
15             MR. MCGRATH:  Oh, sorry.
16             THE COURT:  To come back, let's focus on *Knight*.
17             MR. MCGRATH:  So you're asking me --
18             THE COURT:  What's the distinction.
19             MR. MCGRATH:  What I'd say is *Knight* was not
20   considering an exclusive representation law where it had a
21   pared-back duty of fair representation.  I think that the Court
22   in *Knight* saw what it's always seen as the years have gone by.
23   They'll say there's exclusive representation, we understand
24   it's an impingement, but also you have the full duty of fair
25   representation.

MAQ6OLC

```
1                THE COURT:  So this is the 209-a.2 argument?

2                MR. MCGRATH:  That's one of the ways.

3                THE COURT:  Let's pause on that one for a moment.

4     Let's talk about that.

5                The carve-out that is 209-a.2, Taylor Law, is that --

6     that is essentially a product of the discussion in Janus,

7     right, and the holding in Janus that the law narrows the

8     duties, that state law narrows the duties of the union, right?

9                MR. MCGRATH:  My understanding is that was in

10    anticipation of Janus.  That it wasn't Janus then law, it was

11    law then Janus.

12               THE COURT:  But Janus also seems in its language to

13    approve narrowing the scope of responsibilities to hive off

14    individualized grievance representations, no?

15               MR. MCGRATH:  I think it was pondering in a vacuum, as

16    you said earlier, in dicta, what would be a lesser burden here

17    as opposed to fair-share fees.  And I think it was more saying,

18    oh, this could happen.  But it hadn't evaluated this law or any

19    statute that had been put into place to try to follow that.

20    And so I think that you have to take it as in a vacuum, they

21    haven't actually said what type of carve-out --

22               THE COURT:  Fair enough.  So in that respect, Knight

23    is not controlling here as to your argument if framed in

24    209-a.2 terms because by definition, as of the time of Knight,

25    apparently nobody was doing what New York law now does which is
```

MAQ6OLC

 1 │ to exempt individualized grievance procedures.

 2 │          So in that respect, whether you're right or wrong,

 3 │ *Knight* doesn't control this formulation of your argument?

 4 │          MR. MCGRATH:  I would say that's correct.

 5 │          THE COURT:  So let's then -- continuing with the

 6 │ 209-a.2 dimension, I'll let you move onto other things, but I

 7 │ wanted to tidy up this branch of the decision for me, if you

 8 │ will.

 9 │          MR. MCGRATH:  Sure.

10 │          THE COURT:  Put the 209-a.2 related challenge in

11 │ 1st Amendment terms.

12 │          MR. MCGRATH:  Well, what I think our argument would be

13 │ on that is that exclusive representation is a Constitutional

14 │ matter.  And the Courts have said we will allow for exclusive

15 │ representation when it has these elements.  209-a basically

16 │ makes exclusive representation unconstitutional.

17 │          THE COURT:  So it's a question begging what the

18 │ parameters of the required exclusive representation are.  You

19 │ know, it may well be that historically unions also gratis or

20 │ took on individual grievance proceeding representations.  But

21 │ just because that was a familiar historical practice doesn't

22 │ speak one way or the other to whether it's part of the

23 │ irreducible minimum of what the exclusive representation must

24 │ entail.

25 │          So you're apparently arguing that the duty is

[T42] A.322

MAQ6OLC

1   essentially hollowed out if you get rid of individualized as

2   opposed to group level advocacy.

3          MR. MCGRATH:  So a couple things on that.  In the

4   past, the duty to fair representation has been known to

5   encompass the contract negotiation, administration, and then

6   grievance adjustment.  That's how the Court always talked about

7   it.  If you go back to --

8          THE COURT:  Is that saying that because it must be

9   part of it or because in practice that's the way in particular

10  pre *Janus* things developed in this country?

11         MR. MCGRATH:  Well, to be fair, I don't -- I can't

12  think off the top of my head if any that said this that must be

13  what it is, although this was the accepted kind of component of

14  it.  But I think what it goes more to is the Supreme Court

15  seeing the detriment to nonmembers or minorities or less than

16  majority folks if the union wanted to move against them in any

17  way.

18         I think what those three components do is it really

19  highlights how the Court says, hey, there could be a problem

20  here.  This is what we need this full body, this full -- there

21  would be a fair representation to protect these people in the

22  minority and as nonmembers, so that they can't be discriminated

23  against.  So I think what the Court said how they look at it is

24  they see a problem for a nonmember, and so to try to cure that

25  they are saying this full duty needs to be present for us to

 1    allow --

 2           THE COURT:  Why is the white line drawn to treat

 3    individualized one-off proceedings as within the duty of fair

 4    representation?  I mean, in other words, the purpose of the

 5    exclusive representation is to make sure that in the context of

 6    public sector unions you have one voice speaking for collective

 7    issues.

 8           But if I've got a grievance because I'm breaching the

 9    dress code every morning and it's a factual issue of whether

10    I'm doing that or not, why do I need -- why does that

11    bargaining unit need to be my champion?  Why can't I hire you

12    or somebody else to do that?

13           MR. MCGRATH:  Well, so as we always say, the union

14    owns the grievance.  So they've collectively bargained for the

15    process, the union -- the actual contract is between the union

16    and the employer.  And it's the union who chooses how to

17    enforce that.

18           So the defendant's briefs talk about this -- but there

19    is no individual --

20           THE COURT:  Look, suppose I'm coming into work every

21    day wearing a sleeveless T-shirt and CUNY says, hey, that's not

22    consistent with our dress code, we're suspending you for a day.

23    You know, the union may or may not agree with the member of the

24    bargaining unit about the T-shirt rule, but even if the union

25    doesn't agree, what's to stop and what's wrong with a separate

MAQ6OLC

```
1    representative coming in and standing up for the professor and
2    defending that mode of dress that's consistent with whatever
3    governing rules are.
4            Just because the union takes a pass on that, who
5    cares?
6            MR. MCGRATH:  Well, I mean, it's because the union is
7    supposed to enforce the contract.  So no more and no less and
8    to make sure all of the employees in the bargaining unit
9    receive what they are owed under the contract.  And so they are
10   really the ones that should be assessing that.  And when they
11   make that assessment, they're often saying is this something we
12   want to enforce because it will have bargaining unit
13   implications.  Every grievance has bargaining unit --
14           THE COURT:  But the union might pass, if I were a
15   member of the union and happy with the union speech, the union
16   might still pass on pursuing a grievance like that.  The union
17   might just say, hey, professor, you've got to elevate your
18   dress game, you can't do that, we're not going to back you up
19   and support a frivolous claim like that.  The union's not duty
20   bound to take any position an individual wants it to, right?
21           MR. MCGRATH:  That's correct.
22           THE COURT:  So if a union takes a pass on representing
23   the interest of an individual, the individual wouldn't have to
24   give up.  The individual could still try to vindicate his or
25   her claim through a separate counsel or pro se.
```

[T45] A.325

1          MR. MCGRATH:  Well, I mean, typically, the union gets

2     to control that too as far as if they can pursue it on their

3     own, if they can bring their own counsel.  And I think that's

4     one of the problems really even with the statute.  If you look

5     at it, it says the valuation of a public member, where the

6     nonmember is permitted to proceed without the employer

7     organization.  And the question is, like the union, does a

8     union get to decide when it's permissible or when it's not or

9     when this happens and when it doesn't happen.

10          THE COURT:  Do we know the answer to that yet?

11          MR. MCGRATH:  Well, I just heard Mr. Kronland say that

12     the employee gets to choose, but we don't -- that's a factual

13     issue.

14          THE COURT:  But at this point, your premise in making

15     this argument is you're reading the new statute to presumably

16     say it's up to the union whether to even authorize or

17     greenlight the nonmembers bringing of an individual grievance.

18     But that's your say so as to how that law should be

19     interpreted.  I take it that point has not been litigated.

20     There's no case or controversy that presents that issue.

21          MR. MCGRATH:  I believe that's correct, and I think

22     that's one of the problems here, we don't know how this would

23     play out.  And, you know, Mr. Kronland just said, well, it

24     would be the employee who would choose if they wanted to do

25     that.

MAQ6OLC

1        You know, first, in their opening brief, they said we

2    have no duty in their Footnote 5.  And then they came back

3    later in their brief and said, well, we do have a duty, if they

4    can't represent themselves, we will do that.  I think this is

5    exactly why one of the reasons why the motions to dismiss

6    should not be granted because we don't know how this is going

7    to play out.  We don't know what the union plans to do with

8    this.

9        THE COURT:  This argument, the one based on 209-a.2,

10   has to be a facial challenge, right?

11       MR. MCGRATH:  That's how we've brought it.

12       THE COURT:  It can't be an as-applied challenge

13   because there are no facts particular to any of the plaintiffs

14   here about any grievance.

15       MR. MCGRATH:  That's correct.

16       THE COURT:  In what respect is 209-a.2 a violation of

17   1st Amendment -- the 1st Amendment in every application,

18   explain to me why that is so.

19       MR. MCGRATH:  I think going back to just the fact that

20   we believe the Supreme Court has said exclusive representation

21   is only -- they are only going to allow this impingement if

22   there's a full duty of representation.  209-a.2 is an example

23   of the carving out of that full duty, which then we believe

24   makes exclusive representation lawful.

25       THE COURT:  So, look, I have no mechanism for the

MAQ6OLC

1  determination of the matter of state law by a state court as to

2  how 209-a.2 would be construed.  Or this case to get to the

3  circuit.  The circuit, unlike the district court, has the

4  ability to certify a question like that.

5       But in what way am I authorized as a district court to

6  just make an assumption that 209-a.2 arrogates, as a mandatory

7  gatekeeper to the union, the power to allow a nonunion member

8  of the bargaining unit to litigate a grievance

9       MR. MCGRATH:  Your Honor, I think what you can do is

10  say, listen, *Knight* did not consider this situation.  And so

11  from looking at the Supreme Court cases, I believe that when

12  they said there needs to be a duty of fair representation, it

13  needed to include this or else exclusive representation is

14  unconstitutional.  I find that this exists, it seems to be a

15  variation of what the Supreme Court had in mind on this,

16  therefore exclusive representation is unconstitutional.

17       THE COURT:  Is the line you're now drawing essentially

18  that, providing the union didn't get in the way of a bargaining

19  unit member who's not a union member litigating a grievance on

20  their own, there's no problem here.  But the 1st Amendment

21  problem comes when the union effectively controls whether

22  the -- that individual employee's grievance can even go

23  forward; is that the line you're drawing?

24       MR. MCGRATH:  I think it might be that and one the

25  union basically can just let go of the grievance and not have

MAQ6OLC

1   to pursue it for the employee.

2           THE COURT:  If the union stays mum and says, as it

3   could for a member, we're not pursuing this, but be my guest.

4   Why is that a violation of the duty of fair representation?

5   Where is it written that the union is obliged to take on

6   one-off individual causes, key to a particular person?  If it's

7   a matter of state law, the state law either says or might be

8   construed to say that's not part of the union's duty, where

9   does the case law say that the 1st Amendment prevents the state

10  from defining the duties not to include grievance

11  representations?

12          MR. MCGRATH:  Well --

13          THE COURT:  It's circular.  I not having difficulties

14  with it.

15          MR. MCGRATH:  I think that it's -- it is true that

16  they can choose when to take a grievance for it or not.  But

17  it's when they're alleviated from any duty to pursue a

18  grievance on behalf of -- and it's no longer a part of a duty

19  of fair representation for them to pursue the grievance on

20  behalf of a nonmember.

21          THE COURT:  *Janus* seems to be saying, as a matter of

22  economics, if you're not going to pay the dues, you don't get

23  the deluxe plan.  You get the basic plan and the basic plan

24  doesn't include free grievance work.  What's wrong with that?

25          MR. MCGRATH:  I think they were just throwing out

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    ideas of what they can do less than --

2              THE COURT:  But this is the Supreme Court throwing out

3    ideas in the course of evaluating a 1st Amendment claim that's

4    very close to this space.  It's not somebody spit-balling.

5              MR. MCGRATH:  But they also didn't say what exactly

6    that entails.  So here the law doesn't talk about the union

7    will still carry this grievance forward if you pay for it,

8    which is one of the suggestions by the Supreme Court.

9              THE COURT:  Right.

10             MR. MCGRATH:  So here the law just says, it's not an

11   unfair labor practice if you don't do this.  Like, this

12   isn't -- you know.  And so I think that's one of the

13   differences.

14             THE COURT:  Final question or two on 209-a.2.  Has any

15   state adopted anything like that provision or is New York at

16   this point standing alone?

17             MR. MCGRATH:  I think that you've gotten very -- you

18   know, the defendants have put in their brief different statutes

19   that have been changed.

20             THE COURT:  And are those essentially for relevant

21   purposes here on all fours with 209-a.2?

22             MR. MCGRATH:  I don't know that's exactly the same,

23   but a similar concept where you can charge a nonmember, that

24   type of thing.  But none of those have been scrutinized yet.

25             THE COURT:  You're certainly not saying any of them

MAQ6OLC

1  has been resolved in your favor, but is what you're saying

2  essentially none of them have really been assessed at all.

3          MR. MCGRATH:  I don't think any of them have been

4  challenged at all, honestly, that I know of.

5          THE COURT:  Your first distinction, let's move on from

6  209-a.2, putting that aside.  In what other way is this

7  situation distinct from *Knight*?

8          MR. MCGRATH:  I think the other way it's distinct is

9  for Count One purposes is that in *Knight*, it was about

10  professors who are trying to basically -- they were saying we

11  have a Constitutional right have to access to petition the

12  government.  And *Knight* said you, no, you don't.  The

13  government can basically choose who they're going to listen to

14  and how they're going to do that.

15          Here we have professors who are not trying to petition

16  the government, they're trying to get away from the

17  state-imposed union, basically, that's speaking for them.  So I

18  think that --

19          THE COURT:  Is that not implicit in *Knight*?

20          MR. MCGRATH:  I don't think that it is.  I think

21  *Knight* was narrower.  And I think there have been many courts

22  who have basically just applied *Knight* to similar situations as

23  we have here.  But I think they've done that really too hastily

24  and that they haven't seen the nuance that's truly there.

25          THE COURT:  Is *Jarvis*, put aside it's a summary order,

MAQ6OLC

1    is *Jarvis* on point?

2            MR. MCGRATH:  Is *Jarvis* on point as to?

3            THE COURT:  As to this issue?

4            MR. MCGRATH:  I think *Jarvis* -- well, I mean, this

5    kind of falls back into the first distinction, but *Jarvis* was

6    before the law, and so that --

7            THE COURT:  Sorry, I'm putting aside 209-a.2, we

8    touched on that.  I'm now focusing on your second distinction

9    which is that *Knight* was about the right to petition the

10   government, essentially the union's collectivized work.  And

11   you're saying, well, this is different.  The problem here is

12   that it's not so much the union's collective duty, it's that

13   your clients hate the speech that the union is making.

14           MR. MCGRATH:  I think *Jarvis* was similarly applied as

15   the other circuits did, which was to say all exclusive for

16   *Knight* and be done.

17           THE COURT:  There's a lot of ferment in this area

18   after *Janus* understandably, I understand why *Janus* might have

19   been perceived as an invitation to push to see whether the

20   1st Amendment might have larger reach even than *Janus* had.

21           But based on my readings so far of the cases that I

22   looked at, I'm not seeing any circuit that has bit at the

23   argument you're making, even though it's been made in a number

24   of cases.  Am I missing something?

25           MR. MCGRATH:  I think the closest you get is probably

1   the Sixth Circuit and *Thompson*, where they say this is in

2   conflict with *Janus* but, hey, there's *Knight*, so we're bound.

3        THE COURT:  But *Janus* doesn't -- doesn't *Janus* itself

4   speak approvingly of *Knight*?  I mean, it's not as if *Janus* is

5   not addressing *Knight* and leaves us to wonder what *Janus*

6   thought of *Knight*.  *Janus* seems to take *Knight* as part of a

7   firmament.

8        MR. MCGRATH:  I think in *Janus* it just generally

9   said -- I think the position the Court took there was the

10  historical one, this is an impingement, duty of fair

11  representation is required and exclusive representation is not

12  before us, so we just take things as they are.  Like, this is

13  what it is, the laws are what they are and this isn't before

14  us.

15       THE COURT:  Let's suppose you got your way in this

16  case.  Put aside all case authority.  Let's suppose the spirit

17  of your client's grievances -- I couldn't use the word

18  grievance -- but the spirit of your client's claim is we do not

19  want to be associated with a union that has these political

20  views on issues that has nothing to do with its duties.

21       Suppose a court said, all right, I -- there is some

22  1st Amendment violation requiring the person to be hitched to

23  that wagon.  What's the remedy?

24       MR. MCGRATH:  I think the remedy is to say that the

25  exclusive representation concept, scheme, is unconstitutional.

MAQ6OLC

1      THE COURT:  In other words, it's not to shut up the

2  union because the union has those rights, correct?

3      MR. MCGRATH:  Correct.

4      THE COURT:  To speak, and it's not to -- is it to say

5  any time a member of the bargaining group is, you know, claims

6  offense at an idea being spoken by the union, that member of

7  the bargaining group is at liberty to bargain separately to

8  eliminate the association with the union that is engaged in the

9  offensive speech, is that the notion?

10      MR. MCGRATH:  I think, your Honor, if exclusive

11  representation goes away, it doesn't mean unions go away.  In

12  fact, I think there would be more unions.

13      THE COURT:  There might be, but would you have

14  little -- you would have little unions of two.  The --

15      MR. MCGRATH:  You could have individuals speak on

16  their own.

17      THE COURT:  Right.  But if you have -- you've got

18  hypothetically, how many professors -- how many teachers are in

19  this bargaining unit?

20      MR. MCGRATH:  The bargaining unit is 30,000.

21      THE COURT:  Let's take 30,000.  And let's suppose the

22  union, you know, takes 30 political positions as to which, I

23  don't know if you're a lifelong New Yorker, if you remember

24  Ed Koch who used to say basically if you agree with me on seven

25  out of ten issues, you should vote for me; if you agree on nine

[T54] A.334

1  out of ten, you should be locked up.  It's unrealistic to agree

2  with any one person.

3       So if you assume the union takes ten or 20 positions,

4  every one of those 30,000 people is going to have to something

5  to beef about.  Is it really the case that each of them can

6  call a foul because they disagree with something the union has

7  said, and on that basis step aside and self-represent or hope

8  to find somebody else who's got their particular constellation

9  of views and bargain about dress code or about healthcare with

10 an employer?

11      MR. MCGRATH:  I think the 1st Amendment says yes.  And

12 what I think you would do, so take the 30,000.  You have all

13 these people, the employer can still choose who they listen to,

14 how they negotiate or not.  So you would go to member-only

15 unions, which means if the union's providing a service I want

16 or speaks how I want to, I'm part of it.  If not, I leave.  And

17 if they build up this good rapport with the employer and I look

18 over and I say, oh, boy, the people of Union B get what they

19 want, I want that, I'm going to go join them.

20      THE COURT:  But the effect is have to an endlessly

21 shifting set of unions.  Every time one union speaks, depending

22 on how much people are calling faults on the speech, you've got

23 a whole bunch of people moving in or out of unions or creating

24 their own little bargaining unit, you know, essentially based

25 on ideological consistency.

MAQ6OLC

```
 1          I realize people might also -- some people might not
 2     care about the ideology, they just want the biggest salary.
 3     But at the end of the day the right to disassociate with
 4     something you disagree with would empower people to bargain as
 5     a onesy at will.
 6          MR. MCGRATH:  I think --
 7          THE COURT:  Is that your position?
 8          MR. MCGRATH:  That's correct.  I think the
 9     1st Amendment would say your ability to associate and speak
10     freely and associate with people who you want to be associated
11     with or not, trumps this shifting -- it's basically the open
12     market, right?  Car dealerships --
13          THE COURT:  Right.  But at the end of the day, for
14     better or worse, this is at war with, you know, decades of case
15     law that, for better or worse, enshrines and attaches great
16     weight to the idea of a single representative for public
17     employee unions.
18          MR. MCGRATH:  I think the Supreme Court has really had
19     an uneasy relationship about it, and I think that's why it goes
20     back to the duty of fair rep.  I think about our clients,
21     right, two of them have joined us today.
22          THE COURT:  Well, who are the clients?
23          Raise your hands.  Thank you for being here, I
24     appreciate it.  Your names are?
25          MR. LAX:  I'm Jeffrey Lax.
```

MAQ6OLC

1          MR. GOLDSTEIN:  I'm Avraham Goldstein.

2          THE COURT:  At the end of the proceeding give your

3     lawyer your name so the court reporter can take down the

4     spelling.  I appreciate the fact this matters enough for you to

5     be here.  Thank you.  I respect that.

6          MR. MCGRATH:  So I think about the two of them, I was

7     thinking about this this morning.  Professor Goldstein, his

8     family escaped from the USSR when he was a child.  Came over to

9     America to get away from anti-Semitism and oppression there.

10          THE COURT:  Still, by the way, a good move.

11          MR. MCGRATH:  Indeed.  And Professor Lax, that I don't

12     know if it was all, but most of his great-grandparents were

13     killed by the Nazis, his grandparents were tortured by them.

14     They came to America seeking to escape that as well.

15          And I think the beauty of America is you can come here

16     and you don't have to associate with those people anymore who

17     basic -- state-imposed association, which this is, the state

18     has created this bargaining unit, certified it and said you're

19     in the bargaining unit.  And then they've recognized this union

20     to be your spokesperson and they cannot escape this.

21          So when this union says what they believe to be

22     anti-Semitic things and to hate the very core of who they are,

23     they have no recourse, they can't get away.

24          THE COURT:  Look.  As a pragmatic matter, you've

25     described the problem, I don't think anyone is disputing that

1   is, in a denotative sense, an accurate description of the

2   predicament they are in.  The issue is how that sits,

3   vis-a-vis, long lines of case law.

4          Let me be very graphic with you.  I'm a district

5   court.  Your remedy here would effectively overturn a mode of

6   representation that goes back either to the New Deal or the

7   Cold War.  What authority do I have?

8          MR. MCGRATH:  Well --

9          THE COURT:  Or am I a way station to the

10  Second Circuit or the Supreme Court?

11         MR. MCGRATH:  No, your Honor.  Again, I think that you

12  can -- everyone is relying on *Knight*.  I think you can

13  distinguish from *Knight* the two ways that we gave to you, plus

14  Count Two which we haven't talked about yet, but was never

15  contemplated by *Knight* or any other court for that matter.  I

16  think that you're writing on a clean slate there.

17         THE COURT:  Tell me about Count Two.

18         MR. MCGRATH:  Well, so in Count One, we have trying to

19  get away from the union as your spokesperson.

20         THE COURT:  Right.

21         MR. MCGRATH:  In Count Two what you have is a group of

22  people -- the 30,000 people in this situation who have been

23  lumped together, put into a bargaining unit, state-endorsed,

24  state-certified and the arguments made, well, no one would

25  reasonably believe that, you know, they agree with everybody,

MAQ6OLC

1  et cetera, et cetera, or they have their own way of getting

2  their message out or something like that.

3       But as we cited to you in our brief, *Dale* and others,

4  it doesn't matter if people know you agree with it or not, or

5  that you have a way to get out your own message or not.  What

6  matters is that the state has forced your association

7  unwantingly when you don't want it.  And that's what we have

8  here with this bargaining unit.

9       THE COURT:  The state forces -- I mean, look, if I

10  want to get on my LIRR train to Suffolk County, I'm associating

11  with a bunch of other passengers who want to be on the same

12  train.  But I'm there because -- if we're now talking about the

13  fellow passengers, we all have the same commuting interests

14  just like the professors have the same interest in tenure,

15  track and salary and healthcare.

16       But the beauty of America, to put it your way, is that

17  it's this mosaic of people with a whole bunch of different

18  views and because some of us wind up on the same train doesn't

19  mean we're adopting what the passenger next to us thinks.

20       You know, the argument is stronger in a sense where

21  there's a person who purports to represent you, and then

22  decides to pop off on extraneous issues just because.  But the

23  fact that somebody else is in the bargaining group, where is

24  the case law that says that the state in any sense has -- is

25  responsible for -- that some breach of one's 1st Amendment

MAQ6OLC

```
1   right to not associate?
2            I mean, we rub elbows with people we disagree with all
3   day long, and we don't think of that including, you know,
4   public transit.  We don't think of it as the state forcing me
5   to cohabit with someone I disagree with.
6            MR. MCGRATH:  But this is state-compelled association.
7   And then you're handed over, going back to Count One, to a
8   representative that you don't want to be associated with, and
9   basically they put you together in this bargaining unit for the
10  express purpose of petitioning the government together.
11           THE COURT:  Which of these do you think is a stronger
12  claim?
13           We'll take a break in a moment or two.
14           Which of your claims are stronger, the 1st Amendment
15  claim based on association with the union as bargaining rep, or
16  with the fellow members of the bargaining unit?  Neither of
17  them seems to have on-point case law supporting you even though
18  I understand the spirit of the argument.  But which is
19  stronger, which is weaker?  I don't intend to be Sophie's
20  Choice, but it's a fair question.
21           MR. MCGRATH:  It's a fair question.  I think in the
22  sense that Count Two doesn't have any case law on it, it can be
23  a stronger argument in the sense of you have the ability to
24  really dive into this and make a ruling that isn't supposedly,
25  you know, you're going to have to wrestle with that --
```

```
 1            THE COURT:  And the remedy on Count Two has all 30,000
 2    members of your bargaining unit being solo actors because
 3    there's somebody there who's offended by everybody else.
 4            MR. MCGRATH:  Well, it's back to, again, you can
 5    associate how you want to affiliate and how you want --
 6            THE COURT:  Let me ask you one question and then we'll
 7    take a ten-minute break and I want to hear a brief rebuttal
 8    from the other side.
 9            Coming back to your 209-a.2 question, why do your
10    clients want to be represented in a grievance proceeding by a
11    bargaining rep whom they find obnoxious, ideologically?
12            MR. MCGRATH:  Well, I think their first preference
13    would not to be.  Certainly.  But if they do have to be, I
14    think that they want the full protections of what duty of fair
15    representations has been known.
16            And, again, if you want to look at it that way, if you
17    go back to the statute, the statute is kind of poorly written,
18    it's kind of open ended, no one really knows what any of that
19    means.
20            THE COURT:  Right.
21            MR. MCGRATH:  The union gets to make it up.  So...
22            THE COURT:  When we come back, from the Defense, I'd
23    be eager to get that perspective which is how to read the
24    statute, and at what point the law is developed enough as to
25    the meaning of the statute that one can reasonably resolve
```

1     this.  In other words, I welcome your take on that.

2     Plaintiff's counsel has an empirically correct point, which is

3     that statute doesn't appear to be litigated, so there may be

4     some latitude for its interpretation.  I'd be eager to get your

5     take.  I also want to hear about Claim Two.  I'll see you all

6     in ten minutes.

7               (Recess)

8               THE COURT:  All right.  I'll hear briefly from the

9     defense in rebuttal.  Mr. Kronland.

10              MR. KRONLAND:  Thank you, your Honor.  A few quick

11    points.  With regard to the 209-a argument, there is some

12    discussion about how the law works.  So I thought I would just

13    clarify and reread the state law.

14              So with respect to grievances, the state law is

15    referring only to certain types of grievances.  There are only

16    grievances concerning the evaluation or discipline of a public

17    employee.  And it provides that the union can only decline to

18    represent the nonmember, quote, where the nonmember is

19    permitted to proceed without the employer organization and be

20    represented by his or her own --

21              THE COURT:  So there's never a vacuum, it's either the

22    union or the employee's permitted to gain his or her own

23    representation?

24              MR. KRONLAND:  Correct.  And not only that, but in

25    this case we have the collective bargaining agreement in the

     1    record.  It's attached to the complaint as Exhibit A and it has

     2    the grievance procedure in it.  And in section, it's Article

     3    21, Section 21.3 provides that the employee, this is member or

     4    a nonmember, can choose to be represented by an attorney or a

     5    union representative.

     6         THE COURT:  But if I'm an employee and I'm protesting

     7    a discipline, I can -- under the law, I can go to the union.

     8    And the union either has to represent me or can't resist my

     9    finding a nonunion individual representative.

    10         Is that basically right?

    11         MR. KRONLAND:  Correct.  And, in fact, you wouldn't

    12    even have to go to the union.  Any member or nonmember that

    13    wants to represent himself or herself can represent himself or

    14    herself in a disciplinary grievance, can go to arbitration by

    15    themselves under the CBA.

    16         THE COURT:  The point is the union can step aside only

    17    if it's not putting up some obstacle to a separate

    18    representation?

    19         MR. KRONLAND:  That's exactly right.  And in terms of

    20    the fact that there aren't any state cases interpreting a new

    21    statute.  For this federal court where we have what is

    22    essentially a facial challenge, the normal presumption is the

    23    state courts and the state public employment relations board

    24    will interpret it to be Constitutional, will interpret it

    25    reasonably.  We don't anticipate that in advance that there

1    will be some interpretation of the state law that leaves people
2    unprotected.  It creates Constitutional problems that causes
3    people to lose their jobs or suffer unfairness.
4               THE COURT:  I see.  So, in other words, the notion
5    here is an available and arguably most persuasive reading of
6    the statute doesn't create the bog that plaintiff imagined.
7    The natural reading is that either the union will take on the
8    representation or not get in the way of a separate
9    representation.
10              MR. KRONLAND:  That's exactly, right.  It could be
11   read constitutionally and we presume that is what will happen.
12              THE COURT:  And, therefore, I needn't go down the
13   rabbit hole of imagining other interpretations.
14              MR. KRONLAND:  Yes.
15              THE COURT:  But at this point, plaintiff is correct
16   that it's too new to have, in fact, been the subject of a court
17   case construing it?
18              MR. KRONLAND:  Correct.
19              THE COURT:  All right.  Helpful, thank you.
20              MR. KRONLAND:  So the second point is about Count Two,
21   you know, association with the other union members.  We
22   would --
23              THE COURT:  I guess it's both with the unit and the
24   other members of the unit as opposed to Count One which is with
25   the union.

1          MR. KRONLAND:  Yes, and we would suggest that

2     Count Two is just putting in other words the same argument

3     that's foreclosed by *Knight*.  The only sense in which people

4     would be associated with the bargaining unit members is that

5     there they're all represented by the union in the bargaining

6     unit.

7          You know, they would all be, as I said, faculty

8     members at the same universities in the absence of a union.

9     They could all be subject to the same terms and conditions of

10    employment.  It's just putting the claim in *Knight* that was

11    rejected in different words.

12         And with regard to *Knight*, the principal point in

13    *Knight*, as the Supreme Court said, is the instructors had the

14    right to force the government to listen to them, which the

15    Supreme Court rejected.  But then it went on in Section 2B in

16    *Knight* to deal with rights the Supreme Court said the

17    instructors did have, which were the rights to speak and to

18    associate or not to associate.

19         And the Supreme Court said that right of

20    non-association was not impaired.  And this is really --

21         THE COURT:  Not impaired by what?

22         MR. KRONLAND:  It was not -- by the fact that there

23    was an exclusive representative.  And saying that when there's

24    an exclusive representative, we're forced to associate with the

25    other bargaining unit members, it's really just putting in

MAQ6OLC

1    different words the same 1st Amendment argument.

2         THE COURT:  Got it.  Let me ask you a question about

3    the remedy that came up late in my colloquy with Mr. McGrath.

4    And I asked what the remedy would be if I were able to write

5    with a free hand and impose the remedy that he sought to spare

6    the plaintiff's association with obnoxious fellow union members

7    or unions, to which the answer was get rid of the exclusivity.

8         In other words, permit multiple bargaining units.  And

9    I may have been hyperbolic in imagining 30,000 bargaining

10   units, but one could at least imagine a fair number coming out

11   of that process.

12        What's your perspective on that, and how much case law

13   would that overrule?

14        MR. KRONLAND:  Yes, your Honor.  That was the third

15   and final point I was going to make about what the case law

16   refers to sometimes as labor piece.

17        It's often said in the law that a page of history is

18   worth a thousand points of logic.  And there's a lot of history

19   here about exclusive representation.  There's a reason we use

20   it in the National Labor Relations Act, in the Railway Labor

21   Act, in essentially state public employee relation system.  And

22   that's because the experience of the United States is you need

23   a single representative democratically chosen to bargain a

24   unit-wide contract to get labor piece.

25        And the Taylor Law itself was adopted by the New York

1    legislature after a failed experiment with legislation that

2    didn't provide real collective bargaining rights that led to

3    massive strikes.

4           THE COURT:  Why is that those -- back to history.  Why

5    were those strikes the product of the lack of an exclusive

6    representative?

7           MR. KRONLAND:  Because there was no way -- there was

8    no system by which the employees' concerns could be satisfied

9    and put in a binding contract that the employees agreed through

10   their representative would include a no-strike provision.  In

11   other words, exclusive representation leads to a contract

12   that's broadly acceptable to the unit, which gets to

13   democratically choose its representative.

14          There were experiments with members-only bargaining

15   and public employment in the 1950s.  They're discussed in the

16   law review article we cite in our brief.  They were a failure.

17          THE COURT:  You said members only?

18          MR. KRONLAND:  Yes.  A union bargains only for its

19   members and you can have multiple unions, multiple

20   organizations all participating.

21          THE COURT:  Just walk through with me functionally why

22   that failed.

23          MR. KRONLAND:  It failed because, you know, for one

24   thing, the unions would compete against each other, you could

25   never give one organization more than you gave to another one.

```
 1     It also led to compensation and would could be the most

 2     militant organization, who was going to be the toughest with

 3     the employer who was going to, you know, hold out for the most.

 4              Employers, public employers hated it.  It's a system

 5     that was adopted by the government, we have to recall, to serve

 6     the government's interest.  Those are the findings at the

 7     beginning of the Taylor law in having a labor piece and the

 8     effective functioning of government.

 9              And the government wants one representative, one

10     contract, one democratically chosen representative, not chaos

11     where you have multiple representatives, some of whom may not

12     be satisfied.

13              THE COURT:  But were the strikes in place because

14     having a single representative tended to create an outcome

15     where what was negotiated included terms that precluded strikes

16     or were the strikes caused by something else?

17              MR. KRONLAND:  Well, prior to the Taylor Law there was

18     no collective bargaining system.  What you have is a

19     prohibition among public employee union strikes.  And that led

20     to massive public employee union strikes.  Those were the days

21     of the blue flu and other illegal public employee strikes under

22     what was the common Walden Act.

23              The exclusive representative system provides a means

24     for an interactive relationship between all of the employees

25     through their representative, and the public employer to try to
```

 1   reach a settlement that would be broadly acceptable to the

 2   unit.

 3          THE COURT:  You have said in the case law is of a

 4   piece that this principle is a thing involving public employee

 5   unions.  The logic of what you just described would seem to

 6   apply more or less as much to a private sector union, does it

 7   not?

 8          MR. KRONLAND:  It would and that's why we have

 9   exclusive representation in the National Labor Relations Act

10   and the Railway Labor Act.  And you have the legislative

11   history of the NLRA.  It's very clear that Congress felt you

12   need exclusive representation.  I think the quote, and I think

13   we cited in our brief, was it's generally agreed by employers

14   and unions that the making of a contract is impossible in the

15   absence of a single exclusive representative.

16          THE COURT:  And in those statutes, I take it, do not

17   deal with public employee unions?

18          MR. KRONLAND:  No.  Those statutes are private-sector

19   employees but they're --

20          THE COURT:  No.  I'm saying the National Labor

21   Relations Act, for example.  Forgive me.  It's been since first

22   year of law school that I took labor law.  Did those statutes

23   not recover public employees?

24          MR. KRONLAND:  Yes, National Labor Relations Act only

25   covers private-sector employees.

[T69] A.349

MAQ6OLC

```
1          THE COURT:  Is there no federal analog for public
2   sector employees, do we only -- is the area federal area or
3   only state law?
4          MR. KRONLAND:  They have collective bargaining for
5   federal employees.  That's an exclusive representative system.
6          THE COURT:  I see.
7          MR. KRONLAND:  And then each state --
8          THE COURT:  So there's federal law that deals with the
9   private sector, and then there is federal law that deals with
10  federal employees.  But public sector state employees are the
11  province of state law as limited by what such Constitutional
12  considerations as apply.
13         MR. KRONLAND:  Yes, and, you know, all those laws
14  would be based on the exclusive representative model and you
15  would have, you know, more than 10 million.  I mean, probably
16  just in the public sector at least seven and a half million
17  public employees would be covered by collective bargaining
18  agreements that are premised on exclusive representation, all
19  of which would be invalid on the plaintiff's view.  Plus it
20  would cast into question the constitutionality of the NLRA and
21  the RLA which are millions and millions of private-sector
22  employees and exclusive representative.
23         THE COURT:  The logic you're describing about the need
24  for a single representative, as a matter of just organizational
25  logic, equally applies public versus private, the reason the
```

```
 1    case law speaks in terms of public is because there isn't a
 2    statute on point, there isn't a federal statute on point.
 3              MR. KRONLAND:  Well, the reason the case law speaks
 4    about public is because you have these 1st Amendment challenges
 5    in the public sector.  But, you know, the original case law is
 6    all about the private sector, it's about the NLRA.
 7              THE COURT:  Why wouldn't -- if the NLRA forces people
 8    into single bargaining units, there's still state action that
 9    presses people together.  It may not be winning 1st Amendment
10    argument, but not for want of state action, right?
11              MR. KRONLAND:  That arguably is state action, the
12    certification by the National Labor Relations Board of a single
13    exclusive representative for a bargaining unit under the NLRA
14    could be challenged to state action.  And that's why, you know,
15    the Supreme Court may have been very careful in *Janus* to say it
16    wasn't seeking to rip up fundamental principles of modern labor
17    law.
18              THE COURT:  So taking plaintiff's remedy as described,
19    but understanding that it's not a remedy that's being requested
20    today involving the private sector, what would that tear up?
21    In other words, take me back to the founding head of the law
22    that that would void if essentially a public -- there was a
23    right to end run your exclusive bargaining unit, not make it
24    exclusive but have a series of breakaways.
25              MR. KRONLAND:  It would be an understatement to say it
```

 1    would chaos.

 2           THE COURT:  I get that, but from a doctrine

 3    perspective, what would that -- where would that transport us

 4    back to in time?

 5           MR. KRONLAND:  I mean, the Railway Labor Act was a

 6    1925 statute that had exclusive representation.  The NLRA would

 7    be 1937.

 8           THE COURT:  Right.  But as it relates to the state

 9    public employee.

10           MR. KRONLAND:  The late 1950s started public sector

11    collective bargaining laws.

12           THE COURT:  Those are all state laws, but they have

13    been the subject of the Supreme Court cases we have been

14    talking about.

15           MR. KRONLAND:  Yes.  It started in Wisconsin in the

16    late 1950s and within a relatively short time about 40 states

17    had adopted collective bargaining laws.

18           THE COURT:  Any further rebuttal.

19           MR. KRONLAND:  Not unless the Court has questions.

20           MR. SIEGEL:  I can rest on my briefs, your Honor.

21           THE COURT:  Counsel, thank you.  An unusually

22    interesting argument on both sides.  And I might add it was

23    well briefed.  Thank you.  I will take the case under

24    advisement.  We stand adjourned.

25           (Adjourned)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVRAHAM GOLDSTEIN et al., | |
| Plaintiffs, | 22 Civ. 321 (PAE) |
| -v- | OPINION & ORDER |
| PROFESSIONAL STAFF CONGRESS/CUNY et al., | |
| Defendants. | |

PAUL A. ENGELMAYER, District Judge:

This case involves First Amendment challenges by professors at a public university to

their compulsory inclusion in a bargaining group and consequent representation by a union

whose political advocacy the professors claim to abhor. The six plaintiffs are faculty members

(the "professors") employed by the City University of New York ("CUNY"). For purposes of

collective bargaining, the professors are exclusively represented by the Professional Staff

Congress/CUNY (the "PSC"). The professors, however, have denounced the PSC's political

advocacy, particularly on issues relating to Israel and Palestine, and have resigned from the PSC.

In this lawsuit against the PSC, CUNY, the City of New York (the "City"), and affiliated

individuals, the professors claim that New York state law governing public sector unions violates

their First Amendment speech and associational rights insofar as it compels them to be

represented in collective bargaining by the PSC. Relatedly, they challenge a 2019 amendment to

state law, which allows the PSC to forego representing non-members in individualized

proceedings, such as investigations, grievances, and disciplinary hearings.

Pending now are motions to dismiss from the PSC, CUNY, and individual defendants Thomas DiNapoli, John Wirenius, Rosemary A. Townley, and Anthony Zumbolo.[1] These take aim at all three counts in the Complaint: Count One, which challenges the professors' compelled association with the PSC; Count Two, which challenges the professors' compelled association with other faculty and staff in the same bargaining unit; and Count Three, which challenges certain plaintiffs' compelled financial support of the PSC through wage deductions that allegedly continued to be made after their resignations from the PSC. The motions addressed to Counts One and Two are brought under Federal Rule of Civil Procedure 12(b)(6); those addressed to Count Three are brought under Rule 12(b)(1).

For the following reasons, the Court grants the motions to dismiss Counts One and Two, and denies the motion to dismiss Count Three as moot, on account of concessions by the parties and one plaintiff's acceptance of an offer of judgment that together have significantly narrowed the scope of that Count.

## I.      Background

### A.      Factual Background[2]

#### 1.      New York's System of Exclusive Representation and the PSC

New York State's Public Employees' Fair Employment Act, N.Y. Civ. Serv. Law §§ 200, *et seq.* (the "Taylor Law"), puts in place an exclusive representation model of collective

---

[1] The City also moved to dismiss, Dkt. 59, but as all agreed at argument, the City is not a named defendant as to Counts One and Two, *see* Dkt. 82 ("Tr.") at 10–11, and a plaintiff's acceptance of an offer of judgment and concessions by the parties have mooted the claims for relief from the City as to Count Three. *See infra* Section IV.

[2] This account is based upon the Complaint, Dkt. 1 ("Compl.), and the exhibits incorporated therein. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may

bargaining. Under the Taylor Law, the Public Employee Relations Board ("PERB") separates

public employees into distinct "bargaining units"[3] for the purpose of collective bargaining. *See*

*id.* § 207. A bargaining unit comprises a group of public employees that share "a community of

interest" with respect to the terms and conditions of their employment. *Id.* § 207.1(a). A

bargaining unit (or units) is then represented by a union after the union's certification or

recognition by the state. *See id.* § 204.2. That union, under the Taylor Law, then has exclusive

legal authority to speak for all employees in its bargaining unit or units. *See id.* § 204.

On June 16, 1972, PERB certified the PSC—a union—to represent a bargaining unit

containing approximately 30,000 members of CUNY's instructional staff. *See* Compl. ¶¶ 57, 60.

The PSC and CUNY have entered into a Collective Bargaining Agreement ("CBA") and

Memorandum of Agreement ("MOA") that, along with other agreements, today control many

terms and conditions of the employment of the covered instructors. *Id.* ¶ 24; *see also id.*, Exs. A

(CBA), B (MOA).

The bargaining unit today includes the six plaintiffs: Avraham Goldstein ("Goldstein"),

Michael Goldstein, Frimette Kass-Shraibman, Mitchell Langbert, Jeffrey Lax, and Maria

Pagano. *See id.* ¶¶ 58, 60. Each has resigned from the PSC. *See id.* ¶¶ 10–15, 47. Under a 2019

amendment to the Taylor Law, the union owes them, as non-members whom it represents in

---

consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and
documents incorporated by reference in the complaint.").
For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all
well-pled facts to be true and draws all reasonable inferences in favor of plaintiff. *See Koch v.
Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *Nat. Res. Def. Council v. Johnson*, 461
F.3d 164, 171 (2d Cir. 2006).

[3] The Taylor Law uses the terms "bargaining unit" and "negotiating unit" interchangeably. *See,
e.g.*, N.Y. Civ. Serv. Law §§ 208.1(d) (referring to "bargaining unit"), 204.2 (referring to
"negotiating unit"). For the balance of this Opinion and Order, the Court adopts the term
"bargaining unit."

3

collective bargaining, a duty of fair representation "limited to the negotiation or enforcement of the terms of an agreement with [their] public employer." N.Y. Civ. Serv. Law § 209-a.2(c). However, the PSC is not required to provide representation to non-union members of the bargaining unit, in circumstances involving "questioning by the employer," *id.* § 209-a.2(c)(i), "in statutory or administrative proceedings or to enforce statutory or regulatory rights," *id.* § 209-a.2(c)(ii), or "in any stage of a grievance, arbitration or other contractual process concerning the evaluation or discipline of a public employee where the non-member is permitted to proceed without the employee organization and be represented by his or her own advocate," *id.* § 209-a.2(c)(iii). Further, a union is permitted to "provid[e] legal, economic or job-related services or benefits beyond those provided in the agreement with a public employer only to its members." *Id.* § 209-a.2.

## B. The CUNY Professors' Relationship with—and Opposition to—the PSC

The six plaintiffs are full-time instructional staff employed by CUNY. Compl. ¶ 1. The details of their employment vary—some are tenured professors, others are adjunct lecturers, and they teach across several CUNY schools, in subjects including accounting, math, and business. *Id.* ¶¶ 10–15. Each, however, is included in the instructional staff bargaining unit that the PSC exclusively represents. *See id.* ¶ 23.

For two reasons, plaintiffs seek to shed the PSC as their representative in collective bargaining.

First, plaintiffs, all but one of whom identify as Jewish, *id.* ¶ 3, "abhor" the PSC's political advocacy, *id.* ¶ 2, and stated positions on Israel and international affairs, *id.* ¶¶ 3, 27–35. In June 2021, after the PSC adopted a "Resolution in Support of the Palestinian People," *see id.* ¶ 3; *see also id.*, Ex. C. (the "Resolution"), the five Jewish plaintiffs resigned, *see id.* ¶ 36, based on what they termed the PSC's "anti-Semitic, anti-Jewish, and anti-Israel" pronouncements, *id.*

4

A.356

¶ 3. The PSC's political advocacy, they stated, "harms the Jewish plaintiffs and singles them out for opprobrium, hatred, and harassment based on their religious, ethnic, and/or moral beliefs and identity." *Id.* Relatedly, plaintiffs state, since the adoption of the Resolution, PSC members "have held chapter-level discussions, as required by the Resolution," *id.* ¶ 41, on the subjects discussed in the Resolution; these meetings, plaintiffs state, have fomented anti-Jewish sentiment among other members of the union, *id.* Plaintiffs oppose the PSC's use of members' dues, including to support financially the Working Families Party and the Occupy Wall Street movement. *Id.* ¶ 45; *see id.* ¶ 30.

Second, plaintiffs state that the PSC's representation of them in negotiating employment terms and conditions has been low quality, causing them to lose confidence in the union. *Id.* ¶¶ 27, 46. The PSC, they state, has prioritized the economic and employment interests of part-time adjunct professors over those of full-time CUNY faculty and staff. *Id.* ¶ 46; *see id.* ¶¶ 28–33. Plaintiffs also fault the PSC for treating them, as non-members, less favorably than PSC members of the bargaining unit, based on a recent Taylor Law amendment allowing unions to decline to represent non-members of the bargaining unit in individualized proceedings, such as investigations, grievances, and disciplinary hearings. *Id.* ¶¶ 53–56.

As of September 17, 2021, all six plaintiffs had resigned from the PSC. *See id.* ¶¶ 10–15. Nonetheless, plaintiffs claim, the City and DiNapoli continued to deduct dues for three plaintiffs following their resignations—Goldstein, *id.* ¶ 75, Kass-Shraibman, *id.* ¶ 76, and Langbert, *id.*—to transmit to the PSC.

**C.  Procedural History**

On January 12, 2022, plaintiffs filed a Complaint against the PSC, CUNY, the City, and four individuals in their official capacities: Wirenius, PERB's chairperson; Townley and Zumbolo, each a PERB member; and DiNapoli, the New York State Comptroller. *See generally*

Compl. The Complaint brought First Amendment claims against the PSC, CUNY, and all individual defendants except DiNapoli; and claims of improper post-resignation dues deductions against the PSC, the City, and DiNapoli. On all counts, plaintiffs seek declaratory, injunctive, and monetary relief, plus attorneys' fees and costs. On March 9, 2022, the Court held an initial conference and granted a joint request to stay discovery pending resolution of the anticipated motions to dismiss. Dkt. 47.

On April 20, 2022, the Court received motions to dismiss and supporting memoranda from: (1) CUNY, DiNapoli, Townley, Wirenius, and Zumbolo (the "State Defendants"), Dkt. 55 ("State MTD"); (2) the PSC, Dkt. 58 ("PSC MTD"); and (3) the City, Dkt. 60. On May 24, 2022, plaintiffs filed a combined memorandum opposing these motions. Dkt. 64 ("Pl. Response MTD"). On June 14, 2022, the State Defendants and the PSC each filed a reply in support of dismissal, Dkts. 66, 68 ("PSC Reply MTD"). The City did not file a reply, but later filed a notice that Goldstein had accepted an offer of judgment under Federal Rule of Civil Procedure 68 as to his claims against the City of improper wage deductions. Dkts. 67, 77 (as refiled).

On September 28, 2022, the Court scheduled argument on Counts One and Two, and ordered the parties to file a joint letter as to Count Three's surviving scope. Dkt. 70. On October 7, 2022, the parties filed that letter. Dkt. 72. On October 26, 2022, the Court held argument on Counts One and Two. On November 2, 2022, the City filed a proposed judgment as to Goldstein's Count Three claim, Dkt. 77, which the Court entered the following day, Dkt. 78.

On November 11, 2022, the parties filed another joint letter apprising the Court of the status of Count Three. Dkt. 80. On November 17, 2022, Goldstein moved for attorneys' fees and costs pursuant to 42 U.S.C. § 1988. Dkt. 84.

A.358

## II. Legal Standards Governing Motions to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145; *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party."). That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Analysis of Plaintiffs' First Amendment Claims (Counts One and Two)

Counts One and Two bring closely related claims. Each challenges the Taylor Law's requirement that the professors be represented in collective negotiations over employment terms and conditions by the PSC, as the exclusive representative of the professors' bargaining unit. The professors contend that this infringes their First Amendment speech and associational rights by compelling them to associate with the PSC (Count One) and the bargaining unit's other instructional staff (Count Two).

In moving to dismiss, defendants contend that settled precedent—*Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271 (1984) ("*Knight*"), and its progeny—disposes

7

A.359

of these claims. Plaintiffs dispute that. And, plaintiffs argue, even if *Knight* foreclosed their claims, the decision in *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018), compels a reassessment of *Knight*. The Court reviews these arguments and then addresses, in light of these decisions, plaintiffs' various theories of a First Amendment injury.

### A.    The Pertinent Holding in *Knight*

At issue in *Knight* was a Minnesota statute that, to establish "orderly and constructive relationships" between public employers and their employees, authorized public employees to bargain collectively over the terms and conditions of employment. *Knight*, 465 U.S. at 273 (quoting Minn. Stat. § 179.61 (1982) (internal quotation marks omitted)). It provided for the division of employees into appropriate bargaining units. *See id.* at 273–74. It also established a procedure, based on majority support within a unit, for the designation of an exclusive bargaining agent for that unit. *Id.* Consistent with the statute, a faculty union (the Minnesota Community College Faculty Association ("MCCFA")) was designated the exclusive bargaining representative for the state's community college's faculty, which had been deemed a single bargaining unit. *Id.* at 275–76. Twenty professors, who were not members of the union, brought suit against the state board that operated the community college system. *Id.* at 278. Before a three-judge district court panel, they challenged, under the First Amendment, the constitutionality both of exclusive representation in bargaining over terms and conditions of employment *and* of a statutory provision requiring the public employer to engage in "meet and confer" sessions, *id.* at 271, with *only* the exclusive representative—that is, the union—"on policy questions relating to employment but outside the scope of mandatory bargaining," *id.* at 273. The district court panel upheld the requirement of exclusive representation in bargaining, but it struck down the designation of the exclusive representative as the bargaining unit's sole representative at the "meet and confer" sessions regarding policy. *Id.* at 278–79.

The Supreme Court summarily affirmed as to the statute's designation of an exclusive representative in negotiations over mandatory employment terms and conditions. *Knight v. Minn. Cmty. Coll. Fac. Ass'n*, 460 U.S. 1048 (1983) (summary disposition). But it granted *certiorari* on the professors' challenge to the meet-and-confer provision with respect to non-mandatory policy questions, and, in *Knight*, sustained that provision, reversing the district court panel. The Court rejected the professors' contention that that provision abridged their speech and associational rights and unconstitutionally denied them "a government audience for their views." *Knight*, 465 U.S. at 282, 286. The professors' speech and association rights, the Court held, were not infringed by exclusively empowering the union to negotiate for the state on behalf of the bargaining unit and to express "the faculty's official collective position," *id.* at 276; *see id.* at 288. The statute left the professors "free[] to speak on any education-related issue," *id.* at 288, and "to associate or not to associate with whom they please, including the exclusive representative," *id.*; *see id.* at 276 ("Not every instructor in the bargaining unit is a member" of the association, and "not every instructor agrees with the official faculty view on every policy question."). And the professors had "no constitutional right to force the government to listen to their views," whether "as members of the public, as government employees, or as instructors in an institution of higher education." *Id.* at 283.

The parties disagree over *Knight*'s scope—and relevance—here. Plaintiffs cast *Knight*'s holding as "modest": "that government officials are constitutionally free to choose to whom they listen in nonpublic fora." Pl. Response MTD at 24. The decision, plaintiffs state, speaks only to the constitutionality of denying non-union members of a bargaining group the right to participate in meet-and-confer sessions with the public employer regarding policy. *Id.* It is irrelevant, they contend, to their claims here that "an exclusive representative's authority to speak and contract"

unconstitutionally compels dissenting employees to associate with the union and the other members of the bargaining unit. *Id.* at 23.

For a number of reasons, plaintiffs' attempt to cabin and marginalize *Knight* is unsustainable.

First and most obviously, before it granted *certiorari* on the meet-and-confer issue, the Supreme Court in *Knight* summarily *affirmed* the portion of the decision below that upheld the exclusive bargaining arrangement against a First Amendment challenge. Rejecting that challenge, the district court panel had held: "The provisions of [the statute] that allow for an exclusive representation system of collective bargaining and that impose duties to 'meet and negotiate' with respect to compensation and other terms and conditions of employment are constitutionally valid on their face and as applied in the community colleges . . . ." *Knight v. Minn. Cmty. Coll. Fac. Ass'n*, 571 F. Supp. 1, 12–13 (D. Minn. 1982), *aff'd in part*, 460 U.S. (summary disposition), *and rev'd in part sub nom.* 465 U.S. The Court's summary affirmance of that ruling binds lower courts to the judgment. *Mandel v. Bradley*, 432 U.S. 173, 176 (1977); *see also Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975) ("The lower courts are bound by summary decisions by the Supreme Court until such time as the court informs them that they are not." (cleaned up)). And while "the rationale of the affirmance may not be gleaned solely from the opinion below," *Mandel*, 432 U.S. at 176, the Court, in *Knight,* supplied its reasoning for the summary order. *See Knight*, 465 U.S. at 288–90.

Second, the Court's analysis in *Knight* upholding the exclusive meet-and-confer system referenced the exclusive negotiation process and treated it as logically analogous. In language that emphasized the similarity between the meet-and-negotiate and meet-and-confer provisions, the Court wrote:

A.362

Appellees' associational freedom has not been impaired. Appellees are free to form whatever advocacy groups they like. They are not required to become members of MCCFA . . . . Appellees may well feel some pressure to join the exclusive representative in order to give them the opportunity to serve on the 'meet and confer' committees or to give them a voice in the representative's adoption of positions on particular issues. *That pressure, however, is no different from the pressure they may feel to join MCCFA because of its unique status in the 'meet and negotiate' process, a status the Court has summarily approved.* Moreover, the pressure is no different from the pressure to join a majority party that persons in the minority always feel. Such pressure is inherent in our system of government; it does not create an unconstitutional inhibition on associational freedom.

*Id.* at 289–90 (emphasis added).

Third, a Second Circuit panel in 2016 rejected the narrow construction of *Knight* that plaintiffs propose, in upholding against a First Amendment challenge an exclusive bargaining unit arrangement for public employees. *See Jarvis v. Cuomo*, 660 F. App'x 72, 74 (2d Cir. 2016) (summary order), *cert. denied*, 137 S. Ct. 1204 (2017). Although *Jarvis* was resolved by a non-binding summary order, *see* Local Rule of the Second Circuit 32.1.1(a) ("Rulings by summary order do not have precedential effect."), "[d]enying summary orders precedential effect does not mean that" the Circuit, and by extension a lower court, should "consider[] itself free" to disregard the panel's ruling "in similar cases," *United States v. Payne*, 591 F.3d 46, 58 (2d Cir. 2010) (cleaned up). And here, the *Jarvis* panel's reasons for reading *Knight* to uphold such an arrangement are convincing.

At issue in *Jarvis* was a challenge by 10 operators of home childcare businesses to Article 19-C of the New York Labor Law, which permitted day-care providers to organize and join a union. *See Jarvis*, 660 F. App'x at 74. Under Article 19-C, New York State had certified a union as the exclusive representative for the plaintiffs' bargaining unit. *See Jarvis v. Cuomo*, No. 14 Civ. 1459 (LEK) (TWD), 2015 WL 1968224, at *2 (N.D.N.Y. Apr. 30, 2015), *aff'd*, 660 F. App'x. That arrangement, the plaintiffs claimed, compelled them to associate with the union

11

A.363

and its expressive activities, in violation of their First Amendment rights.  The district court expressly rejected the plaintiffs' narrow reading of *Knight, id.* at \*4 ("*Knight*'s holding is broader than Plaintiffs suggest."), stating:  "The Supreme Court's language indicates that it broadly considered whether exclusive representation by MCCFA infringed the plaintiffs' associational rights," *id.*  In affirming, the Second Circuit panel, quoting the passage reproduced above, similarly held that *Knight* had "foreclosed" claims that exclusive bargaining arrangements, by putting non-members to the choice of joining a union or losing influence over the exclusive representative's advocacy, breached their First Amendment speech and association rights.  *Jarvis,* 660 F. App'x at 74.[4]

Fourth, every other Circuit to consider the question has similarly held *Knight* to foreclose speech and association claims by employees within the bargaining group exclusively responsible for negotiating with the public employer.  *See, e.g., D'Agostino v. Baker*, 812 F.3d 240, 243 (1st Cir. 2016) (Souter, J. by designation) (non-members' ability to "speak out publicly on any subject" and "free[dom] to associate themselves together outside the union however they might desire" defeated compelled association claim), *cert. denied*, 579 U.S. 909 (2016) (mem.); *Adams v. Teamsters Union Loc. 429*, 2022 WL 186045, at \*2 (3d Cir. Jan. 20, 2022) (reading *Knight* as "only about whether the employees could demand a forum with their employer" would be

---

[4] The Circuit had previously reached a compatible conclusion in the context of private sector employees.  *See Virgin Atl. Airways, Ltd v. Nat'l Mediation Bd.*, 956 F.2d 1245 (2d Cir.), *cert. denied*, 506 U.S. 820 (1992).  The employees there objected to the certification of a union as their exclusive representative, on the ground that, due to the improper consideration of votes by ineligible persons, the union chosen to represent the bargaining group had been selected by less than a majority of the eligible workers.  *See id.* at 1247–49.  Rejecting a First Amendment challenge, the Circuit noted that the right of free association "has never been held to mandate 'majority rule' in the labor relations sphere," adding, in language apposite to the situation addressed in *Knight*:  "If the First Amendment did protect individuals from being represented by a group that they do not wish to have represent them, it is difficult to understand why that right would cease to exist when a majority of the workers elected the union," *id.* at 1251–52.

12

A.364

"simply at odds with what it says," as "*Knight* foreclose[d] the First Amendment [speech and association] challenge"), *cert. denied*, 2022 WL 4651460 (mem.); *Akers v. Md. State Educ. Ass'n*, 990 F.3d 375, 382 n.3 (4th Cir. 2021) (*Knight* "foreclosed" a freedom of association claim, in holding that Minnesota's exclusive representation regime "did not violate speech and associational rights of those who were not members of [the] organization selected as exclusive representative"); *Thompson v. Marietta Educ. Ass'n*, 972 F.3d 809, 813–14 (6th Cir. 2020) (*Knight* precluded First Amendment compelled speech and association challenge to exclusive representation; plaintiff's attempt to distinguish *Knight* was "such a cramped reading of *Knight*" that it "would functionally overrule the decision"), *cert. denied*, 141 S. Ct. 2721 (2021) (mem.); *Bennett v. Council 31 of the AFSCME*, 991 F.3d 724, 734–35 (7th Cir. 2021) (rejecting argument that *Knight* "addressed only whether the plaintiffs could force the government to listen to their views," as "*Knight* speaks directly to the constitutionality of exclusive representation," and barred the free speech and association claim), *cert. denied sub nom. Bennett v. AFSCME, Council 31*, 142 S. Ct. 424 (2021) (mem.); *Hill v. Serv. Emps. Int'l Union*, 850 F.3d 861, 864 (7th Cir. 2017) (per *Knight*, an "exclusive-bargaining-representative scheme is constitutionally firm" where non-members "are also free to form their own groups, oppose the [union], and present their complaints to the State"), *cert. denied*, 138 S. Ct. 446 (2017) (mem.); *Bierman v. Dayton*, 900 F.3d 570, 574 (8th Cir. 2018) (*Knight* "summarily affirmed the constitutionality of exclusive representation for subjects of mandatory bargaining" and thereby foreclosed the claim that the "'mandatory agency relationship' between [public employees] and the exclusive representative . . . violates their right to free association under the First and Fourteenth Amendments"), *cert. denied sub nom. Bierman v. Walz*, 139 S. Ct. 2043 (2019) (mem.); *Mentele v. Inslee*, 916 F.3d 783, 788 (9th Cir. 2019) ("*Knight* is the most appropriate guide" for a

13

compelled association challenge and forecloses First Amendment challenge), *cert. denied sub nom Miller v. Inslee*, 140 S. Ct. 114 (2019) (mem.); *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 969 (10th Cir. 2021) (*Knight* "found exclusive representation constitutionally permissible" and "thus belies [the plaintiff]'s claim that exclusive representation imposes [compelled speech and association] in violation of the First Amendment"), *cert. denied*, 142 S. Ct. 423 (mem.).

The Court accordingly holds—following all courts of appeals to have addressed the issue—that under *Knight*, the "exclusive representation by public-sector labor unions does not violate the speech or associational rights of non-union members." *Peltz-Steele v. UMass Fac. Fed'n, Loc. 1895 Am. Fed'n of Tchrs., AFL-CIO*, 21 Civ. 11590 (WGY), 2022 WL 3681824, at *6 (D. Mass. Aug. 25, 2022). And although plaintiffs declare that "*Knight* cannot bear [such] incredible weight," Pl. Response MTD at 24, they do not cite any contrary authority.

### B.   Whether *Knight* Controls Here

*Knight* unavoidably controls here. The facts here are on all fours with those in *Knight*—indeed, strikingly so. With the exception of a 2019 amendment to the Taylor Law, addressed *infra* Section III.D.4, plaintiffs have not identified any salient difference between the Minnesota statute upheld in *Knight* and New York's Taylor Law. Both statutes prescribe exclusive bargaining with respect to public sector employees, *see* N.Y. Civ. Serv. Law § 204; *Knight*, 465 U.S. at 271; utilize a "bargaining unit" feature, *see* N.Y. Civ. Serv. Law § 204.2; *Knight*, 465 U.S. at 271; and do not compel public employees to join the union elected by the majority of the bargaining unit, *see* N.Y. Civ. Serv. Law § 209-a.2(a); *Knight*, 465 U.S. at 289. And like *Knight*, this case consists of a First Amendment challenge by professors at a public university who do not belong to the union selected by a majority of instructors to represent the bargaining unit in collective bargaining. *Compare Knight*, 465 U.S. at 298, *with* Compl. ¶¶ 10–15, 47.

14

A.366

## C.     The Impact of *Janus* on *Knight*

Plaintiffs next argue that the 2018 decision in *Janus* repudiates, at least implicitly, the holding in *Knight*, requiring its reassessment.  This, too, is wrong.

*Janus* addressed the mandatory payment of agency fees—a portion of union dues—by non-members who are part of an exclusive bargaining unit of public employees.  The plaintiff, Janus, had resigned from the public sector union that had been majority-selected to represent the bargaining unit.  *See Janus*, 138 S. Ct. at 2460–62.  Janus argued that, insofar as he had not consented to the union's representation of him, forcing him to subsidize the union breached his First Amendment rights.  *Id.* at 2462–68.  Michigan's labor law permitting such deductions had been based on the Supreme Court's decision in *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), which had upheld the charging by public sector unions of non-members for a proportionate share of union dues attributable to a union's activities as its collective-bargaining representative.  Ruling for Janus, the Supreme Court overturned *Abood*.  It held that where "public employees are forced to subsidize a union, even if they choose not to join and strongly object to the positions [of] the union[,] . . . [such] violates the free speech rights of nonmembers by compelling them to subsidize private speech on matters of substantial public concern." *Janus*, 138 S. Ct. at 2459–60.

Although contesting the mandatory payment of agency fees by non-members, Janus's claim did not, more broadly, challenge the exclusive representation model for public employees, under the First Amendment or otherwise.  Plaintiffs here nonetheless argue that *Janus* is a doctrinal sea-change that repudiates *Knight* or logically calls it into doubt.  *See* Pl. Response MTD at 21–22.  In contrast, defendants depict *Janus* as consistent with, and indeed confirming, *Knight*'s vitality.  *See* State MTD at 12; PSC MTD at 10.

Plaintiffs are again incorrect. *Janus* repudiated existing law insofar as it overturned *Abood*, the 1977 precedent that had upheld extraction of agency fees from non-members against a First Amendment challenge. But although the decision thus reflects heightened sensitivity to the First Amendment issues implicated by the payment of such fees, *Janus*, as a brief review reflects, cannot fairly be read more broadly to impugn the exclusive representation model of public sector exclusive bargaining upheld in *Knight*.

*Janus* does not cite *Knight*. And *Janus* explicitly assumed that the "labor peace" accomplished by the exclusive representation of public employees was a "compelling state interest," insofar as it avoided the "confusion" and "conflicting demands" that would ensue were a public employer compelled to negotiate with multiple unions on behalf of members of the same bargaining unit. *Janus*, 138 S. Ct. at 2465 (cleaned up). The Court further emphasized that the "designation of a union as the exclusive representative of all employees in a unit" is not "inextricably linked" with "the exaction of agency fees," *id*. Its decision invalidating the extraction of agency fees instead turned on the non-member's compulsory subsidization of a union whose views and values he did not share. *See, e.g., id*. at 2463–64 ("Compelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command," and "[c]ompelling a person to subsidize the speech of other private speakers raises similar First Amendment concerns"). That interest is not implicated by the inclusion of a non-member in a bargaining unit. *Janus* therefore drew the bounds of its ruling as follows:

> It is . . . not disputed that the State may require that a union serve as exclusive bargaining agent for its employees—itself a significant impingement on associational freedoms that would not be tolerated in other contexts. We simply draw the line at allowing the government to go further still and require all employees to support the union irrespective of whether they share its views.

*Id.* at 2478. Lest the point be unclear, the Court added: "States can keep their labor-relations systems exactly as they are," *id.* at 2485 n.27, including by "requir[ing] that a union serve as exclusive bargaining agent for its employees," *id.* at 2478. *See also id.* at 2471 n.7 ("[W]e are not in any way questioning the foundations of modern labor law.").

Unsurprisingly, every court of appeals to address *Knight* since *Janus* has upheld state systems of exclusive representation against First Amendment challenges. *See, e.g.*, *Reisman v. Associated Facs. of Univ. of Me.*, 939 F.3d 409, 414 (1st Cir. 2019), *cert. denied*, 141 S. Ct. 445 (2020) (mem.); *Adams*, 2022 WL 186045, at *2 ("[W]e hold that, consistent with every Court of Appeals to consider a post-*Janus* challenge to an exclusive-representation law, the law does not violate the First Amendment."), *cert. denied*, 2022 WL 4651460 (mem.); *Oliver v. Serv. Emps. Int'l Union Loc. 668*, 830 F. App'x 76, 80–81 (3d Cir. 2020); *Akers*, 990 F.3d at 382 n.3 (First Amendment challenge to exclusive representation barred by *Knight*); *Thompson*, 972 F.3d at 812 (noting that "when the Supreme Court decided *Janus*, it left on the books . . . *Knight*," which "directly controls the outcome of" the First Amendment claim against exclusive representation), *cert. denied*, 141 S. Ct. (mem.); *Bennett*, 991 F.3d at 727 (plaintiff "cannot establish that *Janus* rendered the longstanding exclusive-bargaining-representative system of labor relations unconstitutional"), *cert. denied sub nom.*, 142 S. Ct. (mem.); *Ocol v. Chi. Tchrs. Union*, 982 F.3d 529, 532–33 (7th Cir. 2020) ("[The *Janus*] Court gave no indication that its ruling on fair-share fees necessarily undermined the system of exclusive representation."), *cert. denied*, 142 S. Ct. 423 (2021) (mem.); *Uradnik v. Inter Fac. Org.*, 2 F.4th 722, 726 (8th Cir. 2021) (First Amendment challenge barred where plaintiff's claim "look[ed] very similar to a claim brought by a different group of Minnesota professors in *Knight*"); *Bierman*, 900 F.3d at 574 (*Janus* did not overrule *Knight*; "where a precedent like *Knight* has direct application in a case, [courts]

A.369

should follow it, even if a later decision arguably undermines some of its reasoning"), *cert. denied sub nom.* 139 S. Ct. (mem.); *Mentele*, 916 F.3d at 789 (*Janus* did not overrule *Knight*, and the court must "leave to the Supreme Court the prerogative of overruling its own decisions even if subsequent decisions call into question some of that precedent's rationale" (cleaned up)), *cert denied sub nom.* 140 S. Ct. (mem.); *Hendrickson*, 992 F.3d at 969 (*Janus* "reinforces" the holding in *Knight* that exclusive representation is constitutionally permissible), *cert. denied*, 142 S. Ct. (mem.). There have not been any dissents to these decisions.[5]

Accordingly, *Janus* does not disturb *Knight*, or assist plaintiffs' cause.

### D. Plaintiffs' First Amendment Claims in Light of *Knight*

In light of *Knight*'s continuing vitality and its unambiguous approval of exclusive bargaining arrangements as against First Amendment challenges, plaintiffs' free speech and association claims are necessarily foreclosed by binding precedent. Although plaintiffs are at liberty to seek reassessment on appeal, the Court, under the doctrine of vertical *stare decisis*, lacks authority to depart from such precedent.[6] That is so whether plaintiffs' First Amendment claim is viewed as challenging their compelled association with the PSC (Count One) or with the bargaining unit's other members (Count Two).

---

[5] The Sixth Circuit, although holding the plaintiff's compelled association claims barred, opined that "*Knight*'s reasoning conflicts with the reasoning in *Janus*." *Thompson*, 972 F.3d at 814, *cert. denied*, 141 S. Ct. (mem.). But the Circuit recognized that, because the Supreme Court had not overruled *Knight*, it lacked authority to treat *Knight* as no longer good law. *Id.*

[6] "[V]ertical *stare decisis* is absolute, as it must be in a hierarchical system with 'one supreme Court.'" *Ramos v. Louisiana*, 140 S. Ct. 1390, 1416 n.5 (2020) (Kavanaugh, J., concurring in part) (quoting U.S. Const., Art. III, § 1). This doctrine "provides little, if any, leeway for a district court judge to stray." *Dodge v. Cnty. of Orange*, 282 F. Supp. 2d 41, 80 (S.D.N.Y. Sept. 9, 2003); *see also Palin v. N.Y. Times Co.*, 482 F. Supp. 3d 208, 215 (S.D.N.Y. Aug. 8, 2020), *modified*, 510 F. Supp. 3d 21 (S.D.N.Y. Dec. 29, 2020).

In the interest of completeness, the Court nonetheless evaluates why, under governing doctrine, the four theories of a First Amendment violation that plaintiffs have ventured in this lawsuit do not state a viable claim. As explained, the first three of these are foreclosed, either literally or effectively, by *Knight*. The fourth concerns a recent amendment to the Taylor Law.

### 1.    Compelled Association with the PSC

Plaintiffs' first theory is that New York impermissibly compels them to associate with the PSC and its speech by forcing them to accept the PSC as their mandatory agent for speaking and contracting with CUNY. Pl. Response MTD at 13–14. The association with the PSC is particularly toxic, plaintiffs plead, because the PSC has expressed abhorrent anti-Semitic and anti-Zionist views on extraneous (*i.e.*, non-employment) matters. Compl. ¶ 3. Plaintiffs claim that this further causes them to lack confidence in the PSC to fairly represent the bargaining unit in collective bargaining over the terms and conditions of employment. *Id.* ¶ 43.

Although plaintiffs' dismay at being situated in a bargaining unit led by persons with views they find reprehensible is undeniably sympathetic, *Knight* and its circuit-court progeny squarely foreclose such as a basis of a viable First Amendment claim. As these cases reflect, the remedies for a member of the bargaining unit are instead to resign from the union,[7] to decline to subsidize the union as *Janus* now permits, and/or to otherwise disassociate from the noxious speech. An employee may also seek to vote out the union as representative of the bargaining unit, to work within the union to change its leadership, or to pursue, through appropriate channels, claims of a denial of fair representation. But these authorities do not support a First Amendment right for the minority members to bargain separately with the employer on account

---

[7] The Complaint alleges, in fact, that plaintiff Lax resigned from the PSC after his complaints against the union before the Equal Employment Opportunity Commission prevailed in various respects. These allegedly resulted in determinations that certain defendants "discriminated" and "retaliated" against Lax on the basis of his religion. Compl. ¶ 32.

A.371

of their discomfort with the union's views. *See, e.g.*, *D'Agostino*, 812 F.3d at 244 ("[T]he freedom of the dissenting appellants to speak out publicly on any union position further counters the claim that there is an unacceptable risk the union speech will be attributed to them contrary to their own views; they may choose to be heard distinctly as dissenters if they so wish, and as we have already mentioned the higher volume of the union's speech has been held to have no constitutional significance."), *cert. denied*, 579 U.S. (mem.); *Mentele*, 916 F.3d at 788 (no First Amendment violation "where plaintiff raises concern that a union she dislikes is speaking for her"), *cert denied sub nom.* 140 S. Ct. (mem.).

### 2.    Compelled Association with the Bargaining Unit

Plaintiffs' second theory is that New York impermissibly compels them to associate with "tens of thousands of other instructional staff" in the same bargaining unit, despite the fact that many of these other instructors "do not share [plaintiffs'] beliefs or are overtly hostile to them." Compl. ¶ 48; *see id.* ¶¶ 99–100; Pl. Response MTD at 16 (claiming that New York has interfered with the professors' "right to select with whom they join in a common endeavor").

Plaintiffs depict this theory of a First Amendment violation as an open question, insofar as the challenge by the Minnesota professors in *Knight* was based on dissident instructors' compelled association with the union itself, as opposed to with other members of the bargaining group, and ensuing cases have had a similar factual basis. As a formal matter, such may be so. But even if this feature distinguished this entire line of cases, it would be of no moment. That is because the logic of *Knight* and its progeny would equally dispose of this theory of a First Amendment violation.

By definition, a bargaining unit is comprised of a large number of employees—even tens of thousands, as with plaintiffs' unit. These masses cannot be expected to agree on every issue, employment-related or otherwise, any more than a dissident member of the bargaining unit can

be expected invariably to share the views of the bargaining representative elected by the unit. And like the union and its leadership, the other members of a bargaining unit have First Amendment rights of expression. The analysis in *Knight*—holding that a dissident within the bargaining group does not have a First Amendment right to bargain separately with the public employer so as to enable them to dissociate from others whose views they do not share—equally applies to this theory of plaintiffs. And, taken to its logical extreme, plaintiffs' theory would entitle every single member of a bargaining group to negotiate separately with the public employer over terms and conditions of employment, lest the employee be clustered with another whose views he or she found disagreeable, a point plaintiffs conceded at argument. *See* Tr. at 54–56. Under the case law, that thesis is untenable. *See Knight*, 465 U.S. at 291 ("The goal of reaching agreement makes it imperative for an employer to have before it only one collective view of its employees when 'negotiating.'"); *see also Oliver*, 830 F. App'x at 80–81 (government's interests served by "choos[ing] to listen to a union while ignoring nonmembers without infringing upon the nonmembers' rights"); *Peltz-Steele*, 2022 WL 3681824, at *9 ("Although private in nature, exclusive union representation echoes the representative structures of American democracy both in its assets and its imperfections, fostering a majoritarianism tempered by constraints of fair representation but which inescapably yields a dissenting minority.").

In any event, this theory fails for a separate reason. The case law does not support that including a person in a bargaining group alongside other people is an act of "expressive" quality implicating the First Amendment. The decision in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006), is instructive. Law schools there challenged a federal law (the "Solomon Amendment") requiring that if any part of an institution of higher

A.373

education denied military recruiters access equal to that provided other recruiters, the entire

institution would lose certain federal funds. *Rumsfeld*, 547 U.S. at 51. In the part of its decision

pertinent here, the Supreme Court rejected the law schools' challenge, finding that "the schools

are not speaking when they host interviews and recruiting receptions." *Id.* at 64.[8] "[T]he

conduct regulated by the Solomon Amendment," the Court held, "is not inherently expressive"

because it requires only "explanatory speech" to communicate its message. *Id.* at 66. The Court

added: "Compelling a law school that sends scheduling e-mails for other recruiters to send one

for a military recruiter is simply not the same as forcing a student to pledge allegiance, or forcing

a Jehovah's Witness to display the motto 'Live Free or Die,' and it trivializes the freedom

protected in [*West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943)] and

[*Wooley v. Maynard*, 430 U.S. 705 (1977)] to suggest that it is." *Id.* at 62.

So, too, here. The Complaint does not allege that CUNY's professors are required to

"say" anything, or take any action,[9] as members of the bargaining unit, beyond being bound by

the terms and conditions negotiated on their behalf by the unit's elected exclusive representative,

the PSC. It is thus not of any moment, under the First Amendment, that other members of the

bargaining unit "do not share their same economic interests," Compl. ¶ 48, "do not share their

beliefs," *id.*, and "are overtly hostile to them," *id.* That people with different viewpoints are in a

---

[8] The law schools separately argued that the Solomon Amendment placed an unconstitutional condition on their receipt of federal funds. *See Rumsfeld*, 547 U.S. at 57–66. The Court's assessment of that claim is not relevant here.

[9] Although the Complaint alleges that the Resolution "requir[es] chapter-level discussion of possible support by PSC," Compl. ¶ 34, for the Palestinian-led "Boycott, Divestment, Sanctions" movement against Israel, the Complaint does not allege that the professors are obligated to attend or participate in those discussions. Nor does the Resolution's text suggest an obligation of all union members, let alone non-union members, to participate in these discussions. *See* Resolution at 1–2.

A.374

common unit for purposes of collective bargaining does not associate each—within the meaning

of the First Amendment—with the viewpoints of the others, any more than the travelers on a

common public carrier such as a municipal bus or train, or the students in a common public

school, are associated with one another's ideas or perspectives.[10]  The Complaint here does not

plead any concrete facts why outsiders would reasonably impute an association between a

professor and any of the many viewpoints held among the approximately 30,000 other instructors

in the bargaining unit.  Just as the Solomon Amendment was held not to infringe on the law

school's associational rights even if the school found the military recruiter's messages in

interviews, receptions, bulletin boards, and emails "repugnant," *Rumsfeld*, 547 U.S. at 70, that

the CUNY professors vehemently disagree with the messages of others in the bargaining unit

does not bespeak a cognizable injury under the First Amendment.

### 3.     The PSC as a Hostile Political Group

Plaintiffs' third theory—a variant of the first—casts the PSC as the equivalent of "a

hostile political group," Pl. Response MTD at 14, with which New York is forcing the professors

---

[10] For this reason, the compelled speech cases that plaintiffs cite are far afield.  Plaintiffs, as pled, have not been required to carry, endorse, or embrace any message of another—whether the PSC or its members.  *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557 (1995) (state may not require organizers of private parade to include among marchers a group imparting message the organizers do not wish to convey); *Pac. Gas & Elec. Co. v. Pub. Utility Comm'n of Cal.*, 475 U.S. 1 (1986) (state may not require privately owned utility to include in its billing envelopes speech of a third party with which it disagrees); *Wooley v. Maynard*, 430 U.S. 705 (1977) (state cannot compel citizens to display state motto on license plates); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) (state cannot require newspaper to run rebuttals to its editorials); *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943) (public school students may not be compelled to recite Pledge of Allegiance); *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 644 (2000) (public accommodations law that required Boy Scouts to readmit homosexual member violated Boy Scouts' First Amendment right of expressive association).  To the extent that the PSC's speech presumptively reflects the views of the majority of its members, plaintiffs are free to dissent, and have exercised that right.  *See, e.g.*, Avraham Goldstein, *I'm Stuck with an Anti-Semitic Labor Union*, Wall Street J. (Jan. 21, 2022), https://www.wsj.com/articles/im-stuck-anti-semitic-semitism-public-labor-union-intimidation-dues-cuny-city-university-new-york-janus-11642714137 (last visited November 29, 2022).

to affiliate, *see* Compl. ¶ 68. In support, plaintiffs cite cases giving public employees the right

not to be discharged for refusing to support a political party or its candidates. *See, e.g., Elrod v.*

*Burns*, 427 U.S. 347 (1976) (First and Fourteenth Amendments violated where non-civil-service

employees were threatened with discharge for failure to affiliate with Democratic Party); *Rutan*

*v. Republican Party of Ill.*, 497 U.S. 62 (1990) (promotions, transfers, and recalls based on

political affiliation or support are impermissible infringements on public employees' First

Amendment rights; conditioning hiring decisions on political belief and association violates

applicants' First Amendment rights absent vital governmental interest); *O'Hare Truck Serv., Inc.*

*v. City of Northlake*, 518 U.S. 712 (1996) (governmental retaliation against city contractors for

exercising rights of political association or expression impermissible).

These cases, however, are far afield. Each involves a state actor's consideration of the

political affiliation of an employee or applicant to favor or penalize their career prospects. There

is no analog alleged here. Quite the contrary, the Complaint is notably devoid of any claim that

non-union instructors in the bargaining unit have been, or stand to be, treated in any way

disadvantageously relative to members (or supporters) of the union.[11] Nor does it plead any facts

indicating that instructors have been differentially treated based on political affiliation or point of

view. The Complaint instead faults New York for treating the non-union-member instructors *in*

*pari passu* with the union instructors, as common members of the bargaining unit. Notably, too,

although the Complaint states that the six plaintiffs subjectively doubt the PSC can ably serve as

a fiduciary for them in negotiating terms and conditions of employment, Compl. ¶ 43, it does not

---

[11] To the extent the professors argue that they, as non-members, are treated "worse" than
members owing to a 2019 amendment to the Taylor Law which limits the PSC's duty to non-
members in individualized grievance settings, that argument is addressed *infra* Section III.D.4.

24

A.376

allege that any have experienced adverse consequences from their decisions to resign from the PSC.

### 4.    Facial Challenge to the Taylor Law's Section 209-a.2

Plaintiffs' final theory is of a different character.  They contend that a 2019 amendment to the Taylor Law, *see* N.Y. Civ. Serv. Law § 209-a.2, gives rise to a facial First Amendment violation.[12]  That amendment states that the union designated as the exclusive bargaining representative owes "non-members" or the bargaining unit a duty of fair representation "limited to the negotiation or enforcement of the terms of an agreement with [their] public employer," *id.* § 209-a.2(c).  But, it states, such a union is not required to provide representation to non-members in situations that involve "questioning by the employer," "in statutory or administrative proceedings or to enforce statutory or regulatory rights," or "in any stage of a grievance, arbitration or other contractual process concerning the evaluation or discipline of a public employee where the non-member is permitted to proceed without the employee organization and be represented by his or her own advocate." *Id.* § 209-a.2(c)(i)–(iii).

Plaintiffs contend that this provision—added in the wake of the *Janus* decision—authorizes the PSC to "treat [the CUNY Professors] less favorably than PSC members, solely because they have exercised their constitutional rights to become or remain non-members," Compl. ¶ 53, and that such violates the First Amendment.  As plaintiffs put the point: "This state of affairs leaves [plaintiffs'] and other non-members' interests vulnerable to arbitrary and discriminatory union conduct," Pl. Response MTD at 12, notwithstanding the admonition in

---

[12] Although neither the Complaint nor plaintiffs' memorandum of law denotes the challenge as facial, counsel at argument agreed that the challenge is necessarily facial. *See* Tr. at 17, 47.

25

A.377

*Janus* that the "duty of fair representation is a necessary concomitant of the authority that a union seeks when it chooses to be the exclusive representative," *Janus*, 138 S. Ct. at 2456.[13]

Plaintiffs' argument based on *Janus* is unpersuasive, as § 209-a.2, as amended, in fact responds to the analysis in *Janus*. Addressing a union's duty of fair representation to members and non-members, the Court there held: "What this duty entails, in simple terms, is an obligation not to act solely in the interests of [the union's] own members." *Id.* at 2467 (cleaned up). The Court further made clear that a union henceforth is at liberty to decline to represent non-members in the grievance process, thereby eliminating the risk, after *Janus*, of freeriding by a non-member who declined to pay agency fees. "[W]hatever unwanted burden is imposed by the representation of non-members in disciplinary matters can be eliminated through means significantly less restrictive of associational freedoms. Individual non-members could be required to pay for that service *or could be denied union representation altogether*." *Id.* at 2468–69 (emphasis added) (cleaned up).

The amendment to the Taylor Law adopts the approach invited by *Janus*. It does so by limiting the public employee union's duty to represent non-members, so as to apply to collective bargaining, but not to individualized proceedings such as disciplinary grievances. To this end, § 209-a.2 states that a union need not represent a non-member "during questioning by the employer," N.Y. Civ. Serv. Law § 209-a.2(c)(i), "in statutory or administrative proceedings or to enforce statutory or regulatory rights," *id.* § 209-a.2(c)(ii), and "in any stage of a grievance, arbitration or other contractual process concerning the evaluation or discipline," *id.* § 209-a.2(c)(iii), "where the non-member is permitted to proceed without the employee organization

---

[13] At argument, plaintiffs acknowledged that this challenge is unlike that in *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192 (1944), which held that a union could not exclude or deny equal treatment to non-union members based on a protected classification. *See* Tr. 39–40.

26

A.378

and be represented by his or her own advocate," *id.* Plaintiffs' claim that § 209-a.2 as amended is inconsistent with *Janus*'s reminder that a union must discharge its duty of fair representation thus overlooks the line the Court in *Janus* drew between collective and individualized proceedings. Read on its face and evaluated in light of *Janus*, § 209-a.2 faithfully applies *Janus*. It does not infringe on the rights of a non-member, whether to free speech and expression under the First Amendment or to fair representation.[14]

In a bid to avoid this result, plaintiffs suggest that the final clause of the amended section—"where the non-member is permitted to proceed without the employee organization and be represented by his or her own advocate"—might be read to modify only § 209-a.2(c)(iii), and not § 209-a.2(c)(i) and § 209-a.2(c)(ii). That construction is textually unpersuasive. *See Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 782 (2d Cir. 2013) ("When there is no comma, as in the statute considered in *Barnhart* [*v. Thomas*, 540 U.S. 20, 26 (2003)], the subsequent modifier is ordinarily understood to apply only to its last antecedent. When a comma is included, . . . the modifier is generally understood to apply to the entire series."). And even if § 209-a.2 were ambiguous on this point, the canon of constitutional avoidance would dictate the same outcome. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018); *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005) ("[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court."). That is because the

---

[14] With this caveat: The parties have not drawn to the Court's attention case law construing the amended § 209-a.2. *See* Tr. 63. Should that provision be construed differently than the Court has here and so as to intrude on the duty of fair representation, the above analysis would not apply.

reading the professors suggest—under which a union would be permitted not to represent the non-member in settings where the member was not allowed to "be represented by his or her own advocate"—would leave the non-member unassisted "during questioning by the employer," N.Y. Civ. Serv. Law § 209-a.2(c)(i), and "in statutory or administrative proceedings or to enforce statutory or regulatory rights," *id.* § 209-a.2(c)(ii). The constitutional questions potentially raised under *Janus* by this reading are, however, avoided by construing the final clause to apply to all of § 209-a.2's subsections. Consistent with this, the Complaint does not allege that non-members of the PSC have been denied representation by the PSC, where they *cannot select their own advocate for representation*, in any category of individualized proceeding described in § 209-a.2.[15]

The Court therefore rejects plaintiffs' final theory of a First Amendment violation. New York's statutory amendment restricting the scope of a public employee union's obligatory representation of non-members is, on its face, in accord with *Janus*. There is no basis to hold that it breaches the First Amendment rights of the non-members.

Plaintiffs' First Amendment challenges to their representation by the PSC and inclusion in the bargaining unit alongside members of the PSC, as brought in Counts One and Two, therefore fail to state a claim. These Counts must be dismissed.

## IV. Status of Certain Plaintiffs' Improper Dues-Deduction Claims (Count Three)

The scope of Count Three has narrowed substantially since the filing of the Complaint, as a result of concessions by the parties and plaintiff Goldstein's acceptance of an offer of judgment by the City.

---

[15] The PSC's collective bargaining agreement, which the Complaint attaches and incorporates, *see* CBA, is in accord. In Section 21.3, it provides that an employee, whether or not a union member, can choose to be represented by either an attorney or a union representative in grievance proceedings. CBA at 57.

A.380

At the outset, three plaintiffs—Goldstein, Kass-Shraibman and Langbert—sought prospective and retroactive relief against the PSC, DiNapoli, and the City. *See* Compl. ¶¶ 108–18. In their reply to the motions to dismiss, plaintiffs conceded that their Count Three "claims for prospective relief are not justiciable," Pl. Response MTD at 33. Goldstein then accepted an offer of judgment from the City, in the amount of $223.35, "plus reasonable attorneys' fees, expenses, [and] costs in an amount to be determined by the Court." Dkts. 77, 78.[16]

This leaves intact—as the parties have confirmed in a joint letter, *see* Dkt. 80, and at argument, *see* Tr. at 5—only the claims for retroactive relief by the three plaintiffs[17] against the PSC. *See* Dkt. 80. The PSC did not move to dismiss these claims. *See* PSC Reply MTD at 12. Therefore, the Court denies as moot all motions to dismiss as to Count Three.

## CONCLUSION

For the reasons above, the Court grants defendants' motions to dismiss in full. The Court therefore dismisses Counts One and Two, and the portions of Count Three on which defendants have moved.

The case will now proceed to discovery on the surviving portion of Count Three, which is limited to the claims against the PSC by Goldstein, Kass-Shraibman, and Langbert, with respect to dues and interest allegedly deducted from their wages after their resignations from the union. Because no live claims remain against any defendants other than the PSC, the Court accordingly dismisses all other defendants from this case. The Court directs counsel for the remaining parties

---

[16] Goldstein moved shortly thereafter for an award of attorneys' fees and costs. Dkt. 84. In the interests of economy and consistency, the Court will not entertain any such motion until Count Three, whose resolution could prompt further motions for fees and costs, has been resolved.

[17] Goldstein has indicated, in the latest joint letter, Dkt. 80 at 1, that he plans to drop his remaining claim against the PSC.

(Goldstein, Kass-Shraibman, Langbert, and the PSC) to jointly submit, by December 9, 2022, a proposed case management plan contemplating, *inter alia*, the completion of discovery on the remaining claim by February 9, 2023.

The Court respectfully directs the Clerk of the Court to close the motions pending at docket numbers 53, 56, and 59, and to terminate the City of New York, CUNY, DiNapoli, Wirenius, Townley, and Zumbolo as defendants in this matter.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 30, 2022
       New York, New York

A.382

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AVRAHAM GOLDSTEIN; MICHAEL GOLDSTEIN; FRIMETTE KASS-SHRAIBMAN; MITCHELL LANGBERT; JEFFREY LAX; MARIA PAGANO, | **Case No. 1:22-cv-00321-PAE** |
| Plaintiffs, | Hon. Paul A. Engelmayer |
| v. | |
| PROFESSIONAL STAFF CONGRESS/CUNY, *et al.*, | **UNOPPOSED MOTION FOR ENTRY OF FINAL JUDGMENT IN A CIVIL CASE** |
| Defendants. | |

TO THE HONORABLE COURT:

Pursuant to Rule 58(d) of the Federal Rules of Civil Procedure, Plaintiffs Avraham Goldstein, Michael Goldstein, Frimette Kass-Shraibman, Mitchell Langbert, Jeffrey Lax and Maria Pagano ("Plaintiffs"), as represented below, request the Court to enter final judgment in this civil case: a) for all Defendants, except Defendant City of New York, against them on counts one and two of the above-referenced case in accordance with the Court's Opinion and Order of November 30, 2022, Doc. No. 95; and (b) for Defendant Professional Staff Congress/CUNY ("PSC") against Plaintiffs Frimette Kass-Shraibman and Mitchell Langbert in accordance with the February 14, 2023 Order of Dismissal with Prejudice of Count Three as to Defendant PSC (Doc. No. 110). In support of this motion, Plaintiffs state:

1.      On January 12, 2022, Plaintiffs filed a three-count complaint against the seven Defendants. Doc. No. 1.

2.      On November 2, 2022, this Court issued a Rule 68 Judgment for Plaintiff Avraham Goldstein against Defendant City of New York. Doc. No. 78.

A.383

3.      By letter dated November 11, 2022, Plaintiffs informed the Court that "[t]here are no outstanding claims against State Defendants under Count 3" of the Complaint.  Doc. No. 80.  (The State Defendants are John Wirenius, Rosemary A. Townley, Anthony Zumbolo, The City University of New York, and Thomas P. DiNapoli.)

4.      In an Opinion and Order dated November 30, 2022, the Court granted in full the Motions to Dismiss filed by the remaining six Defendants PSC, City University of New York ("CUNY"), DiNapoli, Wirenius, Townley, and Zumbolo and dismissed counts one and two of the complaint and all Defendants other than Defendant PSC. Doc. No. 95.

5.      On February 14, 2023, the Court ordered count three dismissed with prejudice as to Defendant PSC pursuant to Federal Rule of Civil Procedure 41(a)(2). Doc. No. 110.

6.      The above described orders and Rule 68 Judgment have resolved all claims made in Plaintiffs' Complaint, Doc No. 1.

WHEREFORE, Plaintiffs request this Court to enter final judgment in this case pursuant to Rule 58 of the Federal Rules of Civil Procedure. A proposed final judgment is filed herewith.

Respectfully submitted,

Dated: March 14, 2023

**s/ William L. Messenger**
William L. Messenger (*pro hac vice*)
Email: wlm@nrtw.org
Milton L. Chappell (*pro hac vice*)
Email: mlc@nrtw.org
c/o National Right to Work Legal
  Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Telephone: 703.321.8510
Facsimile: 703.321.9319

A.384

Danielle R. Acker Susanj (*pro hac vice*)
Email: drasusanj@fairnesscenter.org
Nathan J. McGrath (*pro hac vice*)
Email: njmcgrath@fairnesscenter.org
THE FAIRNESS CENTER
500 North Third Street, Suite 600B
Harrisburg, Pennsylvania 17101
Telephone: 844.293.1001
Facsimile: 717.307.3424

*Attorneys for Plaintiffs*

A.385

**CERTIFICATE OF SERVICE**

I, the undersigned, certify that on this date I electronically filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will send electronic notification of filing to all counsel of record in this matter who are ECF participants.

Dated: March 14, 2023               **s/ William L. Messenger**       
                                   William L. Messenger (*pro hac vice*)
                                   Email: wlm@nrtw.org
                                   c/o National Right to Work Legal
                                     Defense Foundation, Inc.
                                   8001 Braddock Road, Suite 600
                                   Springfield, Virginia 22160
                                   Telephone: 703.321.8510
                                   Facsimile: 703.321.9319

                                   *Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVRAHAM GOLDSTEIN; MICHAEL GOLDSTEIN; FRIMETTE KASS-SHRAIBMAN; MITCHELL LANGBERT; JEFFREY LAX; MARIA PAGANO, | **Case No. 1:22-cv-00321-PAE** |
| Plaintiffs, | |
| v. | Hon. Paul A. Engelmayer |
| PROFESSIONAL STAFF CONGRESS/CUNY, *et al.*, | |
| Defendants. | |

### [Proposed] FINAL JUDGMENT IN A CIVIL CASE

IT IS ORDERED AND ADJUDGED THAT FINAL JUDGMENT IS HEREBY ENTERED in accordance with the November 30, 2022 Opinion and Order granting in full the Motions to Dismiss filed by Defendants Professional Staff Congress/CUNY ("PSC"), City University of New York ("CUNY"), DiNapoli, Wirenius, Townley and Zumbolo and dismissing counts one and two of the complaint and all Defendants other than Defendant PSC (Doc. No. 95) and the February 14, 2023 Order of Dismissal with Prejudice of Count Three as to Defendant PSC (Doc. No. 110).

IT IS FURTHER ORDERED that the Unopposed Motion for Entry of Final Judgment, Doc. No. 111, be, and the same hereby is, GRANTED.

FINAL JUDGMENT is therefore entered in favor of Defendants CUNY, DiNapoli, Wirenius, Townley and Zumbolo against all Plaintiffs on all three counts of the complaint; in favor of Defendant PSC against all Plaintiffs on counts one and two of the complaint; AND with the

voluntary dismissal of count three by the remaining Plaintiffs against Defendant PSC, the complaint

is HEREBY DISMISSED IN ITS ENTIRETY.

      Dated this _____ day of March, 2023.         SO ORDERED

_____
Hon. Paul A. Engelmayer
United States District Judge

A.388

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AVRAHAM GOLDSTEIN; MICHAEL GOLDSTEIN; FRIMETTE KASS-SHRAIBMAN; MITCHELL LANGBERT; JEFFREY LAX; MARIA PAGANO, | **Case No. 1:22-cv-00321-PAE** |
| Plaintiffs, | |
| v. | Hon. Paul A. Engelmayer |
| PROFESSIONAL STAFF CONGRESS/CUNY, *et al.*, | |
| Defendants. | |

## FINAL JUDGMENT IN A CIVIL CASE

IT IS ORDERED AND ADJUDGED THAT FINAL JUDGMENT IS HEREBY ENTERED in accordance with the November 30, 2022 Opinion and Order granting in full the Motions to Dismiss filed by Defendants Professional Staff Congress/CUNY ("PSC"), City University of New York ("CUNY"), DiNapoli, Wirenius, Townley and Zumbolo and dismissing counts one and two of the complaint and all Defendants other than Defendant PSC (Doc. No. 95) and the February 14, 2023 Order of Dismissal with Prejudice of Count Three as to Defendant PSC (Doc. No. 110).

IT IS FURTHER ORDERED that the Unopposed Motion for Entry of Final Judgment, Doc. No. 111, be, and the same hereby is, GRANTED.

FINAL JUDGMENT is therefore entered in favor of Defendants CUNY, DiNapoli, Wirenius, Townley and Zumbolo against all Plaintiffs on all three counts of the complaint; in favor of Defendant PSC against all Plaintiffs on counts one and two of the complaint; AND with the

A.389

voluntary dismissal of count three by the remaining Plaintiffs against Defendant PSC, the complaint is HEREBY DISMISSED IN ITS ENTIRETY.

        Dated this __14__ day of March, 2023.           SO ORDERED

_____
Hon. Paul A. Engelmayer
United States District Judge

A.390

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AVRAHAM GOLDSTEIN, MICHAEL GOLDSTEIN; FRIMETTE KASS-SHRAIBMAN; MITCHELL LANGBERT; JEFFREY LAX; MARIA PAGANO, | Case No. 1:22-cv-00321-PAE |
| Plaintiffs, | Hon. Paul A. Engelmayer |
| v. | **NOTICE OF APPEAL** |
| PROFESSIONAL STAFF CONGRESS/CUNY, *et al.*, | |
| Defendants. | |

PLEASE TAKE NOTICE that Plaintiffs Avraham Goldstein, Michael Goldstein, Frimette Kass-Shraibman, Mitchell Langbert, Jeffrey Lax, and Maria Pagano hereby appeal to the United States Court of Appeals for the Second Circuit from this Final Judgment, ECF No. 112, entered on March 14, 2023, entering final judgment, *inter alia*, on counts one and two in favor of Defendants Professional Staff Congress/CUNY; the City University of New York; John Wirenius, in his official capacity as Chairperson of the New York Public Employee Relations Board; Rosemary A. Townley, in her official capacity as Member of the New York Public Employee Relations Board; and Anthony Zumbolo, in his official capacity as Member of the New York Public Employee Relations Board; and this Court's Opinion and Order, ECF No. 95, entered on November 30, 2022, granting Defendants' motions to dismiss, ECF Nos. 56 and 59.

Respectfully submitted,

Dated: March 16, 2023

**s/ Nathan J. McGrath**
Nathan J. McGrath (*pro hac vice*)
Email: njmcgrath@fairnesscenter.org
Danielle R. Acker Susanj (*pro hac vice*)
Email: drasusanj@fairnesscenter.org
THE FAIRNESS CENTER
500 North Third Street, Suite 600B
Harrisburg, Pennsylvania 17101

A.391

Phone: 844.293.1001
Facsimile: 717.307.3424

Milton L. Chappell (*pro hac vice*)
Email: mlc@nrtw.org
William L. Messenger (*pro hac vice*)
Email: wlm@nrtw.org
c/o National Right to Work Legal
Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Telephone: 703.321.8510
Facsimile: 703.321.9319
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date a copy of the foregoing Notice of Appeal was filed

electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's

CM/ECF system.

Dated: March 16, 2023            **s/ Nathan J. McGrath**
                                 Nathan J. McGrath (*pro hac vice*)
                                 Email: njmcgrath@fairnesscenter.org
                                 THE FAIRNESS CENTER
                                 500 North Third Street, Suite 600B
                                 Harrisburg, Pennsylvania 17101
                                 Phone: 844.293.1001
                                 Facsimile: 717.307.3424

                                 *Attorney for Plaintiffs*