# No. 23-384

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

AVRAHAM GOLDSTEIN; MICHAEL GOLDSTEIN; FRIMETTE KASS-SHRAIBMAN;
MITCHELL LANGBERT; JEFFREY LAX; MARIA PAGANO,

*Plaintiffs-Appellants,*

v.

PROFESSIONAL STAFF CONGRESS/CUNY; CITY UNIVERSITY OF NEW YORK; JOHN
WIRENIUS, in his official capacity as Chairperson of the New York Public Employee
Relations Board; ROSEMARY A. TOWNLEY, in her official capacity as Member of the
New York Public Employee Relations Board; ANTHONY ZUMBOLO, in his official
capacity as Member of the New York Public Employee Relations Board; CITY OF
NEW YORK; THOMAS P. DINAPOLI, in his official capacity as New York State
Comptroller,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

**APPELLANTS' OPENING BRIEF**

_____

Nathan J. McGrath
Danielle R. Acker Susanj
THE FAIRNESS CENTER
500 North Third Street, Suite 600B
Harrisburg, Pennsylvania 17101
Telephone: 844.293.1001

William L. Messenger
Milton L. Chappell
Glenn M. Taubman
c/o National Right to Work Legal
Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Telephone: 703.321.8510

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ........................................................................................... 1

STATEMENT OF JURISDICTION ............................................................... 3

STATEMENT OF THE ISSUES .................................................................... 3

STATEMENT OF THE CASE ........................................................................ 4

I.    LR 28.1(b) Case Summary ......................................................... 4

II.   Legal Background: Exclusive Representatives Are Mandatory Agents Vested With Legal Authority to Speak and Contract for Employees ........................... 4

III.  Facts: The Professors Are Forced to Accept an Advocacy Group They Abhor as Their Exclusive Representative ..................... 6

IV.  Proceedings Below: The District Court Held *Knight* Forecloses the Professors' Claims on Appeal ................................ 9

SUMMARY OF ARGUMENT ...................................................................... 11

ARGUMENT .................................................................................................. 13

I.    The State Appellees, CUNY, and PSC Infringe on the Professors' First Amendment Rights by Compelling Them to Accept PSC as Their Exclusive Representative for Speaking and Contracting with CUNY ......................... 13

    A.   The State Appellees and CUNY Violate the Professors' Free Speech Rights by Granting PSC Legal Authority to Speak and Contract for the Professors ...................................... 14

    B.   Appellees Violate the Professors' Associational Rights by Forcing Them to Accept PSC as Their Mandatory Agent ................ 17

    C.   State Appellees, CUNY, and PSC Violate the Professors' Associational Rights by Forcing Them into a Mandatory Association of CUNY Instructional Staff ...................................... 19

    D.   The Professors' First Amendment Injuries Are Exacerbated by PSC's Limited Fiduciary Duty to Them ............................... 22

i

II.    *Knight* Did Not Hold That Governments Can Appoint Exclusive
       Representatives to Speak and Contract for Individuals For Any Rational
       Basis and Without Satisfying First Amendment Scrutiny ................................. 25

       A.    *Knight* Did Not Address the First Amendment Claims Made in
             This Case .................................................................................................. 25

       B.    The Lower Court's Misinterpretation of *Knight* Brings *Knight* into
             Conflict with *Janus* and Other Precedents Concerning Exclusive
             Representation ........................................................................................... 30

       C.    The Lower Court's Interpretation of *Knight* Would Allow the
             Government to Designate Exclusive Representatives to Speak and
             Contract for Citizens for Any Rational Basis............................................ 34

III.   No Compelling State Interest Justifies Forcing the Professors to Accept
       PSC as Their Exclusive Representative ............................................................... 37

       A.    Labor Peace Is Not a Compelling Government Interest......................... 38

       B.    Forcing the Professors to Accept an Exclusive Representative Is Not
             the Least Restrictive Means to Achieve a Theoretical Compelling
             State Interest ............................................................................................. 41

CONCLUSION ................................................................................................................. 42

# TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*14 Penn Plaza v. Pyett,*
556 U.S. 247 (2009) ................................................................. 12, 15, 23, 32

*Abood v. Detroit Board of Education,*
431 U.S. 209 (1977) ................................................................. 38, 39, 40, 41

*ALPA v. O'Neill,*
499 U.S. 65 (1991) ............................................................................... 5, 23

*Am. Commc'ns Ass'n v. Douds,*
339 U.S. 382 (1950) ................................................................................. 31

*Citizens Against Rent Control v. City of Berkeley,*
454 U.S. 290 (1981) ................................................................................. 36

*City of Madison, Joint Sch. Dist. v. Wis. Emp't Rels. Comm'n,*
429 U.S. 167 (1976) ................................................................................. 40

*Conley v. Gibson,*
355 U.S. 41 (1957) ................................................................................... 23

*Elrod v. Burns,*
427 U.S. 347 (1976) ................................................................................. 19

*Ford Motor Co. v. Huffman,*
345 U.S. 330 (1953) ................................................................................. 15

*Harris v. Quinn,*
573 U.S. 616 (2014) ........................................................................... *passim*

*Hill v. SEIU,*
850 F.3d 861 (7th Cir. 2017) .................................................................... 34

*Janus v. AFSCME, Council 31,*
138 S. Ct. 2448 (2018) ....................................................................... *passim*

*Jarvis v. Cuomo,*
660 F. App'x 72 (2d Cir. 2016) ........................................................... 28, 35

*Kassner v. 2nd Ave. Delicatessen Inc.,*
496 F.3d 229 (2d Cir. 2007) ..................................................................... 13

*Knight v. Minn. Cmty. Coll. Fac. Ass'n,*
    571 F. Supp. 1 (D. Minn. 1982) ....................................................... 25

*Knox v. SEIU, Loc. 1000,*
    567 U.S. 298 (2012) ................................................................. 37, 40

*Mentele v. Inslee*
    916 F.3d 783 (9th Cir. 2019) ........................................................ 30

*Minn. State Bd. v. Knight,*
    465 U.S. 271 (1984) ............................................................. *passim*

*Mulhall v. Unite Here Loc. 355,*
    618 F.3d 1279 (11th Cir. 2010) ..................................................... 18

*N.Y. Times v. Sullivan,*
    376 U.S. 254 (1964) ................................................................. 40

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982) ................................................................. 36

*NLRB v. Allis-Chalmers Mfg. Co.,*
    388 U.S. 175 (1967) ...................................................... 5, 14, 15, 32

*O'Hare Truck Serv., Inc. v. City of Northlake,*
    518 U.S. 712 (1996) ................................................................. 19

*Pacific Gas & Elec. Co. v. Public Util. Comm'n,*
    475 U.S. 1 (1986) ............................................................... 15, 16

*Ry. Employes' Dep't v. Hanson,*
    351 U.S. 225 (1956) ................................................................. 38

*Riley v. Nat'l Fed'n of the Blind,*
    487 U.S. 781 (1988) ................................................................. 36

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ........................................................ 12, 19, 20, 41

*Rumsfeld v. FAIR, Inc.,*
    547 U.S. 47 (2006) ................................................................. 21

*Rutan v. Republican Party of Ill.,*
    497 U.S. 62 (1990) ................................................................. 19

iv

*Smith v. Ark. State Hwy. Emps., Loc. 1315*,
    441 U.S. 463 (1979) ............................................................ 41

*Steele v. Louisville & N.R. Co.*,
    323 U.S. 192 (1944) ................................................ 12, 24, 31

*Teamsters Loc. 391 v. Terry*,
    494 U.S. 558 (1990) ................................................... 5, 6, 18

*Thompson v. Marietta Educ. Ass'n*,
    972 F.3d 809 (6th Cir. 2020) ............................................. 30

*USW v. Warrior & Gulf Nav. Co.*,
    363 U.S. 574 (1960) .......................................................... 23

*Vaca v. Sipes*,
    386 U.S. 171 (1967) .......................................................... 31

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
    956 F.2d 1245 (2d Cir. 1992) ...................................... 28, 29

*Wallace Corp. v. NLRB*,
    323 U.S. 248 (1944) ............................................................ 5

## Statutes

N.Y. Civ. Serv. Law § 201 ................................................ 5, 20
N.Y. Civ. Serv. Law § 203 ...................................................... 22
N.Y. Civ. Serv. Law § 204 ............................................. 5, 14, 22
N.Y. Civ. Serv. Law § 209-a ............................................ *passim*
N.Y. Lab. Law §§ 695-a to -g ................................................ 35

## Other Authorities

THE FEDERALIST No. 10 (James Madison) ................................... 21
U.S. DEP'T OF LAB., BUREAU OF LAB. & STATISTICS, NEWS RELEASE (Jan. 19, 2023),
https://www.bls.gov/news.release/pdf/union2.pdf. .................... 41

**INTRODUCTION**

Appellants Avraham Goldstein, Michael Goldstein, Frimette Kass-Shraibman, Mitchell Langbert, Jeffrey Lax, and Maria Pagano ("Professors") are faculty members of the City University of New York ("CUNY") who are forced to associate with an advocacy group that supports anti-Semitic policies the Professors abhor. Specifically, CUNY and the State Appellees[1] require the Professors to accept the Professional Staff Congress/CUNY ("PSC") as their exclusive representative for dealing with CUNY on certain matters. This means PSC has legal authority to both speak for the Professors and to enter into binding contracts on their behalf under New York state's Taylor Law, N.Y. Civ. Serv. Law §§ 200–15. The Professors—all but one of whom are Jews and Zionists—want nothing to do with PSC because, among other reasons, PSC supports the so-called "Boycott, Divestment, and Sanctions" ("BDS") movement that the Professors believe vilifies Zionism, disparages the national identity of Jews, and seeks to destroy Israel as a sovereign state.

The Professors cannot end this mandatory association with PSC short of quitting their positions—an option that would effectively allow PSC to drive them, and their disfavored viewpoints, from CUNY. So, to disassociate themselves from PSC and its objectionable speech, the Professors filed suit to enjoin the Appellees from forcing them to accept PSC's compulsory representation.

---

[1] "State Appellees" refers to Appellees John Wirenius, Rosemary A. Townley, and Anthony Zumbolo, in their official capacities as members of New York Public Employee Relations Board.

1

Despite finding the Professors' plight "undeniably sympathetic," Appendix ("A.") 371, the district court held that *Minnesota State Board v. Knight*, 465 U.S. 271 (1984), foreclosed their compelled speech and associational claims. A.370. In so doing, the district court joined a number of other courts that broadly interpreted *Knight* to exempt regimes of exclusive representation from all First Amendment scrutiny. A.364–65.

This expansive reading of *Knight* is untenable because the case merely addressed the limited issue of whether it was constitutional for the government to exclude certain employees from its nonpublic meetings with union officials. *See* 465 U.S. at 292. That is not the issue here. Further, *Knight* never held that individuals are not associated with their exclusive representative or with its speech as their proxy, something that makes as much sense as the notion that principals are not associated with their own agents. Indeed, the Supreme Court recently reaffirmed that "[d]esignating a union as the employees' exclusive representative substantially restricts the rights of individual employees" and inflicts "a significant impingement on associational freedoms that would not be tolerated in other contexts." *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2460, 2478 (2018).

This Court should break ranks with other courts and recognize that *Knight* never authorized governments to force dissenting individuals to accept the exclusive representation of an advocacy group for any rational basis and without satisfying First Amendment scrutiny. The government does not have untrammeled authority to

dictate who speaks and contracts for citizens in their relations with the government. The First Amendment reserves that choice to each individual. The district court's opinion should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it arises under the First and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. § 1343, because relief is sought under 42 U.S.C. § 1983. A.21. The Professors' complaint raises three counts. A.36–43. On November 30, 2022, the district court issued an opinion and order dismissing counts one and two, but not count three. A.353–82. Count three was resolved with respect to one defendant in a Rule 68 Judgment entered on November 2, 2022, (A.12; A.383), and with respect to the other defendants in a dismissal order entered on February 14, 2023. A.16; A.384. On March 14, 2023, the district court entered a Final Judgment on all counts of the complaint except the portion already governed by the Rule 68 Judgment. A.389. On March 16, 2023, the Professors filed a timely Notice of Appeal from the March 14, 2023 Final Judgment and the November 22, 2022 dismissal of counts one and two of their complaint. A.391. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the Supreme Court's decision in *Knight* allows the government to compel dissenting individuals to accept an exclusive representative for speaking

3

and contracting with the government for any rational basis and without having to satisfy heightened First Amendment scrutiny.

2.    Whether the State Appellees and CUNY violate the Professors' First Amendment rights by granting PSC legal authority to speak and contract for them, by compelling the Professors to associate with PSC and its speech, and by forcing the Professors into a mandatory association of faculty members.

## STATEMENT OF THE CASE

### I.    LR 28.1(b) CASE SUMMARY

This case presents First and Fourteenth Amendment claims of Professors whom the state forces to associate with a union with which they vehemently disagree, simply to pursue their chosen profession. Judge Paul A. Engelmayer issued an opinion and order dismissing counts one and two, which are the only counts at issue in this appeal, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). A.353–82.

### II.    LEGAL BACKGROUND: EXCLUSIVE REPRESENTATIVES ARE MANDATORY AGENTS VESTED WITH LEGAL AUTHORITY TO SPEAK AND CONTRACT FOR EMPLOYEES

New York's Taylor Law provides that, when a union is certified by New York's Public Employment Relations Board ("PERB"), "it shall be the exclusive representative . . . of all the employees in the appropriate negotiating unit." N.Y. Civ. Serv. Law § 204. This is true whether employees choose to be card-carrying members of the union or not. Exclusive representatives are often called "exclusive bargaining

4

agent[s]." *Janus*, 138 S. Ct. at 2478; *see, e.g., Harris v. Quinn*, 573 U.S. 616, 649 (2014).

That is for good reason. "By its selection as bargaining representative, [a union] . . .

become[s] the agent of all the employees, charged with the responsibility of

representing their interests fairly and impartially." *Wallace Corp. v. NLRB*, 323 U.S.

248, 255 (1944). The Supreme Court has likened this mandatory agency relationship

to that between trustee and beneficiary. *See Teamsters Loc. 391 v. Terry*, 494 U.S. 558,

567 (1990). "[J]ust as a beneficiary does not directly control the actions of a trustee . . .

an individual employee lacks direct control over a union's actions taken on his

behalf." *Id.*

      Unions vested with this extraordinary power have the "exclusive right to speak

for all the employees in collective bargaining," *Janus*, 138 S. Ct. at 2467, as well as the

right to contract for those employees, *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175,

180 (1967); *see* N.Y. Civ. Serv. Law § 201 (granting exclusive representatives legal

authority to negotiate and enter into binding contracts for employees with respect to

"terms and conditions of employment" and "administration of grievance."). This

authority is exclusive in the sense "that individual employees may not be represented

by any agent other than the designated union; nor may individual employees negotiate

directly with their employer." *Janus*, 138 S. Ct. at 2460.

      The power of an exclusive representative to speak and contract for others

carries with it a fiduciary duty to those individuals. *See ALPA v. O'Neill*, 499 U.S. 65,

74–77 (1991). As the Supreme Court explained in *Terry*, "[j]ust as a trustee must act in

the best interests of the beneficiaries . . . a union, as the exclusive representative of the workers, must exercise its power to act on behalf of the employees in good faith." 494 U.S. at 567. Among other things, an exclusive representative's "duty of fair representation" includes a duty to not discriminate against employees who are not union members. *See Janus*, 138 S. Ct. at 2468.

In 2018, however, New York amended its Taylor Law to limit the fiduciary duty not to discriminate and provided that exclusive bargaining agents have no duty to represent nonmember employees with respect to certain workplace grievances, even those that arise under the union-negotiated contract. N.Y. Civ. Serv. Law § 209-a.2. The amended Taylor Law provides that "an employee organization's duty of fair representation to a public employee it represents but who is not a member of the employee organization shall be limited to the negotiation or enforcement of the terms of an agreement with the public employer." *Id.* The Taylor Law further specifies that:

> No provision of this article shall be construed to require an employee organization to provide representation to a non-member: (i) during questioning by the employer, (ii) in statutory or administrative proceedings or to enforce statutory or regulatory rights, or (iii) in any stage of a grievance, arbitration or other contractual process concerning the evaluation or discipline of a public employee where the nonmember is permitted to proceed without the employee organization and be represented by his or her own advocate.

*Id.*

## III.   FACTS: THE PROFESSORS ARE FORCED TO ACCEPT AN ADVOCACY GROUP THEY ABHOR AS THEIR EXCLUSIVE REPRESENTATIVE

The Professors are fulltime faculty of CUNY. A.22–23 ¶¶ 10–15. All except

6

Pagano are Jewish and ardent Zionists, and several are devoutly Orthodox in their religious beliefs. A.25–28 ¶¶ 28–32.

As a condition of their employment at CUNY, the Professors must accept the state-certified PSC as their exclusive representative and accept inclusion in an "Instructional Staff" bargaining unit composed of other CUNY employees, pursuant to New York's Taylor Law. A.25 ¶ 25; A.33 ¶¶ 57, 58. This state-mandated association includes thousands of CUNY employees, such as part-time adjuncts, whose employment interests diverge from those of the full-time Professors. A.39 ¶ 104. The Professors currently are subject to a binding collective bargaining agreement and memorandum of understanding that PSC negotiated with CUNY in its capacity as their exclusive bargaining agent. A.24 ¶ 24.

The Professors are not PSC members because they became "alienated from PSC due to its political advocacy and stated positions on Israel and involvement in international affairs, as well as the quality of PSC's representation." A.25 ¶ 27; A.29 ¶¶ 36–38. The Professors' opposition to PSC crystalized in June 2021 when PSC adopted a Resolution supporting the BDS movement that they believe seeks to destroy Israel. A.29 ¶ 34; A.262–64. Pursuant to that Resolution, PSC subsequently held chapter-level discussions across CUNY campuses to encourage faculty to support this anti-Israel movement. A.29–30 ¶ 41.

The Professors "believe that this Resolution is openly anti-Semitic and anti-Israel," a belief amply supported by the Resolutions' terms. A.29 ¶ 35. As a result of

7

PSC's Resolution and subsequent conduct, the Jewish Professors have been ostracized on campus based on their identities, religious beliefs, and support for Israel. A.25–29 ¶¶ 28–32, 41. "The Resolution, and related conduct by PSC, sets them and their co-religionists apart and singles them out for disparate treatment, opprobrium, and hostility, based solely upon their religious, ethnic, and moral beliefs and identity, including their support for Israel, the nation-state of the Jewish people." A.30 ¶ 43; A.34 ¶ 67 (similar).

In addition to opposing PSC's anti-Semitic agenda, the Professors find PSC does a poor job negotiating and contracting with CUNY as their exclusive bargaining agent. A.30–31 ¶ 46. "Among other things, [the Professors] believe that PSC prioritizes the economic and employment interests of part-time adjunct professors and other groups in the bargaining unit over their interests as full-time faculty." *Id.* Professor Kass-Shraibman "believes that instead of negotiating contracts on behalf of the CUNY faculty as it should have, PSC frequently acted as a 'social justice' agency instead of a labor union." A.26–27 ¶ 30.

In protest of PSC's anti-Semitic Resolution and related conduct, the Professors other than Pagano, who had already ended her membership, provided notice that they resigned their union membership. A.29 ¶¶ 36–39. The Professors "do not want to be associated with, represented by, or linked to PSC in any way." A.30 ¶ 42. The Professors, however, have been unable to fully disassociate themselves from PSC. The State Appellees, CUNY, and PSC continue to force them, as a condition of their

employment, to accept PSC as their exclusive bargaining agent and to remain part of a bargaining unit composed of other instructional staff who do not share their economic interests or core beliefs. A.31 ¶¶ 47–48. PSC retains legal authority to speak and contract for the Professors, though it has no corresponding duty to protect their interests in grievances arising under the union-negotiated contract. A.31–33 ¶¶ 49, 53–56.

## IV. PROCEEDINGS BELOW: THE DISTRICT COURT HELD *KNIGHT* FORECLOSES THE PROFESSORS' CLAIMS ON APPEAL

In January 2022, the Professors filed a three-count complaint to disassociate themselves from PSC and its offensive speech. A.19–44. Count one asserts that the State Appellees, CUNY, and PSC violate the Professors' First Amendment rights by compelling them to associate with PSC and its speech and by granting PSC authority to speak and contract for them. A.37–38 ¶¶ 87–93. Count two asserts that it violates the First Amendment for the Appellees to force the Professors into a mandatory association of CUNY instructional staff. A.39 ¶¶ 102–05. Count three asserted that several Professors' First Amendment rights were violated because they were compelled to financially subsidize PSC after they resigned their union membership. A.41–43 ¶¶ 113–17. The lower court's disposition of count three was not appealed and is not before the Court.[2]

---

[2] Defendants City of New York and DiNapoli were defendants only with respect to count three and thus not parties here.

On November 30, 2022, the district court issued an opinion and order dismissing counts one and two for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). A.353–82. Although finding the Professors' claims "undeniably sympathetic," A.371, the district court concluded "plaintiffs' free speech and association claims are necessarily foreclosed by binding precedent" under *Knight*. A.370. In so doing, the lower court joined a number of other courts that reached a similar conclusion. A.369–70. The district court further concluded that, of what it considered the Professors' "four theories of a First Amendment violation" in the case, "the first three of these are foreclosed, either literally or effectively, by *Knight*." A.371.

The fourth "theory" concerned the 2018 amendment to the Taylor Law, N.Y. Civ. Serv. Law § 209-a.2, that limited a union's duty to represent nonmembers in grievances arising under the union-negotiated contract. A.377.[3] As both a textual matter and to avoid constitutional problems, the district court interpreted § 209-a.2 to relieve unions of their duty to represent nonmembers only when the nonmembers can proceed without the union and choose other advocates. A.379–80. Based on this narrow interpretation, the court found amended section 209-a.2 did not infringe on a nonmembers' First Amendment rights under *Janus* nor violate the duty of fair representation. *Id.*

---

[3] To be clear, this "theory" is not a separate claim. Rather, New York's decision to truncate the duty of fair representation that unions owe to nonmembers is yet another reason that it violates the First Amendment to compel the Professors to accept PSC as their exclusive representative.

The Professors could not immediately appeal the foregoing decision because portions of count three remained unresolved. A.381. Those remaining claims were resolved in a dismissal order entered on February 14, 2023. A.16. On March 14, 2023, the district court entered a Final Judgment on all counts of the complaint except a portion governed by an earlier Rule 68 Judgment. A.389–90. On March 16, 2023, the Professors filed a timely Notice of Appeal to seek this Court's review of the order dismissing counts one and two. A.391–93.

## SUMMARY OF ARGUMENT

If the First Amendment prohibits anything, it prohibits the government from dictating who speaks for citizens in their relations with the government. The State Appellees and CUNY thus necessarily infringe on the Professors' speech and associational rights by forcing them to accept a hostile political group, which they view as anti-Semitic, as their exclusive agent for speaking and contracting with their government employer.

The Supreme Court did not hold in *Knight* that the government can designate exclusive representatives to speak for nonconsenting individuals for any rational basis, and without satisfying First Amendment scrutiny. *Knight*'s narrow decision merely held it constitutional for a college to exclude employees from its nonpublic meetings with union officials. 465 U.S. at 292. *Knight* never addressed, much less held, that individuals subject to exclusive representation are not compelled to associate with their bargaining agent or with its speech.

11

Indeed, this misinterpretation of *Knight* places the decision into conflict with a nearly 80-year long line of Supreme Court precedents recognizing that exclusive representation restricts individual liberties. *See, e.g.*, *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 202 (1944); *14 Penn Plaza v. Pyett*, 556 U.S. 247, 271 (2009). Recently, in *Janus*, the Court stated not just once, but twice, that "[d]esignating a union as the employees' exclusive representative substantially restricts the rights of individual employees." 138 S. Ct. at 2460; *see id.* at 2469 (similar). The Supreme Court created the duty of fair representation for this reason. *See Steele*, 323 U.S. at 202–03.

The lower court's misreading of *Knight* also leads to an absurd result: it grants government carte blanche to politically collectivize individuals and compel them to accept exclusive representatives for dealing with the government. It defies credulity to believe the Supreme Court intended such an incongruous result. The First Amendment obviously protects the right of each individual to choose which association, if any, speaks for her and represents her interests before the government.

The Court should thus reject the expansive reading of *Knight* adopted by the district court and other courts and hold that regimes of exclusive representation are subject to heightened First Amendment scrutiny. At a minimum, this means the government cannot force individuals to accept an exclusive representative unless it "serve[s] compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. U.S. Jaycees,* 468 U.S. 609, 623 (1984). Here, even if CUNY had a compelling

12

interest in dealing only with PSC when formulating its employment policies—which it does not—CUNY can easily do that without forcing the Professors into a mandatory agency relationship with PSC. Allowing the Professors to exercise their First Amendment right to disassociate themselves from PSC and its offensive speech and discriminatory conduct undermines no compelling state interest.

## ARGUMENT

The district court's dismissal of counts one and two for failure to state a claim is subject to *de novo* review, in which the allegations are accepted as true and construed in the Professors' favor. *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir. 2007).

The Professors discuss in Section I how the State Appellees, CUNY, and PSC infringe on their speech and associational rights guaranteed by the First Amendment. Section II addresses why *Knight*'s limited holding does not control here. Section III establishes why Appellees' violation of the Professors' First Amendment rights fails First Amendment scrutiny.

I.   **THE STATE APPELLEES, CUNY, AND PSC INFRINGE ON THE PROFESSORS' FIRST AMENDMENT RIGHTS BY COMPELLING THEM TO ACCEPT PSC AS THEIR EXCLUSIVE REPRESENTATIVE FOR SPEAKING AND CONTRACTING WITH CUNY**

The First Amendment guarantee of "freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus*, 138 S. Ct. at 2463 (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). "The right to eschew

13

association for expressive purposes is likewise protected" by the First Amendment because "'[f]reedom of association . . . plainly presupposes a freedom not to associate.'" *Id.* (quoting *Roberts*, 468 U.S. at 623). As discussed below, Appellees violate the Professors' speech and associational rights by: (a) granting PSC legal authority to speak and contract for them; (b) compelling the Professors to associate with PSC and its speech; and (c) compelling the Professors to be part of the Instructional Staff bargaining unit.

**A.    The State Appellees and CUNY Violate the Professors' Free Speech Rights by Granting PSC Legal Authority to Speak and Contract for the Professors**

1. The point of the exclusive-representative designation is to establish that a union speaks not just for itself or its voluntary members, but that it has the "exclusive right to speak for all the employees in collective bargaining." *Janus*, 138 S. Ct. at 2467. Thus, "when a union negotiates with the employer or represents employees in disciplinary proceedings, the union speaks for the *employees*, not the employer." *Id.* at 2474. In compelling the Professors to accept PSC as their exclusive representative, the State Appellees and CUNY have granted this private interest group legal authority to speak for those Professors.

The State grants PSC not only authority to speak for the Professors, but also the power to enter into binding contracts that control their working life, *i.e.*, their terms and conditions of employment. *See Allis-Chalmers*, 388 U.S. at 180; N.Y. Civ. Serv. Law § 204. This power includes the ability to enter into contracts that may harm

14

employees' interest, *see Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 349–40 (1953), and to contractually waive employees' statutory rights, such as their right to bring discrimination claims against their employer. *See 14 Penn Plaza v. Pyett*, 556 U.S. 247, 273–74 (2009). Under regimes of exclusive representation, a represented individual "may disagree with many of the union decisions but is bound by them." *Allis-Chalmers*, 388 U.S. at 180.

State Appellees and CUNY infringe on the Professors' free speech rights by granting PSC legal authority to speak and contract for them. "[F]reedom of speech 'includes the right to refrain from speaking at all,'" *Janus*, 138 S. Ct. at 2463 (quoting *Wooley*, 430 U.S. at 714), and includes the right of each individual to control the content of his or her message, *see, e.g.*, *Pacific Gas & Elec. Co. v. Public Util. Comm'n*, 475 U.S. 1, 10–11 (1986) (plurality opinion). The government violates both principles by giving an advocacy group the power to speak for citizens who oppose that advocacy group's message.

Here, the Professors do not want PSC to speak for them and vehemently disagree with it on many core issues. A.30 ¶ 42; A.34 ¶ 66. Yet, to remain employed at CUNY, the Professors must suffer the indignity of PSC speaking for them and entering into binding legal contracts governing their working lives. This indignity is compounded by PSC's advocacy of anti-Semitic positions that cut to the core of the Professors' identities and beliefs. That indignity violates core constitutional principles of free association and personal autonomy.

15

2. The district court suggested the Professors can mitigate their association with PSC's speech by speaking against PSC and its positions. *See* A.371–72; A.375. To the contrary, the Professors speaking out to distance themselves from PSC and its noxious positions intensifies, rather than relieves, their constitutional injuries.

In *Pacific Gas*, the Supreme Court held that a state, by requiring a utility to give space on its billing envelopes to an advocacy group to disseminate its message, unconstitutionally compelled the utility "to associate with speech which the [utility] may disagree." 475 U.S. at 15. The Court reasoned the requirement pressured the utility "to respond to arguments and allegations made by [the advocacy group] in its messages to appellant's customers," and found "[t]hat kind of forced response is antithetical to the free discussion that the First Amendment seeks to foster." *Id.* at 16. PSC's status as the Professors' exclusive representative likewise puts the Professors in the unenviable position of having to speak out against the positions advanced by their exclusive representative—a situation akin to a principal having to disclaim the speech of his own agent. That is no solution at all—it is unconstitutional compelled speech.

In reality, the Professors can escape having PSC speak and contract for them only by either succeeding in this lawsuit or by quitting their jobs at CUNY. The latter alternative would essentially award PSC its presumed goal of driving those who support Israel from CUNY. Indeed, the Professors and other Jewish faculty are already being set apart and singled out for opprobrium and hostility based on their identity, religion, and support for Israel. A.30 ¶ 42; A.34 ¶ 66. The Professors should

16

not have to sacrifice their speech and associational rights to remain faculty at CUNY. Only the first alternative is just and proper: the Court should hold it violates the First Amendment to compel the Professors to accept PSC as their exclusive representative.

### B. Appellees Violate the Professors' Associational Rights by Forcing Them to Accept PSC as Their Mandatory Agent

The Supreme Court has recognized that requiring individuals to accept an exclusive bargaining agent is "itself a significant impingement on associational freedoms that would not be tolerated in other contexts." *Janus*, 138 S. Ct. at 2478. That acknowledgement is well founded. By forcing the Professors into a mandatory agency relationship with PSC, in which PSC has authority to enter into legally binding contracts, the State has necessarily associated the Professors with an advocacy group they despise.

Indeed, it makes no sense to say that the Professors are exclusively represented by PSC and, at the same time, not associated with PSC. That counterintuitive notion makes as much sense as saying that a principal is not associated with her agent or with its actions on her behalf.

Nor can the notion be squared with PSC's duty to fairly represent the Professors and other nonmembers when negotiating or enforcing agreements. N.Y. Civ. Serv. Law § 209-a.2. PSC owes this fiduciary duty to the Professors because it chose to be their exclusive representative. Just as New York would violate the Professors' associational rights if it forced them to accept an anti-Semitic trustee as

17

the sole manager of their personal finances and property against their wishes, New York violates the Professors' associational rights by forcing them to accept PSC as their mandatory agent for speaking and contracting with CUNY. *Cf. Terry*, 494 U.S. at 567–68 (analogizing an exclusive representative to a trustee).

In *Mulhall v. Unite Here Local 355*, the Eleventh Circuit held that a private sector employee had "a cognizable associational interest under the First Amendment" in whether he was subjected to exclusive representation. 618 F.3d 1279, 1286–87 (11th Cir. 2010). That court reasoned, correctly, that the union's "status as his exclusive representative plainly affects his associational rights" because the employee would be "thrust unwillingly into an agency relationship" with a union that may pursue policies with which he disagrees. *Id.* at 1287.

The same is true here, except the Professors' associational injury is worse, because they are thrust into an agency relationship with what is effectively an anti-Semitic political advocacy group that is openly hostile to them and their beliefs. *Mulhall* concerned requiring a racetrack employee to accept a union representative for dealing with a private employer. Here, the Professors are being compelled to accept PSC as their agent for dealing with a public entity, CUNY. The Supreme Court recognized in *Janus* that the core functions of exclusive representatives in the public sector are political in nature because they bargain with governments over matters of public concern. 138 S. Ct. at 2474–76. Further, PSC's advocacy extends to other

18

political matters the Professors oppose, such as PSC's support for the anti-Israel BDS movement and the Working Families Party. A.29 ¶ 35; A.30 ¶ 45.

The Supreme Court has long recognized that the First Amendment prohibits governmental entities, with an exception inapplicable here, from requiring their employees or contractors to affiliate with a political party. *See, e.g., Elrod v. Burns*, 427 U.S. 347 (1976); *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996).[4] State Appellees and CUNY requiring the Professors to affiliate with what is effectively a hostile political interest group is indistinguishable from requiring them to affiliate with a political party and just as unconstitutional.

**C.    State Appellees, CUNY, and PSC Violate the Professors' Associational Rights by Forcing Them into a Mandatory Association of CUNY Instructional Staff**

1. In addition to infringing on the Professors' right not to associate with PSC and its advocacy, State Appellees, CUNY, and PSC also infringe on the Professors' right to choose with which of their colleagues they associate. The First Amendment guarantees each individual the freedom to band together, or to not band together, with other individuals for expressive purposes. *See Roberts*, 468 U.S. 622. "[W]hen the

---

[4]  The lower court was wrong to find these cases "far afield," A.376, because in each, individuals were favored or penalized based on their political affiliation. The principle these cases establish is that it is unconstitutional for the government to make political affiliation a condition of employment or of receiving a contract. That is exactly what State Appellees and CUNY have done here: made affiliation with a political interest group (PSC) a condition of working at CUNY. The only way the Professors can escape this compulsory affiliation, absent winning this lawsuit, is to quit their jobs.

State interferes with individuals' selection of those with whom they wish to join in a common endeavor, freedom of association . . . may be implicated." *Id.* at 618.

State Appellees, CUNY, and PSC interfere with the Professors' right to select with whom they join in a common endeavor by requiring them to be part of a state-created mandatory association, namely a bargaining unit of all CUNY instructional staff. A.38–39 ¶¶ 99–100. This unit is composed of "tens of thousands of other instructional staff of CUNY . . . who do not share [the Professors'] same economic interests, and who also do not share their beliefs or are overtly hostile to them." A.31 ¶ 48. The Professors would not be part of this mandatory association of CUNY staff if they had the choice. A.39 ¶¶ 103–04. The Professors, however, are forced together into a compulsory association with these disparate individuals by PERB's certification order and the Taylor Law. A.25 ¶ 25; A.38–39 ¶¶ 99–100.

The purpose of this state-imposed association of instructional staff is inherently expressive: to bargain with a state entity (CUNY) for more compensation and over its employment policies. *See* N.Y. Civ. Serv. Law § 201. This is literally "speech" "petition[ing] the government for a redress of grievances" within the meaning of the First Amendment. This speech and petitioning concerns issues that are political in nature and matters of public concern. *Janus*, 138 S. Ct. at 2474–76.

In effect, the Professors are being compelled to be part of a state-organized and defined "faction"—*i.e.*, a group of similarly situated persons who associate together to pursue rent-seeking policy objectives. The problems caused by citizens

forming voluntary factions have been recognized since the nation's founding. *See* THE FEDERALIST No. 10 (James Madison). The Founders would have been aghast at the prospect of a government forming, and then forcing dissenting individuals to be part of, mandatory factions for petitioning that government for more benefits.

2. Contrary to the district court's reasoning, *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47 (2006) does not support a different conclusion. A.373–74. *Rumsfeld* held that requiring schools to allow military recruiters to use their property did not associate the schools with the recruiters' messages. 547 U.S. at 69–70. A state forcing dissenting individuals to be part of a collective bargaining unit is nothing like requiring a school to allow certain individuals to use its physical property. Nor is it anything like the lower court's strained analogy of "travelers on a common public carrier such as a bus or train" or "students in a common public school," A.375, in which random individuals merely share a physical space. State Appellees and CUNY are requiring the Professors to be part of an *expressive association* whose very purpose is to petition a government entity (CUNY) over its policies.

If anything, *Rumsfeld* supports the Professors' claims because the Court noted that its "compelled speech cases are not limited to the situation in which an individual must personally speak the government's message." 547 U.S. at 63. The Court has also "limited the government's ability to force one speaker to host or accommodate another speaker's message." *Id.* By forcing the Professors and other nonmembers into a bargaining unit exclusively represented by PSC, the appellees have effectively

conscripted these individuals to support PSC's message by making them one of the

tens of thousands for whom PSC speaks. PSC's exclusive power to speak for all

employees in a bargaining unit significantly increases PSC's leverage to obtain its

objectives and "'results in a tremendous increase in the power' of the union." *Janus*,

138 S. Ct. at 2467 (quoting *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 401 (1950)).

*Rumsfeld* is no obstacle to the Professors' quest in count two to be freed from being

politically collectivized into a bargaining unit.

### D. The Professors' First Amendment Injuries Are Exacerbated by PSC's Limited Fiduciary Duty to Them

The Professors are not only being compelled to accept a mandatory agent they

despise. They also are being compelled to accept an agent that does not owe a full

fiduciary duty to them, despite the Supreme Court's requirement of that full duty to

protect their rights in the context of exclusive representation. *See Janus*, 138 S. Ct. at

2469 ("That duty is a necessary concomitant of the authority that a union seeks when

it chooses to serve as the exclusive representative of all the employees in a unit.").

While New York has granted PSC authority to exclusively represent nonmembers

with respect to "administration of grievances" and other matters, N.Y. Civ. Serv. Law

§§ 203, 204.2, New York relieved PSC of any duty to "provide representation to a

non-member . . . in any stage of a grievance, arbitration, or other contractual process

concerning the evaluation or discipline of a public employee where the nonmember is

permitted to proceed without the employee organization and be represented by his or her own advocate." *Id.* § 209-a.2.

This is a significant limitation of a union's duty to nonmembers. "[T]he grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government" because it is the "vehicle by which meaning and content are given to the collective bargaining agreement." *USW v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 581 (1960). Thus, courts have long recognized that an exclusive representative's duty extends from negotiating a contract to administering the contract it negotiated—*i.e.*, to grievance processing, which is part of contract administration. *See ALPA*, 499 U.S. at 77; *14 Penn Plaza*, 556 U.S. at 271; *Conley v. Gibson*, 355 U.S. 41, 46–47 (1957), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

Under the amended Taylor Law, PSC retains the power to enter into binding contracts with CUNY that control the parameters of what constitutes a grievance, control what disputes are subject to arbitration, and define the contractual processes for evaluations and discipline. The Professors are subject to those contractual terms, whether they like it or not. But PSC has no corresponding duty to fairly represent the Professors and other nonmembers in a "grievance, arbitration, or other contractual process concerning the evaluation or discipline of a public employee," unless PSC allows them to represent themselves, in which case the Professors are still subject to the contractual process and limitations PSC negotiated. N.Y. Civ. Serv. Law § 209-a.2.

23

This state of affairs leaves the Professors' and other nonmembers' interests vulnerable to arbitrary and discriminatory union conduct. The Professors believe PSC would not fairly represent them in grievances due to their past experiences with PSC, their vocal opposition to PSC (which now includes this lawsuit), and PSC's "expressed anti-Semitism and anti-Zionism." A.30 ¶¶ 43–44. Under Section 209-a.2 of the Taylor Law, PSC is now free, whenever it so chooses, to abandon the Professors and other nonmembers to their own devices if they want to enforce a term of a collective bargaining agreement they were compelled to accept.

The district court's interpretation of Section 209-a.2 to relieve unions of their duty to represent nonmembers only when they can proceed without the union and choose their own advocate, A.379–80, does little to mitigate this harm. The nonmembers are still being required to navigate on their own a contractual maze that was foisted on them by their mandatory union representative. This result is incongruous. "It is a principle of general application that the exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf." *Steele*, 323 U.S. at 202. An exclusive union representative's power to impose a contract and grievance process on nonmembers must carry with it a concomitant fiduciary duty to represent nonmembers under that contract and in that process. The State Appellees, by forcing the Professors to accept an exclusive representative that lacks a full fiduciary duty to fairly represent them, has compounded their First Amendment injuries.

## II. *KNIGHT* DID NOT HOLD THAT GOVERNMENTS CAN APPOINT EXCLUSIVE REPRESENTATIVES TO SPEAK AND CONTRACT FOR INDIVIDUALS FOR ANY RATIONAL BASIS AND WITHOUT SATISFYING FIRST AMENDMENT SCRUTINY

### A. *Knight* Did Not Address the First Amendment Claims Made in This Case

1. The district court erred in holding that *Knight* forecloses the Professors' claims. *Knight* merely held it constitutional for a public employer to *exclude* employees from its nonpublic meetings with union officials. 465 U.S. at 273. The Court did not address, much less reject, the compelled speech and associational claims made in this case.

The plaintiffs-appellees in *Knight* were twenty Minnesota community college faculty instructors who were not union members. 465 U.S. at 278. The lower court's decision in *Knight v. Minn. Cmty. Coll. Fac. Ass'n*, 571 F. Supp. 1 (D. Minn. 1982) addressed three claims made by those instructors: (1) that exclusive representation violates the non-delegation doctrine, *id.* at 3–5; (2) that agency fees unconstitutionally compel nonmembers to subsidize political activities, *id.* at 5–7; and (3) that it is unconstitutional for the college to bar nonmembers from participating in union "meet-and-negotiate" and "meet-and-confer" sessions, *id.* at 7–12. Conspicuously absent is any claim exclusive representation compels speech and association in violation of the First Amendment.

The lower court in *Knight* rejected all of these claims except the allegation that it was unconstitutional to exclude nonmembers from meet-and-confer sessions, to

which the court found merit. *See Knight*, 465 U.S. at 278–79. The Supreme Court

summarily affirmed those portions of the lower court's decision that rejected the

plaintiffs-appellees' claims and took up the remaining claim. *Id.* at 279–80. The

remaining claim concerned a Minnesota statute that provided that a public "employer

may neither 'meet and negotiate' nor 'meet and confer' with any members of that

bargaining unit except through their exclusive representative." *Id.* at 275 (citing Minn.

Stat. § 179.66, subd. 7).

The Supreme Court said the "question presented in these cases is whether *this

restriction on participation* in the nonmandatory-subject exchange process violates the

constitutional rights of professional employees." *Id.* at 273 (emphasis added). The

"appellees' principal claim [was] that they have a right to force officers of the state

acting in an official policymaking capacity to listen to them in a particular formal

setting." *Id.* at 282. The Court disagreed, reasoning "[t]he Constitution does not grant

to members of the public generally a right to be heard by public bodies making

decisions of policy." *Id.* at 283. The Court further reasoned that "[a] person's right to

speak is not infringed when government simply ignores that person while listening to

others." 465 U.S. at 288. Consequently, the Court concluded that "[t]he District Court

erred in holding that appellees had been unconstitutionally denied an opportunity to

participate in their public employer's making of policy." *Id.* at 292.

*Knight* did not address whether an exclusive representative's authority to speak

and contract for dissenting employees unconstitutionally compels those employees to

26

associate with the union and its speech. *Knight* also did not address the claim made in count two of this matter: that a bargaining unit is a mandatory association of individuals forced together for an expressive purpose.

Rather, *Knight* stands only for the proposition that government officials are constitutionally free to choose to whom they listen in nonpublic forums. That holding has no bearing here. The Professors do not allege that CUNY wrongfully excludes them from its meetings with PSC. Nor do the Professors assert a "constitutional right to force the government to listen to their views." *Id.* at 283. Rather, the Professors assert their constitutional right not to be compelled to accept PSC as their mandatory agent for speaking and contracting with CUNY. *Knight's* holding that the government can choose to whom it *listens* says little about the government's ability to dictate who *speaks* to the government for individuals.

2. The lower court's four reasons for finding *Knight* to be controlling are unpersuasive. *See* A.362–66.

*First*, the district court hung its hat on the *Knight* Court's summary affirmance of the resolution of the challenges to the "meet and negotiate" provisions of Minnesota's labor statute, the "PELRA." A.360–62. The lower court here missed the narrow scope of those challenges. The *Knight* Court's summary affirmance: (1) "rejected appellees' argument . . . that PELRA delegated legislative authority to private parties" and (2) "rejected the constitutional attack on PELRA's *restriction* to the exclusive representative *of participation* in the 'meet and negotiate' process." 465 U.S. at

279 (emphasis added). *Knight* did not summarily affirm, or otherwise address, the type of compelled speech and association claims made here.

*Second*, the lower court quoted a paragraph in *Knight* that found that a college meeting and conferring only with union representatives did not impair nonmembers' associational rights by unduly pressuring them to join the union. A.363 (quoting *Knight*, 465 U.S. at 289–90). This paragraph further proves *Knight* only addressed the impact of excluding nonmembers from government meetings with unions, and not whether exclusive representation is an unconstitutional mandatory association. This is made plain by the Court's earlier statement in *Knight* that "Appellees' speech and associational rights, however, have not been infringed by Minnesota's *restriction of participation* in 'meet and confer' sessions to the faculty's exclusive representative." 465 U.S. at 288 (emphasis added).

*Third*, the lower court cited to an unpublished, non-precedential order in *Jarvis v. Cuomo*, 660 F. App'x 72, 74 (2d Cir. 2016) (per curiam), that tersely concluded that *Knight* forecloses a claim that exclusive representation compels association. A.363. *Jarvis* is unpersuasive for reasons already discussed and for reasons that will be discussed. If anything, the conclusion in *Jarvis* that *Knight* gives states free rein to impose exclusive representatives on citizens who run childcare businesses in their own homes is reason to reject an over-expansive reading of *Knight*. *See infra* pp. 35–36.

The district court fares no better with its footnote citing to *Virgin Atlantic Airways, Ltd. v. National Mediation Board*, 956 F.2d 1245 (2d Cir. 1992), which

28

concerned "private sector employees." A.364. *Virgin Atlantic* simply found that the constitutionality of exclusive representation in the private sector does not turn on whether a majority of employees support it. *Id.* at 1251–52.

The plaintiffs in *Virgin Atlantic* claimed a union's certification violated the Railway Labor Act and several constitutional provisions. *Id.* at 1249. One of their claims was that the "First Amendment guarantees [employees] the right not to be represented by a group chosen by less than a majority of their co-workers." *Id.* at 1251. The Court rejected the claim on the grounds that "[i]f the First Amendment did protect individuals from being represented by a group that they do not wish to have represent them, it is difficult to understand why that right would cease to exist when a majority of the workers elected the union." *Id.* at 1252. This Court did not decide, one way or the other, if the First Amendment actually protects individuals from being represented by an unwanted group because that decision was unnecessary in order to resolve the claim before the court.

*Finally*, the district court found that every other circuit court to consider the question has held *Knight* forecloses First Amendment speech and associational challenges to exclusive union representation. A.364. The Professors submit that these opinions are not persuasive and that they misinterpreted or misapplied *Knight*.

Indeed, two of those circuits suggested *Knight* may not be directly on point. The Ninth Circuit in *Mentele v. Inslee* found that "*Knight*'s recognition that a state cannot be forced to negotiate or meet with individual employees is arguably distinct" from a

29

compelled representation claim, but then illogically declared *Knight* controlling anyway because it supposedly "is a closer fit than *Janus*." 916 F.3d 783, 788 (9th Cir. 2019). The Sixth Circuit in *Thompson v. Marietta Education Association* stated that "[e]ven assuming plaintiff's compelled-representation theory is technically distinguishable [from the claims made in *Knight*]," and even though "*Knight's* reasoning conflicts with the reasoning in *Janus*," the Court would still deem *Knight* controlling because "a cramped reading of *Knight* would functionally overrule the decision." 972 F.3d 809, 814 (6th Cir. 2020). Neither court's rationale justifies holding that *Knight* resolved the key constitutional question presented here—whether exclusive representation is a mandatory expressive association—when that was not the issue *Knight* addressed.

    **B.**     **The Lower Court's Misinterpretation of *Knight* Brings *Knight* into Conflict with *Janus* and Other Precedents Concerning Exclusive Representation**

    1. The proposition that the Supreme Court held in *Knight* that employees are not associated with their exclusive bargaining agent, or with its speech on their behalf, becomes impossible to accept when viewed in context of other Supreme Court precedents addressing mandatory association. The Court has consistently held compelling individuals to accept an exclusive representative impinges on their rights.

    In 1944, the Supreme Court in *Steele* held that this impingement gives rise to a duty of fair representation. *Steele* concerned a railway union that discriminated against African American employees. In *Steele*, the Court recognized that the union's exclusive representation authority "clothe[s] the bargaining representative with powers

30

comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents." 323 U.S. at 202. It also found that "minority members of a craft are . . . deprived by the statute of the right, which they would otherwise possess, to choose a representative of their own, and its members cannot bargain individually on behalf of themselves as to matters which are properly the subject of collective bargaining." *Id.* at 200. To address this issue, the Court construed the Railway Labor Act to impose on exclusive representatives a duty of fair representation to all employees subject to their representation. *Id.* at 202–03.

In the decades after *Steele*, the Supreme Court reiterated that an exclusive representative's authority to speak and contract for nonconsenting employees restricts their individual liberties. In *Douds*, the Court recognized that, under exclusive representation, "individual employees are required by law to sacrifice rights which, in some cases, are valuable to them" and that "[t]he loss of individual rights for the greater benefit of the group results in a tremendous increase in the power of the representative of the group—the union." 339 U.S. at 401.

In *Vaca v. Sipes*, the Court explained that it created a duty of fair representation in *Steele* because the "grant of power to a union to act as exclusive collective bargaining representative, with its corresponding reduction in the individual rights of the employees so represented, would raise grave constitutional problems if unions were free to exercise this power to further racial discrimination." 386 U.S. 171, 182 (1967). That same year, in *Allis-Chalmers*, the Court recognized that exclusive

representation "extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees." 388 U.S. at 180. In 2009, the Court in *14 Penn Plaza* held that exclusive representatives can contractually waive individuals' statutory rights without their consent and acknowledged "the sacrifice of individual liberty that this system necessarily demands." 556 U.S. at 271.

*Janus* reaffirmed these principles. In *Janus*, the Court twice stated that "[d]esignating a union as the employees' exclusive representative substantially restricts the rights of individual employees." 138 S. Ct. at 2460; *see id.* at 2469 (similar). If that were not clear enough, the Court also recognized that requiring individuals to accept an exclusive bargaining agent is "itself a significant impingement on associational freedoms that would not be tolerated in other contexts." *Id.* at 2478.

The district court's misinterpretation of *Knight* cannot be squared with other Supreme Court precedents concerning exclusive representation. Nor can it be squared with the extraordinary authority these state-imposed agents have to speak and contract for dissenting individuals or with their fiduciary duty to those individuals.

2. The lower court and most other courts treat the foregoing precedents other than *Janus* as if they did not exist. With respect to *Janus*, the lower court incorrectly asserts that the Professors "argue that the 2018 decision in *Janus* repudiates, at least implicitly, the holding in *Knight*, requiring its reassessment." A.367. That is *not* the Professors' position. Their position both then and now is that *Knight* and *Janus* do not

32

conflict because *Knight* merely addressed whether a public employer can exclude

nonmembers from its nonpublic meetings with a union. *Knight* did not address the

issue touched upon in *Janus* and other precedents: whether exclusive representation is

a compulsory association that impinges on nonmembers' speech and associational

rights.

Nor is it the Professors' position that *Janus* held exclusive representation

unconstitutional, but rather that *Janus* recognized the arrangement impinges on

nonmembers' associational rights. The constitutionality of exclusive representation

was "not disputed" in *Janus*, 138 S. Ct. at 2478, because Petitioner Mark Janus did not

directly challenge it. However, Mr. Janus did argue that nonmembers should not be

forced to pay union agency fees because exclusive representation already infringes on

their speech and associational rights.[5] The Supreme Court, when holding that union

agency fees violate the First Amendment, reached several conclusions directly relevant

here: that exclusive representation grants unions the power "to speak" for

nonmembers, *id.* at 2467; "substantially restricts the nonmembers' rights," *id.* at 2469;

and inflicts a "significant impingement on associational freedoms," *id.* at 2478.

The lower court's observation that "*Janus* does not cite *Knight*," A.368, only

suggests the Supreme Court in *Janus* saw no inconsistency with *Knight*. In contrast, the

misconception that *Knight* implicitly held that compelling nonmembers to accept an

---

[5] Brief for Petitioner at 48–52, *Janus v. AFSCME, Council 31*, No. 16-1466, 2017 WL 5952674 (Nov. 29, 2017).

33

exclusive representative does *not* restrict their rights or impinge on their association freedoms would bring *Knight* into conflict with *Janus*. The Court should thus reject this misreading of *Knight* in order to harmonize the decision with *Janus*.[6]

### C. The Lower Court's Interpretation of *Knight* Would Allow the Government to Designate Exclusive Representatives to Speak and Contract for Citizens for Any Rational Basis

1. It is inconceivable that the Supreme Court, when deciding in 1984 whether a college can exclude certain faculty members from its meeting with union officials, intended to rule that the First Amendment is no barrier whatsoever to states designating exclusive representatives to speak and contract for dissenting individuals. Yet, courts have construed *Knight* to have just that effect and to have held that this compulsory arrangement does not infringe on speech or associational rights, is not subject to heightened constitutional scrutiny, and requires only a rational basis to be lawful. *See, e.g.*, *Hill v. SEIU*, 850 F.3d 861, 866 (7th Cir. 2017)

The implications of this expansive interpretation of *Knight* are staggering: it would mean states are free to vest advocacy groups with exclusive authority to speak and contract for individuals for any rational basis. Under this conception of *Knight*, a state could compel Zionist Jews to accept an anti-Semitic advocacy group as their exclusive representative without that raising any First Amendment issues. States could

---

[6] If the Court finds, contrary to the Professors' positions, that *Knight* bears on the Professors' claims or is tension with *Janus*, the Court should find that *Janus* controls because it is a more recent decision and is far more consistent with other Supreme Court precedents addressing exclusive representation in particular and mandatory associations in general.

also politically collectivize entire professions or industries under the aegis of a state-favored interest group. Neither absurd result is hypothetical, as illustrated by this case and the situation in *Jarvis*.

*Jarvis* concerned a New York law that imposed an exclusive representative on "individuals who operate *child-care businesses* out of their upstate New York homes." 660 F. App'x at 74 (emphasis added); *see* N.Y. Lab. Law §§ 695-a to -g. Specifically, New York's Representation of Child Care Providers law authorizes state recognition of representatives for four categories of child care providers, including family day care home businesses. *Id.* §§ 695-b to -d. The law grants these state-recognized representatives authority to meet and contract with state regulators to "address the stability, funding and operation of child care programs, expansion of quality child care, improvement of working conditions, salaries and benefits and payment for child care providers." *Id.* § 695-f.1. In effect, the New York law compels owners of certain types of businesses to accept a state-appointed representative to lobby the State over programs and regulations that affect that industry.

Yet, the non-precedential order in *Jarvis* found that *Knight* "foreclosed" the child care business owners' claim that this scheme "violates their First Amendment rights because it compels union association." 660 F. App'x at 74. If *Knight* allows states to force individuals who operate child care businesses in their own homes to accept mandatory representatives for petitioning state regulators over public policies, then the decision has no bounds.

35

2. This frightening interpretation of *Knight* cannot be correct because it is incompatible with basic First Amendment principles. An individual's right to choose which organization, if any, petitions the government for him or her is a fundamental liberty protected by the First Amendment. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907–09 (1982); *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 294–95 (1981). The government tramples on this liberty when it chooses who will be an individual's advocate in dealing with the government. "[T]he government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers . . . ; free and robust debate cannot thrive if directed by the government." *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 790–91 (1988). Indeed, the state action turns basic precepts of democracy on their head: instead of citizens choosing their representatives in government, the government is choosing representatives to speak for its citizens.

It is for good reason that the Supreme Court has refused to "'sanction a device where men and women in almost any profession or calling can be at least partially regimented behind causes which they oppose,'" or to "'practically give *carte blanche* to any legislature to put at least professional people into goose-stepping brigades.'" *Harris*, 573 U.S. at 630 (quoting *Lathrop v. Donohue*, 367 U.S. 820, 884 (1961) (Douglas, J., dissenting)). "'Those brigades are not compatible with the First Amendment.'" *Id.*

The lower court and other courts have approved such a device by interpreting

*Knight* to allow states to compel individuals to accept an exclusive representative for speaking and contracting with state entities on any mere rational basis. It is imperative that the Court correct this error and make clear that this mandatory expressive association is permissible only if and when it satisfies heightened First Amendment scrutiny—and it cannot do so here.

## III. NO COMPELLING STATE INTEREST JUSTIFIES FORCING THE PROFESSORS TO ACCEPT PSC AS THEIR EXCLUSIVE REPRESENTATIVE

Mandatory associations are "exceedingly rare" and "permissible only when they serve a 'compelling state interes[t] . . . that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Knox v. SEIU, Loc. 1000*, 567 U.S. 298, 310 (2012) (quoting *Roberts*, 468 U.S. at 623). The Supreme Court applied "exacting scrutiny" to compelled subsidization of speech in *Janus* and other cases, but suggested that a higher level of scrutiny may be appropriate. 138 S. Ct. at 2465.

While strict scrutiny is appropriate because this case involves infringements on free speech rights in addition to associational rights, Appellees' conduct cannot survive even exacting scrutiny. *First*, the so-called "labor peace" interest is not a compelling government interest that can justify infringements on First Amendment rights. *See infra* Section III(A). *Second*, if it were a compelling interest, CUNY can bargain with PSC without forcing the Professors to associate with PSC in violation of their First Amendment rights. *See infra* Section III(B).

37

**A.      Labor Peace Is Not a Compelling Government Interest**

1. In *Abood v. Detroit Board of Educ*ation, 431 U.S. 209 (1977), overruled by *Janus*, 138 S. Ct. 2468, the Supreme Court found exclusive representation in the public sector to be "presumptively" justified by a "labor peace" interest that the Court referenced in an earlier case construing a private-sector labor statute, *Railway Employes' Department v. Hanson*, 351 U.S. 225 (1956). *Abood*, 431 U.S. at 220–21, 224. This interest is a mere rational-basis justification for a regulation of interstate commerce under the Commerce Clause. *See Harris*, 573 U.S. at 626–31. *Abood*, however, applied this interest to the public sector without constitutional analysis. 431 U.S. at 224. That lack of analysis was criticized at the time. *Id.* at 259–61 (Powell, J., concurring in judgment).

*Abood*'s labor-peace holding is no longer good law after *Janus*, 138 S. Ct. at 2486 and *Harris*, 573 U.S. at 635–36. This is not only because *Janus* overruled *Abood*. In *Harris*, the Court explained that "industrial peace" was its justification for holding in *Hanson* that a private-sector agency fee requirement was a "permissible regulation of commerce." *Harris*, 573 U.S. at 629. The Court further explained that *Abood* then relied on *Hanson* and that commerce-clause interest to uphold a public-sector agency fee requirement under the First Amendment. *See Harris*, 573 U.S. at 634–35. In both *Harris*, 573 U.S. at 635–36, and *Janus,* 138 S. Ct. at 2479–80,[7] the Supreme Court

---

[7] In another part of the decision, *Janus* did "assume" for purposes of deciding that case that labor

38

sharply criticized *Abood* for wrongly finding that a commerce-clause decision controlled a First Amendment issue. "The [*Hanson*] Court did not suggest that 'industrial peace' could justify a law that 'forces men into ideological and political associations which violate their right to freedom of conscience, freedom of association, and freedom of thought.'" *Harris*, 573 U.S at 631 (quoting *Hanson*, 351 U.S. at 236–37). Under *Harris*, labor-peace interest is merely a rational-basis justification for a regulation of interstate commerce, and not a compelling state interest that justifies constitutional violations.

2. A closer analysis of *Abood*'s now-overruled conception of the labor peace interest demonstrates why it cannot justify infringements on First Amendment rights. *Abood* framed the labor peace interest as one to "free[] the employer from the possibility of facing conflicting demands from different unions," 431 U.S. at 221, and avoiding "[t]he confusion and conflict that could arise if rival teachers' unions, holding quite different views . . . each sought to obtain the employer's agreement," *id.* at 224.

Whatever its merits in the private sector, there is no legitimate interest in suppressing diverse expression to influence the government. That is the essence of democratic pluralism. As Justice Powell stated in his concurrence in *Abood*: "I would

_____

peace was a compelling interest because, even if it were compelling, the interest would not justify forcing nonmembers to subsidize an exclusive representative's speech and activities. *Id.* at 2465–66. But *Janus* did not adopt *Abood's* labor-peace holding or hold labor peace was a compelling state interest.

have thought the 'conflict' in ideas about the way in which government should operate was among the most fundamental values protected by the First Amendment." *Id.* at 261. Justice Powell was correct. "The First Amendment . . . creates 'an open marketplace' in which differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference." *Knox*, 567 U.S. at 309 (quoting *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 208 (2008)).

Neither New York nor any other state has an interest in imposing exclusive representation to suppress the diverse petitioning of government that the First Amendment protects. "To permit one side of a debatable public question to have a monopoly in expressing its views to the government is the antithesis of constitutional guarantees." *City of Madison, Joint Sch. Dist. v. Wis. Emp't Rels. Comm'n*, 429 U.S. 167, 175–76 (1976). The reason is "[t]he First Amendment . . . 'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection.'" *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964) (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Hand, J.)).

Here, the possibility that multiple groups of CUNY faculty may petition CUNY for different employment policies is not a "problem" to be solved. It would exemplify the pluralism and diverse expression the First Amendment protects. New York does not possess a legitimate interest, much a less a compelling one, in forcing the

40

Professors and their co-workers to accept an exclusive representative in order to shield CUNY "from the possibility of facing conflicting demands" in deciding government operations. *Abood*, 431 U.S. at 221.

###### B. Forcing the Professors to Accept an Exclusive Representative Is Not the Least Restrictive Means to Achieve a Theoretical Compelling State Interest

Even if New York had a compelling labor-peace interest in ensuring that CUNY and other public employers do not have to deal with demands from multiple unions, that end could "be achieved through means significantly less restrictive of associational freedoms" than compelling employees to accept exclusive representatives. *Roberts*, 468 U.S. at 623.

*First*, CUNY could simply not bargain or deal with any union or employee association. That is the usual state of affairs in America: a majority of government workers—more than 63% in 2022—are not subject to exclusive union representation.[8] The government violates no constitutional rights by *not* collectively bargaining with an exclusive union representative. *See Smith v. Ark. State Hwy. Emps., Loc. 1315*, 441 U.S. 463, 464–65 (1979).

*Second*, CUNY could permit the Professors and other dissenting faculty members to disassociate from PSC and leave the bargaining unit, while at the same time continuing to bargain only with PSC. CUNY's ostensible labor-peace interest in

---

[8] U.S. Dep't of Lab., Bureau of Lab. & Statistics, News Release (Jan. 19, 2023), tbl. 3, p. 2, https://www.bls.gov/news.release/pdf/union2.pdf.

only bargaining with one union can be achieved by only bargaining with one union and no others. The ostensible interest does not require compelling the Professors or other dissenters to accept that union's exclusive representation. The Court can thus vindicate the Professors' speech and associational rights to dissociate themselves from PSC and its noxious speech without upsetting any countervailing state interest.

## CONCLUSION

The district court's opinion and final judgment dismissing counts one and two of the Complaint should be reversed.

Respectfully submitted,

Dated: June 2, 2023

/s/Nathan J. McGrath
Nathan J. McGrath
Email: njmcgrath@fairnesscenter.org
Danielle R. Acker Susanj
Email: drasusanj@fairnesscenter.org
THE FAIRNESS CENTER
500 North Third Street, Suite 600B
Harrisburg, Pennsylvania 17101
Telephone: 844.293.1001

William L. Messenger
Email: wlm@nrtw.org
Milton L. Chappell
Email: mlc@nrtw.org
Glenn M. Taubman
Email: gmt@nrtw.org
c/o National Right to Work Legal
 Defense Foundation
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Telephone: 703.321.8510

*Attorneys for Appellants*

42

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT AND
TYPEFACE AND TYPE-STYLE REQUIREMENTS**

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,554 words according to the word-processing system used to prepare this brief.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word in Garamond 14 font.


Dated: June 2, 2023          /s/Nathan J. McGrath_____
                             Nathan J. McGrath
                             THE FAIRNESS CENTER
                             500 North Third Street, Suite 600B
                             Harrisburg, Pennsylvania 17101
                             Telephone: 844.293.1001
                             Email: njmcgrath@fairnesscenter.org

                             *Attorney for Appellants*