# No. 23-384

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

—————————

AVRAHAM GOLDSTEIN; MICHAEL GOLDSTEIN; FRIMETTE KASS-SHRAIBMAN;
MITCHELL LANGBERT; JEFFREY LAX; MARIA PAGANO,

*Plaintiffs-Appellants,*

v.

PROFESSIONAL STAFF CONGRESS/CUNY; CITY UNIVERSITY OF NEW YORK; JOHN
WIRENIUS, in his official capacity as Chairperson of the New York Public Employee
Relations Board; ROSEMARY A. TOWNLEY, in her official capacity as Member of the
New York Public Employee Relations Board; ANTHONY ZUMBOLO, in his official
capacity as Member of the New York Public Employee Relations Board; CITY OF
NEW YORK; THOMAS P. DINAPOLI, in his official capacity as New York State
Comptroller,

*Defendants-Appellees.*

—————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————

## APPELLANTS' REPLY BRIEF

—————————

Nathan J. McGrath
Danielle R. Acker Susanj
THE FAIRNESS CENTER
500 North Third Street, Suite 600B
Harrisburg, Pennsylvania 17101
Telephone: 844.293.1001

William L. Messenger
Milton L. Chappell
Glenn M. Taubman
c/o National Right to Work Legal
Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Telephone: 703.321.8510

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ............................................................................................... 1

REPLY .............................................................................................................. 2

I.    THE PROFESSORS' FIRST AMENDMENT RIGHTS ARE VIOLATED IN WAYS
      *KNIGHT* DID NOT CONSIDER .................................................................... 2

      A.    *Knight* Did Not Address the Professors' Constitutional Claims, Including
            Whether an Exclusive Representative Is a Mandatory Association ......... 2

      B.    Appellees' Misinterpretation of *Knight* Brings *Knight* into Conflict with
            *Janus* and Other Precedents Concerning Exclusive Representation ........ 4

      C.    The Government Cannot Have Free Rein to Dictate Which
            Organization Speaks and Contracts for Citizens Under the First
            Amendment .................................................................................................. 7

II.   APPELLEES ARE INFRINGING ON THE PROFESSORS' FIRST AMENDMENT
      RIGHTS IN AT LEAST THREE WAYS ......................................................... 9

      A.    Appellees Violate the Professors' Free Speech Rights by Granting PSC
            Legal Authority to Speak and Contract for the Professors ...................... 9

      B.    Appellees Violate the Professors' Associational Rights by Forcing Them
            to Accept PSC as Their Mandatory Agent .............................................. 11

      C.    Appellees Violate the Professors' Associational Rights by Forcing Them
            into a Mandatory Association of CUNY Instructional Staff .................. 19

III.  NO COMPELLING STATE INTEREST JUSTIFIES FORCING THE PROFESSORS TO
      ACCEPT PSC AS THEIR EXCLUSIVE REPRESENTATIVE ....................... 20

CONCLUSION ................................................................................................ 24

# TABLE OF AUTHORITIES

**Cases**                                                            **Page(s)**

*14 Penn Plaza LLC v. Pyett*,
556 U.S. 247 (2009) ............................................................... 4, 20

*Abood v. Detroit Bd. of Educ.*,
431 U.S. 209 (1977) .................................................................. 21

*Bennett v. Council 31 of the AFSCME*,
991 F.3d 724 (7th Cir. 2021) ...................................................... 8

*Bierman v. Dayton*,
900 F.3d 570 (8th Cir. 2018) ...................................................... 8

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ........................................................ 10, 13, 16

*D'Agostino v. Baker*,
812 F.3d 240 (1st Cir. 2016) ................................................ 16, 17

*Harris v. Quinn*,
573 U.S. 616 (2014) ........................................................... 5, 7, 21

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) ........................................................ 10, 13, 15

*Janus v. AFSCME, Council 31*,
138 S. Ct. 2448 (2018) ........................................................ *passim*

*Jordahl v. Brnovich*,
336 F. Supp. 3d 1016 (D. Ariz. 2018) ........................................ 14

*Knox v. SEIU, Loc. 1000*,
567 U.S. 298 (2012) ............................................................... 8, 24

*Mentele v. Inslee*,
916 F.3d 783 (9th Cir. 2019) ...................................................... 8

*Minn. State Bd. v. Knight*,
465 U.S. 271 (1984) ............................................................ 1, 2, 3

*Mulhall v. Unite Here Loc. 355,*
  618 F.3d 1279 (11th Cir. 2010) ...................................................... 11, 12, 14

*NAACP v. Claiborne Hardware Co.,*
  458 U.S. 886 (1982) ............................................................................. 14

*New Hope Family Servs. v. Poole,*
  966 F.3d 145 (2d Cir. 2020) ................................................................ 13

*Pac. Gas & Elec. Co. v. Pub. Util. Comm'n,*
  475 U.S. 1 (1986) ............................................................................. 10, 11

*Reisman v. Associated Faculties of Univ. of Me.,*
  939 F.3d 409 (1st Cir. 2019) ................................................................. 8

*Slattery v. Hochul,*
  61 F.4th 278 (2d Cir. 2023) ............................................................. 13, 22

*Steele v. Louisville & N.R. Co.,*
  323 U.S. 192 (1944) ............................................................................. 4, 5

*Thompson v. Marietta Educ. Ass'n,*
  972 F.3d 809 (6th Cir. 2020) ................................................................. 8

*W. Va. State Bd. v. Barnette,*
  319 U.S. 624 (1943) ............................................................................. 20

*Wooley v. Maynard,*
  430 U.S. 705 (1977) ....................................................................... 10, 15

**Statutes**

N.Y. Civ. Serv. Law § 201 ...................................................................... 19

N.Y. Civ. Serv. Law § 204 ...................................................................... 16

**Other Authorities**

Carl Campanile, *CUNY professors union slams university brass for calling law student Fatima Mohammed's grad address "hate speech,"* N.Y. POST (June 13, 2023), https://nypost.com/2023/06/13/cuny-professors-union-slams-university-brass-for-calling-law-student-fatima-mohammeds-grad-address-hate-speech/ .......................... 17

*Labor Force Statistics from the Current Population Survey*, tbl. 42, U.S. Dep't of Lab., Bureau of Lab. Stats. (Jan. 25, 2023), https://www.bls.gov/cps/cpsaat42.htm..... 23

Terry O'Neil & E.J. McMahon, Taylor Made: The Cost & Consequences of N.Y.'s Public-Sector Labor Laws 34 n.22 (May 2018), www.empirecenter.org/wp-content/uploads/2018/05/Taylor-Made_2018-Edition_Final-1.pdf. ......................... 23

U.S. Dep't of Lab., Bureau of Lab. Stats., Econ. News Release, Union Members Summary (Jan. 19, 2023), https://www.bls.gov/news.release/pdf/union2.pdf. ....................................................................................................... 18

**INTRODUCTION**

The state of New York, with the union it statutorily empowers, forces the

Professors into a stark choice: abandon their chosen, trained-for profession, or remain

tied to PSC, a union whose speech and positioning are antithetical to their deeply held

religious and political beliefs. The First Amendment cannot countenance such a

choice. And, contrary to the district court's opinion, the Supreme Court in *Minnesota*

*State Board v. Knight*, 465 U.S. 271 (1984), did not require it.

For the reasons explained in the Professors' Opening Brief, the Professors'

claims of forced speech and association differ from the First Amendment claims

considered in *Knight*, a decision which held only that public employees have no

constitutional right to participate in a government employer's private meetings with

union officials. Here, as a condition of their employment at CUNY, the Professors

must accept PSC as their exclusive bargaining agent, must accept PSC's authority to

speak and contract for them, and must accept being part of a mandatory association

of faculty members. Because, as discussed below, these were not the constitutional

harms challenged in *Knight*, that decision does not prevent the Professors from stating

claims in this matter.

Because the Professors' claims are not foreclosed, this Court should reverse the

district court's dismissal of Counts I and II and remand for this case for further

proceedings.

1

# REPLY

## I. THE PROFESSORS' FIRST AMENDMENT RIGHTS ARE VIOLATED IN WAYS *KNIGHT* DID NOT CONSIDER

### A. *Knight* Did Not Address the Professors' Constitutional Claims, Including Whether an Exclusive Representative Is a Mandatory Association

Much ink has been spilled concerning *Knight*'s relevance in this matter. Simply put, *Knight* does not control here. Appellees' argument, and the decision of the court below, errs by turning *Knight* into a rubber stamp. It would grant states unfettered discretion to dictate who speaks and contracts for citizens, no matter the constitutional harms alleged.

The Supreme Court in *Knight* addressed whether it was constitutional for a public employer to exclude employees from its nonpublic meetings with union officials. 465 U.S. at 273. The Court repeatedly said as much in its opinion. *See id.* at 273, 282, 283, 285, 288, 289. The Court stated in *Knight*'s opening paragraph that the "question presented in this case is whether this restriction on participation in the nonmandatory-subject exchange process violates the constitutional rights of professional employees." *Id.* at 273. The Court identified as the faculty members' "principal claim that they [had] a right to force officers of the state acting in an official policymaking capacity to listen to them in a particular formal setting." *Id.* at 282. The Court then explained why it rejected that claim: because "[t]he Constitution does not grant to members of the public generally a right to be heard by public bodies making

decisions of policy." *Id.* at 283. The Court concluded at the end of its opinion that "[t]he District Court erred in holding that appellees had been unconstitutionally denied an opportunity to participate in their public employer's making of policy." *Id.* at 292. It is difficult to conceive of how the Court could have been clearer as to the exact question it was resolving.

The Professors raise a different question. They do not allege it is unconstitutional to exclude them from PSC's meetings with CUNY. The Professors do not even want to participate in those meetings. Rather, they want to completely disassociate themselves from PSC and its speech. The Appellees are violating the Professors' First Amendment rights because they have granted PSC legal authority to speak for the Professors, compelled them to associate with PSC and its speech, and compelled them into a mandatory association of CUNY personnel. The Court in *Knight* did not address, much less resolve, these constitutional claims.

PSC takes out of context a sentence in *Knight* that stated "[t]he State has in no way restrained appellees' freedom to speak on any education-related issue or their freedom to associate or not to associate with whom they please, including the exclusive representative." *Id.* at 288; *see* PSC Br. 15. As the preceding sentence in the opinion makes clear, the Court was addressing only whether *excluding* employees from union meetings caused such restraints. In that sentence, the Court stated, "Appellees' speech and associational rights . . . have not been infringed by Minnesota's *restriction of*

*participation* in 'meet and confer' sessions to the faculty's exclusive representative." *Id.* at 288 (emphasis added).

That holding has no bearing here. While individuals like the Professors may not have a First Amendment right to participate in private meetings between CUNY officials and PSC officials under *Knight*, they certainly have a constitutional right to control who speaks for them and a right not to associate with an undesirable organization. The government's ability under *Knight* to choose to whom it listens in no way means the government is free to dictate, for any rational basis, which organization speaks and contracts for individuals in their relations with the government. This type of compulsory expressive association necessarily infringes on core rights guaranteed by the First Amendment.

## B. Appellees' Misinterpretation of *Knight* Brings *Knight* into Conflict with *Janus* and Other Precedents Concerning Exclusive Representation

Both the *Knight* decision itself, and the Supreme Court's other cases addressing exclusive representation, confirm that constitutional rights are at stake. Appellees' counter interpretation both ignores the text of *Knight* and would place *Knight* into conflict with other Supreme Court cases. *See* Op. Br. 30–34. The Supreme Court has long recognized that systems of exclusive representation impinge on employees' constitutional rights. *Id.* In 1944, the Supreme Court created the duty of fair representation for that reason. *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 198 (1944). In 2009, the Court acknowledged "the sacrifice of individual liberty that this system

4

necessarily demands." *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 271 (2009). Just a few years ago, the Court stated in *Janus v. AFSCME, Council 31* that exclusive representation results in a "significant impingement on associational freedoms." 138 S. Ct. 2448, 2478 (2018).

Appellees assert that the Supreme Court was referring in those and other cases not to impingements on First Amendment freedoms, but to "economic liberties (like freedom of contract)," PSC Br. 32, and to "employees' ordinary freedom to make individualized employment contracts (and to form associations to advance their economic interests)," State Br. 30. This assertion is belied by the Supreme Court's statement in *Steele* that "constitutional questions arise" under exclusive representation. 323 U.S. at 198. Moreover, the *Janus* Court recognized that exclusive-representative authority grants a union the "exclusive right *to speak* for all the employees in collective bargaining." 138 S. Ct. at 2467 (emphasis added). And it reiterated that, in the public sector, this speech is political in nature and concerns matters of substantial public concern. *Id.* at 2474–77; *see Harris v. Quinn*, 573 U.S. 616, 636–37, 653–54 (2014). An exclusive representative's function, after all, is to speak with and to petition governmental bodies to influence government policies.

Unions often take controversial stances on important public issues when acting as employees' exclusive representatives. *See Janus*, 138 S. Ct. at 2476. For example, "[u]nions can also speak out in collective bargaining on controversial subjects such as climate change, the Confederacy, sexual orientation and gender identity, evolution,

and minority religions." *Id.* In the Professors' case, this is not a hypothetical concern: PSC's advocacy of the "Boycott, Divestment, and Sanctions" movement *at CUNY* could easily extend to advocacy in collective bargaining for divestment of financial dealings with the State of Israel and Israeli businesses. J.A. 263–64. The Professors see PSC's advocacy on this point as an attack on their religious beliefs and personal identities. J.A. 30.

Appellees' notion that the *Janus* Court was talking about economic rights and economic associational freedoms is impossible to accept: The Court stated that "[d]esignating a union as the employees' exclusive representative substantially restricts the rights of individual employees," 138 S. Ct. at 2460, and causes a "significant impingement on associational freedoms," *id.* at 2478. The Court meant that requiring employees to accept an exclusive representative for petitioning the government over its policies significantly impinges on the employees' expressive rights and freedom of expressive association. Those types of infringements are subject to at least exacting, if not strict, constitutional scrutiny. *Id.* at 2465.

Indeed, exacting constitutional scrutiny would apply even if one accepted Appellees' untenable contention that exclusive representation impinges only on individuals' economic freedoms. As the *Janus* Court explained, "[t]he exacting scrutiny standard . . . was developed in the context of commercial speech." *Id.* at 2478; *see id.* at 2464–65. Thus, even if PSC's divisive speech could be labelled commercial or economic, which it cannot under *Janus*, the reality would remain that the Professors

6

cannot be compelled to associate with PSC and its speech unless exacting constitutional scrutiny is satisfied.

### C. The Government Cannot Have Free Rein to Dictate Which Organization Speaks and Contracts for Citizens Under the First Amendment

The ramifications of the lower court's misinterpretation of *Knight* counsel strongly against accepting it: The interpretation would grant states unbridled authority to designate mandatory agents to speak and contract for citizens in their relations with the government. Op. Br. 34–37. Remarkably, Appellees suggest no limiting constitutional principle for regimes of exclusive representation. Instead, they embrace the proposition that, under *Knight*, when a state compels individuals to accept an exclusive representative, it does not burden or impinge upon those individuals' First Amendment rights. This means that states can impose exclusive representatives on anyone for any rational basis. For example, under this misconception of *Knight*, CUNY would be constitutionally free to force Zionist Jews to accept an anti-Semitic organization as their mandatory representative for dealing with the state.

That cannot be right. It defies credulity to believe the Supreme Court, in *Knight* or in any other case, would hold that the government has a free hand to grant private advocacy groups legal authority to speak and contract for citizens who oppose that group and its speech. The Supreme Court has made clear it would not "'sanction a device where men and women in almost any profession or calling can be at least partially regimented behind causes which they oppose.'" *Harris*, 573 U.S. at 630

(quoting *Lathrop v. Donohue*, 367 U.S. 820, 884 (1961) (Douglas, J., dissenting)). The Court also has held that mandatory associations are "exceedingly rare" and are permissible "only when they serve a 'compelling state interes[t] . . . that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Knox v. SEIU, Loc. 1000*, 567 U.S. 298, 310 (2012) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984)). The Court did not abandon those principles in *Knight* to implicitly declare that the government has *carte blanche* to force individuals into exclusive-representative relationships with political advocacy groups. This Court must reject this frightening misconstruction of the Court's holding in *Knight*.

Finally, even if this Court still believes that *Knight* mandates dismissal, the Supreme Court's most recent discussion in this area nevertheless casts some doubt on its validity as to the issues before this Court. Many of this Court's sister circuits have recognized that *Janus* is hard to square with *Knight* and that there is some degree of tension between the two. *See, e.g.*, *Thompson v. Marietta Educ. Ass'n*, 972 F.3d 809, 813–14 (6th Cir. 2020); *Reisman v. Associated Faculties of Univ. of Me.*, 939 F.3d 409, 414 (1st Cir. 2019); *Mentele v. Inslee,* 916 F.3d 783, 788–89 (9th Cir. 2019); *Bierman v. Dayton*, 900 F.3d 570, 574 (8th Cir. 2018); *see also Bennett v. Council 31 of the AFSCME*, 991 F.3d 724, 735 (7th Cir. 2021).

## II.   APPELLEES ARE INFRINGING ON THE PROFESSORS' FIRST AMENDMENT RIGHTS IN AT LEAST THREE WAYS

Because *Knight* does not control, the Professors have identified at least three grounds for a First Amendment violation, *see* Sections I(A)–(C) of the Opening Brief, which Appellees do not refute.

### A.   Appellees Violate the Professors' Free Speech Rights by Granting PSC Legal Authority to Speak and Contract for the Professors

The First Amendment prohibits the government from giving one party the right to speak for another, unwilling party—in effect transferring that person's right to speak to the first party. Yet, that is what the State Appellees are doing to the Professors. They legally empower an advocacy group the Professors oppose to speak and contract for them. Op. Br. 14–17.

PSC illogically asserts that it does not speak and contract for the Professors or any individual employee when acting as their exclusive representative, but only for the bargaining unit as a whole. PSC Br. 28–29; *see* State Br. 32–33. That makes no sense because the bargaining unit is composed of individuals like the Professors. The argument is akin to saying a union speaks both for everyone and for no one at all.

PSC asserts the Professors can, and sometimes do, speak against PSC and its positions. PSC Br. 35; *see* State Br. 15. But the Professors' public criticism of PSC only highlights why they do not want this divisive advocacy group speaking for them. The Professors' ability to engage in that criticism does not mitigate the First Amendment

injuries they are suffering. States are not free to compel speech even when they do not restrict the victim's right to engage in contrary speech.

In compelled speech and association cases in which the Supreme Court found constitutional violations, victims almost always were free to otherwise speak or associate with others. In *Wooley v. Maynard*, motorists were free to express messages different from the motto inscribed on the license plates they had to display. 430 U.S. 705, 717 (1977). In *Pacific Gas & Electric Co. v. Public Utility Commission*, a utility compelled to let an advocacy group use its property to convey a message was free to disseminate contrary messages. 475 U.S. 1, 15–16 (1986) (plurality opinion). In *Boy Scouts of America v. Dale*, the Boy Scouts spoke against the positions of the activists with whom they were compelled to associate. 530 U.S. 640, 651–52 (2000). And in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, the parade organizers were free to express messages opposing the group they were required to include in a parade. 515 U.S. 557, 573 (1995). Yet the Supreme Court held each instance of compelled speech or association unconstitutional. The same result is appropriate here.

If anything, that the Professors must speak out to distance themselves from PSC and its objectionable advocacy as their exclusive representative only intensifies their constitutional injuries. *See* Op. Br. 16–17. By forcing the Professors to accept PSC as their mandatory agent, the State Appellees place them in the difficult position of having to disclaim their own agent's positions and message. Otherwise, silence on the Professors' part could be interpreted as agreement. "[T]his kind of forced

response is antithetical to the free discussion that the First Amendment seeks to foster." *Pac. Gas*, 475 U.S. at 16.

**B.  Appellees Violate the Professors' Associational Rights by Forcing Them to Accept PSC as Their Mandatory Agent**

1.  An exclusive representative is the epitome of a mandatory expressive association. Op. Br. 17–19.

Consider again the basic situation before this Court. The State of New York is compelling individuals (the Professors) to accept a controversial advocacy group (PSC) to be their exclusive agent for purposes of speaking and contracting with a public body (CUNY). If this does not constitute state-compelled association for an expressive purpose, it is hard to imagine what does.

The Eleventh Circuit got it right when it reasoned in *Mulhall v. Unite Here Local 355*, that a union's status as an employee's "exclusive representative plainly affects his associational rights" because the "arrangement creates a fiduciary relationship, akin to that between a trustee and beneficiary," and because the employee's views "may be at variance with a wide variety of activities undertaken by the union in its role as exclusive representative." 618 F.3d 1279, 1286–87 (11th Cir. 2010). While PSC is correct that *Mulhall* concerned an issue of standing, *see* PSC Br. 33, PSC fails to explain why the Eleventh Circuit's reasoning is faulty (it is not) or why that reasoning does not inevitably lead to the conclusion that exclusive representation infringes on associational rights guaranteed by the First Amendment.

11

State Appellees try to distract this Court from the foregoing way in which exclusive representation compels association. Instead, they note that the Professors do not have to be members of PSC, State Br. 38, and can associate with other organizations, *id.* at 37–38. But the Professors still have to accept PSC's representation as a condition of their employment. As the Eleventh Circuit held in *Mulhall*, "regardless of whether [an individual] can avoid contributing financial support to or becoming a member of the union . . . its status as his exclusive representative plainly affects his associational rights" because the individual is "thrust unwillingly into an agency relationship" with that union. *Id.* at 1287. The fact remains that the Professors are compelled to associate with PSC and its speech against their will. That the Professors may retain their freedom to associate with other groups does not mitigate this injury to their First Amendment rights.

When State Appellees address the actual way in which the Professors are being forced to associate with PSC, they tersely declare the Professors' "theory fails as a matter of law, because any limited association between plaintiffs and PSC does not 'significantly affect' plaintiffs' 'ability to advocate [their] viewpoints.'" State Br. 39 (quoting *Slattery v. Hochul*, 61 F.4th 278, 287 (2d Cir. 2023)). This declaration flies in the face of the Supreme Court's recognition that "[d]esignating a union as the employees' exclusive representative *substantially* restricts the rights of individual employees" and inflicts "a *significant* impingement on associational freedoms that

12

would not be tolerated in other contexts." *Janus*, 138 S. Ct. at 2460, 2478 (emphasis added).

The Professors' situation, as individuals forced into association with an expressive organization, is the converse of one where the Supreme Court and this Court have found a substantial burden on associational rights: when a state compels an expressive organization to associate with individuals who hold different views than the organization. *See Dale*, 530 U.S. at 651–52; *Hurley*, 515 U.S. at 573–74; *Slattery*, 61 F.4th at 287–88; *New Hope Family Servs. v. Poole*, 966 F.3d 145, 178–79 (2d Cir. 2020). The Court in each case held that this compelled association significantly affected the organization's desired message and its public image. *See Dale*, 530 U.S. at 651–52 *Hurley*, 515 U.S. at 573–74; *Slattery*, 61 F.4th at 287–88; *Poole*, 966 F.3d at 178–79. This case is the reverse: a state is compelling *individuals* to associate with an *expressive organization* that holds different views than the individuals. The impact is similar: this compelled association significantly affects the individuals' desired message and image.

2. The Professors cannot completely disassociate from PSC.

PSC argues the Professors have not been compelled to associate with it or its speech because they are "not personally required to do anything." PSC Br. 2, 10, 27. To the contrary, Appellees are requiring the Professors to accept PSC's exclusive representation and their inclusion in a mandatory association of CUNY staff. In other words, the Appellees prohibit the Professors from completely *disassociating* themselves from PSC and the bargaining unit.

13

The First Amendment protects the right of individuals to distance themselves from, or to boycott, persons or entities for political or ideological reasons or to express such a message. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). In that matter, the NAACP organized a boycott of white-owned businesses to pressure a county government to accept integration-related demands. *Id.* at 889. The NAACP promoted the boycott through speeches and other expressive activities. *Id.* at 907. The Court found the First Amendment protected the NAACP's deliberate act of refusing to deal with the businesses in order to make a political point and to pressure them to change their policies. *Id.* at 911. "*Claiborne* stands for the proposition that collective boycotting activities undertaken to achieve social, political or economic ends [are] conduct that is protected by the First Amendment." *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016, 1041 (D. Ariz. 2018), *vacated as moot by Jordahl v. Brnovich*, 789 F. App'x 589 (9th Cir. 2020) (non-precedential).

The Professors want to engage in conduct that is indistinguishable from a boycott of PSC. They want to wholly dissociate themselves from the advocacy group in protest of its anti-Semitic positions, political agenda, and failings as a union. J.A. 25–35. The Professors' repudiating and escaping PSC's representation would itself be an expressive activity. Appellees are violating the Professors' First Amendment rights by prohibiting them from doing so.

An example illustrates the point. An exclusive representative relationship is analogous to that between a trustee and beneficiary. *See Mulhall*, 618 F.3d at 1286–87.

14

Assume several Black individuals want to publicly sever all ties with a trustee to protest conduct by it that they consider racist. Or several Jews want to sever ties with a trustee in protest of conduct they deem anti-Semitic. There would be no doubt that a state would violate those individuals' First Amendment rights by prohibiting them from engaging in that conduct and requiring they retain their relationship with an objectionable trustee. The Professors' situation is even worse than the hypothetical. Appellees are prohibiting the Professors from severing their relationship not with a trustee of their property, but with an agent empowered to speak for them.

3.     Public perception links the Professors to PSC.

PSC also argues that the Professors are not being compelled to associate with PSC and its speech because reasonable observers will supposedly realize that not all bargaining unit members "agree" with their exclusive representative and its positions. PSC Br. 28–29; *see* State Br. 33. This argument is untenable for several reasons.

*First*, PSC is trying to turn a vice into a virtue. The Professors' vehement disagreement with PSC's speech is a reason *why* it violates the First Amendment for the Appellees to associate them with it. After all, "[t]he First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster . . . an idea they find morally objectionable." *Wooley*, 430 U.S. at 715; *see Hurley*, 515 U.S. at 573. The proposition that outside observers may know the Professors don't want to associate with PSC does not change that reality. If anything, that knowledge only exacerbates the Professors' injuries because a state "[f]orcing free

15

and independent individuals to endorse ideas they find objectionable is always demeaning." *Janus*, 138 S. Ct. at 2464.

In other words, public knowledge of state-compelled association does not make that compulsion constitutional. In most, if not all, compelled speech and association cases it was readily apparent to the public that the plaintiff(s) opposed the group or message with which they were compelled to associate. The plaintiff's lawsuit alone established that. For example, in *Dale*, the Boy Scouts at that time made clear to any observer that they did not want to associate with homosexual scoutmasters, as they had a written policy on the matter and filed a highly publicized lawsuit challenging the requirement. 530 U.S. at 651. The Professors' making clear in their lawsuit that they want nothing to do with PSC supports, not undermines, their compelled association claims.

*Second*, the State Appellees have associated the Professors with PSC and its speech *as a matter of state law*. Under New York's Taylor Law, PSC has actual, legal authority to act as the Professors' exclusive bargaining agent and to speak and contract for them. N.Y. Civ. Serv. Law § 204. That amounts to state-compelled association for an expressive purpose regardless of what the public may believe.

PSC relies on the First Circuit's reasoning in *D'Agostino v. Baker*, 812 F.3d 240, 244 (1st Cir. 2016), that exclusive representation does not compel association because "the relationship is one that is clearly imposed by law, not by any choice on a dissenter's part, and when an exclusive bargaining agent is selected by majority choice,

16

it is readily understood that employees in the minority, union or not, will probably disagree with some positions taken by the agent answerable to the majority." *D'Agostino*, 812 F.3d at 244. *See* PSC Br. 29; State Br. 42. This turns the law on its head because these propositions only *prove* a First Amendment violation. State-compelled association and speech is, by definition, "imposed by law," and "not by any choice on a dissenter's part." *D'Agostino*, 812 F.3d at 244. That affected individuals "will probably disagree with some positions taken by [their] agent," *id.*, shows the individuals are being associated with advocacy they oppose. *D'Agostino* inverted reality by relying on the very factors that prove a state is compelling association in violation of the First Amendment to reach the opposite conclusion.

*Finally*, nothing in the record supports PSC's unsubstantiated claims that outside observers will believe that individuals represented by PSC often do not agree with its positions. This case is before this Court on the pleadings and nothing in those pleadings supports that or similar assertions.[1]

---

[1] Similarly, PSC also attempts to avoid the record on appeal to imply that its anti-Semitic speech is an isolated incident, PSC Br. 33–35, but on remand the Professors welcome the opportunity to point to numerous instances of such harassing and religiously intolerant speech. *See, e.g.*, Carl Campanile, *CUNY professors union slams university brass for calling law student Fatima Mohammed's grad address "hate speech,"* N.Y. POST (June 13, 2023), https://nypost.com/2023/06/13/cuny-professors-union-slams-university-brass-for-calling-law-student-fatima-mohammeds-grad-address-hate-speech/. Indeed, PSC's assertions to this Court that it is not in fact anti-Semitic simply demonstrate how incapable PSC is of understanding the damage and pain it has wrought to the Professors and their deeply held beliefs.

There is good reason to believe the public will generally attribute PSC's speech and positions to CUNY faculty members—PSC is, after all, their exclusive representative and speaks for them. Indeed, unions generally present their positions to be the positions of represented employees. Given that over 88% of workers are not subject to union representation,[2] and thus have little to no experience with it, this Court cannot assume that most people even know that unions represent employees who oppose the union. Almost all associations in this country are voluntary, so many people may believe that exclusive union representatives are voluntary associations composed of willing members. Even those observers who know that exclusive representatives are involuntary associations with dissenting employees are unlikely to know who those dissenting employees are. Without knowing who the dissenters are, those observers will still tend to believe that a union's views generally reflect the views of those it represents.

Consequently, this Court cannot accept PSC's unsupported claims to the contrary. If this Court believes this disputed factual issue to be legally relevant, it should reverse the lower court and remand the case for the development of a factual record.

---

[2] "The percentage of workers represented by a union was 11.3 percent in 2022." U.S. DEP'T OF LAB., BUREAU OF LAB. STATS., ECON. NEWS RELEASE, UNION MEMBERS SUMMARY (Jan. 19, 2023), https://www.bls.gov/news.release/pdf/union2.pdf.

**C.**     **Appellees Violate the Professors' Associational Rights by Forcing Them into a Mandatory Association of CUNY Instructional Staff**

1. The bargaining unit of CUNY instructional staff in which the Professors must be members is itself a mandatory expressive association that the State created under the Taylor Law. Op. Br. 19–22. Under the auspices of that law, the State Appellees mandate that certain individuals (CUNY instructional staff) associate with one another for the expressive purpose of collectively petitioning CUNY over its employment policies. The State Appellees are infringing on the Professors' associational and speech rights by forcing them to be part of this state-organized faction.

State Appellees argue the Professors' "association with the instructional staff is not 'inherently expressive.'" State Br. 41. It most certainly is. The very purpose for this mandatory association is to bargain with a state entity (CUNY) for compensation and over its employment policies. *See* N.Y. Civ. Serv. Law § 201. This conduct is literally "speech" and "petition[ing] the government for a redress of grievances" within the meaning of the First Amendment. This speech and petitioning concerns issues that are political in nature and matters of public concern. *Janus*, 138 S. Ct. at 2474–76. A bargaining unit's purpose, as well as PSC's function as an exclusive representative, is as "expressive" as the lobbying of any political special interest.

2. PSC's observation that systems of exclusive representation are based on majority rule only highlights the constitutional *problem* with this system; it does not

immunize it. The First Amendment exists to protect speech and associational rights from majority rule. As the Supreme Court famously stated in *West Virginia State Board v. Barnette*:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

319 U.S. 624, 638 (1943). The fact that individual liberties are sacrificed and subordinated to the interests of the collective in bargaining units, *see Pyett*, 556 U.S. at 271, is why imposing forcing dissenting individuals into the mandatory association infringes on their First Amendment rights.

## III. NO COMPELLING STATE INTEREST JUSTIFIES FORCING THE PROFESSORS TO ACCEPT PSC AS THEIR EXCLUSIVE REPRESENTATIVE

1. This Court cannot find labor peace to be a compelling government interest on the record before it. Appellees' claim a so-called "labor peace" interest justifies any infringement exclusive representation works on the Professors' First Amendment rights. PSC Br. 37; State Br. 45. The claim fails both as a matter of law, *see* Op. Br. 38–41, and as a factual matter, because the limited record before this Court does not support it.

*First*, while Appellees assert labor peace is a compelling interest, they fail to address the Supreme Court's explanation in *Harris* that it is a mere rational-basis

justification for federal regulation of interstate commerce, not a compelling interest. *See* 573 U.S. at 635–36; Op. Br. 38–39. In the public sector, the government has *no* legitimate interest, much less a compelling interest, in suppressing diverse expression to influence the government. Op. Br. 39–41.

To recap, in *Abood v. Detroit Board of Education*, 431 U.S. 209, 221, 224 (1977), overruled by *Janus*, 138 S. Ct. 2468, the Supreme Court defined the labor peace interest as one in "free[ing] the employer from the possibility of facing conflicting demands from different unions" and avoiding "[t]he confusion and conflict that could arise if rival teachers' unions, holding quite different views . . . each sought to obtain the employer's agreement." 431 U.S. at 221, 224. At that time, Justice Powell recognized the problem with applying this interstate commerce interest to public employers: "'conflict' in ideas about the way in which government should operate was among the most fundamental values protected by the First Amendment." *Id.* at 261 (Powell, J., concurring in the judgment). Justice Powell was right. *See* Op. Br. 38–41.

Notwithstanding *Janus* overruling *Abood*, State Appellees both rely on *Abood*'s labor peace interest and disclaim it. State Br. 46–48. They rely on it by asserting "it is necessary [for the State] to prevent the workforce from splintering into factions that would foster conflicting demands for differing employment conditions." *Id.* at 46 (emphasis added). But the State has no legitimate interest whatsoever in suppressing individuals' rights to "splinter[ ] into factions" (*i.e.*, form or join other associations) or

to make "conflicting demands" on the government (*i.e.*, to petition the government for a redress of grievances as they see fit). The First Amendment protects both rights.

Apparently recognizing the validity of the Professors' point that "there is no legitimate interest in suppressing diverse expression to influence the government," Op. Br. 39, the State Appellees walk back their earlier position by asserting "[t]hat is *not* the State's interest here, nor does the Taylor Law have any such effect. The Taylor Law does not suppress (or mandate) anyone's expressive or petitioning activity; it simply says that a contract made with the exclusive representative is binding on all employees in the bargaining unit." State Br. 47. If that is true, then the Taylor Law does not further the labor peace interest discussed in *Abood*, which is predicated on attaining "peace" by using exclusive representation to quash diverse representation.

*Second*, even if this interest were legally cognizable in the public sector (it is not), the record before the Court does not support Appellees' arguments in support of it. "[W]hen applying tiers of scrutiny higher than rational basis, 'the norm is to wait until the summary judgment stage of the litigation to address the ultimate question of whether the [regulation] should stand.'" *Slattery*, 61 F.4th at 289 (quoting *Cornelio v. Connecticut*, 32 F.4th 160, 172 (2d Cir. 2022)).

For example, PSC's assertion that it is a "democratically chosen" union in a system that is "essentially universal in the United States," PSC Br. 1, relies on two dubious "facts" found nowhere in the limited record before the Court. There is no evidence that the 30,000 current members of the CUNY faculty bargaining unit

"democratically chose[]" PSC. The record shows that the State certified PSC to be an exclusive representative over fifty years ago, in 1972. J.A. 25. It is exceedingly unlikely that many current faculty members participated in that election and chose PSC to be their representative. Further, as the Complaint states (which must be accepted as true at this procedural point), "No Plaintiff has ever participated in a vote to certify or recognize PSC as his or her exclusive representative." J.A. 33. Moreover, unionization is nowhere close to being "essentially universal" for employees. In 2022, only 36.8% of public employees were subject to union representation.[3] The notion that New York has a compelling interest in imposing exclusive representatives on its employees is belied by the fact that the vast majority of public workplaces in this country operate without it.[4]

To offer another example, PSC claims New York enacted the Taylor Law to address labor unrest. PSC Br. 37–38. PSC neglects to discuss what happened next: The law failed to quell that unrest. The years 1967 to 1981 were "the peak period for illegal public employee strikes in New York State." Terry O'Neil & E.J. McMahon, TAYLOR MADE: THE COST & CONSEQUENCES OF N.Y.'S PUBLIC-SECTOR LABOR LAWS 34 n.22 (May 2018), www.empirecenter.org/wp-content/uploads/2018/05/Taylor-Made_2018-Edition_Final-1.pdf. The decrease in

---

[3] *Labor Force Statistics from the Current Population Survey*, tbl. 42, U.S. DEP'T OF LAB., BUREAU OF LAB. STATS. (Jan. 25, 2023), https://www.bls.gov/cps/cpsaat42.htm.

[4] And even fewer operate this way when extending to all workplaces, including the private sector. *See supra* n.2.

labor strikes that New York experienced in recent years has simply followed national trends. *Id.* at 22.

Thus, Appellees' claims that the Taylor Law facilitated labor peace are, at best, debatable. If the Court finds that labor peace interest could be a compelling state interest, it should remand the case for development of the record.

2. Exacting scrutiny requires not just that an interest be compelling, but also that the interest "cannot be achieved through means significantly less restrictive of associational freedoms.'" *Knox*, 567 U.S. at 309 (quoting *Roberts*, 468 U.S. at 623. Forcing the Professors to accept PSC as their exclusive representative is not essential to labor peace. Allowing six professors to remove themselves from a bargaining unit of 30,000 poses no existential threat to CUNY. The notion that this action would somehow lead to labor unrest or strife is fanciful.

However, allowing the Professors to sever their ties with PSC would vindicate the Professors' religious, political, and moral beliefs. It would free the Professors from an arranged and imposed marriage with a union they believe to be anti-Semitic. If PSC truly were a "democratic union," as it claims, it would accept this outcome and allow the Professors to freely choose whether to associate with it.

## CONCLUSION

The Professors have done everything they can under current law to separate themselves from PSC and its messages. But PSC remains their exclusive representative. The Professors' only option to fully separate themselves, under the

district court's ruling, is to resign their employment. But if job resignation is the

answer, PSC and a public employer would have effectively wielded state power to

purge Zionist Jews (or those who support them) from the CUNY ranks, silencing

PSC's detractors—the very thing the First Amendment was designed to protect

against. The district court's opinion and final judgment dismissing counts one and two

of the Complaint should be reversed, and this case should be remanded to proceed.

Respectfully submitted,

Dated: August 25, 2023

/s/Nathan J. McGrath
Nathan J. McGrath
Email: njmcgrath@fairnesscenter.org
Danielle R. Acker Susanj
Email: drasusanj@fairnesscenter.org
THE FAIRNESS CENTER
500 North Third Street, Suite 600B
Harrisburg, Pennsylvania 17101
Telephone: 844.293.1001

William L. Messenger
Email: wlm@nrtw.org
Milton L. Chappell
Email: mlc@nrtw.org
Glenn M. Taubman
Email: gmt@nrtw.org
c/o National Right to Work Legal
  Defense Foundation
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Telephone: 703.321.8510

*Attorneys for Appellants*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT AND TYPEFACE AND TYPE-STYLE REQUIREMENTS

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,156 words according to the word-processing system used to prepare this brief.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word in Garamond 14 font.


Dated: August 25, 2023          /s/Nathan J. McGrath
                                Nathan J. McGrath
                                THE FAIRNESS CENTER
                                500 North Third Street, Suite 600B
                                Harrisburg, Pennsylvania 17101
                                Telephone: 844.293.1001
                                Email: njmcgrath@fairnesscenter.org

                                *Attorney for Appellants*